UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **STEVEN A. KAMEN** | ) | **Case No. 1:06CV01063 (RMC)** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **INTERNATIONAL BROTHERHOOD** | ) | |
| **OF ELECTRICAL WORKERS, AFL-CIO and** | ) | |
| **EDWIN D. HILL, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION TO FOR SUMMARY JUDGMENT

COME NOW, defendants International Brotherhood of Electrical Workers, AFL-CIO, and Edwin D. Hill, by and through its counsel, Sherman, Dunn, Cohen, Leifer & Yellig, P.C., and respectfully requests this Honorable Court grant summary judgment against plaintiff Steven A. Kamen in the above-captioned case pursuant to Rule 56 of the Federal Rules of Civil Procedure for the following reasons:

1.      The undisputed material facts demonstrate that defendant International Brotherhood of Electrical Workers, AFL-CIO, had no knowledge that plaintiff Kamen was infected by the human immunodeficiency virus (HIV) at the time his employment was terminated and, therefore, plaintiff Kamen cannot establish a *prima facie* case of discrimination under the Americans with Disabilities Act.

2.      The undisputed material facts demonstrate that plaintiff Kamen cannot present a genuine issue of material fact as to whether he was disabled under the Americans with Disabilities Act at the time his employment was terminated.

3.    The undisputed material facts demonstrate that defendant International Brotherhood of Electrical Workers, AFL-CIO, did not fail to provide a reasonable accommodation for plaintiff Kamen's alleged disability in violation of the Americans with Disabilities Act inasmuch as plaintiff Kamen never requested an accommodation.

4.    The undisputed material facts demonstrate that plaintiff Kamen failed to allege a reasonable accommodation claim in the charge of discrimination, which he filed with the Equal Employment Opportunity Commission against defendant International Brotherhood of Electrical Workers, AFL-CIO, and, therefore, failed to exhaust administrative remedies that are a jurisdictional prerequisite for judicial relief under the Americans with Disabilities Act.

5.    The undisputed material facts demonstrate that plaintiff Kamen's hostile work environment claim against defendants International Brotherhood of Electrical Workers, AFL-CIO, and Edwin D. Hill, which is based on their alleged maintenance of a policy and practice of hostility towards homosexuals, is time-barred by the one-year statute of limitations in the DCHRA.

6.    The undisputed material facts demonstrate that plaintiff Kamen cannot establish a *prima facie* of hostile work environment based on alleged scattered episodes of hostility toward homosexuals, which even if true were not severe and pervasive enough to create a hostile work environment in violation of the DCHRA.

7.    The undisputed material facts demonstrate that the District of Columbia's choice of law principles support application of District of Columbia law to plaintiff Kamen's tortious interference claim.

8.    The undisputed material facts demonstrate that under District of Columbia Law plaintiff Kamen failed to establish a claim of tortious interference with a business relationship as

- 2 -

a matter of law because he can not prove the existence of a valid business relationship or expectancy inasmuch as he was an "at-will" employee of defendant International Brotherhood of Electrical Workers, AFL-CIO.

9.    The undisputed material facts demonstrate that under District of Columbia Law plaintiff Kamen can not establish a claim of tortious interference with a business relationship or expectancy as a matter of law because defendant Edwin D. Hill, as International President of the International Brotherhood of Electrical Workers, AFL-CIO, and, therefore, its alter ego, and is not a "third party" capable of interfering with plaintiff Kamen's alleged business relationship or expectancy with the International Brotherhood of Electrical Workers, AFL-CIO.

WHEREFORE, defendants International Brotherhood of Electrical Workers, AFL-CIO, and Edwin D. Hill respectfully request this Honorable Court grant this motion for summary judgment, dismiss plaintiff's Amended Complaint with prejudice and grant defendants costs.

Respectfully submitted,

TERRY R. YELLIG (D.C. Bar No. 946095)

SHERMAN, DUNN, COHEN, LEIFER & YELLIG, P.C.
900 SEVENTH STREET, N.W.
SUITE 1000
WASHINGTON, D.C. 20001
TELEPHONE NO. (202) 785-9300

Attorneys for Defendants International
Brotherhood of Electrical Workers, AFL-CIO,
and Edwin D. Hill

Dated: February 26, 2008.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STEVEN A. KAMEN** ) | **Case No. 1:06CV01063 (RMC)** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **INTERNATIONAL BROTHERHOOD** ) | |
| **OF ELECTRICAL WORKERS, AFL-CIO and** ) | |
| **EDWIN D. HILL, an individual,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## DEFENDANTS CONTEND THERE IS NO GENUINE ISSUE

In accordance with Local Rule LCvR 7(h) of this Court, defendants International Brotherhood of Electrical Workers, AFL-CIO ("IBEW") and Edwin D. Hill, IBEW International President, the moving parties on this Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, set forth the following material facts relevant to the disposition of said Motion for Summary Judgment as to which there are no genuine issues need to be tried.

1.    Steven A. Kamen (hereafter "plaintiff Kamen") began his employment by the IBEW as an International Representative on or about July 1, 1997, pursuant to the terms and conditions stated in a letter of employment dated June 26, 1997 and signed by IBEW International President J.J. Barry. Declaration of Edwin D. Hill, International President, International Brotherhood of Electrical Workers (hereafter "Hill Dec.") at ¶ 9 and Exhibit No. 1 attached thereto.

2.    IBEW International President Barry's June 26, 1997 letter of employment expressly stated that it "is intended to inform you of the various current aspects of your

employment" and that it "does not constitute a contract of employment nor does it establish a fixed term of employment inasmuch as you serve at the pleasure of the International President." *Id.* at ¶ 10 and Exhibit No. 1 attached thereto.

3.    The annual salary of Senior International Representatives, which is currently $128,576.00, is set annually on October 1 based on a formula set forth in the IBEW International Constitution.

4.    Plaintiff Kamen was assigned by International President Barry to the IBEW Third District under the supervision of IBEW International Vice-President Lawrence E. Rossa. Hill Dec. at ¶ 11.

5.    IBEW International President Edwin D. Hill, has known that plaintiff Kamen is homosexual since March 2001. Hill Dec. at ¶¶ 21-31.

6.    IBEW International Vice-President Donald C. Siegel frequently admonished plaintiff Kamen in writing and verbally about his failure to maintain regular contact with the IBEW Third District Office without much effect. Declaration of Donald C. Siegel (hereafter "Siegel Dec.") at ¶¶ 16, 18-22, Declaration of Michael D. Welsh (hereafter "Welsh Dec.") at ¶ 4-6 & 8.

7.    On January 20, 2004, International Vice-President Siegel instructed plaintiff Kamen in a memorandum, which was sent to him by regular mail, to arrange to attend the 2004 IBEW Manufacturing Conference scheduled for May 5-7, 2004 at the Frontier Hotel & Casino in Las Vegas, Nevada. Siegel Dec. at ¶ 23 and Exhibit No. 1 attached thereto; *see also* Welsh Dec. at ¶ 9.

8.    Plaintiff Kamen decided not to attend the 2004 IBEW Manufacturing Conference even though he was not instructed by International Vice-President Siegel or any other IBEW

officer or representative not to attend that meeting. Siegel Dec. at ¶ 24; *see also* Welsh Dec. at ¶ 10.

9.     International Vice-President Siegel received a letter by fax on February 27, 2004 that was signed by seven members of IBEW Local Union No. 1968, which is one of the Local Unions that plaintiff Kamen was responsible for providing support services. Siegel Dec. at ¶ 25 and Exhibit No. 2 attached thereto.

10.     These union members expressed their dissatisfaction with the support services provided by plaintiff Kamen, stating that he had cancelled three meetings, each at the last minute, during a time in which they were engaged in collective bargaining with their employer. Siegel Dec. at ¶ 26.

11.     International Vice-President Siegel sent an e-mail to plaintiff Kamen that same day, which asked him to "Call me ASAP." Siegel Dec. at ¶ 27 and Exhibit No. 3 attached thereto.

12.     Plaintiff Kamen did not even open International Vice-President Siegel's February 27, 2004 e-mail until April 8, 2004. Siegel Dec.. at ¶ 28 and Exhibit No. 4 attached thereto.

13.     Even then, plaintiff Kamen failed to respond to International Vice-President Siegel's request to "Call me ASAP." Siegel Dec.. at ¶ 29.

14.     On March 1, 2004, International Vice-President Siegel learned that plaintiff Kamen had been very ill for a couple of weeks and that he was going to be admitted to the hospital. Siegel Dec. at ¶ 30; *see also* Welsh Dec. at ¶ 11.

15.     Based on this information concerning plaintiff Kamen's health and the obvious need to continue providing support and assistance to the Local Unions assigned to him, which had been contacting the Third District Office for assistance due to plaintiff Kamen's

unavailability, International Vice-President Siegel decided to reassign responsibility for providing support services to Local Union Nos. 385 and 1968 to other IBEW International Representatives in the Third District. Siegel Dec. at ¶ 34.

16.     Accordingly, International Vice-President Siegel sent separate letters to International Representatives James M. Schosser and Pasguale Gino on March 1, 2004 in which he assigned responsibility for providing support services to Local Union Nos. 385 and 1968, respectively. *Id.* at ¶ 35 and Exhibit Nos. 5 & 6 attached thereto.

17.     International Vice-President Siegel also sent copies of these letters dated March 1, 2004 to plaintiff Kamen. Siegel Dec. at ¶ 37.

18.     Thereafter, on March 12, 2004, International Vice-President Siegel learned that plaintiff Kamen had once again contacted the IBEW Third District Office and said that he had been in and out of the hospital during which time tests confirmed that he had viral meningitis and possibly problems with his gall bladder and that more tests were scheduled the following week. Siegel Dec. at ¶ 38 and Exhibit No. 9 attached thereto; *see also* Welsh Dec. at ¶¶ 16-18.

19.     International Vice-President Siegel was further informed that the earliest plaintiff Kamen could return to work would be April 1, 2004. Siegel Dec. at ¶ 39 and Exhibit No. 9 attached thereto; *see also* Welsh Dec. at ¶ 19.

20.     International Vice-President Siegel decided, upon receiving this information, to reassign to International Representative Gino responsibility for providing support services to IBEW Local Union No. 2007 and to International Representative Schlosser responsibility for providing support services to IBEW Local Union No. 1690, two other Local Unions heretofore assigned to plaintiff Kamen. Siegel Dec. at ¶ 41.

21.    Accordingly, International Vice-President Siegel sent letters to Mr. Gino and Mr. Schlosser as well as the Business Managers of Local Union No. 2007 and Local Union No. 1690, which advised them of the reassignment of responsibility for providing support services to the Local Union. Siegel Dec.. at ¶ 42 and Exhibit Nos. 10 -13 attached thereto.

22.    International Vice-President Siegel also sent copies of these letters dated March 12, 2004 to plaintiff Kamen. Siegel Dec.. at ¶ 43.

23.    Shortly thereafter, International Vice-President Siegel received a letter dated March 16, 2004 from plaintiff Kamen attached to which was a copy of a note dated March 11, 2004 that was signed by Dr. John R. Rocchi, who plaintiff Kamen identified as his primary care physician. Siegel Dec. at ¶ 44.

24.    Plaintiff Kamen apologized to International Vice-President Siegel in his March 16, 2004 letter for failing to send in a letter from his doctor sooner and for failing to call into the Third District Office. Siegel Dec.  at ¶ 45 and Exhibit No. 14 attached thereto.

25.    Plaintiff Kamen's March 16, 2004 letter further stated that he was suffering from viral meningitis and "a gall bladder problem." Siegel Dec.. at ¶ 46 and Exhibit No. 14 attached thereto.

26.    Dr. Rocchi's note, dated March 11, 2004, which was enclosed with plaintiff Kamen's March 16, 2004 letter, stated that plaintiff Kamen "has been very ill since the end of February and continues to have unexplained fevers and illness." Siegel Dec. at ¶ 47 and Exhibit No. 15 attached hereto.

27.    Dr. Rocchi's note further stated that plaintiff Kamen's illness required hospitalization, frequent doctor's visits, and that he "has been unable to work since 2/20/04." Siegel Dec. at ¶ 48 and Exhibit No. 14 attached thereto.

28.     In closing, Dr. Rocchi's note stated: "to my best approximation [plaintiff Kamen] will be able to return to work 4/01/04." Siegel Dec. at ¶ 49 and Exhibit No. 14 attached thereto.

29.     Subsequently, plaintiff Kamen sent another letter to International Vice-President Siegel dated April 6, 2004 with another note from Dr. Rocchi, which was dated April 2, 2004, attached. Siegel Dec. at ¶ 50.

30.     Plaintiff Kamen stated in his April 6, 2004 letter that Dr. Rocchi had advised him that he should be able to return to work on May 1, 2004. Siegel Dec. at ¶ 51 and Exhibit No. 16 attached thereto.

31.     In addition, Dr. Rocchi's April 2, 2004 note stated that Plaintiff Kamen "continues to recover from multiple serious health conditions including meningitis and diverticulitis." Id. at ¶ 51 and Exhibit No. 17 attached thereto.

32.     The next month, after he resumed working, International Vice-President Siegel met privately with plaintiff Kamen during the IBEW Third District Progress Meeting, which was held in Atlantic City, New Jersey, from May 11-14, 2004. Siegel Dec. at ¶ 53.

33.     Plaintiff Kamen asked International Vice-President Siegel to reassign to him responsibility for providing support services to IBEW Local Union Nos. 385, 1968, 1690 and 2007, which International Vice-President Siegel had assigned to other International Representatives on March 1, 2004 and March 12, 2004, respectively. Siegel Dec. at ¶ 54.

34.     International Vice-President Siegel denied plaintiff Kamen's request. Siegel Dec. at ¶ 55.

35.     For his part, International Vice-President Siegel expressed to plaintiff Kamen his dissatisfaction with plaintiff Kamen's ongoing failure to timely submit his weekly activity

reports and bi-weekly expense reports as well as plaintiff Kamen's failure to timely complete his assignments. Siegel Dec. at ¶ 57.

36.    IBEW International Vice-President Lawrence Rossa and his successor, International Vice-President Donald C. Siegel frequently admonished plaintiff Kamen about the tardy submission of weekly activity reports and bi-weekly expense reports. Siegel Dec. at ¶ 59.

37.    Prior to May 2004, IBEW International Vice-President Donald C. Siegel also had problems with plaintiff Kamen's failure to complete assignments in a timely fashion. Siegel Dec. at ¶ 61 and Exhibit No. 21 attached thereto.

38.    In addition, International Vice-President Siegel expressed his dissatisfaction with plaintiff Kamen's chronic failure to maintain communications with the Third District Office, including his complete lack of responsiveness to various requests for information submitted to him by e-mail. Siegel Dec. at ¶ 62.

39.    International Vice-President Siegel asked plaintiff Kamen whether the laptop computer provided by the IBEW to him was not operating properly, and if so to report the problem to the IBEW Information Technology Department, which would try to resolve the problem. Siegel Dec. at ¶ 63.

40.    He also offered to arrange specific training to teach plaintiff Kamen how to properly use his laptop computer. Siegel Dec. at ¶ 64.

41.    Plaintiff Kamen explained during the May 2004 private meeting with International Vice-President Siegel that his divorce, the death of his Mother and the distractions attendant to settling her estate, including disputes with the Internal Revenue Service, as well as his recent health problems, which included viral meningitis, diverticulitis and gall bladder problems, had hampered his job performance. Siegel Dec. at ¶ 65.

42.     Nonetheless, plaintiff Kamen assured International Vice-President Siegel during their private meeting at the Third District Progress Meeting in Atlantic City that he would bring his outstanding assignments up-to-date and file his reports and complete his assignments on time in the future. Siegel Dec. at ¶ 66.

43.     At no time during his meeting in May 2004 did plaintiff Kamen tell IBEW International Vice-President Siegel that he was infected by HIV, that this illness was affecting his ability to perform his duties as an IBEW International Representative, or that he needed some kind of accommodation. Siegel Dec. at ¶ 667.

44.     International Vice-President Siegel subsequently learned that Plaintiff Kamen's weekly activity reports for the weeks ending on January 10, 17, 24 and 31, 2004, were received in the IBEW Third Vice-President's Office on May 11, 2004. Siegel Dec. at ¶ 68.

45.     Thereafter, on May 27, 2004, the IBEW Third District Office received plaintiff Kamen's weekly activity reports for the nine-week period that he was on sick leave beginning sometime on February 23, 2004 through April 30, 2004, as well as his weekly activity reports for the first three weeks of February 2004, before he went on sick leave. Siegel Dec. at ¶ 69.

46.     The IBEW Third District Office did not receive another weekly activity report from plaintiff Kamen until November 30, 2004. Siegel Dec. at ¶ 70.

47.     Notwithstanding his assurances to International Vice-President Siegel that his job performance would improve, plaintiff Kamen repeatedly failed to respond to e-mail requests from the IBEW Third Vice-President's Office for information, including a request on October 5, 2004 for plaintiff Kamen's Per Capita and LM-2 Reporting Form. Siegel Dec. at ¶ 71.

48.     In fact, International Vice-President Siegel became so exasperated by plaintiff Kamen's lack of responsiveness to his requests for information that he asked the IBEW

Information Technology Department to determine whether plaintiff Kamen's laptop computer was operating. Siegel Dec. at ¶ 72.

49.    The IBEW Information Technology Department subsequently informed International Vice-President Siegel that someone had accessed plaintiff Kamen's e-mail account on October 14, 2004, however, plaintiff Kamen never responded to International Vice-President Siegel's October 5, 2004 request for his Per Capita and LM-2 Reporting Form by e-mail or any other means. Siegel Dec. at ¶ 73.

50.    International Vice-President Siegel sent plaintiff Kamen a letter dated November 22, 2004, which instructed him to attend a meeting with International Vice-President Siegel in the IBEW Third District Office on November 30, 2004 at 10:00 a.m. Siegel Dec.. at ¶ 75 and Exhibit No. 23 attached thereto.

51.    During their November 30, 2004 meeting, International Vice-President Siegel advised plaintiff Kamen that International Representatives assigned to the Third District Office are expected to perform their duties and carry out their responsibilities with a minimum of supervision and a maximum of self-direction. Siegel Dec.. at ¶ 79.

52.    International Vice-President Siegel also reminded plaintiff Kamen that, notwithstanding this expectation, it was necessary for him on several occasions, including their private meeting at the 2004 Progress Meeting in Atlantic City, New Jersey in May 2004, since he became International Vice-President of the Third District in March 2002, to have conversations with plaintiff Kamen about his failure to regularly submit weekly activity reports and bi-weekly expense reports, to complete outstanding assignments in a timely manner, and his failure to maintain regular contact with the Third District Office.  Siegel Dec. at ¶ 80.

53.     International Vice-President Siegel also mentioned plaintiff Kamen's chronic lack of responsiveness to requests from the Third District Office for information, including the October 5, 2004 e-mail requesting his Per Capita and LM-2 Reporting Form that plaintiff Kamen apparently knew about but chose to ignore, and International Vice-President Siegel's offer to provide plaintiff Kamen with training about how to use his IBEW-issued laptop computer. Siegel Dec. at ¶ 81.

54.     In fact, International Vice-President Siegel commented to plaintiff Kamen that he had failed to take advantage of the offer of technical assistance and/or computer literacy training. Siegel Dec. at ¶ 82.

55.     In addition, International Vice-President Siegel informed plaintiff Kamen that his neglect of some of the Local Unions that he was assigned to provide support services as well as complaints from some of these unions had forced him to reassign the Local Unions to other International Representatives in the Third District, which is why he refused plaintiff Kamen's request in May 2004 to reassign these Local Unions back to him. Siegel Dec. at ¶ 83.

56.     Once again, as he had done at their meeting in May 2004, plaintiff Kamen apologized for his shortcomings and promised to improve his job performance, and blamed them on the breakup of his marriage, the death of his Mother, and his health problems. Siegel Dec. at ¶ 84.

57.     Plaintiff Kamen did not, however, advise International Vice-President Siegel during their November 30, 2004 meeting that he was infected by HIV, or that he needed an accommodation on account of this disease. Siegel Dec. at ¶ 85.

58.     However, International Vice-President Siegel informed plaintiff Kamen that he was either incapable of improving his job performance or unwilling to do so. Siegel Dec. at ¶ 86.

59.    For that reason, International Vice-President Siegel advised plaintiff Kamen at their November 30, 2004 meeting that he no longer had the patience to tolerate plaintiff Kamen's lack of attention to his duties as an International Representative and, therefore, he no longer needed him on the Third District staff and that he intended to refer the matter to International President Hill for further consideration. Siegel Dec. at ¶ 87.

60.    International Vice-President Siegel did not tell plaintiff Kamen during their November 30, 2004 meeting that his employment as an International Representative of the IBEW would be terminated. Siegel Dec. at ¶ 88.

61.    That same day, International Vice-President Siegel called IBEW International President Hill to tell him that he had met with plaintiff Kamen and advised him that his services as an International Representative were no longer needed in the Third District. Siegel Dec. at ¶ 89; *see also* Hill Dec. at ¶ 32.

62.    International Vice-President Siegel then sent an e-mail message to International President Hill attached to which was a copy of a letter addressed to International President Hill and dated November 30, 2004, which set forth the reasons for International Vice-President Siegel's decision not to retain plaintiff Kamen as an International Representative on the Third District staff. International Vice-President Siegel Dec. at ¶ 90 and Exhibit No. 24 attached thereto.

63.    International Vice-President Siegel's November 30, 2004 letter was also sent to International President Hill by first-class U.S. Postal Service mail. International Vice-President Siegel Dec. at ¶ 91.

64.    In addition, International Vice-President Siegel placed in the U.S. Postal Service mail a memorandum to International President Hill with a copy of spread sheets that track the

date on which the weekly activity reports submitted by each International Representative assigned to the Third District of their weekly activity reports is received in the Third District Office. Siegel Dec. at ¶ 92 and Exhibit No. 25 attached thereto.

65.    The Third District Office has prepared this tracking report in the regular course of business each week since November 2002. Siegel Dec. at ¶ 93.

66.    International President Hill decided, based on International Vice-President Siegel's November 30, 2004 letter, that plaintiff Kamen's tenure as an IBEW International Representative should be terminated inasmuch as it appeared that he was unable to perform the duties and responsibilities of that position in the manner that he expected. Hill Dec. at ¶ 39.

67.    Subsequently, on the same day, International President Hill notified plaintiff Kamen by letter that based on International Vice-President Siegel's assessment of his job performance his employment as an International Representative of the IBEW would be terminated effective December 31, 2004. Hill Dec. at ¶ 46 and Exhibit No. 6 attached thereto.

68.    International President Hill was not aware that plaintiff Kamen was infected by the human immunodeficiency virus (HIV) at the time he terminated plaintiff Kamen's employment as an IBEW International Representative on December 8, 2004. Hill Dec. at ¶ 47.

69.    In fact, International President Hill was not aware that plaintiff Kamen was infected by HIV until he read the Complaint that plaintiff Kamen filed in the above-referenced case against him and the IBEW on June 6, 2006, which alleges that he terminated his employment with the IBEW on December 8, 2004 because, among other things, International President Hill knew he was infected by HIV.  Hill Dec. at ¶ 46.

70.    IBEW International Vice-President Siegel was unaware that plaintiff Kamen is homosexual until he read the Complaint that plaintiff Kamen filed in the above-referenced case

against the IBEW and International President Hill on June 6, 2006, which alleges that International President Hill terminated plaintiff Kamen's employment with the IBEW on December 8, 2004 because, among other things, International President Hill knew plaintiff Kamen is homosexual. Siegel Dec. at ¶ 95; Welsh Dec. at ¶ 23.

71.     Similarly, IBEW International Vice-President Siegel was unaware that plaintiff Kamen was infected by HIV until he read the Complaint that plaintiff Kamen filed in the above-referenced case against International President Hill and the IBEW on June 6, 2006, which also alleges that International President Hill terminated plaintiff Kamen's employment with the IBEW on December 8, 2004 because, among other things, International President Hill knew plaintiff Kamen was infected by HIV. Siegel Dec. at ¶ 96; Welsh Dec. at ¶ 22.

72.     In October 1998, the IBEW adopted a revised "Anti-Harassment Policy," which was distributed to every IBEW employee, including International Representatives, and incorporated it in the IBEW Personnel Policy Manual. Hill Dec. at ¶ 53 and Exhibit No. 7 attached thereto.

73.     IBEW International President Hill, in his prior position as IBEW International Secretary, issued this revised Anti-Harassment Policy, which prohibits "unwelcome conduct, whether verbal or physical that is based upon a person's … protected group status," which includes sexual orientation. Hill Dec. at ¶ 54.

74.     The IBEW "Anti-Harassment Policy," states that "the IBEW will not tolerate harassing conduct that . . . creates an intimidating, hostile, or offensive working environment," and "[i]f an investigation confirms that harassment has occurred, the IBEW will take corrective action, including such discipline, up to and including immediate termination of employment, as is appropriate." Hill Dec. at ¶ 55.

75.    Plaintiff Kamen never invoked the IBEW's Anti-Harassment Policy to have the IBEW's alleged policy and practice of hostility and prejudice towards homosexuals investigated and, if the investigation confirmed that such a policy or practice exists, to take corrective action. Hill Dec. at ¶ 57.

Respectfully submitted,

_____
TERRY R. YELLIG (D.C. Bar No. 946095)

SHERMAN, DUNN, COHEN, LEIFER & YELLIG, P.C.
900 SEVENTH STREET, N.W.
SUITE 1000
WASHINGTON, D.C. 20001
TELEPHONE NO. (202) 785-9300

Attorneys for Defendants International Brotherhood of Electrical Workers, AFL-CIO, and Edwin D. Hill

Dated: February 26, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **STEVEN A. KAMEN** | ) | **Case No. 1:06CV01063 (RMC)** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **INTERNATIONAL BROTHERHOOD** | ) | |
| **OF ELECTRICAL WORKERS, AFL-CIO and** | ) | |
| **EDWIN D. HILL, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO FOR SUMMARY JUDGMENT

### INTRODUCTION

Steven A. Kamen (hereafter "plaintiff Kamen") has sued his former employer, the International Brotherhood of Electrical Workers, AFL-CIO ("IBEW") and its International President, Edwin D. Hill, asserting that they violated the Pennsylvania Human Rights Act ("PHRA"), 43 Pa. Stat. Ann. § 951 *et seq.*, the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the District of Columbia Human Rights Act of 1977 ("DCHRA"), D.C. Code Ann. § 2-1401.01 *et seq.,* the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and tortiously interfered with his employment contract, when they discharged him from his position as a Senior International Representative.[1/]

---

[1/]    The Court has dismissed plaintiff Kamen's claims set forth in the Amended Complaint based on alleged violations of the PHRA, ERISA, and all of the claims under the DCHRA except for allegations that defendants IBEW and Hill "have had and continue to maintain through the present policy and practice of hostility and prejudice towards homosexuals." Amended Complaint at ¶¶ 83 & 84 (*see also* ¶¶ 51-55). *Kamen v. International Brotherhood of Elec. Workers, AFL-CIO and Edwin D. Hill*, 505 F. Supp. 2d 66 (D D.C. 2007) (Document #18).

## STATEMENT OF THE FACTS

Plaintiff Kamen began his employment by the IBEW as an International Representative[2]

on or about July 1, 1997, pursuant to the terms and conditions stated in a letter of employment

dated June 26, 1997 and signed by IBEW International President J.J. Barry. Declaration of

Edwin D. Hill, International President, International Brotherhood of Electrical Workers

(hereafter "Hill Dec.") at ¶ 9 and Exhibit No. 1 attached thereto. Plaintiff Kamen did not have a

contract of employment with the IBEW. *Id.* at ¶ 10 and Exhibit No. 1 attached thereto. Instead,

he was an "at-will" employee. *Id.* The current annual salary of an IBEW International

Representative is $128,576.00. Hill Dec. at ¶ 16.

Plaintiff Kamen was assigned by International President Barry to the IBEW Third

District under the supervision of IBEW International Vice-President Lawrence E. Rossa. Hill

Dec. at ¶ 11. Plaintiff Kamen often failed to maintain regular contact with the IBEW Third

District Office. Declaration of Donald C. Siegel (hereafter "Siegel Dec.") at ¶ 15. International

Vice-President Donald C. Siegel, who succeeded Mr. Rossa as International Vice-President of

the Third District in 2002, frequently admonished plaintiff Kamen in writing and verbally about

his failure to maintain regular contact with the IBEW Third District Office without much effect.

Siegel Dec. at ¶ 16.

International Vice-President Siegel often found it difficult to communicate assignments

to plaintiff Kamen and to ascertain the status of those assignments as well as his general

whereabouts when questions arose concerning matters related to the IBEW Local Unions that he

was assigned to provide support and assistance. *Id.* at ¶¶ 17-22; 27-29; and 71-73 and Exhibit

Nos. 3, 4 & 22 attached thereto; Declaration of Michael D. Welsh (hereafter "Welsh Dec.") at ¶¶

---

[2]    IBEW International President Edwin D. Hill describes the position of "International Representative" in his Declaration. Hill Dec. at ¶¶ 12-20; *see also* Siegel Dec. at ¶¶ 11-14.

4-8 and Exhibit No. 1 attached thereto. International Vice-President Siegel also received complaints about plaintiff Kamen's job performance from representatives of the Local Unions that he was assigned to assist. Siegel Dec. at ¶ 25-26 and Exhibit No. 2 attached thereto.

In addition, both International Vice-President Siegel and his predecessor, Lawrence Rossa, frequently admonished plaintiff Kamen about the tardy submission of weekly activity reports and bi-weekly expense reports. Siegel Dec. at ¶ 59. Plaintiff Kamen always had some excuse or simply offered his apology for his tardiness. *Id.* at ¶ 60 and Exhibit Nos. 18 -20 attached thereto. International Vice-President Siegel also had problems with plaintiff Kamen's failure to complete assignments in a timely fashion, which he addressed in a letter dated April 21, 2003 that he sent to plaintiff Kamen in which he admonished plaintiff Kamen about the importance of completing assignments in a timely fashion. Siegel Dec. at ¶ 61 and Exhibit No. 21 attached thereto.

International Vice-President Siegel became aware on March 1, 2004 that plaintiff Kamen was ill and had been hospitalized. Siegel Dec. at ¶ 30; Welsh Dec. at ¶ 11. Subsequently, International Vice-President Siegel was informed by plaintiff Kamen and his primary care physician that plaintiff Kamen was being treated for viral meningitis, diverticulitis, gall bladder problems and fever. *Id.* at ¶¶ 32, 38, 46-47 & 65 and Exhibit Nos. 9, 14, 15 & 17 attached thereto; Welsh Dec. at ¶ 14 & 18.

Initially, plaintiff Kamen and his primary care physician advised International Vice-President Siegel that plaintiff Kamen would return to work by April 1, 2004. Siegel Dec. at ¶ 39 & 49 and Exhibit No. 15 attached thereto; Welsh Dec. at ¶ 19 and Exhibit No. 1 attached thereto. Subsequently, however, plaintiff Kamen informed International Vice-President Siegel that he would not be able to return to work until May 1, 2004. *Id.* at ¶ 51 and Exhibit No. 16 attached

thereto. As a result, plaintiff Kamen did not work from approximately February 23, 2004 until May 1, 2004 when he resumed his duties and responsibilities as an IBEW International Representative.

Based on this information concerning plaintiff Kamen's health and the obvious need to continue providing support and assistance to the Local Unions assigned to him, some of which had been contacting the Third District Office for assistance due to plaintiff Kamen's unavailability, International Vice-President Siegel decided to reassign responsibility for providing support services to four of these IBEW Local Unions to other IBEW International Representatives in the Third District. Siegel Dec. at ¶¶ 34-38 & 41-43 and Exhibit Nos. 5-8 & 10-13 attached thereto.

The next month, after he resumed working, International Vice-President Siegel met privately with plaintiff Kamen during the IBEW Third District Progress Meeting, which was held in Atlantic City, New Jersey, from May 11-14, 2004. Siegel Dec. at ¶ 53. Plaintiff Kamen asked International Vice-President Siegel to reassign to him responsibility for providing support services to the four IBEW Local Unions, which International Vice-President Siegel had assigned to other International Representatives on March 1, 2004 and March 12, 2004, respectively. Siegel Dec. at ¶ 54. International Vice-President Siegel denied plaintiff Kamen's request because, in his judgment plaintiff Kamen had neglected these Local Unions before his illness, which is why he had reassigned them to other International Representatives in the Third District in the first place, and International Vice-President Siegel had no reason to believe that plaintiff Kamen would provide better support services to these Local Unions than they were receiving from the International Representatives to whom he reassigned them earlier in the year. *Id.* at ¶ 55.

For his part, International Vice-President Siegel expressed to plaintiff Kamen his dissatisfaction with plaintiff Kamen's ongoing failure to timely submit his weekly activity reports and bi-weekly expense reports as well as plaintiff Kamen's failure to timely complete his assignments. Siegel Dec. at ¶ 57. In addition, International Vice-President Siegel expressed his dissatisfaction with plaintiff Kamen's chronic failure to maintain communications with the Third District Office, including his complete lack of responsiveness to various requests for information submitted to him by e-mail. *Id.* at 62. International Vice-President Siegel even asked plaintiff Kamen whether the laptop computer provided by the IBEW to him was not operating properly, and if so to report the problem to the IBEW Information Technology Department, which would try to resolve the problem. *Id.* at 63. He also offered to arrange specific training to teach plaintiff Kamen how properly to use his laptop computer. *Id.* at 64.

Plaintiff Kamen explained during the May 2004 meeting with International Vice-President Siegel that his divorce, the death of his Mother and the distractions attendant to settling her estate, including disputes with the Internal Revenue Service, as well as his recent health problems had hampered his job performance. *Id.* at ¶ 65. Nonetheless, plaintiff Kamen assured International Vice-President Siegel during their meeting at the Third District Progress Meeting in Atlantic City that he would bring his outstanding assignments up-to-date and file his reports and complete his assignments on time in the future. *Id.* at ¶ 66.[3/]

---

[3/] International Vice-President Siegel subsequently learned that plaintiff Kamen's weekly activity reports for the weeks ending on January 10, 17, 24 and 31, 2004, were received in the IBEW Third District Office on May 11, 2004. Siegel Dec. at ¶ 68. Thereafter, on May 27, 2004, the IBEW Third District Office received plaintiff Kamen's weekly activity reports for the nine-week period that he was on sick leave beginning sometime on February 23, 2004 through April 30, 2004, as well as his weekly activity reports for the first three weeks of February 2004, before he went on sick leave. *Id.* at ¶ 69. However, the IBEW Third District Office did not receive another weekly activity report from plaintiff Kamen until November 30, 2004. *Id.* at ¶ 70.

Notwithstanding his assurances to me that his job performance would improve, plaintiff Kamen repeatedly failed to respond to e-mail requests from the IBEW Third District Office for information, including a request on October 5, 2004 for plaintiff Kamen's Per Capita and LM-2 Reporting Form. Siegel Dec. at ¶ 71. In fact, International Vice-President Siegel became so exasperated by plaintiff Kamen's lack of responsiveness to his requests for information that he asked the IBEW Information Technology Department to determine whether plaintiff Kamen's laptop computer was operating. *Id.* at ¶ 72. The IBEW Information Technology Department subsequently informed International Vice-President Siegel that someone had accessed plaintiff Kamen's e-mail account on October 14, 2004, however, plaintiff Kamen never responded by e-mail or any other means to International Vice-President Siegel's October 5, 2004 request for his Per Capita and LM-2 Reporting Form. *Id.* at ¶ 73.

The deficiencies in plaintiff Kamen's performance of his duties and responsibilities as an International Representative described above became so acute that International Vice-President Siegel decided to inform plaintiff Kamen that his services were no longer needed in the IBEW Third District. Siegel Dec. at ¶ 74. Accordingly, International Vice-President Siegel sent plaintiff Kamen a letter dated November 22, 2004, which instructed him to attend a meeting with International Vice-President Siegel in the IBEW Third District Office on November 30, 2004. *Id.* at ¶ 75 and Exhibit No. 23 attached thereto.

The purpose of International Vice-President Siegel's November 30, 2004 meeting with plaintiff Kamen was to inform him that his services as an International Representative were no longer needed in the IBEW Third District, and that International Vice-President Siegel intended to inform IBEW International President Hill of that fact. Siegel Dec. at ¶ 76. However, International Vice-President Siegel did not offer a reason for convening the meeting with

plaintiff Kamen on November 30, 2004. *Id.* at ¶ 77. Nevertheless, plaintiff Kamen brought with him to the meeting most of his delinquent weekly activity reports and bi-weekly expense reports dating back to when he returned to work from sick leave on May 1, 2004. *Id.* at ¶ 78.

During their November 30, 2004 meeting, International Vice-President Siegel advised plaintiff Kamen that International Representatives assigned to the IBEW Third District Office are expected to perform their duties and carry out their responsibilities with a minimum of supervision and a maximum of self-direction. *Id.* at ¶ 79. International Vice-President Siegel also reminded plaintiff Kamen that, notwithstanding this expectation, it was necessary for him on several occasions since he became International Vice-President of the Third District in March 2002, including their meeting at the 2004 Progress Meeting in Atlantic City, New Jersey in May 2004, to have conversations with plaintiff Kamen about his failure to regularly submit weekly activity reports and bi-weekly expense reports, to complete outstanding assignments in a timely manner, and his failure to maintain regular contact with the Third District Office. *Id.* at ¶ 80.

International Vice-President Siegel also mentioned plaintiff Kamen's chronic lack of responsiveness to requests from the Third District Office for information, including the October 5, 2004 e-mail requesting his Per Capita and LM-2 Reporting Form that plaintiff Kamen apparently knew about but chose to ignore, and International Vice-President Siegel's offer to provide plaintiff Kamen with training about how to use his IBEW-issued laptop computer. *Id.* at ¶ 81. In fact, International Vice-President Siegel commented to plaintiff Kamen that he had failed to take advantage of the offer of technical assistance and/or computer literacy training. *Id.* at ¶ 82. In addition, International Vice-President Siegel informed plaintiff Kamen that his neglect of some of the Local Unions that he was assigned to provide support services as well as complaints from some of these unions about his inattentiveness had forced him to reassign

responsibility for some Local Unions to other International Representatives in the Third District, which is why he refused plaintiff Kamen's request in May 2004 to reassign these Local Unions back to him. *Id.* at ¶ 83.

Once again, as he had done at their meeting in May 2004, plaintiff Kamen apologized for his shortcomings and promised to improve his job performance, and blamed them on the breakup of his marriage, the death of his Mother, and his health problems. Siegel Dec. at ¶ 84. Plaintiff Kamen did not, however, advise International Vice-President Siegel during their November 30, 2004 meeting that he was infected by HIV, or that he needed an accommodation on account of this disease. *Id.* at ¶ 85.

International Vice-President Siegel informed plaintiff Kamen that he was either incapable of improving his job performance or unwilling to do so. Siegel Dec. at ¶ 86. For that reason, International Vice-President Siegel advised plaintiff Kamen at their November 30, 2004 meeting that he no longer had the patience to tolerate plaintiff Kamen's lack of attention to his duties as an International Representative and, therefore, he no longer needed him on the Third District staff and that he intended to refer the matter to International President Hill for further consideration. *Id.* at ¶ 87. International Vice-President Siegel did not tell plaintiff Kamen during their November 30, 2004 meeting that his employment as an International Representative of the IBEW would be terminated. *Id.* at ¶ 88.

That same day, International Vice-President Siegel called IBEW International President Hill to tell him that he had met with plaintiff Kamen and advised him that his services as an International Representative were no longer needed in the Third District. Siegel Dec. at ¶ 89; *see also* Hill Dec. at ¶ 32. He then sent an e-mail message to International President Hill attached to which was a copy of a letter addressed to International President Hill dated November 30, 2004,

which set forth the reasons for International Vice-President Siegel's decision not to retain plaintiff Kamen as an International Representative on the Third District staff. *Id.* at ¶ 90 and Exhibit No. 24 attached thereto.[4/] In addition, International Vice-President Siegel placed in the U.S. Postal Service mail a memorandum to International President Hill with a copy of spread sheets that track the date on which the weekly activity reports submitted by each International Representative assigned to the Third District. *Id.* at ¶ 92 and Exhibit No. 25 attached thereto.[5/]

Subsequently, International President Hill notified plaintiff Kamen by letter dated December 8, 2004 that based on International Vice-President Siegel's assessment of his job performance his employment as an International Representative of the IBEW would be terminated effective December 31, 2004. Hill Dec. at ¶ 46 and Exhibit No. 6 attached thereto.

IBEW International President had been aware that plaintiff Kamen is homosexual since early 2001. *See* Hill Dec. at ¶¶ 21-31 (describing episode that occurred at the IBEW Manufacturing Conference in Chicago, Illinois on February 28–March 2, 2001 when plaintiff Kamen passed a note to a male IBEW member, which proposed a sexual liaison with him). No other officer or representative of the IBEW was aware of plaintiff Kamen's homosexuality. Siegel Dec. at ¶ 95; Welsh Dec. at ¶ 23. Moreover, Plaintiff Kamen never told any officer or representative of the IBEW during his term of employment that he was infected by the human immunodeficiency virus (HIV). Hill Dec. at ¶ 47; Siegel Dec. at ¶ 96, and Welsh Dec. at ¶ 22.

---

[4/]     International Vice-President Siegel's November 30, 2004 letter was also sent to International President Hill by first-class U.S. Postal Service mail. Siegel Dec. at ¶ 91.

[5/]     The Third District Office has prepared this tracking report in the regular course of business each week since November 2002. Siegel Dec. at ¶ 93.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material dispute of fact "is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth." *Siragy v. Georgetown University,* C.A. No. 97-2557 (RMU) (Documents # 25, 26), 1999 U.S. Dist. LEXIS 21021 at *6 (D. D.C., Aug, 20, 1999) (citing *Hirschhorn v. Sizzler Restaurants Int'l Inc.*, 913 F. Supp. 1393, 1397 (D. Nev. 1995)). When considering a motion for summary judgment, the Court must construe all facts and inferences in a light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991-92 (D.C. Cir. 2002); *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002). A party opposing a properly-supported motion for summary judgment "may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 5 (D.D.C. 2000) ("For any non-movant, 'including a discrimination plaintiff, to survive a motion for summary judgment, [she] must do more than present conclusory allegations of discrimination; concrete particulars must be presented to substantiate the discrimination claim.'" (quoting *Siragy* at *7.)).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although courts should not weigh the evidence or make credibility determinations when reviewing a motion for summary judgment, a genuine factual issue does not

exist "when the evidence favoring the nonmoving party is merely colorable or is not significantly probative." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997); *see Anderson*, 477 U.S. at 249-50.

## ARGUMENT

### I.  DEFENDANT IBEW DID NOT UNLAWFULLY DISCRIMINATE AGAINST PLAINTIFF KAMEN BECAUSE HE WAS DISABLED.

The Americans with Disabilities Act ("ADA") prohibits employers from discriminating against a qualified individual with a disability because of that disability. 42 U.S.C. § 12112(a). In addition to prohibiting adverse employment actions against disabled persons because of their disabilities, the ADA requires employers to make reasonable accommodations for the disabilities of qualified individuals. 42 U.S.C. § 12112(b)(5)(A).

Count I of the Amended Complaint alleges that defendant IBEW terminated plaintiff Kamen's employment because of his disability. *See* Amended Complaint at ¶ 60. The Amended Complaint also alleges that defendant IBEW terminated plaintiff Kamen's employment "because of its unwillingness to accommodate Plaintiff's known disability." *Id.* at ¶ 61. The Amended Complaint then alleges that "[d]efendant IBEW's actions were in violation of the ADA's [Americans with Disability Act] prohibition against discrimination based on disability." *Id.* at ¶ 62.

ADA plaintiffs bear the burden of establishing a *prima facie* case of discrimination either by pointing to direct evidence of discriminatory intent, or creating an inference of discrimination through circumstantial evidence. *See Chockla v. Celebrity Cruise Lines, Inc.*, 47 F. Supp. 2d 1365, 1369 (S.D. Fla. 1999). "Direct evidence" is evidence that "establishes discriminatory intent without inference or presumption." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081

(11th Cir. 1990). Put another way, "only the most blatant remarks whose intent could only be to discriminate . . . constitute direct evidence." *Id.* (*citing Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir 1989)).

In an ADA case with no direct evidence of discrimination and where the defendant denies that its decisions were motivated by the plaintiff's disability, the D.C. Circuit applies the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Duncan v. Washington Metropolitan Area Transit Authority* 240 F.3d 1110, 1114 (D.C. Cir. 2001) (*citing Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997)). At the outset an ADA plaintiff must establish, by a preponderance of the evidence, a *prima facie* case of discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Plaintiff Kamen alleges that defendant IBEW terminated his employment because he was disabled. *See* Amended Complaint at ¶ 60. To establish a *prima facie* case of unlawful discrimination based on disparate treatment in this case, plaintiff Kamen must show, by a preponderance of the evidence, that: (1) he had a disability within the meaning of the ADA; (2) he was qualified for the position with or without reasonable accommodation; and (3) he suffered an adverse employment action (*i.e.*, termination) because of his disability. *Lytes v. District of Columbia Water and Sewer Authority*, C.A. No. 05-402 (RMC) (Document # 62), 2007 U.S. Dist. LEXIS 91154 at *19 (D.D.C., Dec. 13, 2007) (*citing Duncan*, 240 F.3d at 1114).[6] Plaintiff

---

[6]    The D.C. Circuit has never explicitly adopted the four-prong test, nor has it recognized the distinction between claims of failure to accommodate and claims of disparate treatment. *See Breen v. Dep't of Transp.*, 282 F.3d 839, 840-41 (D.C. Cir. 2002). Judge Urbina recently suggested in *Jones v. University of the District of Columbia*, 505 F. Supp.2d 78, 88 n.6 (D.D.C. 2007) (*citing Morisky v. Broward City*, 80 F.3d 445, 448 (11th Cir. 1996) (reasoning that "it is intuitively clear . . . that an employer cannot fire an employee 'because of' a disability unless it knows of the disability"), that there is no reason to distinguish between the two claims, *see* 42 U.S.C. § 12112(b)(5)(A) (defining failure to make reasonable accommodations as a form of discrimination), and noted that the elements of the two tests are essentially the same.

Kamen can not establish a *prima facie* case of disparate discrimination against defendant IBEW for each of the following reasons.

### A.  DEFENDANT IBEW HAD NO KNOWLEDGE THAT PLAINTIFF KAMEN WAS INFECTED BY HIV AT THE TIME IT TERMINATED HIS EMPLOYMENT.

Neither IBEW International President Hill nor IBEW International Vice-President Siegel knew that plaintiff Kamen was infected by HIV at the time his employment was terminated on December 8, 2004. Hill Dec. at ¶47; Siegel Dec. at ¶96.

Admittedly, it is rare that that there is no genuine dispute whether an employer knew about an employee's disability when it decides to terminate his/her employment. The question does not arise in most cases of alleged race and sex discrimination inasmuch as in race and sex discrimination, the protected characteristic of the employee is immediately obvious to the employer, but that is not always the case with disability discrimination.

It is true that an employer will automatically know of some disabilities. For example, an employer would know that a person in a wheelchair, or with some other obvious physical limitation, has a disability. Furthermore, an employer may actually know of disabilities that are not immediately obvious: the employee may ask for an accommodation under the ADA, or he/she may inform the employer gratuitously about his/her disability.

However, unlike with race and sex discrimination, there are situations in disability discrimination cases where an employer clearly did not know and could not have known of an employee's disability. In those circumstances, an employer cannot be held liable under the ADA for firing an employee when it indisputably had no knowledge of the disability. This is supported

---

Specifically, Judge Urbina pointed out that the notice requirement of the four-prong test is implied in the three-prong test's requirement of an adverse employment decision due to a disability. *Id.*

both by simple logic and by the conclusions of other courts that have considered analogous issues.

In *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928 (7th Cir. 1995), a former employee claimed that his employment was unlawfully terminated because of his disability. The Seventh Circuit affirmed the trial court's decision to grant summary judgment in favor of the employer holding that there was not genuine issue of fact as to whether the employer knew of the former employee's disability. 47 F.3d at 931. The court concluded that because the former employee failed to demonstrate that the former employer had knowledge of his disability, he did not establish a *prima facie* case of discriminatory discharge under the ADA. *Id.* at 932. The court explained:

> At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee "because of" a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee "because of" some other reason.

*Id.*

Other courts have applied the same logic. The Sixth Circuit reached this conclusion in a similar context in *Landefeld v. Marion General Hospital,* 994 F.2d 1178 (6th Cir. 1993).[2/] In *Landefeld,* a physician employed by a hospital had been caught stealing mail from other physicians' mailboxes. He had been under psychiatric care, and apparently had a mental disorder that caused his misbehavior. The hospital's Board of Directors fired the physician, and he failed

---

[2/]    *Landefeld* was an appeal from summary judgment granted to an employer in a case under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.,* which prohibits discrimination on the basis of disability by branches of the Federal Government and by entities funded by the Federal Government. The ADA and the Rehabilitation Act of 1973 are very similar, and "cases interpreting either are applicable and interchangeable." *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) (*quoting Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998)); *accord Jones v. University of the District of Columbia*, 505 F. Supp. 2d 78, 82, n.1 (D.D.C. 2007).

to produce any evidence, which showed that at the time of the firing the Board knew of his

mental illness. The Sixth Circuit held that, because there was no genuine issue that those who

made the decision to fire the physician were aware of his disability, the employer could not be

liable. *Landefeld,* 994 F.2d at 1181-82. *See Morisky v. Broward County,* 80 F.3d 445, 447-49

(11th Cir. 1996) (liability under the ADA requires actual or constructive notice of the disability);

*Collings v. Longview Fibre Co.,* 63 F.3d 828, 834 (9th Cir. 1995) (assuming plaintiffs had a

medically recognizable drug disability, they could not make out a case under the ADA where

they could not show that employer was aware of it); *see also Grinstead v. Pool Co. of Texas,*

1994 U.S. Dist. LEXIS 793, 1994 WL 25515 (E.D. La. 1994) (holding that there can be no

liability under the ADA for firing a worker with a 20 percent disability rating when the plaintiff

produced no evidence that the employer knew of disability), *aff'd without op.,* 26 F.3d 1118 (5th

Cir. 1994); *Mazzarella v. United States Postal Serv.,* 849 F. Supp. 89, 96-97 (D. Mass. 1994)

(holding that lack of knowledge of decisionmaker who fired an employee with a mental disorder

precluded liability under Rehabilitation Act).[8]

Most importantly, the D.C. Circuit held in *Crandall v. Paralyzed Veterans of Am.*, 146

F.3d 894 (D.C. Cir. 1998), that an employer, which was covered by the Rehabilitation Act  of

---

[8]    Other courts have applied the same logic under state law. *See Dutson v. Farmers
Insurance Exchange,* 815 F. Supp. 349, 352 (D. Ore. 1993) *aff'd without op.,* 35 F.3d 570 (9th
Cir. 1994) (holding that where there was no evidence that an employer knew of its employee's
being HIV-positive, the employer could not have intentionally inflicted emotional distress on the
plaintiff by illegally discriminating against him on the basis of disability in violation of state
common law); *McIntyre v. Kroger Co.,* 863 F. Supp. 355, 358-59 (N.D. Tex. 1994) (holding that
there could be no liability under Texas human rights law that forbade discharge "because of
disability" for employer's discharge of mentally ill employee, where plaintiff produced no
evidence that the employer knew of disability); *O'Keefe v. Niagara Mohawk Power Corp.,* 714
F. Supp. 622, 627 (N.D. N.Y. 1989) (holding that there could be no liability under New York
human rights law, forbidding discharge "because of disability," where there was no genuine
issue of material fact that those who decided to fire plaintiff knew nothing of his alcoholism).

1973 because it received federal financial assistance, could not have terminated the plaintiff's employment on account of his bipolar disorder, which allegedly made him behave rudely, unless it could be shown that the employer acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability. *Id.* at 896-97. More recently, in *Evans v. Davis Memorial Goodwill Industries*, 133 F. Supp.2d 24 (D.D.C. 2000), the court granted summary judgment to the defendant charitable organization dismissing an ADA plaintiff's allegation that he was improperly fired because of behavior problems stemming from his brain injury, because there was no indication that the plaintiff told his former employer that the injury created a mental condition that would affect his ability to accept criticism and otherwise hold a job. The court explained:

> Employers can only be held liable for discriminating on the basis of "known" disabilities. The disabled employee typically has the burden of providing notice of the disability and the limitations it imposes. It similarly lies with the disabled employee to request needed accommodation.
>
> It is uncontested that plaintiff told Goodwill about his brain injury. Moreover, it is undisputed that [plaintiff] told Goodwill he would need extra time to learn the accounting and financial features of the job -- an accommodation he was apparently given.
>
> However, there is no indication that plaintiff told Goodwill that the injury had created a mental condition that would affect his ability to accept criticism and otherwise hold the job -- the features plaintiff now advances as the basis of his disability.

133 F. Supp.2d at 27 (citations omitted).

Given that under the ADA, the purpose of plaintiff's *prima facie* case, where no direct evidence of intent is available, is to give the plaintiff the benefit of a rebuttable presumption of discriminatory intent if he or she establishes the *prima facie* case, *St. Mary's Honor Ctr.*, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993), an ADA plaintiff must establish, as an

- 16 -

element of his or her *prima facie* case, that the defendant knew or believed that the plaintiff was disabled, or knew that the symptoms were caused by the alleged disability. This is a logical element to an ADA plaintiff's *prima facie* case because, unless the employer knew or believed that the plaintiff was disabled, or knew that the symptoms were caused by the alleged disability, it would be impossible for the employer to have made its decision *because of* the disability, let alone *solely because of* the disability. Where the plaintiff cannot prove employer knowledge or belief, there is no reasonable basis for extending to the plaintiff the inference that the employer discriminated "solely because of" the plaintiff's alleged disability.

Plaintiff Kamen can not present any evidence to contradict the declaration testimony of Mr. Hill and Mr. Siegel, who unequivocally state they were unaware that plaintiff Kamen was infected by HIV when his employment was terminated. Therefore, he can not sustain his burden of presenting a genuine issue of material fact as to an essential element of his *prima facie* case of disparate discrimination against defendant IBEW – knowledge of his disability.

## B. HIV Infection Does Not Automatically Qualify as a Disability under the ADA.

Additionally, plaintiff Kamen can not sustain his burden of presenting a genuine issue of material fact as to whether he was disabled under the law at the time his employment was terminated.

The ADA defines "disability" as: (A) "a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Under the ADA, plaintiff Kamen bears the burden of proving that he was disabled. *Lytes*, at * 19-20; *see Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004); *Nichols v. Billington*, 402 F. Supp. 2d 48, 78

(D.D.C. 2005). For the reasons set forth below, plaintiff Kamen was not an individual with a qualified disability within the framework of the ADA.

Under the ADA, a "disability" is:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

> (B) a record of such an impairment; or

> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

To qualify as "disabled" under subsection (A) of the ADA's definition of disability in 42 U.S.C § 12102(2), a claimant must initially prove that he or she has a physical or mental impairment. *Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 194 (2002) (*citing* 42 U.S.C. § 12102(2)(A)). Under the ADA, a physical impairment that "substantially limits one or more . . . major life activities" is a disability. *Toyota,* 534 U.S. at 195 (*quoting* 42 U.S.C. § 12102(2)(A)).

The EEOC has issued regulations to provide additional guidance regarding the proper interpretation of the term "disability" in the ADA. After restating the definition of disability given in the statute, *see* 29 C.F.R. § 1630.2(g), the EEOC regulations define the three elements of disability: (1) "physical or mental impairment," (2) "substantially limits," and (3) "major life activities." *See id.* at 42 C.F.R. §§ 1630.2(h)-(j).

Under the regulations, a "physical impairment" includes "any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 42 U.S.C. § 1630.2(h)(1). The term "substantially limits" means, among other things, "unable to perform a major life activity that the average person in the general population

can perform;" or "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 42 U.S.C. § 1630.2(j). Finally, "major life activities" means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 42 U.S.C. § 1630.2(i).

The Supreme Court has held that determination of whether a person is "disabled" within the meaning of the ADA is an "individual inquiry." It stated:

> The definition of disability also requires that disabilities be evaluated "with respect to an individual" and be determined based on whether an impairment substantially limits the "major life activities of such individual." Thus, whether a person has a disability under the ADA is an individualized inquiry.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999) (citations omitted); *see* 42 U.S.C. § 12102(2)(A); *Toyota Motor Mfg. Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) ("Congress intended the existence of a disability to be determined in such a case-by-case manner.").

Accordingly, determination of whether HIV infection is a disability must be based on an individual inquiry. Applying this test to the facts in this case, it is clear that HIV infection is not a *per se* disability under the ADA**.**

### 1.    HIV Infection is an Impairment.

It is undisputed that plaintiff Kamen was diagnosed as being infected with human immunodeficiency virus ("HIV") in 2004 before the IBEW terminated his employment. *See* Amended Complaint at ¶ 20; Plaintiff's Answers to Defendant International Electrical Workers' First Set of Interrogatories (hereafter "Plaintiff's Answers to IBEW's Interrogatories" ) at No. 3; Kamen Dep. at 56, Lines 2-10, and Exhibit No. 20 attached thereto. In *Bragdon v. Abbott*, 524 U.S. 624-25 (1998), the Supreme Court explained that from the moment of infection and

throughout every stage of the disease, HIV infection satisfies the statutory and regulatory definition of a "physical impairment" for purposes of the ADA.

Therefore, in light of the Supreme Court's decision in *Bragdon*, there is no question that plaintiff Kamen's HIV infection is an impairment within the meaning of the ADA inasmuch as it "satisfies the statutory and regulatory definition of a physical impairment during every stage of the disease." *Id.* at 637. However, merely having an impairment does not make one disabled for purposes of the ADA. *Toyota*, 534 U.S. at 195. Rather, plaintiff Kamen must demonstrate that HIV infection "substantially limits" a "major life activity." *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 656 (D.D.C. 1997); *Thompson v. Rice*, 422 F. Supp. 2d 158, 169 (D.D.C. 2006). For that reason, plaintiff Kamen must identify one or more life activities, which he claims are substantially limited by being infected by HIV.

### 2.   There is No Evidence that HIV Infection is a Substantial Limitation of any of Plaintiff Kamen's Major Life Activities.

In *Bragdon v. Abbott*, the Supreme Court provided a thorough discussion of the progression from infection by HIV to developing full blown AIDS. The Court described the progression of the disease as follows:

> The initial stage of HIV infection is known as acute or primary HIV infection. In a typical case, this stage lasts three months. The virus concentrates in the blood. The assault on the immune system is immediate. The victim suffers from a sudden and serious decline in the number of white blood cells. There is no latency period. Mononucleosis-like symptoms often emerge between six days and six weeks after infection, at times accompanied by fever, headache, enlargement of the lymph nodes (lymphadenopathy), muscle pain (myalgia), rash, lethargy, gastrointestinal disorders, and neurological disorders. Usually these symptoms abate within 14 to 21 days. HIV antibodies appear in the bloodstream within 3 weeks; circulating HIV can be detected within 10 weeks.
>
> After the symptoms associated with the initial stage subside, the disease enters what is referred to sometimes as its asymptomatic phase. The term is a misnomer, in some respects, for clinical features persist throughout, including lymphadenopathy, dermatological disorders, oral lesions, and bacterial infections.

> Although it varies with each individual, in most instances this stage lasts from 7 to 11 years. The virus now tends to concentrate in the lymph nodes, though low levels of the virus continue to appear in the blood. It was once thought the virus became inactive during this period, but it is now known that the relative lack of symptoms is attributable to the virus' migration from the circulatory system into the lymph nodes. The migration reduces the viral presence in other parts of the body, with a corresponding diminution in physical manifestations of the disease. The virus, however, thrives in the lymph nodes, which, as a vital point of the body's immune response system, represents an ideal environment for the infection of other CD4+ cells. Studies have shown that viral production continues at a high rate. CD4+ cells continue to decline an average of 5% to 10% (40 to 80 cells/mm3) per year throughout this phase.

*Bragdon*, 524 U.S. at 635-36 (citations omitted).

According to Dr. Joel E. Gallant, Associate Professor of Medicine in the Division of Infectious Diseases at the Johns Hopkins University School of Medicine in Baltimore, who testified in *Taylor v. Rice*, 451 F.3d 898 (D.C. Cir. 2006):

> When a person's CD4+ lymphocytes decrease in number, "the body becomes less able to fight infections that it otherwise would be able to defeat. . . . If not treated, the loss of CD4+ cells eventually results in death, usually due to "opportunistic infections" that appear in people with suppressed immune systems.

451 F.3d at 902 n.5. "For this reason, HIV-positive individuals must monitor the number of CD4+ lymphocytes in their bodies on a regular basis. Until 1996, an HIV infection was invariably fatal. *Id.* At that time, however, the introduction of a new class of antiretroviral medications combined with other drugs, proved able to suppress HIV and to prevent deteriorating compromise of patients' immune systems." *Ibid.*

Consequently, although others may ***perceive*** it as a physical impairment that substantially limits major life activities,[9] HIV infection is not necessarily a death sentence or even a substantial limitation of major life activities. In any event, it is essential that plaintiff Kamen

---

[9]     In her concurring opinion in *Bragdon*, Justice Ginsburg observed that "HIV infection is 'a physical . . . impairment that substantially limits . . . major life activities,' ***or is so perceived***, including the afflicted individual's family relations, employment potential, and ability to care for herself. . . ." 524 U.S. at 656 (Ginsburg, J., concurring) (citations omitted) (emphasis added).

present evidence which demonstrates that his ability to perform one or more major life activities is substantially limited by his HIV infection. *Sutton*, 527 U.S. at 491-92. Plaintiff Kamen's inability to meet this evidentiary burden means that he can not prove that he was disabled within the meaning of the ADA. For that reason, he is not entitled to invoke the protections of the ADA and his claim of disparate treatment must be dismissed as a matter of law.

### C.  DEFENDANT IBEW DID NOT FAIL TO REASONABLY ACCOMMODATE PLAINTIFF KAMEN'S ALLEGED DISABILITY.

The ADA also defines discrimination to include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business[.]" 42 U.S.C. § 12112(b)(5)(A). "Under the ADA's scheme, then, it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question would impose an undue hardship[.]" *Aka v Washington Hospital Center*, 156 F.3d 1284, 1300 (D.C. Cir. 1998) (*en banc*). To establish a *prima facie* case for failure to accommodate under the ADA, a plaintiff must show: "(1) that he or she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his or her disability; (3) that with reasonable accommodation he or she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.'" *Nichols v. Billington*, 402 F. Supp. 2d 48, 78 (D.D.C. 2005) (*citing Scarborough v. Natsios*, 190 F. Supp.2d 5, 19 (D.D.C. 2002) (*quoting Rhoads v. Federal Deposit Ins. Corp.*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001)). If such evidence is produced, it is up to the employer to submit rebuttal evidence; the ultimate burden, however, remains with the plaintiff. *Aka*, 156 F.3d at 1288 (*citing Barth v. Gelb*, 2 F.3d

1180, 1186 (D.C. Cir. 1993) (explaining that a reasonable accommodation claim is not always subject to the *McDonnell-Douglas* analysis).

### 1. Plaintiff Kamen Failed to Request a Reasonable Accommodation for Being Infected by HIV.

"[A]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999). "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp.2d 120, 130 (D.D.C. 2003) (*citing Woolcott v. E.I. DuPont de Nemours & Co.*, No. 95-CV-0721, 1997 U.S. Dist. LEXIS 6700, at *20 (W.D.N.Y. Apr. 29, 1997) (*quoting Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)). The employee bears the burden of requesting a necessary accommodation and, absent such a request, an accommodation claim fails. Id.; *Evans v. Davis Memorial 'Goodwill Indus.*, 133 F. Supp. 2d 24, 28 (D.D.C. 2000); *Becker v. Gallaudet Univ.*, 66 F. Supp. 2d 16, 22 (D.D.C. 1999) ("The ADA does not impose a general duty on an employer to provide unrequested accommodations.").

Plaintiff Kamen acknowledges that he neither informed IBEW International President Hill, IBEW International Vice-President Siegel, or anyone else associated with the IBEW at any time that he was infected by HIV, nor did he request an accommodation of any kind. Plaintiff's Answers to Defendant Edwin D. Hill's First Set of Interrogatories at No. 11. Thus, plaintiff Kamen never made a request for an accommodation that was denied by the IBEW, or identified what "accommodation" he believes that the IBEW owed to him. Therefore, plaintiff Kamen's claim that defendant IBEW failed to accommodate his HIV-infected status must fail because he did not request an accommodation.

### 2. Plaintiff Kamen Failed to Allege a Reasonable Accommodation Claim in His EEOC Charge and, Therefore, May Not Pursue Such a Claim as Part of This Lawsuit.

Plaintiff Kamen's EEOC charge alleged that:

> the respondent [IBEW] discriminated against me because of my medical conditions, and/or my disabilities, and/or my perceived disabilities, in violation of the Americans with Disabilities Act of 1990, as amended, in that, the respondent [IBEW] did not discharge a non-disabled individual (Wyatt Earp, Jr.) (sic).

Exhibit No. 1 attached to the Declaration of Terry R. Yellig. Plaintiff Kamen's EEOC charge did not mention or allege that he had requested a reasonable accommodation or that the IBEW and/or International President Hill had denied his request. *Id.* The date of the alleged discrimination was identified as December 8, 2004, the date on which IBEW International President Hill notified plaintiff Kamen that his employment by the IBEW would be terminated effective on December 31, 2004. *Ibid.*

Plaintiff Kamen may not pursue a reasonable accommodation claim in this case inasmuch as he did not allege a reasonable accommodation claim in his EEOC charge of discrimination. The Court explained in *Bugg-Barber v. Ranstad*, 271 F. Supp.2d at 131-32:

> The purpose of the charge and government investigation is to address and resolve discrimination charges as quickly and inexpensively as possible, without the cost and duration of formal litigation. The scope of any subsequent lawsuit is limited to "the administrative investigation that can reasonably be expected to follow the charge of discrimination," *Marshall v. Fed. Express Corp.*, 327 U.S. App. D.C. 302, 130 F.3d 1095, 1097 (D.C. Cir. 1997) (*quoting Park v. Howard Univ.*, 315 U.S. App. D.C. 196, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks omitted)), to make sure that this administrative process has an opportunity to work.

This Court dismissed the plaintiff's reasonable accommodation claim in *Bugg-Barber* because she failed to exhaust her administrative remedies before the EEOC. *Id.* at 132. Specifically, the Court found that the plaintiff's EEOC charge did not mention or allege that the plaintiff had requested a reasonable accommodation or that the employer had denied her request

and, therefore, the reasonable accommodation claim was not properly presented to the Court. *Id.* Similarly, plaintiff Kamen's reasonable accommodation claim in this case should be dismissed for failure to exhaust administrative remedies inasmuch as his EEOC charge did not encompass his failure to accommodate the claim set forth in the Amended Complaint.

## II. PLAINTIFF KAMEN'S CLAIM THAT THE IBEW MAINTAINS AN ONGOING POLICY AND PRACTICE OF HOSTILITY AND PREJUDICE TOWARD HOMOSEXUALS SHOULD BE DISMISSED BECAUSE HE CANNOT STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

In *Kamen v. IBEW*, 505 F. Supp. 2d 66, 76-77 (D.D.C. 2007), this Court held:

> the claims in Count IV that Mr. Kamen was denied training opportunities, not permitted to assist at IBEW manufacturing conferences, never restored duties he had been assigned before his sick leave, denied promotion, and terminated because of his sexual orientation, are time barred by the one-year statute of limitations period under the DCHRA.

However, Count IV of the Amended Complaint also alleges that defendants IBEW and International President Hill "have had and continue to maintain through the present a policy and practice of hostility towards homosexuals." Amended Complaint at ¶ 83. Furthermore, Count IV of the Amended Complaint asserts that defendants' alleged policy and practice of hostility towards homosexuals "is a continuing violation of the [District of Columbia Human Rights Act]." *Id.* at ¶ 84.

More specifically, the Amended Complaint claims that "members of the IBEW, including management, regularly mock and ridicule homosexuals, and express opposition to being associated with homosexuals." *Id.* at ¶ 51. In addition, the Amended Complaint says that "[t]he IBEW has had and continues to have a practice of systemic hostility toward homosexuals," *id.* at ¶ 52; and that "this hostility is embedded in a culture fostered and sustained by senior management in IBEW, including Defendant Hill." *Id.* at ¶ 53. Moreover, the Amended

- 25 -

Complaint states that "[t]his hostility manifested itself not only in overtly anti-homosexual language by IBEW employees and management, but in anti-homosexual hiring practices." *Id.* at ¶ 54. Finally, the Amended Complaint avers that "[t]his hostility continued unabated during Plaintiff's employment with IBEW, and continues unabated through this present time." *Id.* at ¶ 55.

Unlike the other claims asserted in Count IV of the Amended Complaint, each of which alleged a discrete discriminatory act that the Court held are time-barred by the one-year statute of limitations period in the DCHRA, the allegations set forth in ¶¶ 83-84 and 51-55 of the Amended Complaint appear to assert a hostile work environment claim, which will not be time-barred if all acts constituting the claim are part of the same unlawful practice and at least one act falls within the statutory filing period. *Lively v. Flexible Packaging Ass'n,* 830 A.2d 874, 889-90 (D.C. 2003) (*adopting National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 115-17 (2002)).

Defendants IBEW and Hill did not move to dismiss these allegations in Count IV of the Amended Complaint earlier because, as noted in *Kamen,* 505 F. Supp.2d at 75, n.5, "[t]he Court must accept all factual allegations of the complaint as true when considering a motion to dismiss pursuant to Rule 12(b)(1), unless they can be refuted by undisputed facts evidenced in the record." Defendants could not assert, prior to conducting discovery, that plaintiff Kamen will be unable to establish a set of facts which support the allegation that defendants IBEW and Hill currently maintain a policy and practice of hostility and prejudice toward homosexuals. *Id.*

Accordingly, defendants initiated discovery to: (1) determine whether at least one act contributing to plaintiff Kamen's hostile work environment claim occurred within the DCHRA one-year statute of limitations period; and (2) whether the evidence which supports plaintiff Kamen's allegations that defendants currently maintain a policy and practice of hostility and

prejudice toward homosexuals, is sufficient to state a *prima facie* hostile work environment claim.

Defendant IBEW submitted written interrogatories to plaintiff Kamen dated August 23, 2007, which, *inter alia*, propounded questions that sought to identify each fact he claims supports the allegations in ¶¶ 82 & 84 and 51-55 of the Amended Complaint. First Set of Interrogatories Submitted on Behalf of Defendant International Brotherhood of Electrical Workers to Plaintiff Steven A. Kamen (hereafter "IBEW Interrogatories") at Interrogatory Nos. 17-24.

In response, plaintiff Kamen described a recurring episode that he alleged occurred annually at the IBEW Third District staff meeting/Christmas party held in Hershey Park. According to plaintiff Kamen's account, each year a male and female IBEW International Representative "mocked" and joked about inadvertently walking into "an all-gay Christmas Party [also held] at the Hershey Park." Plaintiff's Answers to IBEW's Interrogatories No. 17. Additionally, plaintiff Kamen responded to IBEW Interrogatory Nos. 18 and 19, which asked him to identify each fact which supports the allegations in ¶¶ 52 and 53 of the Amended Complaint concerning "systemic hostility towards homosexuals" that "[i]t is evident at all IBEW functions that if you are not married or without a potential spouse you were jeered as not being part of the projected family friendly IBEW mentality." Plaintiff's Answers to IBEW's Interrogatories at Nos. 18 & 19. Similarly, IBEW Interrogatory No. 20 asked plaintiff Kamen to state each fact that supports the allegation in ¶ 54 of the Amended Complaint that there is "systemic hostility toward homosexuals manifested itself . . . in overtly anti-homosexual language by IBEW employees and management." Plaintiff Kamen answered that the same two IBEW International Representatives who he claims annually discussed the "all-gay Christmas

party" they inadvertently encountered at Hershey Park in a "mocking" and "joking" manner, as well as "the Buffalo Local Union Utility Business Manager" "for years have made derogatory remarks about homosexuals." Plaintiff's Answers to IBEW's Interrogatories at No. 20.

In addition, IBEW Interrogatory No. 21 asked plaintiff Kamen to state each fact, which supports the allegation in ¶ 54 of the Amended Complaint that alleged "systemic hostility toward homosexuals" alleged in ¶ 52 "manifested itself . . . in anti-homosexual hiring practices." In response, plaintiff Kamen cryptically answered: "Disclose known homosexuals prior to this action." Plaintiff's Answers to IBEW's Interrogatories at No. 21. He offered the same answer to IBEW Interrogatory No. 22, which asked him to state each fact, which supports the allegation in ¶ 55 of the Amended Complaint that the "systemic hostility toward homosexuals" alleged in ¶ 52 "continues unabashed through the present time."

Defendants IBEW and Hill then attempted during plaintiff Kamen's November 28, 2007 deposition to elicit of any additional facts of which he is aware that support the allegations in ¶¶ 51-55 and 82-84 of the Amended Complaint, which he failed to provide in his Answers to the IBEW Interrogatory Nos. 17-22, as well as seek clarification of those facts that plaintiff Kamen had identified therein. However, plaintiff Kamen failed to provide any additional facts about alleged hostile acts, which he had not already identified in response to IBEW Interrogatory Nos. 17-22, and offered little or no additional factual information about the alleged hostile acts that he identified in response to IBEW Interrogatory Nos. 17-22.  *See* Kamen Dep. at 148, line 15, through 156, line 5.

### A. Plaintiff Kamen's Hostile Work Environment Claim in Count IV of the Amended Complaint is Time-Barred by the DCHRA Statute of Limitations.

The one fact that plaintiff Kamen clarified during his November 28, 2007 deposition is that none of the alleged hostile activity, which he identified in his Answers to the IBEW Interrogatory Nos. 17-22 and in his deposition, occurred after his employment by the IBEW terminated on December 31, 2004. Plaintiff Kamen did not file the above-captioned action until June 6, 2006, more than one year after his employment by defendant IBEW terminated.

This Court held in *Kamen* that the "DCHRA statute of limitations bars any court suit not brought within one year of its occurrence, regardless of whether plaintiff initially filed an administrative complaint." 505 F. Supp.2d at 75-76 (*citing Anderson v. U.S. Safe Deposit Co.*, 552 A.2d 859, 863 (D.C. 1989); *Weiss v. International Brotherhood of Elec. Wkrs.*, 729 F. Supp. 144, 146 (D.D.C. 1990)). Accordingly, the allegations in Count IV of the Amended Complaint that defendants IBEW and Hill currently maintain a policy and practice of hostility and prejudice toward homosexuals should be dismissed because they are time-barred by the one-year statute of limitations period under the DCHRA.

### B. Plaintiff Kamen Cannot Make a *Prima Facie* Case for His Hostile Work Environment Claim.

The D.C. Court of Appeals has "often looked to cases construing Title VII to aid [it] in construing the [DCHRA]." *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 n.14 (*quoting Atlantic Richfield, Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1103 n.6 (D.C. 1986) (citations omitted)). In that regard, the historic approach to hostile work environment cases in the District of Columbia is consistent with the Supreme Court's hostile work environment analysis under Title VII in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). The D.C. Court of Appeals first broached the possibility of a hostile work environment claim

under the DCHRA in *Howard University v. Best*, 484 A.2d 958, 978 (D.C. 1984). There the

court articulated the elements of a *prima facie* case of sexual harassment. *Best,* 484 A.2d at 981.

Years later, the court concluded that the elements set forth in *Best* were applicable to a hostile

work environment discrimination case:

> [T]he same test should apply, *mutatis mutandis*, in any DCHRA case in
> which a plaintiff alleges unlawful discrimination that takes the form of a hostile or
> abusive working environment. In other words, applying the *Best* standard more
> generically, a plaintiff . . . has a viable hostile environment claim if she can
> demonstrate (1) that he is a member of a protected class, (2) that he has been
> subjected to unwelcome harassment, (3) that the harassment was based on
> membership in the protected class, and (4) that the harassment is severe and
> pervasive enough to affect a term, condition or privilege of employment.

*Daka, Inc.*, 711 A.2d at 92 (*citing Best*, 484 A.2d at 978). The D.C. Court of Appeals further

discussed in *Daka, Inc.* the type of proof required to establish a hostile work environment claim:

> "More than a few isolated incidents must have occurred, and genuinely
> trivial occurrences will not establish a prima facie case." [*Best*, 484 A.2d] at 980
> (citations and footnote omitted). However, "no specific number of incidents, and
> no specific level of egregiousness" need be proved. *Id.* Whether the plaintiff has
> met his burden depends on the totality of the circumstances. *Id.* at 980-81. This
> means that in determining whether the DCHRA has been violated, "the trier of
> fact should consider . . . the amount and nature of the conduct, the plaintiff's
> response to such conduct, and the relationship between the harassing party and the
> plaintiff." *Id.* at 981.

*Id.* at 93. More recently, the D.C. Court of Appeals adopted the Supreme Court's analysis in

*Morgan* in *Lively* and held:

> because "[a] hostile work environment claim is comprised of a series of separate
> acts that collectively constitute 'one unlawful employment practice,'" *Morgan*,
> *supra*, 536 U.S. at 117 (citation omitted), the trier of fact must focus on "all the
> circumstances," including "the frequency of the discriminatory conduct, its
> severity, whether it is physically threatening or humiliating, or a mere offensive
> utterance; and whether it interferes with an employee's work performance." *Id.* at
> 116 (internal citations and quotation marks omitted).

830 A.2d at 890. The court also reaffirmed in *Lively* the basic principles governing a hostile

work place claim set forth in *Daka, Inc.* 830 A.2d at 890.

Therefore, a work environment is considered "hostile" under Title VII, and thus the DCHRA, only when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted)).

This Court recently held that "[i]n determining whether a *hostile* work environment claim is substantiated, a court must look at all the circumstances of the plaintiff's employment, specifically focusing on such factors as the frequency of the alleged discriminatory conduct, its severity, whether it was threatening and humiliating or was merely offensive, and whether it unreasonably interfered with the employee's work performance." *Odeyale v. Aramark Management Services L.P.*, 518 F. Supp.2d 179, 183 (D.D.C. 2007) (*citing Harris*, 510 U.S. at 23). "The conduct must be sufficiently extreme to constitute an alteration in the conditions of employment." *Id.* (*citing Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998)). "Consequently, "'mere utterance of an  . . . epithet which engenders offensive feeling in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Ibid.* (*quoting Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). By ensuring that "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable," *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002), these standards are "sufficiently demanding to ensure that Title VII [and the DCHRA do] not become a general civility code." *Faragher,* 524 U.S. at 788 (*quoting Oncale*, 523 U.S. at 80) (internal quotation marks omitted)).

Plaintiff Kamen alleges that an annual discussion in a "mocking" and "joking" manner among IBEW International Representatives about their inadvertent encounter with an "all-gay Christmas party" the first year they attended the IBEW Third District staff meeting/Christmas party at Hershey Park, as well as derogatory remarks about homosexuals made "for years" by "the Buffalo Local Union Utility Business Manager" (who is not an officer, agent or employee of the IBEW) at annual Third District Progress meetings, together with what he described as the IBEW's "projected family friendly IBEW mentality," which he claims ostracizes International Representatives who attend IBEW functions unaccompanied by their spouse or significant other, is sufficiently severe and pervasive to constitute a hostile work environment.

This alleged conduct undoubtedly fails to amount to a hostile work environment inasmuch as it is much less severe and pervasive than the conduct described by this Court in *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005) (statements by three employees over a six-month period telling the plaintiff to "go back where she came from," separate acts of yelling and hostility, and allegations that the plaintiff was not given the type of work she deserved) and *Singh v. United States House of Representatives*, 300 F. Supp.2d 48 (D.D.C. 2004) (employer humiliated the plaintiff at important meetings, screamed at her in one instance, told her to "shut up and sit down" in one instance, and was "constantly hostile and hypocritical"), both of which other courts in this jurisdiction found was not sufficiently severe to amount to a hostile work environment. *See Odeyale*, 518 F. Supp.2d at 184 (supervisor's alleged frequent practice of calling plaintiff racially derogatory names during the second, third and fourth days of his employment, while offensive, was not sufficiently severe and pervasive to constitute a hostile work environment).

Accordingly, the hostile work environment claim set forth in the remaining allegations in Count IV of the Amended Complaint should be dismissed because they fail to state a claim upon which relief can be granted.

## C. The IBEW Cannot be Held Vicariously Liable for the Alleged Harassment of Plaintiff Kamen

An employer can escape vicarious liability for a hostile work environment claim by establishing that the alleged victim failed to take advantage of the employer's system for reporting and preventing harassment. *Faragher*, 524 U.S. at 807-08; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). In *Faragher* and *Ellerth*, the Supreme Court held that an employer can escape strict liability under Title VII for a supervisory employee's harassment of one of its other employees if it can demonstrate, by a preponderance of the evidence, that (1) it "exercised reasonable care to prevent and correct promptly any harassing behavior"; and (2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

Although the courts have not specifically applied the *Faragher/Ellerth* affirmative defense to claims arising under the DCHRA, as discussed above, the D.C. Court of Appeals has "often looked to cases construing Title VII to aid [it] in construing the [DCHRA]." *Daka, Inc. v. Breiner*, 711 A.2d at 92 n.14 (*quoting Atlantic Richfield, Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d at 1103 n.6 (citations omitted)). Under the *Faragher/Ellerth* affirmative defense, defendant IBEW and its alter ego, defendant International President Hill, cannot be held liable for creating the hostile work environment alleged by plaintiff Kamen.

The first prong of the *Faragher/Ellerth* affirmative defense requires the IBEW to prove that it exercised reasonable care to respond to the hostile work environment alleged by plaintiff

Kamen. However, plaintiff Kamen never complained of the alleged hostile work environment, which he says exists because of a "systematic hostility toward homosexuals." Amended Complaint at ¶ 52. Hill Dec. at ¶ 57. Moreover, there was nothing for defendants IBEW and International President Hill to act upon since plaintiff Kamen never attempted to utilize the IBEW anti-harassment policy to complain about the alleged systematic hostility toward homosexuals he claims exists in the IBEW, and there is no evidence that defendants IBEW and International President Hill had any knowledge about the alleged hostile work environment described by plaintiff Kamen in the Amended Complaint. Under these circumstances, the IBEW has satisfied the first prong of the *Faragher/Ellerth* affirmative defense.

The second prong of the *Faragher/Ellerth* affirmative defense requires defendants IBEW and International President Hill to establish that plaintiff Kamen "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. Defendant IBEW, by and through International President Hill, who was principally responsible for adoption of the IBEW anti-harassment policy, established multiple methods for an employee to complain of any manner of hostile work environment or harassment.[10/] Hill Dec. at ¶¶ 53-57 and Exhibit No. 7 attached thereto. Notwithstanding the existence of this well-publicized anti-harassment policy, plaintiff Kamen

---

[10/]    The IBEW has adopted an anti-harassment policy that prohibits all forms of harassment, which it defines as "unwelcome conduct, whether verbal or physical, that is based upon a person's protected status, such as sex, color, race, ancestry, religion, national origin, age, physical handicap, medical condition, disability, marital status, veteran status, citizenship status, or other protected group status." Hill Dec. at ¶ 54 and Exhibit No. 7 attached thereto. In addition, the IBEW anti-harassment policy states that the IBEW "will not tolerate harassment of IBEW Employees by anyone, including any staff member, supervisor, co-worker, or patron of the IBEW." *Id.* Finally, the IBEW anti-harassment policy instructs employees that, in the event he or she has "experienced or witnessed harassment," he or she should "notify immediately the Director of the Personnel Department, or in his absence, the International Secretary-Treasurer or his Executive Assistant over Personnel." *Id.* at ¶ 56.

inexplicably failed to take advantage of its preventative and corrective mechanisms. Hill Dec. at ¶ 57.

Plaintiff Kamen knew or should have known about the IBEW anti-harassment policy not only because it has been part of the IBEW's employee handbook, which has been available to all IBEW employees since it was adopted on August 10, 1992, but more significantly because the most recently revised version of the policy, which was adopted on October 1, 1998, was distributed to every IBEW employees, including International Representatives, shortly after it was adopted. Hill Dec. at ¶ 53. Plaintiff Kamen was appointed as an IBEW International Representative in July 1997, therefore, he cannot claim that he was unaware of the IBEW anti-harassment policy.

Accordingly, plaintiff Kamen's failure reasonably to avail himself of the IBEW's preventative and corrective anti-harassment policies satisfies the defendants' burden under the second prong of the *Faragher/Ellerth* affirmative defense. *See Ellerth*, 524 U.S. at 765 (a demonstration of an unreasonable failure to use any complaint procedure provided by the employer "will normally suffice to satisfy the employer's burden under the second element of the defense"). Hence, defendants IBEW and its alter ego, International President Edwin D. Hill, cannot be held vicariously liable in this case for failing to take appropriate action to correct an alleged "systematic hostility toward homosexuals" even assuming, without admitting, that such alleged hostility is severe and pervasive enough to create a hostile work environment, because the defendants have satisfied both prongs of the *Faragher/Ellerth* affirmative defense inasmuch as plaintiff Kamen failed to take advantage of the IBEW anti-harassment policy.

### III. PLAINTIFF KAMEN'S CLAIM THAT INTERNATIONAL PRESIDENT HILL TORTIOUSLY INTERFERED WITH HIS BUSINESS RELATIONSHIP WITH THE IBEW FAILS AS A MATTER OF LAW UNDER DISTRICT OF COLUMBIA LAW.

Count V of the Amended Complaint alleges that under Pennsylvania common law, defendant IBEW International President Edwin D. Hill tortiously interfered with plaintiff Kamen's business relationship with the IBEW. Amended Complaint at ¶¶ 87-93. In essence, plaintiff Kamen alleges that defendant IBEW International President Hill made false statements to members of the IBEW regarding plaintiff Kamen's performance as a Senior International Representative. *Id.* at ¶¶ 88, 89. Plaintiff Kamen alleges that these statements interfered with his business relationship with the IBEW and led to termination of his employment. *Id.* at ¶ 92. Plaintiff Kamen further alleges that defendant International President Hill's actions damaged his past and future earnings and his reputation in the field of union representation. *Id.* at ¶¶ 92, 93. For the following reasons, the Court should grant summary judgment in favor of defendant Hill with respect to Count V because plaintiff Kamen's tortious interference claim fails as a matter of law under District of Columbia law.

### A. DISTRICT OF COLUMBIA CHOICE OF LAW PRINCIPLES SUPPORT APPLICATION OF DISTRICT OF COLUMBIA LAW TO PLAINTIFF KAMEN'S TORTIOUS INTERFERENCE CLAIM.

The first issue presented by this claim is whether the Court should apply the law of Pennsylvania or the law of the District of Columbia to plaintiff Kamen's tortious interference claim. To resolve such a choice of law question, a federal court must first determine which jurisdiction's choice of law principles to apply. *See Shenandoah Assoc. v. Tirana*, 182 F. Supp. 2d 14, 18 (D.D.C. 2001). A federal court sitting in the District of Columbia is "obligated under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), to apply the choice of law rules prevailing in this jurisdiction." *Shenandoah Assoc.*, 182 F. Supp. 2d at 18 (*quoting Dowd v. Calabrese*, 589 F.

Supp. 1206, 1210 (D.D.C. 1984) (*applying Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941))). *See also Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1226 (D.C. Cir. 2004); *Gray v. American Express Co.*, 743 F.2d 10, 16 (D.C. Cir. 1984). Thus, the District of Columbia's choice of law rules govern the determination of which jurisdiction's substantive law the Court should apply in this tortious interference claim. *Jaffe*, 374 F.3d at 1227; *Shenandoah Assoc.*, 182 F. Supp. 2d at 18.

District of Columbia courts use a "governmental interests" analysis to resolve choice of law questions. *Herbert v. District of Columbia*, 808 A.2d 776, 779 (D.C. 2002); *Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985). The governmental interests test requires a court to "balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more 'substantial interest' in the resolution of the issue." *Lamphier v. Washington Hosp. Ctr.*, 524 A.2d 729, 731 (D.C. 1987). *See also Jaffe*, 374 F.3d at 1227. In applying the governmental interests test, District of Columbia courts:

> consider four factors, enumerated in the Restatement (Second) of Conflict of Laws (1971) § 145, Comment d.: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship is centered.

*Herbert*, 808 A.2d at 779 (*citing District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995).

If, after applying the governmental interests test, a court determines that the "interests of the two jurisdictions in the application of their law are equally weighty, [then] the law of the forum will be applied." *Bledsoe v. Crowley*, 849 F.2d 639, 641 n.1 (D.C. Cir. 1988) (citing *Stutsman*, 491 A.2d at 509 and n.10). Furthermore, courts applying the District of Columbia's

governmental interests test have held that "the state where the defendant's conduct occurs has the dominant interest in regulating it." *Biscoe v. Arlington County*, 738 F.2d 1352, 1361 (D.C. Cir. 1984) (*citing* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 146 *comment d* (1969)). *See also Bledsoe*, 849 F.2d at 643.

The Court should apply District of Columbia law to plaintiff Kamen's tortious interference claim in this case because the District of Columbia has a substantial interest in the resolution of the matter. This conclusion is supported by application of the factors set forth in *Herbert*, 808 A.2d at 779, to the facts of this case. The first factor – the place where the injury occurred – is the only factor that supports plaintiff Kamen's argument that Pennsylvania law should apply. Plaintiff Kamen was, indeed, residing in Pennsylvania when his employment by the IBEW was terminated. Nevertheless, each of the remaining factors supports the conclusion that District of Columbia law should apply.

First, the conduct causing the alleged injury occurred in the District of Columbia. From his office at the IBEW's headquarters, which is located in the District of Columbia, International President Hill issued the letter in which he terminated plaintiff Kamen's employment – the action which caused the alleged injury. Hill Dec. at ¶ 46 and Exhibit No. 6 attached thereto. Under the D.C. Circuit's holding in *Biscoe*, based on this fact, the District of Columbia has a "dominate interest in regulating" International President Hill's conduct. *See Biscoe*, 738 F.2d at 1361. Second, International President Hill's place of business is in the District. *Id.* Third, the employment relationship between the IBEW and plaintiff Kamen was centered in the District of Columbia. Although plaintiff Kamen lived in and provided supportive services to Local Unions in Pennsylvania, plaintiff Kamen's employment relationship was centered in the District of

Columbia, the place where his employment relationship with the IBEW began and ended. Hill

Dec. at ¶¶ 9-10 and 46 and Exhibit Nos. 1 and 6 attached thereto.

Therefore, the Court should apply District of Columbia law to plaintiff Kamen's tortious

interference with a business relationship claim against International President Hill because the

conduct, which allegedly caused him injury occurred in the District of Columbia, and because

the District of Columbia's interest in applying its law to plaintiff Kamen's tortious interference

claim is more substantial under the governmental interests test than Pennsylvania's interest. *See*

*Biscoe*, 738 F.2d at 1361; *Herbert*, 808 A.2d at 779. As shown below, plaintiff Kamen's claim

fails as a matter of law under District of Columbia common law.

### B.   UNDER DISTRICT OF COLUMBIA LAW, PLAINTIFF KAMEN FAILED TO ESTABLISH A CLAIM OF TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP AS A MATTER OF LAW.

The tort, which plaintiff Kamen is asserting in his Amended Complaint, has many labels.

It is termed tortious interference with an economic or prospective advantage in the District of

Columbia. *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978) (*citing* W. Prosser, *Torts* § 130 at 949

(4th ed. 1971)). The D.C. Court of Appeals explained in *Carr v. Brown* that the acts of an

individual in maliciously interfering with the business rights of another are actionable in tort,

regardless of the libel or slander involved:

> That the acts of an individual in maliciously interfering with the business rights of another are actionable in tort, regardless of the slander involved, is of long standing . . . Such an action differs markedly from a regular libel or slander action.

395 A.2d at 84 (*quoting Henry V. Vaccaro Constr. Co. v. A. J. De Pace, Inc.*, 137 N.J. Super.

512, 349 A.2d 570, 573 (Law Div. 1975) (citations omitted)).

The D.C. Court of Appeals further explained:

By this theory, business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate, are considered to be property and therefore protected from unjustified interference.

Since a large part of what is most valuable in modern life depends upon "probable expectancies" as social and industrial life becomes more complex the courts must do more to discover, define and protect them from undue interference.

*Id.* (*citing* W. Prosser, *Torts,* § 130 at 950 (4th ed. 1971)).

This cause of action is the most analogous claim under District of Columbia law to plaintiff Kamen's claim that International President Hill tortiously interfered with his business relationship with the IBEW.[11] The factual basis for this claim is the same as the interference

---

[11]     District of Columbia courts also recognize the tort of intentional interference with contract. To recover in tort for interference with contractual relations, the plaintiff must prove four elements: (1) the existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach. *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 288 (D.C. 1977) (citation omitted). Here, plaintiff Kamen can not state a claim for intentional interference with contract because, drawing all reasonable inferences in his favor, he has nonetheless failed to establish the existence of any contract. It is undisputed that plaintiff Kamen did not have an employment contract with the IBEW. Rather, plaintiff Kamen was an at-will employee of the IBEW and had no contractual guarantee that he would be employed until he reached normal retirement age. Instead, he merely contends that his employment with the IBEW was terminated on December 8, 2004.

In *Bible Way Church v. Beards,* the D.C. Court of Appeals held that an employment contract is a "necessary prerequisite for . . . tortious interference with contract claims." *Bible Way,* 680 A.2d 419, 432 (D.C. 1996) (affirming trial court dismissal where plaintiff failed to rebut at-will employment presumption, thus leaving "no basis for . . . a tortious interference with contract claim"). More recently, in *McManus v. MCI Communications Corp.,* 748 A.2d 949, 957 (D.C. 2000), the D.C. Court of Appeals again concluded that "it is clear that, as an at-will employee, [the plaintiff] did not have a contractual employment relationship she could use as the basis for a suit for tortious interference with a contractual relationship."

Indeed, relying on *Bible Way* and *McManus,* numerous cases decided in the District of Columbia have denied interference with contract claims where, as here, the plaintiff was an at-will employee and therefore did not, as a matter of law, have a contractual relationship that could form the basis for an interference with contract claim. *See Riggs v. Home Builders Institute,* 203 F. Supp.2d 1, 22-23 (D.D.C. 2002); *Dale v. Thomason,* 962 F. Supp. 181, 183-84 (D.D.C. 1997); *Bell v. Ivory,* 966 F. Supp. 23, 30 (D.D.C. 1997).

with contract claim – namely, plaintiff Kamen contends that defendant Hill interfered with his employment relationship with the IBEW and led to termination of his employment by making false statements to members of the IBEW regarding his performance as an IBEW Senior International Representative. He further alleges that defendant International President Hill's actions damaged his past and future earnings and his reputation in the field of union representation.   To prevail on a claim for tortious interference with prospective economic advantage, a plaintiff must show: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 45 (D.D.C. 2005) (*citing Bennett Enter., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995) (*citing Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 422-23 (D.D.C. 1988) and *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 289 (D.C. 1977)).

### 1.    Plaintiff Kamen Can Not Base His Tortious Interference Claim on an At-Will Employment Relationship.

Here, plaintiff Kamen can not establish the existence of a valid business relationship or expectancy. As in its ruling on the interference with contract claim, the D.C. Court of Appeals has also rejected a claim for tortious interference with prospective economic advantage by an at-will employee. *McManus v. MCI Communications Corp.*, 748 A.2d 949, 957 (D.C. 2000).

The court first explained in *McManus* that District of Columbia courts have defined "prospective advantage" as "business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate, [and are considered to be

property." *Id.* (*quoting Carr v. Brown*, 395 A.2d at 84). The plaintiff in *McManus* argued that her claim for tortious interference with a prospective or economic advantage should survive summary judgment because of her long-term relationship with her employer and her expectation that this business relationship would continue. *Id.*

In *McManus*, the court rejected this argument explaining that it "never has held that an employee can maintain a suit for interference with prospective advantage where her expectancy was based on an at-will relationship, and we do not do so now." *Id; see also Riggs v. Home Builders Institute,* 203 F. Supp.2d 1, 24-25 (D.D.C. 2002) (dismissing tortious interference with prospective advantage claim where plaintiff was at-will employee). Consequently, the court granted summary judgment in favor of the employer because the plaintiff in *McManus* based her claim on an expectancy that was based on an at-will employment relationship. *Id.*

Like the plaintiff in *McManus*, plaintiff Kamen is attempting to base his tortious interference claim on his "expectancy" of continued employment with the IBEW. His "expectancy," however, was not "commercially reasonable" because it was based on an at-will employment relationship. *See Carr*, 395 A.2d at 84. Plaintiff Kamen was an at-will employee who served "at the pleasure of the International President." Hill Dec. at ¶ 10 and Exhibit No. 1 attached thereto. *See also Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991) (holding that under District of Columbia law, "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all").

Indeed, the letter in which President Barry appointed plaintiff Kamen as an International Representative, expressly stated that it did "not constitute a contract of employment nor [did] it establish a fixed term of employment . . . ." *Id.* The International President's authority to hire and discharge International Representatives is established by the IBEW Constitution, which states

that all International Representatives, "shall work under the direction of the [International President] and he has the power to discharge them." (*quoting* IBEW Constitution, Article IV, Section 3(d)). Accordingly, Defendant International President Hill is entitled to judgment as a matter of law with regard to plaintiff Kamen's claim of tortious interference because he was an at-will employee and, therefore, did not have a commercially reasonable expectancy of continued employment with the IBEW.

### 2.   A Third Party did not Interfere with Plaintiff Kamen's Business Relationship with the IBEW.

Assuming, without admitting, that it finds, notwithstanding his employment at-will relationship with the IBEW, that plaintiff Kamen had a commercially reasonable expectancy of continued employment; the Court should still enter judgment for defendant International President Hill because "it is axiomatic that an employer cannot interfere with its own contract." *McManus*, 748 A.2d at 958 (*citing Sorrells v. Garfinkel's*, 565 A.2d 285, 290 (D.C. 1989); *Press v. Howard Univ.*, 540 A.2d 733, 736 (D.C. 1988)). "'Employer,' in the context of a corporation, is 'a person who is realistically the alter ego of the corporation' and not 'merely a foreman, supervisor, or manager.'" *Sorrells*, 565 A.2d at 290 (*quoting Rustin v. District of Columbia*, 491 A.2d 496, 501 (D.C.) (citing 2A A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 68.13, at 13-5 (1976)), *cert. denied*, 474 U.S. 946 (1985)).

In *Press v. Howard University*, a former faculty member sued several university officials who, he alleged, interfered with his employment contract with the University and thereby caused him to be fired. The D.C. Court of Appeals held in *Press* that "the individual defendants, all of whom were officers of the University, were acting as agents of the other party to the contract [the University], and that the University through their actions could not interfere with its own contract." *Id.* at 736 (*citing, inter alia, Newman v. Legal Services Corp.*, 628 F. Supp. 535, 541

- 43 -

(D.D.C. 1986) (holding that "a corporate officer is not a third-party to a contract between a corporation and one of its employees"); *Donohoe v. Watt*, 546 F. Supp. 753, 757 (D.D.C. 1982), *aff'd without opinion*, 713 F.2d 864 (1983) (holding that "it is a well settled principle of law that this tort [tortious interference with a contract] arises only when there is interference with a contract between the plaintiff and a third party"). "As officers acting within the scope of their official duties, they served as the alter ego of the University and had the power to bind the University." *Sorrells*, 565 A.2d at 290 (explaining the holding in *Press*). *Accord King & King, Chartered v. Harbert Int'l, Inc.*, 503 F.3d 153, 158 (D.C. Cir. 2007) (President of corporation cannot be liable for tortious interference with corporation's contracts).

Defendant International President Hill was not a third party to the business relationship between the IBEW and plaintiff Kamen. Instead, like the officers in *Press*, *King & King*, *Newman*, and *Donohoe*, International President Hill was acting as the alter ego of the IBEW – the party with whom plaintiff Kamen had a business relationship – when he made the decision to terminate plaintiff Kamen's employment.  Thus, International President Hill, like the officers of Howard University in *Press* and the corporation president in *King & King*, could not tortiously interfere with plaintiff Kamen's business relationship with the IBEW inasmuch as he was acting in the shoes of the IBEW when he terminated plaintiff Kamen's employment with the IBEW. The Court should, therefore, grant summary judgment in favor of defendant International President Hill because a third party did not interfere with plaintiff Kamen's business relationship with the IBEW.

## CONCLUSION

For each of the foregoing reasons set forth herein, the Court should grant defendants'
Motion for Summary Judgment and dismiss each of the remaining claims in the Amended
Complaint because it does not state a claim upon which relief can be granted.

Respectfully submitted,


TERRY R. YELLIG (D.C. Bar No. 946095)

SHERMAN, DUNN, COHEN, LEIFER & YELLIG, P.C.
900 SEVENTH STREET, N.W.
SUITE 1000
WASHINGTON, D.C. 20001
TELEPHONE NO. (202) 785-9300

Attorneys for Defendants International
Brotherhood of Electrical Workers, AFL-CIO,
and Edwin D. Hill

Dated: February 26, 2008.