**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **STEVEN A. KAMEN** | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No.  1:06cv01063 (RMC) |
| | ) | |
| **v.** | ) | **JUDGE ROSEMARY M. COLLYER** |
| | ) | |
| **INTERNATIONAL BROTHERHOOD OF** | ) | |
| **ELECTRICAL WORKERS (IBEW)** | ) | |
| **and EDWIN D. HILL, an individual,** | ) | **Electronically Filed** |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    **AND NOW COMES** Plaintiff, Steve A. Kamen, by and through his counsel, Joseph H.

Chivers, Esquire, and respectfully submits his Response to Defendants' Motion for Summary

Judgment.

## I. INTRODUCTION

    Defendants' Motion with respect to Count I (ADA claim)[1] must be dismissed for the

following principal reasons:

---

    [1]Plaintiff stipulates to the dismissal of the other claims currently pending (Counts IV and
V - the claims for hostile environment under the DCHRA and for tortious interference against
Defendant Hill), so that the current Motion pertains only to Count I (ADA).

(1)     IBEW knew of Plaintiff's homosexuality since at least 2002;

(2)     IBEW knew of Plaintiff's serious and permanent illnesses no later than March 2004;

(3)     IBEW knew of Plaintiff's HIV status no later than October 2004;

(4)     Plaintiff's HIV condition substantially limited Plaintiff's major life activities, had a history of substantially limiting these activities and were perceived by IBEW as substantially limiting these activities <u>before</u> Defendant significantly reduced Plaintiff's duties as of May 1, 2004, and <u>before</u> Defendant terminated Plaintiff on December 8, 2004;

(5)     IBEW knew of Plaintiff's HIV condition no later than its receipt of medical records showing he had HIV <u>before</u> Defendant terminated Plaintiff on December 8, 2004;

(6)     IBEW took 75% of Plaintiff's duties away from him, and never restored them, during Plaintiff's medical leave (February 2004 until May 1, 2004);

(7)     Plaintiff was never consulted or warned about his performance in writing after his return to work from his medical leave on or about May 1, 2004;

(8)     Plaintiff performed whatever duties he had following May 1, 2004, satisfactorily;

(9)     Plaintiff was told on December 8, 2004, there were two reasons he was being terminated: first, that he had failed to submit required reports in a timely fashion and, secondly, that he had performance issues.

(10)    The two reasons given for his termination are both demonstrably false: there were no substantive performance issues after May 1, 2004, and the performance issues

prior to Plaintiff's medical leave did not warrant termination and in fact did not

result in termination; and,

(11)   Plaintiff's reports were no less timely than the reports of a fellow International

Representative, Wyatt Earp, who had repeated and chronic problems with

submitting reports in a timely fashion, was suspended for the very same problem

some years before and warned that similar infractions in the future would result in

Earp's termination, but was never again disciplined let alone terminated even

when his reports were more chronically delinquent than Plaintiff's.

In short, the very premise of Defendants' Motion is false.  IBEW knew for years about

Plaintiff's homosexuality; knew about the serious and chronic nature of Plaintiff's condition

before his duties were significantly reduced as of May 1, 2004; knew that Plaintiff had been

diagnosed with HIV in 2004 before Plaintiff was terminated; knew of the substantial limitations

on Plaintiff's major life activities resulting from the HIV placed on Plaintiff as a result; gave

demonstrably false reasons for Plaintiff's termination; and, treated Plaintiff differently than his

comparator, Wyatt Earp, in similar circumstances.  In short, there are genuine issues of material

fact that preclude summary judgment.

## II.  BACKGROUND

This is an individual action under the Americans With Disabilities Act of 1990, as

amended (ADA)(42 U.S.C. 12101 et seq.).  Defendants have filed their Motion for Summary

Judgment asserting there are no genuine issues of material fact as to Kamen's claim.  (Document

26).

### III.  PLAINTIFF'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff is responding to Defendant's Statement of Facts in Exhibit 1 (attached and incorporated herein).  In addition, Plaintiff is providing the following:

1.      Plaintiff was employed by Defendant as a Senior International Representative from on or about July 1, 1997, until on or about December 8, 2004.  Kamen D.T. (Exhibit 3) at p. 11; Ex. 1 of Kamen D.T. (Letter of December 8, 2004).

2.      Defendant IBEW hired Plaintiff as an International Representative on or about July 1, 1997, and Plaintiff was eventually promoted to the position of Senior International Representative.  Id.; see, also, Hill Declaration (Exhibit 1 of Defendant's Memorandum).

3.      On or about February 20, 2004, Plaintiff became ill and was hospitalized.  Kamen D.T. (Exhibit 3) at pp. 55-56.

4.      Plaintiff was diagnosed with human immunodeficiency virus (HIV).  Id. at 56-57; Kamen Medical Records (Ex. 20 of Kamen D.T. - Records of Dr. Rocchi: 3/5/04; 3/17/04; 3/25/04; 4/12/04; 8/3/04).

5.      Defendant IBEW was informed of this diagnosis shortly after Plaintiff was informed of the diagnosis, and prior to Plaintiff's termination.  Kamen Affidavit (Exhibit 9) at ¶26-38;

Defendants' Answers to Admissions (Exhibit 2), No. 65, 66.

6.    Plaintiff is homosexual. Defendants' Statement of Material Facts (Exhibit 1), ¶5.

7.    Defendant IBEW was aware of Plaintiff's homosexuality years before IBEW became
      aware of his HIV diagnosis.  Hill Declaration (Ex. 1 of Defendants' Memorandum) at
      ¶¶21-31.

8.    Plaintiff was terminated within a matter of months after IBEW learned of his HIV status.

9.    On or about May 1, 2004, Plaintiff was able to return to work from his medical leave.
      Kamen D.T. (Exhibit 3); Kamen Affidavit (Exhibit 9), ¶14.

10.   During his medical leave Plaintiff's duties were reduced by some 75%.  Id.

11.   Upon Plaintiff's return to work those duties were not restored to him.  Id.

12.   Plaintiff requested his regular duties be restored; Defendants denied the request.
      Defendants' Answers to Admissions (Exhibit 2), No. 83.

13.   Plaintiff was capable of performing the essential functions of his position as a Senior
      International Representative from the time he returned to work from his medical leave

until he was terminated. Kamen D.T. (Exhibit 3) at 97-101.

14.    Nevertheless, upon his return to work in May 2004, Plaintiff was denied training

opportunities; was not permitted to assist at manufacturing conferences; and, was never

given back the duties Plaintiff had been assigned prior to Plaintiff's going out on sick

leave. Id.

15.    Plaintiff continued to work until he received a termination letter from Defendants, signed

by Edwin Hill, dated December 8, 2004. Id.

16.    Defendants alleged in the letter of December 8, 2004, that Plaintiff was terminated for

performance reasons, including failure to file certain expense reports in a timely fashion

and to complete his assignments acceptably. IBEW (Edwin Hill) letter of December 8,

2004 (Exhibit 1 of Kamen D.T. - Exhibit 3).

17.    Other International Representatives whose expense reports were late, had incomplete

paperwork, and who were late with their assignments were not terminated as Plaintiff

was. Defendants' Answers to Admissions (Exhibit 2), Nos. 38 through 48.

18.    IBEW had access to Plaintiff's e-mail account. Siegel Declaration (Exhibit to

Defendants' Memorandum); Kamen Affidavit (Exhibit 9) at ¶37, 38.

19.     IBEW in fact accessed this account, at the very least during October 2004.  Id.

20.     The e-mail account, including private e-mails between Plaintiff and his family, contained

        explicit references to Plaintiff's HIV status.  Kamen Affidavit (Exhibit 9), at ¶37, 38.

21.     Wyatt Earp has held the position of Senior International Representative beginning in

        1998.  Defendants' Answer to Plaintiff's Requests for Admission (Exhibit 2). (No. 1).

22.     Steven Kamen held the same title of Senior International Representative during the years

        from 2001 forward until he was terminated in December 2004.  Id. (No. 2).

23.     Steven Kamen and Wyatt Earp held the same title, Senior International Representative,

        from at least 2001 through December 2004.  Id. (No. 3).

24.     A Senior International Representative performs the same essential functions as an

        International Representative.  Id. (No. 4).

25.     A Senior International Representative is a title within the general job category of

        International Representative. Id. (No. 5).

26.     Donald C. Siegel, Vice President of the International Brotherhood of Electrical Workers

        (IBEW), District 3, became the Vice President of District 3 in or about March 2002.  Id.

(No. 6).

27.     From the time he became Vice President through the present Mr. Siegel has reported

        directly to the President of IBEW, Edwin Hill.  Id. (No. 7).

28.     Since the time Vice President Siegel was appointed as Vice President both Wyatt Earp

        and Steven Kamen have reported directly to him.  Id. (No. 8).

29.     Prior to Mr. Siegel's appointment as Vice President Mr. Rossa was the Vice President of

        District 3.  Id. (No. 9).

30.     Wyatt Earp and Steven Kamen both reported directly to Mr. Rossa prior to Mr. Siegel's

        appointment as Vice President.  Id. (No. 10).

31.     As an International Representative Wyatt Earp has been required to submit a weekly

        report in which Earp is required to recap his weekly activities. Id. (No. 12).

32.     Earp is also required to submit a bi-weekly expense report.  Id. (No. 13).

33.     Steven Kamen was required to submit the same reports (weekly activity reports, bi-

        weekly expense reports) during his employment with IBEW as an International

        Representative.  Id. (No. 14).

34.     These reports were submitted to Vice President Siegel. Id. (No. 15).

35.     Vice President Siegel has had other International Representatives reporting to him since

        he became Vice President. Id. (No. 16).

36.     These other International Representatives are required to submit the same reports (weekly

        activity reports and bi-weekly expense reports) as Earp and Kamen. Id. (No. 17).

37.     Wyatt Earp does not suffer from any serious health conditions. Wyatt Earp D.T. (Exhibit

        6) at p. 19.

38.     Wyatt Earp has not missed any significant time for health reasons during the nine years

        that he has worked for IBEW. Defendants' Answers to Admissions (Exhibit 2), No. 19.

39.     Wyatt Earp was suspended sixty days in or about May 2002. Id., No. 20.

40.     Earp returned from his 60-day suspension on or about July 5, 2002. Id., No. 21.

41.     Wyatt Earp received a letter dated May 2, 2002, from Edwin Hill, President of IBEW,

        regarding this suspension. Id., No. 22.

42.     Wyatt Earp was suspended for failure to submit weekly reports and bi-weekly expense reports.  <u>Id.</u>, No. 23.

43.     Wyatt Earp was also suspended for the refusal to comply with numerous requests and instructions to properly prepare and submit these reports on a timely basis.  <u>Id.</u>, No. 24.

44.     In addition, Earp had received numerous letters from the International Vice President regarding his continued failure to complete his assignments and to bring unresolved assignments up to date.  <u>Id.</u>, No. 25.

45.     Earp was told in the May 2, 2002, letter from President Edwin Hill that if Earp failed to perform his duties or failed to observe or carry out instructions of the International President that he would be subject to immediate discharge. <u>Id.</u>, No. 26.

46.     Earp failed to submit weekly reports and bi-weekly expense reports when they were due after he was reinstated from his suspension (July 5, 2002).  <u>Id.</u>, No. 27.

47.     Earp was not suspended after July 5, 2002, for failing to submit his weekly reports or bi-weekly expense reports when they were due. <u>Id.</u>, No. 28.

48.     Earp was not terminated after July 5, 2002, for failure to submit his weekly reports or bi-weekly expense reports when they were due.  <u>Id.</u>, No. 29.

49.     Vice President Siegel's office maintains a report tracking submission by the International
        Representatives in District 3 of the weekly reports and bi-weekly expense reports. Id. No.
        30.

50.     These reports identify for the period beginning no later than November/December  2002
        and continuing through the present time when each International Representative
        submitted a weekly report for a particular workweek. Id., No. 31.

51.     These reports identify for the period beginning no later than January 2003 and continuing
        through the present time when each International Representative submitted a weekly
        report for a particular workweek.  Id., No. 32.

52.     These reports identify for the period beginning no later than January 2004 and continuing
        through the present time when each International Representative submitted a weekly
        report for a particular workweek.  Id., No. 33.

53.     These reports identify for the period beginning no later than November/December 2002
        and continuing through May 2006 when each International Representative submitted a bi-
        weekly expense report for a particular workweek.  Id., No. 34.

54.     These reports identify for the period beginning no later than January 2003 and continuing

through the present time when each International Representative submitted a bi-weekly

expense report for a particular workweek. Id. No. 35.

55.     These reports identify for the period beginning no later than January 2004 and continuing

through the present time when each International Representative submitted a bi-weekly

expense report for a particular workweek. Id., No. 36.

56.     The only period of time when there was a gap in the tracking of the timeliness of the

submission of the weekly reports and the bi-weekly expense reports (from

November/December 2002 through the present) is from the middle of 2006 until the end

of 2006.  Id., No. 37.

57.     These reports show that 77 out of 112 weekly activity reports submitted by IBEW

International Representative Wyatt R. Earp during the period from November 2002

through December 31, 2004, were received in the IBEW Third District Office more than

ten (10) days after the end of the reporting period and one weekly activity report was

never received, and 83 out of 105 weekly activity reports submitted by International

Representative Steven Kamen during the period from November 2002 through December

31, 2004, were received in the IBEW Third District Office more than ten (10) days after

the end of the reporting period and eight (8) weekly activity reports were never received.

In addition, 51 out of 51 bi-weekly expense reports submitted by Earp during the period

from January 2003 and December 31, 2004, were received in the IBEW Third District

Office more than ten (10) days after the end of the reporting period, and that 42 out of 47 bi-weekly expense reports submitted by Kamen were received in the IBEW Third District Office more than ten (10) days after the end of the reporting period and an additional four bi-weekly reports were never submitted by Kamen.  Id., No. 38.

58.    These reports show that Wyatt Earp had more delinquencies in submission of his bi-weekly expense reports from November/December 2002 through the end of 2004 than Steven Kamen did. Id., No. 39.

59.    These reports show that Wyatt Earp continued to submit his weekly reports delinquently after December 2004.  Id., No. 40.

60.    These reports show that Wyatt Earp continued to submit his bi-weekly expense reports delinquently after December 2004. Id., No. 41.

61.    These reports show that Wyatt Earp had delinquencies that were longer (i.e., where the weekly reports were submitted a greater period of time after the due date) than did Steven Kamen during the years November/December 2002 through 2004. IBEW International Representative Expense Reports and Weekly Reports (Exhibit 10).

62.    Wyatt Earp has never been told he would be terminated as a result of submitting late reports since his return from suspension on or about July 5, 2002.  Defendants' Answers

to Admissions (Exhibit 2), No. 43.

63.     Wyatt Earp has never been reminded since the letter of May 2, 2002, that he would be
         terminated as a result of submitting late reports.  Id., No. 44.

64.     Vice President Siegel's  reports show that International Representatives other than Wyatt
         Earp and Steven Kamen submitted weekly reports late after November/December 2002.
         Id., No. 45.

65.     Vice President Siegel's reports show that International Representatives other than Wyatt
         Earp and Steven Kamen submitted bi-weekly expense reports late after
         November/December 2002. Id., No. 46.

66.     No International Representatives (excluding Wyatt Earp and Steven Kamen) were
         disciplined after November/December 2002 for the late submission of weekly reports. Id.,
         No. 47.

67.     No International Representatives (excluding Wyatt Earp and Steven Kamen) were
         disciplined after November/December 2002 for the late submission of bi-weekly expense
         reports. Id. No. 48.

68.     Vice President Siegel recommended termination of Steven Kamen.  Id. No. 49.

69.    Edwin Hill relied upon the information provided by Vice President Siegel regarding

Kamen.  Id. No. 50.


70.    President Hill accepted the recommendation of Vice President Siegel to terminate

Kamen.  Hill D.T. (Exhibit 5).


71.    Vice President Siegel was aware in 2004 when Kamen was out on medical leave that

Kamen had viral meningitis.  Defendants' Answers to Admissions (Exhibit 2), No. 52.


72.    Vice President Siegel was aware in 2004 when Kamen was off on medical leave that

Kamen was having problems with his gall bladder. Id., No. 53.


73.    Vice President Siegel wrote the letter of November 30, 2004, from Siegel to President

Hill.  Id., No. 54.


74.    President Hill's letter of December 8, 2004, is based on Siegel's letter of November 30,

2004. Id., No. 55.


75.    Vice President Siegel never gave Kamen an opportunity to take a job other than

International Representative during or after Kamen's medical leave in 2004.  Id., No. 56.

76.     Vice President Siegel never considered moving Kamen to a local union site, for example,

in the Pittsburgh area after Kamen's return from medical leave.  <u>Id.</u>, No. 57.

77.     Vice President Siegel took away nearly 75% of Kamen's duties during the time Kamen

was on medical leave. <u>Id.</u> No. 58; Kamen D.T. (Exhibit 3 of Plaintiff's Memorandum);

Kamen Affidavit (Exhibit 9) ¶14.

78.     There were no complaints from Local 385 about Steven Kamen.  Defendants' Answers to

Admissions (Exhibit 2), No. 59.

79.     Vice President Siegel relieved Kamen of his duties for Local 385 while Kamen was on

medical leave.  <u>Id.</u>, No. 60.

80.     Kamen had seven Locals assigned to him prior to commencement of his medical leave in

February 2004.  <u>Id.</u>, No. 61.

81.     Upon his return to work on or about May 1, 2004, Kamen had only three Locals. <u>Id.</u>, No.

62.

82.     Other International Representatives (other than Steven Kamen) whose expense reports

have been late have not been terminated. <u>Id.</u>, No. 63.

83.    On November 30, 2004, in a meeting between Steven Kamen and Vice President Siegel,
       Vice President Siegel discussed Steven Kamen's illness with Kamen.  Id., No. 64.

84.    As of October 22, 2004, Vice President Siegel's office was in possession of medical
       documentation showing Kamen was diagnosed with HIV.  Id., No. 65.  See, also, Medical
       Reports of Dr. Rocchi from March 2004 through November 2004 (Exhibit 20 of Kamen
       D.T. - Exhibit 3).

85.    As of October 22, 2004, Vice President Siegel was in possession of medical
       documentation showing Kamen suffered from atrial fibrillation, anxiety, depression,
       coronary artery disease, hyperlipidemia, hypertension and abdominal pain.  Defendants'
       Answers to Admissions (Exhibit 2), No. 66.

86.    Vice President Siegel received a note from Kamen, the note dated April 6, 2004, with a
       note from Kamen's physician attached. Id., No. 67.

87.    The doctor's note excused Kamen from work for the month of April while Kamen
       recovered from multiple serious health conditions including meningitis and diverticulitis.
       Id., No. 68.

88.    Vice President Siegel received a letter dated March 16, 2004, from Kamen.  Id., No. 69.

89.    Vice President Siegel forwarded the letter from Kamen dated April 6, 2004, together with the doctor's note, to President Hill at or about the same time.  Siegel D.T. (Exhibit 4).

90.    Vice President Siegel knew no later than March 12, 2004, that Kamen was on medical leave.  Defendants' Answers to Admissions (Exhibit 2), No. 71.

91.    Edwin Hill became International President in 2001.  Id., No. 72.

92.    Wyatt Earp and Steven Kamen had the same duties but for different locals. Id., No. 73.

93.    Edwin Hill received Vice President Siegel's letter of November 30, 2004, by December 3, 2004.  Id., No. 74.

94.    Steven Kamen was not the only International Representative with open assignments before November 30, 2004.  Id., No. 75.

95.    Steven Kamen was not the only International Representative with open assignments as of November 30, 2004. Id., No. 76.

96.    Vice President Siegel would discuss the open assignments of the International Representatives at the staff meetings of International Representatives.  Id., No. 77.

97.     Kamen was in the hospital when Local Union 1968 needed assistance in bargaining

negotiations and complained about Kamen.  Id., ¶78.


98.     Neither Vice President Siegel nor anyone else in management at IBEW communicated in

writing any complaints about Kamen's performance by the Locals to Kamen himself.

Kamen Affidavit (Exhibit 9), ¶¶40, 41.


99.     During the progress meeting with Vice President Siegel in May 2004 (after Kamen's

return from medical leave) Vice President Siegel said nothing about the weekly activity

reports or the bi-weekly expense reports to Kamen.  Kamen D.T. (Exhibit 3).


100.    During the same progress meeting Kamen asked Vice President Siegel that the three

Locals taken away from Kamen during Kamen's medical leave (Locals 2007, 1968 and

385) be restored to Kamen.  Defendants' Answers to Admissions (Exhibit 2), No. 82.


101.    Vice President Siegel refused to restore these Locals to Kamen. Id., No. 83.


102.    Vice President Siegel gave Kamen no reason for refusing to restore these Locals to

Kamen.  Kamen D.T. (Exhibit 3).


103.    Kamen was unable to attend the meetings in February 2004 for Local 1968, Town of

Rochester Highway employees, because he was seriously ill.  Defendants' Answers to

Admissions (Exhibit 2), No. 85.

104.    Kamen was in the hospital when an e-mail was sent from Vice President Siegel to Kamen
        on February 27, 2004.  Id., No. 86.

105.    During the months of February, March and April 2004, prior to Kamen's return to work
        on May 1, 2004, Kamen was either in the hospital or was being nursed at home and
        unable to perform the functions of his job.  Id., No. 87.

106.    Steven Kamen communicated primarily with Mike Welsh, not Vice President Siegel,
        during his medical leave either directly or through his sisters.  Id., No. 88.  See, also,
        Randy Kamen Affidavit (Exhibit 7); Debra Kamen Affidavit (Exhibit 8).

107.    Whenever Kamen would get a physician's note or an update of his physical condition and
        likely return to work he would provide that information to Vice President Siegel's office
        during the period of time he was on medical leave.  Defendants' Answers to Admissions
        (Exhibit 2), No. 89; Kamen D.T. (Exhibit 3).

108.    Kamen was not informed he had been relieved of duties for Local 385 and Local 1968
        prior to April 6, 2004.  Kamen D.T. (Exhibit 3).

109.    Kamen was not informed he had been relieved of these Locals until he returned to work

after May 1, 2004.  Id.

110.    At no time between May 2003 when Plaintiff met with Vice President Siegel for a

performance review and November 30, 2004, was Plaintiff threatened with termination.

Defendants' Answers to Admissions (Exhibit 2), No. 92.

111.    Between May 1, 2004, when Plaintiff returned to work from his medical leave, and

November 30, 2004, when Vice President Siegel recommended Kamen's termination,

other International Representatives were delinquent in submitting weekly reports.  Id.,

No. 93.

112.    Between May 1, 2004, when Plaintiff returned to work from his medical leave and

November 30, 2004, when Vice President Siegel recommended Kamen's termination,

other International Representatives were delinquent in submitting bi-weekly expense

reports. Id., No. 94.

113.    During the period of time May 1, 2004, until November 30, 2004, other International

Representatives had open assignments. Id., No. 95.

114.    No International Representative other than Kamen was suspended, terminated or

otherwise disciplined as a result of delinquent weekly reports or bi-weekly expense

reports after July 5, 2002, through the present.  Id., No. 96.

115.    No one in management at IBEW said anything to Kamen from the time he returned from his medical leave until he was informed on November 30, 2004, that Vice President Siegel was recommending he be terminated about IBEW management not being able to reach Kamen during his medical leave.  Kamen D.T. (Exhibit 3); Siegel D.T. (Exhibit 4).

116.    No one in management at IBEW said anything to Kamen from the time he returned from his medical leave until he was informed on November 30, 2004, that Vice President Siegel was recommending he be terminated that IBEW management had a problem with his inaccessibility during his medical leave.

117.    No one in management at IBEW said anything to Kamen from the time he returned from his medical leave until he was informed on November 30, 2004, that Vice President Siegel was recommending he be terminated about Kamen not being in communication or IBEW management not being able to communicate with Kamen.  Kamen D.T. (Exhibit 3); Defendants' Answers to Admissions (Exhibit 2).

118.    Prior to the meeting with Vice President Siegel on November 30, 2004, no one in IBEW management informed Kamen of the specific assignments he allegedly failed to complete. Id.

119.    Prior to Kamen's receipt of his termination letter of December 8, 2004, no one in IBEW

management informed Kamen of the specific assignments he allegedly failed to complete. Id.

120.    Prior to the meeting with Vice President Siegel on November 30, 2004, no one in IBEW management informed Kamen that if he did not get his reports in on time that he would be suspended or terminated. Defendants' Answers to Admissions (Exhibit 2), No. 102.

121.    Prior to Kamen's receipt of his termination letter of December 8, 2004, no one in IBEW management informed Kamen that if he did not get his reports in on time that he would be suspended or terminated.  Id., No. 103

122.    From 2002, when Vice President Siegel became Plaintiff's boss, until the start of Plaintiff's medical leave in February 2004, Plaintiff was never suspended.  Kamen D.T. (Exhibit 3) at 175.

123.    Plaintiff had never had any of his assignments or work taken from him prior to February 2004.  Kamen D.T. (Exhibit 3) at 175.

124.    Mr. Siegel, in a brief exchange with Plaintiff in May 2004, never said anything about his inability to reach Plaintiff during his medical leave.  Kamen D.T. (Exhibit 3) at 176-177.

125.    No one ever said anything to Plaintiff about not being able to reach Plaintiff during his

medical leave.  Kamen D.T. (Exhibit 3) at 177.

126.    Nobody criticized Plaintiff or mentioned any problem with Plaintiff's inaccessibility

during Kamen's leave.  Kamen D.T. (Exhibit 3) at 177.

127.    There was never anything in writing or otherwise given to Plaintiff, upon his return to

work on or about May 1, 2004, about his not being in communication with Defendant

during his leave.  Kamen D.T. (Exhibit 3) at 177; Kamen Affidavit (Exhibit 9) at ¶¶38-

43.

128.    When Plaintiff returned to work in the summer of 2004, Plaintiff's workload was reduced

75%.  Kamen D.T. (Exhibit 3) at 182.

129.    Plaintiff's workload was only 25% of what it had been before taking the leave.  Kamen

D.T. (Exhibit 3) at 182.

130.    From that time on, Plaintiff's only busy period was when he was assigned to the

presidential election.  That assignment came from Larry Nidek, Executive Assistant to

President Hill through Vice President Siegel.  Kamen D.T. (Exhibit 3) at 183; Kamen

Affidavit (Exhibit 9) at ¶¶47-50.

131.    The assignment was given verbally rather than written and Plaintiff believes the

assignment came from Washington.  Kamen D.T. (Exhibit 3) at 183.

132.    At no time from May 1, 2004 until December 8, 2004, did Siegel or anyone else on the

behalf of IBEW tell Plaintiff there was a problem with communicating with Plaintiff.

Kamen D.T. (Exhibit 3) at 173.

133.    Only Mike Welsh, in the summer of 2004, asked Plaintiff to call in more often, although

this was not in the context of any kind of warning.  Kamen D.T. (Exhibit 3) at 183.

134.    In the years prior to 2004, no other representatives, save for Wyatt Earp, were ever

threatened or warned (or suspended or otherwise disciplined) for not turning their reports

in.  Kamen D.T. (Exhibit 3) at 186.

135.    Edwin Hill knew that Plaintiff was ill.  Hill D.T. (Exhibit 4) at 29.

136.    Hill knew that Plaintiff had been in ill prior to Plaintiff's termination in December 2004.

Hill D.T. (Exhibit 4) at 29.

137.    Hill became aware of the nature of his illness when he received a piece of paper listing

Plaintiff's condition.  Hill D.T. (Exhibit 4) at 29.

138.    Hill was aware for "quite a while," and was reminded by others, that Plaintiff had HIV.

Hill D.T. (Exhibit 4) at 30.

139.    Hill knew Plaintiff was homosexual in 2001.  Hill Declaration (Exhibit of Defendants'

Memorandum (Document 26-3).

140.    If the issue was simply reports, Plaintiff would have been suspended, not terminated.

Hill D.T. (Exhibit 4) at 43.

141.    Donald Siegel testified that since March of 2002 Wyatt Earp had been late in filing

reports with him.  Siegel D.T. (Exhibit 4) at 8.

142.    Earp had been late in filing expense and other work reports such as the Per Capita

Objection Report.  Siegel D.T. (Exhibit 4) at 8.

143.    A worker who is delinquent in filing weekly reports is generally late in filing the Per

Capita Objection Report.  Siegel D.T. (Exhibit 4) at 9.

144.    Up until 2004, Siegel had never given Plaintiff a suspension or any other discipline.

Siegel D.T. (Exhibit 4) at 25.

145.    Four of Plaintiff's seven locals were taken from Kamen.  Siegel D.T. (Exhibit 4) at 43.

146.  Plaintiff was never given back the locals, or his duties that he had had prior to going on
      sick leave.  Siegel D.T. (Exhibit 4) at 43.


147.  Siegel discussed Kamen's illness with Plaintiff at a meeting on November 30, 200_.
      Siegel D.T. (Exhibit 4) at 51.


148.  Siegel received medical documents from Plaintiff's physician, Dr. Rocchi (DiCuccio &
      Associates), in October 2004.  Siegel D.T. (Exhibit 4) at 58.


149.  Part of the information Siegel received described aspects of Plaintiff's medical condition:
      atrial fibrillation, anxiety, depression, coronary artery disease, hyperlipidemia,
      hypertension and abdominal pain.  Siegel D.T. (Exhibit 4) at 59.


150.  This documentation also included a specific notation that Plaintiff was "HIV+".  Dr.
      Rocchi Medical Reports (Exhibit 20 to Plaintiff's D.T. (Exhibit 3)).


151.  Because Siegel received this information in October 2004, Siegel had knowledge of
      Plaintiff's condition and Plaintiff's medical information prior to recommending to
      President Hill that Plaintiff be terminated.  Siegel D.T. (Exhibit 4) at 60.


152.  Siegel also received an April 2, 2004, letter from Kamen with a note attached from
      Plaintiff's physician that Plaintiff had multiple serious health conditions including

meningitis and diverticulitis.  Siegel D.T. (Exhibit 4) at 65.

153.    Siegel received a letter dated March 16, 2004, from Kamen that Siegel forwarded to

Edwin Hill.  Siegel D.T. (Exhibit 4) at 66.

## IV.  RULE 56 STANDARD OF REVIEW

Fed. R. Civ. P. 56(c) provides that summary judgment may be granted if, drawing all

inferences in favor of the non-moving party, "the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and the movant is entitled to judgment as a matter of law."

Summary judgment may be granted against a party who fails to adduce facts sufficient to

establish the existence of any element essential to that party's claim, and upon which that party

will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The

moving party bears the initial burden of identifying evidence which demonstrates the absence of

a genuine issue of material fact.  Once that burden has been met, the non-moving party must set

forth "specific facts showing that there is a genuine issue for trial," or the factual record will be

taken as presented by the moving party and judgment will be entered as a matter of law.

*Matsushita Electric Industrial Corp. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (quoting Fed.

R. Civ. P. 56(a), (e)) (emphasis in *Matsushita*, 475 U.S. 587).  An issue is genuine if the

evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  The court must resolve all factual doubts and draw

reasonable inferences in favor of the nonmoving party.  *Matsushita*, at 587.  If there is any

evidence in the record from any source from which a reasonable inference in the non-moving

party's favor may be drawn, the moving party simply cannot obtain a summary judgment.

*Celotex*, 477 U.S. at 330n.2.

The courts have recognized that an employee bringing a civil rights suit faces special

difficulties in amassing proof because discrimination "is often subtle."  In order "to assure that

the plaintiff has his day in court despite the unavailability of direct evidence," *Trans World*

*Airlines v. Thurston*, 469 U.S. 111, 121, 83 L.Ed. 2d 523, 105 S.Ct. 613 (1985), (quotation

omitted), courts have developed "a sensible, orderly way to evaluate the evidence in light of

common experience as it bears on the critical question of discrimination." *United States Postal*

*Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 75 L.Ed. 2d 403, 103 S. Ct. 1478 (1983)

(quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 57 L.Ed. 2d 957, 98 S.Ct. 2943

(1978)).  What was has been developed is the now familiar burden-shifting framework first

enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L.Ed.

2d 668, 93 S.Ct. 1817 (1973).  Although *McDonnell Douglas* arose under Title VII, the Circuits

have consistently applied its general framework to cases arising under other discrimination

statutes, including the ADA.  See, e.g., *Duncan v. Washington*, op cit..

Under the *McDonnell Douglas* framework, if the plaintiff establishes the elements of a

prima facie case, the employer must articulate a legitimate, non-discriminatory reason for its

employment decision.  Once such a justification is proffered, the burden then reverts to the

plaintiff to prove by a preponderance of the evidence that the articulated reason is a pretext.  At

all times, the plaintiff bears the ultimate burden of proving that discrimination was a

determinative factor in the adverse employment decision.  See, generally, *St. Mary's Honor Ctr.*

*v. Hicks*, 509 U.S. 502, 125 L.Ed. 2d 407 113 S.Ct. 2742 (1993). The plaintiff "may succeed in this either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 67 L.Ed. 2d 207, 101 S.Ct. 1089 (1981). When a jury finds that the employer's proffered justification for its actions is pretextual, the jury is permitted, albeit not mandated, to return a verdict in the plaintiff s favor. <u>See</u> *Hicks*, 509 U.S. at 511.

The rationale for placing so much emphasis on the justification proffered by the employer can be found in the statement made by the late Chief Justice, then Justice, Rehnquist who wrote that unexplained acts "are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp.*, 438 U.S. at 577. Judge Rehnquist continued, "[W]hen all legitimate reasons for rejecting an [applicant] have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration ...." Id.
Because an employer who knowingly discriminates may leave no written records revealing the forbidden motive and may communicate it orally to no one it is only natural that the focus of a discrimination trial in accordance with *McDonnell Douglas* will be the veracity of the justification offered by the employer to explain its conduct. See, e.g., *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C.Cir. 1998)(en banc); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 899 (3d Cir. 1987) (en banc)(quotation omitted). If the employer fails to tell the truth, "it does so at its own peril .... [and] the jury [may] infer that the real motivation is the one that the plaintiff has charged." See, e.g., *Sheridan v. E. I. DuPont de Nemours*, 100 F.3d 1061,1067 (3d Cir. 1996)

(en banc), cert. denied, 138 L.Ed. 2d 1031, 117 S.Ct. 2532 (1997).

A plaintiff need not discredit every reason given by a defendant. Rather the plaintiff need only establish pretext in one of the reasons and if this raises significant issues about the credibility of the employer it is reasonable for the jury to infer that the other reasons are also illegitimate. As the Circuits have noted, the relevant case-specific inquiry is "whether the employer's lack of credibility as to some of the proffered reasons so seriously undermines his credibility that a fact-finder could reasonably disbelieve all of the employer's proffered reasons." *Stanziale v. Jargowsky*, 200 F.3d 101, 106 n.4, <u>citing</u> *Fuentes*, 42 F.3d at 764 n.7;. In other words, if Defendant demonstrates itself to be deceptive it may warrant rejection of its entire defense. *Fuentes*, at 764, n.7.

## ADA STANDARDS

An individual who claims to have been subject to discrimination under the disability laws may prevail if he establishes, by a preponderance of the evidence, that he: (1) has an impairment that substantially limits a major life activity, has a history of such an impairment or is regarded by an employer as having such an impairment; (2) is qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (3) has suffered an adverse employment action because of discrimination <u>or</u> has been denied a reasonable accommodation of his known disabilities. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002); *Lytes v. District of Columbia Water and Sewer Authority*, C.A. No. 05 -402 (RMC) (Document 62), 2007 U.S. Dist. LEXIS 91154 at *19 (D.D.C., Dec. 13, 2007)(<u>citing</u> *Duncan*, 240 F.3d at 1114); *Taylor v. Phoenixville School* District, 184 F.3d 296, 305 (3d Cir. 1999);

*Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998); *Deane v. Pocono Med. Ctr.*, 142

F.3d 138, 142 (3d Cir. 1998) (en banc).


## V.  ARGUMENT


**I.    PLAINTIFF HAS ADDUCED EVIDENCE TO SHOW THERE ARE GENUINE ISSUES OF MATERIAL FACT SUPPORTING HIS CLAIM THAT DEFENDANT IBEW UNLAWFULLY DISCRIMINATED AGAINST PLAINTIFF BECAUSE HE WAS DISABLED.**

Defendants' argument that Plaintiff's ADA claim (Count I) fails is premised on two false

premises: (1) that Defendant IBEW did not know Plaintiff Kamen was affected by HIV at the

time it terminated his employment; and, (2) that irrespective of whether IBEW knew about

Kamen's HIV status that Kamen's HIV condition did not constitute a substantial impairment

within the meaning of the ADA.  Both of these premises, as noted above, are demonstrably false

by direct reference to the record and by the reasonable inferences to be drawn from the record.


**A.    Defendant IBEW Knew No Later Than October 2004 That Kamen Had Been Diagnosed With HIV, Probably Knew As Early As April 2004, And Reasonably Would Have Inferred Plaintiff's HIV Status As Early As March or April 2004.**

Defendants' assertion of a lack of knowledge is directly contradicted by the records.

Plaintiff was diagnosed with HIV in April 2004, which medical information was being sent

directly to IBEW contemporaneous with the diagnosis, and IBEW has admitted to have received

not only these records but medical records from August 2004 that specifically indicate that

Kamen was diagnosed with HIV.  President Hill and Vice President Siegel's assertions to the

contrary are, therefore, incredible at best.  Contrast this situation with the D.C. Circuit's decision in *Crandall v. Paralyzed Veterans of AM*, 146 F.3d 894 (D.C.C. 1998) where there was no evidence of record that Defendant had ever received any information, written or verbal, about Plaintiff's condition, or the district court's decision in *Evans v. Davis Memorial Goodwill Industries*, 133 F.2d 24 (D.D.C. 2000).  The instant matter is directly distinguishable from these decisions in that not only was the HIV diagnosis contained within Plaintiff's medical records, but it was admitted that these medical records were received contemporaneous with their being issued.

There is, therefore, a genuine issue of material fact about Defendant IBEW's knowledge that Plaintiff was affected by HIV at the time it terminated Plaintiff in December 2004 as well as a genuine issue of material fact about whether Defendant would have reasonably inferred from the circumstances in early 2004 that Plaintiff had HIV (IBEW's knowledge of Plaintiff's homosexuality plus IBEW's knowledge of the HIV-like symptoms Plaintiff suffered from in early 2004 - <u>see</u> discussion <u>re</u> *Bragdon v. Abbott*, below) that Plaintiff had HIV even before Plaintiff returned to work on May 1, 2004.

      **B.**      **While HIV Infection Does Not Automatically Qualify As a Disability, The Evidence Establishes Plaintiff's HIV Condition Not Only Was An Actual Substantial Impairment, But Resulted in a History of Plaintiff Having Such an Impairment And Was Perceived by Defendant IBEW as Such An Impairment.**

Ironically, Defendant relies upon the very case, *Bragdon v. Abbott*, 524 U.S. 624-25 1998), that precludes summary judgment in this matter.  Defendant correctly notes that the Supreme Court has found that HIV infection is an impairment within the meaning of the ADA,

id. at 637, and that it is a physical impairment that substantially limits major life activities or is so perceived. Id. at 656, Judge Ginsberg, concurring. In short, Defendant has conceded the viability of Plaintiff's ADA claim. Plaintiff had HIV, the fact he had HIV was communicated to IBEW well before Plaintiff was terminated, and based on IBEW's actions (relieving Kamen of some 75% of his duties even before he returned from medical leave) speaks volumes about its perception that Plaintiff was substantially limited in the major life activity of working.

The language relied upon by Defendant in the *Bragdon v. Abbott* case further substantiates the connection between Plaintiff's HIV status, his having a substantial impairment, and IBEW's knowledge of this impairment prior to its termination of Plaintiff. Strikingly, the excerpt from the *Bragdon* decision (Defendants' Memorandum of Points and Authorities at page 21, citing *Bragdon* at 635-36) contains the very type of information IBEW had during Plaintiff's medical leave, which symptoms were being communicated to IBEW. See, for example, Kamen medical records of February, March and April 2004 (Exhibit 20 of Kamen D.T.(Exhibit 3)). IBEW was being informed of the very same types of conditions referred to by the Court including "mononucleosis-like symptoms... accompanied by fever, headache, enlargement of the lymph nodes, muscle pain, rash, lethargy and gastrointestinal orders." *Bragdon* at 636. This merely confirms how incredible IBEW's assertion is that it was not aware of Plaintiff's medical status.

As for the assertion Plaintiff has not demonstrated he had a substantial impairment notwithstanding his suffering from HIV, the position is preposterous. Kamen was not only unable to work at all because of the life-threatening illnesses he was suffering from in February, March, and April 2004 but continued to suffer significant limitations in his personal life from the

time he returned to work on May 1, 2004, until the time he was terminated.  Kamen Affidavit

(Exhibit 9), ¶¶16, 17, 18, 19, 20 and 21.  As Dr. Rocchi's medical notes (attached as Exhibit 20

to Kamen D.T. (Exhibit 3)) make clear, Plaintiff was suffering serious side-effects and symptoms

from the HIV infection.  Thus, the record is clear Plaintiff more than satisfied the standard

articulated in *Bragdon v. Abbott* for having not only a substantial impairment that limited major

life activities (such as sleeping, engaging in strenuous activities and working any strenuous jobs),

but had a record of such a substantial impairment from at least early February 2004 until he was

terminated, and was obviously perceived as having such a substantial impairment given the

radical reduction in Plaintiff's job duties upon his return from medical leave on May 1, 2004.

## VI.  CONCLUSION

**WHEREFORE**, Defendant's Motion should be dismissed and this matter set for further

proceedings.

Respectfully submitted,

    s/Joseph H. Chivers
Joseph H. Chivers, Esquire
PA ID No. 39184
Suite 600,  312 Boulevard of the Allies
Pittsburgh, PA 15222
(412) 227-0763
(412) 281-8481 FAX
jchivers@employmentrightsgroup.com

Counsel for Plaintiff
Steve A. Kamen

     s/Bart T. Valad
     s/John Vecchione
Bart T. Valad, Esquire
DC ID No. 462814
John Vecchione, Esquire
Valad & Vecchione, PLLC
3863 Plaza Drive
Fairfax, VA  22030
(703) 352-4800

Local Counsel for Plaintiff
Steven A. Kamen

DATED:  April 7, 2008