**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2

 3                     -  -  -

 4   STEVEN A. KAMEN,                    )
                                         )
 5              Plaintiff,               )
                                         )
 6                                       )
         vs.                             )
 7                                       )  Case No.
                                         )  06-1063 (RMC)
 8   INTERNATIONAL BROTHERHOOD           )
     OF ELECTRICAL WORKERS, AFL-CIO      )
 9          and                          )
     EDWIN D. HILL, an individual,       )
10                                       )
                Defendants.              )
11

12                     -  -  -

13          Deposition of Steven A. Kamen

14          Wednesday, November 28, 2007

15                     -  -  -

16        The deposition of Steven A. Kamen, the Plaintiff
     herein, called as a witness by the Defendants,
17   pursuant to notice and the Federal Rules of Civil
     Procedure pertaining to the taking of depositions,
18   taken before me, the undersigned, Rebecca L. Schnur, a
     Notary Public in and for the Commonwealth of
19   Pennsylvania, at 500 Cherrington Parkway, Suite 325,
     Coraopolis, Pennsylvania, commencing at
20   9:30 o'clock a.m., the day and date above set forth.

21                     -  -  -

22          NETWORK DEPOSITION SERVICES
                247 FORT PITT BOULEVARD
23          PITTSBURGH, PENNSYLVANIA  15222

24                     -  -  -

25
```

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

2 (Pages 2 to 5)

**2**

```
 1   APPEARANCES:
 2      On behalf of the Plaintiff:
 3         Joseph H. Chivers, Esq.
           312 Boulevard of the Allies
 4         Pittsburgh, Pennsylvania 15219
 5      On behalf of the Defendant:
 6         Sherman Dunn Cohen Leifer & Yellig, P.C.
           Terry R. Yellig, Esq.
 7         Suite 1000
           900 Seventh Street, N.W.
 8         Washington, DC 2001
 9            - - -
10
11            I-N-D-E-X
12   EXAMINATION BY:          PAGE:
13   Mr. Yellig          4
14   Mr. Chivers              175
15   Mr. Yellig               188
16   Mr. Chivers              197
17            - - -
18        EXHIBIT INDEX
                    MAR
19   Deposition Exhibit
20   1   Letter from Edwin Hill dated December 8,   21
         2004
21
22   2   Weekly Reports Spreadsheets      50
23   3   Amended Complaint                56
24   4   Expense Reports Spreadsheets     66
25   5   May 2003 Correspondence          68
```

**3**

```
 1        EXHIBIT INDEX (CONTINUED)
 2   7   September/October 2003 Correspondence    72
 3   8   November 17, 2002 Letter re: Labor   74
         2002 Meetings
 4
 5   9   Donald Siegel Letter of April 21, 2003    77
 6   10  January 20, 2004 Letter re: LM-2    79
         Reporting
 7   11  February 27, 2004 Memo from Town of    82
         Rochester Highway Employees
 8
 9   12  December 30, 2003 e-mail from Michael    84
         Welsh
10   13  February 27, 2004 e-mail from Donald C.    85
         Siegel
11
12   14  April 8, 2004 e-mail from Steven Kamen    87
13   15  March 12, 2004 e-mail from Michael    91
         Welsh
14   16  Doctor's Excuse and Cover Letter March    94
         2004
15
16   17  Doctor's Excuse and Cover Letter April    96
         2004
17   18  First Set of Defendants'    110
         Interrogatories
18
19   19  Answer to First Set of Defendants'    110
         Interrogatories
20   20  Medical Records    120
21   21  January 20, 2004 Memo Re: 2004    139
         Manufacturing Conference
22
23   22  Anti-Harassment Policy    164
24
25
```

**4**

```
 1           STEVEN A. KAMEN,
 2   The Plaintiff herein, called as a witness by the
 3   Defendants, having first been duly sworn, as
 4   hereinafter certified, was deposed and said as
 5   follows:
 6           EXAMINATION
 7   BY MR. YELLIG:
 8      Q    Mr. Kamen, I've read some, you know,
 9   materials that give me a general idea, but I don't
10   know the specifics, so I'd like to ask you, first of
11   all, how old are you?
12      A    50 years old.
13      Q    When were you born?  What year?
14      A    1957.  July 29.
15      Q    1957.  Okay.
16   Where were you born?
17      A    New York.
18      Q    New York City?
19      A    New York City.
20      Q    And did you complete high school?
21      A    Yes, I did.
22      Q    Where did you graduate from?
23      A    Ramapo High School.  Ramapo, R-a-m-a-p-o,
24   Rockland County.
25      Q    Rockland County?
```

**5**

```
 1      A    Rockland County, New York.
 2      Q    Did you attend college?  Any secondary --
 3      A    I took a number of courses at the George
 4   Meany Center For Labor Studies, Ramapo College of
 5   New Jersey, Cornell University, no formal college
 6   degree, just a lot of various labor courses.
 7      Q    What kind of courses did you take at --
 8   What's it called?
 9      A    Ramapo College in New Jersey.
10      Q    Yeah.
11      A    Negotiations 101, Negotiations 102, Labor
12   Union Administration, courses related to pension fund
13   administration, health fund administration.
14      Q    So, primarily, related to labor
15   organization administration?
16      A    All related to labor organizations, yeah.
17      Q    How about Cornell?
18      A    Also, Cornell University Division of Labor
19   Studies, which was outside of New York City,
20   organizing courses primarily.
21      Q    Is that part of the industrial relations?
22      A    ILR, yes, it is.  But it's not in Ithaca.
23      Q    It's not?
24      A    They have subcampuses for that.
25      Q    When you graduated from high school, did
```

**Johnstown**
814-266-2042

**Nationwide**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

3 (Pages 6 to 9)

---

**6**

1  you get a job? What did you do after you graduated?
2      A    I was working at the time as a business
3  agent slash organizer for Local Union 1968 during high
4  school.
5      Q    During high school?
6      A    During high school.
7      Q    Wow!
8      A    In fact, I missed my senior prom because I
9  was on a picket line.
10      Q    Wow!
11      A    This has been my whole life.
12      Q    Really?
13      A    Uh-huh.
14      Q    Have you had any other jobs outside of
15  working for the international union?
16      A    Outside of working for the international?
17      Q    Uh-huh.
18      A    I was a business manager of my local. I
19  was fund administrator for the health and pension
20  funds for my local back in New York. I've had several
21  outside businesses, business interests, over the
22  years.
23      Q    What kind of outside businesses?
24      A    During high school I started a snow
25  plowing business, which I ran as a sideline for 25

---

**7**

1  years.
2      Q    Like a truck --
3      A    Several trucks.
4      Q    -- with a plow?
5      A    Yeah.
6      Q    Really? That's cool.
7      A    Just to elaborate on that, I used to save
8  my vacation time and my sick and personal days, when I
9  was younger, and use them in the winter months.
10      Q    Yeah. I know somebody who -- They own a
11  landscaping business, and they did that, and they did
12  very well.
13      A    Uh-huh.
14      Q    So, essentially, outside of these side
15  businesses that you mentioned, prior to your
16  employment by the international union you were
17  employed by the -- Were you employed by Local 1968?
18      A    '68, yes.
19      Q    I see.
20          You mentioned something about a plan -- that you
21  were plan administrator?
22      A    Yes, I was. Fund administrator, IBEW
23  Eastern States health and benefits funds, which are
24  the trust funds for at the time Local 1968. I was the
25  fund administrator, also one of the union trustees.

---

**8**

1      Q    As the administrator -- Well, was that
2  your primary employment?
3      A    That while I was business manager.
4      Q    So you were business manager of
5  Local 1968?
6      A    Uh-huh.
7      Q    And you were --
8      A    Fund administrator.
9      Q    -- fund administrator?
10      A    Uh-huh.
11      Q    Well, I'm just surprised. The reason I
12  made a -- sort of reacted was, I'm surprised because I
13  thought that under ERISA there was some prohibition.
14      A    There's always been some discussions about
15  having two hats on.
16      Q    I'm not an ERISA expert, but I know a
17  little bit about it.
18          So at some point in time -- Maybe I ought to try
19  to get -- I know it's unfair to try to pin you down on
20  dates and everything, but when did you become business
21  manager of Local 1968?
22      A    I believe it was 1991.
23      Q    '91?
24      A    Uh-huh.
25      Q    Okay. Now, I heard Ed, Ed Hill, in his

---

**9**

1  deposition -- he mentioned something about your mother
2  or your father or something being --
3      A    Both of my parents were previous business
4  managers of the same local. I'm the only -- I was the
5  only rep ever on staff that had two parents that were
6  both business managers of the local.
7      Q    So your father was the business manager at
8  one point?
9      A    My mother and father chartered the local
10  in 1956.
11      Q    And who was the business manager first?
12      A    My father, till he passed away in 1970,
13  and then my mother took over. In fact, she was the
14  first female business manager, in the IBEW, of a
15  construction local union.
16      Q    And this was --
17      A    1970.
18      Q    -- '70. Yeah, I can believe that, yeah,
19  at that time.
20      A    The Kamens have been around a long time in
21  the IBEW.
22      Q    Local 1968, is it still in existence?
23      A    I believe it has since been merged over
24  the past couple of years or amalgamated.
25      Q    What was its primary jurisdiction,

---

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
Transcript of Steven Kamen

4 (Pages 10 to 13)

10

1  Local 1968?
2      A    Manufacturing, telephone service contract
3  act, construction, sign jurisdiction, motor shop. It
4  had a vast jurisdiction.
5      Q    How many, approximately, members?
6      A    About 750.
7      Q    750?
8      A    Uh-huh. Small local, a lot of
9  geographical jurisdiction, and a lot of very small
10  shops.
11      Q    What did it cover?
12      A    Jurisdiction-wise?
13      Q    Geographically.
14      A    Geographically?
15      Q    Uh-huh.
16      A    BA membership all of New York State.
17      Q    Do you want to explain that for the
18  record.
19      A    All New York State for BA members.
20      Q    What do you mean by "BA membership"?
21      A    BA members are nonconstruction members,
22  manufacturing, factory workers, primarily.
23      Q    So you're saying that this local union had
24  jurisdiction over all manufacturing, factory workers?
25      A    Anywhere where we were willing to

11

1  organize. We had eleven counties in the jurisdiction
2  of 1968, and then we expanded with President Hill when
3  he took over.
4      Q    Wow!
5      A    Actually, President Barry had expanded --
6  Excuse Me. President Barry had expanded jurisdiction
7  at the time. We were one of the only locals that were
8  actively organizing.
9      Q    So you became business manager in 1991,
10  did you say?
11      A    Uh-huh.
12      Q    And when -- At some point you were
13  appointed as an international representative of the
14  IBEW. Correct?
15      A    Correct.
16      Q    When was that?
17      A    July 1, 1997.
18      Q    And who appointed you?
19      A    President Barry. President Jack Barry.
20      Q    And that was when?
21      A    July 1, 1997.
22      Q    Okay.
23      A    With a recommendation at that time from
24  Vice President Larry Rossa.
25      Q    Rossa?

12

1      A    Rossa.
2      Q    Who replaced you as business manager of
3  Local 1968?
4      A    A gentleman by the name of Frank Knerr,
5  K-n-e-r-r.
6      Q    Now, can you tell me -- I know that, as
7  you just testified, you are from Upstate New York.
8      A    Uh-huh.
9      Q    Correct?
10      A    Yes.
11      Q    But you, apparently, were assigned to work
12  in Western Pennsylvania?
13      A    Yes.
14      Q    Is that correct?
15      A    That's correct.
16      Q    How did that come about, or do you know
17  how it came about?
18      A    In 1997 I had attended a conference in
19  Knoxville, Tennessee as a business manager. I don't
20  recall if it was a manufacturing conference. And
21  Larry Rossa had recently become vice president and
22  asked me if I would consider coming on staff as a rep
23  for him, and I said I would. And it quickly fell into
24  place in a matter of weeks thereafter.
25      Q    Were you told that you were going to have

13

1  to relocate?
2      A    Yes.
3      Q    Was there any particular reason?
4      What I'm trying to ask you is: Do you know if
5  there was any particular reason you were assigned to
6  Western Pennsylvania?
7      A    There was not a manufacturing rep, per se,
8  from what I was told, in Western Pennsylvania. The
9  locals that were out here had not been serviced
10  properly. They were being serviced by construction
11  reps. And there was a lot of difficulty in proper
12  representation for the BA members, per se.
13      Q    There is a different --
14      A    Different culture.
15      Q    -- culture?
16      A    Yes. So at the time there was no rep in
17  Western Pennsylvania. They asked me if I would
18  relocate out here. They offered me a relocation
19  package, which at the time was through Secretary-
20  Treasurer Hill.
21      Q    What do you mean by "a relocation
22  package"?
23      A    They purchased my home. They paid my
24  moving expenses. They moved me out here.
25      Q    Uh-huh.

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

---

14

1    A    They flew me to Iowa to get a car and
2 drive back here.
3    Q    Where in Iowa?
4    A    I believe it was in Iowa City, from a rep
5 that had retired.
6    Q    So there was a car --
7    A    Right.
8        Thereafter, I had done some research, when I was
9 on staff, and presented to President Hill that there's
10 a much cheaper way to do this than to send a body out
11 to the car, is to have the car transported to where
12 it's necessary for the future. I believe they started
13 doing that, after I did some research for them.
14        It was a huge expense. It was four different
15 flights to get out there and four days driving back.
16    Q    It's true.
17    A    It might have been Idaho, actually. I'm
18 not sure if it was Iowa or Idaho, but it was --
19    Q    Now you sound like my wife.
20    A    It was out there.
21    Q    My next-door neighbor, years ago -- I
22 digress for a minute. My next-door neighbor, years
23 ago, worked for the Atomic Energy Commission out of
24 the Department of Energy. And near our house there
25 was a facility, an office, in Germantown, Maryland.

---

15

1 And one day I came home, and my wife said, John and --
2 I think her name was Mary Sue or something like that.
3 They were from Alabama. She said, they're moving to
4 Iowa. And I said: Iowa? There's no nuclear research
5 facilities in Iowa that I'm aware of. And I said:
6 But there is one that I know in Idaho. She said:
7 Iowa, Idaho, I don't know. And I said: Potatoes and
8 corn.
9    A    Uh-huh.
10   Q    Now, when you were appointed as an
11 international representative in 1997 and you were
12 reassigned -- well, you transferred or -- relocated, I
13 guess, is the right word -- You relocated to Western
14 Pennsylvania?
15   A    Correct.
16   Q    What's your understanding of how you are
17 to operate?
18        What I mean by that is: How did you get
19 assignments? How did you get assignments or given
20 assignments?
21   A    Assignments are given usually by the
22 district office -- actually, I should say primarily
23 from the district office.
24        Responded is not the right word. I reported to
25 Vice President Rossa. And when I came out here in

---

16

1 1997, X number of locals were given to me to service.
2 I believe it was 11 or 12, possibly 13. And it was
3 basically a ground-up start. They hadn't been
4 serviced for a very long time. There was some locals
5 that had contracts that had been in abeyance and
6 couldn't get contracts for a number of years.
7    Q    When you say "contracts," you mean
8 collective bargaining agreements?
9    A    Collective bargaining agreements.
10   Q    Yeah.
11   A    When I initially came on staff in '97, I
12 was given some assignments from reps dating back to
13 1989 that had retired, assignments that were not
14 completed. I was given an assignment, for a local in
15 New Jersey, to close the local out and to pick up the
16 seal and retrieve all the documents, and the company
17 had gone out of business.
18   Q    The company that the local had a
19 collective bargaining agreement with?
20   A    Correct.
21        (Discussion off the record)
22   Q    You said that you were originally
23 assigned, you said, what, 12 or 13 local unions?
24   A    Yes. That's quite a few local unions,
25 yeah.

---

17

1    Q    That number diminished over time, I
2 believe. Is that correct?
3    A    Yes. Several locals had gone out of
4 business per se, collective bargaining agreements with
5 the employers. The employers had gone out of
6 business.
7        I also was instrumental in chartering Local 385,
8 which was a new Western Pennsylvania -- It was Vice
9 President Rossa's baby, so to speak, of taking
10 me -- In other words, prior to my time coming on staff
11 a lot of BA members weren't being represented in
12 Western Pennsylvania. It was during Vice President
13 Rossa, prior to that Vice President Hill. And they
14 weren't being represented. And because there was no
15 service and representation they were put into
16 construction locals out here, Local 10, Local 5, and
17 it was causing a lot of chaos. And Vice President
18 Rossa, when he came on staff as vice president, wanted
19 to start a new local in Western Pennsylvania, a catch-
20 all local, so to speak, of all these members.
21        So members came out of Local 712 in Beaver. They
22 came out of Local 5 in Pittsburgh. Local 385 was
23 chartered. I drafted the bylaws for the local union.
24 I was in charge of getting all the officers in place
25 as a start-up local, as a brand-new, start-up local,

---

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

18

1  and nurtured it and got it off the ground to a very
2  successful local today that it is
3      Q    Was there any broadcast jurisdiction?
4      A    Yes, there was. Yes.
5      Q    What did that consist of?
6      A    The broadcast employees were in Local 5.
7  They were taken out and put into this Local 385. They
8  were members that work at Channel 11, Channel 4 out
9  here. Editors, photographers.
10     Q    You anticipated my next question. Yeah.
11 What kinds of occupations were you representing?
12     A    Photographers, editors -- I can't even
13 think of the term -- the guys the run all the cables
14 for the football games, Steelers, Pirates. I'm at a
15 loss for the term.
16     Q    Some sort of technician?
17     A    Technicians. Thank you.
18     Q    Yeah. I don't know what the term is
19 either.
20     A    Okay. They're now in Local 385.
21     Q    I see. So it was, essentially, an effort
22 to address that cultural clash that you mentioned
23 before. Is that correct?
24     A    Correct.
25     Q    Yeah.

19

1          MR. YELLIG: Just for the record, when
2  Mr. Kamen refers to BA members, that's a capital
3  BA. That's a term of art, so the record will be
4  clear.
5      Q    So over time, the local -- the number of
6  local unions that you were assigned to provide support
7  services to, that number diminished. Is that correct?
8      A    It diminished over the years one or two
9  locals. That was it.
10     Q    So is it your testimony that you were, at
11 least for a while, regularly providing support
12 services to ten local unions?
13     A    Yes. Yes.
14     Q    Did there come a time when you
15 were -- that some of those local unions -- the
16 responsibilities for providing support services were
17 assigned to other international representatives of the
18 IBEW?
19     A    Yes, it did.
20     Q    When was that?
21     A    It was during my medical leave in 2004,
22 early in 2004. I believe four -- four, possibly five
23 of the locals that I had serviced.
24     Q    Can you give me the numbers of the local
25 unions, as best as you can remember?

20

1      A    That were taken out of my --
2      Q    Yes.
3      A    Local 2007 in Altoona.
4      Q    2007, Altoona, yeah.
5      A    1968 in New York.
6      Q    1968 was the local that you had been the
7  business manager of. Right?
8      A    Yes. Correct.
9  385 in Butler.
10 I believe that was it, to the best of my
11 recollection.
12     Q    How about one in Rochester?
13     A    Rochester, New York?
14     Q    I think it's Rochester.
15     A    Local 86 in Rochester, New York was a
16 local that I serviced.
17     Q    Were you relieved of the responsibility
18 for that local?
19     A    I don't believe so, no, not that I'm aware
20 of.
21     Q    I'm trying to remember. There was another
22 one out of -- I went to say Youngwood, Pennsylvania,
23 but I'm not sure.
24     A    1963?
25     Q    Yeah.

21

1      A    I continued to service that local. As a
2  matter of fact, a shop steward training seminar I had
3  scheduled for that local union for the new officers,
4  that was supposed to be done a week or two after I was
5  terminated that I had set up and scheduled for that
6  local.
7      Q    So, to the best of your recollection, the
8  three local unions that you were relieved of
9  responsibility for providing support services were
10 2007, 1968, and 385?
11     A    Correct.
12     Q    Okay. Let me show you, if I can find
13 it -- I hope I have these things organized. There we
14 go. Let me show you a letter, and we can mark that as
15 Exhibit Number 1, and ask you if you would identify
16 it, that letter, please.
17         (Whereupon, Deposition Exhibit 1 was
18     marked for identification.)
19     A    Letter dated December 8, 2004, a copy of a
20 letter signed by International President Edwin Hill,
21 copy to Vice President Siegel.
22     Q    That's fine.
23     A    Okay.
24     Q    Take a look at the first paragraph,
25 please, and, specifically, the first two sentences.

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

7 (Pages 22 to 25)

22

1    A    First paragraph, first two sentences?
2    Q    Uh-huh.
3    A    "Under date of June 26, 1997 --"
4    Q    Yes.
5    A    Okay.
6    Q    Have you --
7    A    Yes.
8    Q    Do you disagree with the statement that
9  you received a letter of employment --
10  or assignment of employment under date of June 26,
11  1997?
12    A    You asked me if I disagree?
13    Q    Do you agree that you received a letter
14  dated June 26?
15    A    Yes.
16    Q    More specifically, did that letter
17  indicate to you that the letter "'does not constitute
18  a contract of employment. . .'"?
19    A    I believe the letter stated that.
20    Q    And how about "'. . .nor does it establish
21  a fixed term of employment. . .'"?
22    A    I believe it stated that as well.
23    Q    And "'. . . Inasmuch as you serve at the
24  pleasure of the International President'"?
25    A    Correct.

23

1    Q    What was your understanding of -- or what
2  is your understanding/what was your understanding of
3  what that statement that we just read -- I just read
4  to you meant?
5    A    To my understanding, the short version
6  would be an at-will employee.
7    Q    You hit it right on the head. You got
8  it. Okay.
9        If you would, in the second paragraph, the second
10  sentence, it says: "Based on a report of your
11  performance as an International Representative that I
12  have received from Vice President Siegel under date of
13  November 30, 2004. . ." Do you see that?
14    A    Yes, I do.
15    Q    Did you see a report that Vice President
16  Siegel submitted to President Hill dated November 30,
17  2004?
18    A    I don't recall.
19    Q    Have you ever seen it since then?
20    A    I believe, through Mr. Chivers, I've seen
21  it.
22    Q    Now, in the third -- last sentence in
23  paragraph 2, it says, "Vice President Siegel's report
24  demonstrates that you have been seriously delinquent
25  in the filing of your required reports over a period

24

1  of years, and that you have failed. . ." Let's stop
2  there.
3        Do you agree or disagree with that statement that
4  you've been seriously delinquent in filing your
5  required reports over a period of years?
6    A    I disagree.
7    Q    Can you tell me why?
8    A    At times during my tenure with the IBEW I
9  had been delinquent on reports, as has every other rep
10  within the Third District that I'm aware of.
11  Sometimes we would be on assignments, so it would be
12  very difficult to get reports in in a timely manner.
13    Q    Can I stop there and ask you: What do you
14  mean by that?
15    A    For example, in 1999, Local 1914, which is
16  in Harwick, Pennsylvania, authorized a strike, and I
17  was on the picket line with the local for 94 straight
18  days, including Christmas Eve, Christmas Day,
19  New Year's Day. As a matter of fact, at the time
20  Secretary-Treasurer Hill came out to the picket line
21  on Christmas Day and brought sweaters for those that
22  were picketing.
23        It was very difficult, staying in a hotel room
24  for 94 days, to get reports in. Certainly, the
25  district knew where I was as well as the president and

25

1  vice president and secretary-treasurer.
2        So that's just one example of how it would be
3  difficult to do reports.
4    Q    I see. So -- I don't want to put words in
5  your mouth. You're saying that the characterization
6  that was used in this letter that you were seriously
7  delinquent in filing your required reports over a
8  period of years -- you're not denying, are you, that
9  at times you were delinquent?
10    A    At times I was delinquent, yes.
11    Q    But you're saying --
12    A    Over a period of years -- It reads, to me,
13  that there is -- You know, the assumption in this
14  letter is that for years on end reports weren't done.
15  That's not true.
16        During my seven and a half years with the IBEW
17  there was times that I was delinquent with my reports.
18    Q    Is it your testimony that when those
19  occasions arose where you were delinquent it was
20  because of extenuating circumstances?
21    A    For the most part, yes.
22    Q    Let's use that -- Let's talk about the
23  example that you gave me. I think that the local that
24  I was thinking of -- I said "Youngwood" before. I
25  think it was -- How do you spell that?

**Johnstown**
814-266-2042

**Nationwide**
866-565-1929

**Pittsburgh**
412-281-7908

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

8 (Pages 26 to 29)

---

26

1    A    Harwick.
2    Q    H-a-r-w-i-c-k?
3    A    Correct.
4    Q    I believe that was the local that I wanted
5    to ask you if you continued to have jurisdiction
6    over.
7    A    I believe I did, yes.
8    Q    That was not taken away from you?
9    A    Not that I'm aware of.
10    Q    Were you ever contacted by the Third
11    District International Office concerning your
12    delinquency in submitting weekly reports during the
13    time that you were involved in this picket?
14    A    No, I was not.
15    Q    Who was --
16    I'm sorry. Go ahead.
17    A    During that period of time, then Vice
18    President Rossa had come out and seen the local and
19    myself on the picket line. There was a lot of media
20    attention to the strike. I was dealing with the three
21    television stations, the newspapers. We were in
22    federal court. We were with arbitrators. It was a
23    very trying period for this local.
24    This local sustained, and the strike ultimately
25    was successful.

---

27

1    Q    What was the company? What company --
2    A    Westinghouse.
3    Q    Westinghouse.
4    Is that local still in existence?
5    A    As far as I know.
6    Q    Local 1914?
7    A    '14, yeah, as far as I know.
8    Q    Were there any other periods of time that
9    you can recall when you were delinquent in filing
10    required weekly reports over that time?
11    A    While I was out on medical leave from
12    February till May of 2004.
13    Q    Any other times?
14    A    I'm sure there were other times.
15    I mean --
16    Q    We can get into this a bit, but my
17    recollection is that you -- I believe you didn't
18    submit reports from May through November of 2004. Is
19    that correct?
20    A    From May through November of 2004, I
21    believe that's correct.
22    Q    And that's a separate occasion from what
23    you referred to just a moment ago?
24    A    During my medical absence?
25    Q    Right.

---

28

1    A    Yes, it is.
2    Q    Okay. And any other times you can recall?
3    A    Over the seven and a half years?
4    Q    Uh-huh.
5    A    I'm sure there were some times, yes. I
6    mean, there would be times, at staff meetings that
7    were held two or three times a year, district staff
8    meetings, that a list would either be discussed
9    verbally or given out to all the reps at the staff
10    meeting of who was delinquent, who wasn't, who had
11    open assignments, who didn't. At almost every given
12    time every rep was on that list except for maybe one
13    or two out of 20 reps. They either had open
14    assignments or delinquent expense reports or
15    delinquent assignments.
16    So, I mean, it wasn't uncommon not to be timely
17    all the time on reports.
18    Q    Uh-huh.
19    A    I believe that the district and the
20    president knew what we were doing and that we were
21    doing our jobs to the best of our abilities.
22    Q    Okay. Going back to the Exhibit I, the
23    December 8, 2000 letter from President Hill addressed
24    to you, in the last sentence of the second paragraph
25    it also -- in addition to referring to delinquent

---

29

1    reports, it says: ". . .and that you have failed on a
2    number of occasions to complete the assignments you
3    have received from the Third District Office."
4    A    Okay.
5    Q    Do you have any idea what Mr. Hill was
6    referring to at that time?
7    A    I believe at the time that I had three,
8    possibly four open assignments that had not been
9    completed.
10    Q    Were any of those assignments outstanding
11    for longer than six months, if you can recall?
12    A    Yes.
13    Q    Any particular reason they were still --
14    A    One, in particular, that I remember was
15    with my home local back in New York, 1968. It was
16    with -- It pertained to Vice President Bob Palmatier.
17    A complaint was filed against him by a woman who was
18    the daughter of the then New York State AFL-CIO
19    president. And she no longer worked for the AFL-CIO.
20    It really was a moot point. There was a lot of
21    tension between those gentleman, Palmatier, and this
22    woman for a number of years politically. And it was
23    just -- I kind of just let it fizzle out, the
24    situation. And she no longer -- Her dad was no longer
25    president of the state AFL. She no longer had a job

---

**Johnstown**
814-266-2042

**Nationwide**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

30

1  in the AFL. And it just kind of went away.
2      And reflecting back now on it, I probably should
3  have sent a letter just closing it out or saying, it's
4  really a moot point. I did not.
5      Q   Yes. That was going to be my question.
6  If that's the case, why didn't you -- or did you
7  submit anything indicating what you just said?
8      A   No, I don't believe I did. And I probably
9  should have. But, like I said earlier, I believe, in
10  my testimony, when I came on staff in '97, I was given
11  assignments dating back to '89 from reps that had
12  retired and never completed assignments. I mean, it
13  was just part of the nature of the beast.
14      Q   In the third paragraph it says, "With
15  respect to the former --" I'm assuming that that means
16  referring to the reports, delinquent
17  reports "-- Vice President Siegel advises me that he
18  has had several conversations with you about your
19  failure to file required reports in a timely manner."
20  Is that fair? Is that a correct or an accurate
21  statement?
22      A   That we had verbal discussions? I do
23  recall some discussions with Vice President Siegel
24  along with the other reps on staff.
25      Q   You never had a one-on-one conference with

31

1  him that you can recall?
2      A   I believe, in the spring of 2003, I had a
3  discussion with him in a progress meeting, and I told
4  him I would work on getting my reports filed in a more
5  timely manner.
6      Q   Now, that was the spring of 2003?
7      A   Correct.
8      Q   Correct?
9      And you were hospitalized and were on sick leave,
10  I guess is a fair description, in the late winter,
11  early spring of 2004?
12      A   Correct.
13      Q   Is that correct?
14      So is it fair to say or conclude from the fact
15  that Vice President Siegel spoke to you about
16  delinquent reports in spring of 2003 that there had
17  been other periods of time when you had failed to
18  submit weekly reports?
19      A   Yes. I believe I already stated that,
20  over my seven and a half years, there were times that
21  I was late in my reports.
22      Q   Uh-huh. Okay.
23      A   I also believe that there were a number of
24  other reps that were as late, if not longer than I
25  was.

32

1      Q   If you go to page 2, the first full
2  paragraph, it begins, "Perhaps even more serious. . ."
3      A   Okay. You want me to read the whole
4  paragraph?
5      Q   Yeah, read the whole paragraph. I'm
6  sorry.
7      A   Okay.
8      Q   Now, that paragraph, that first full
9  paragraph on page 2, it indicates, among other things,
10  that -- it says that Vice President Siegel "has
11  frequently experienced an inability to reach you at
12  times when it was important to do so, and you have on
13  many occasions not responded to e-mails from his
14  office."
15      Do you agree or disagree with that?
16      A   I disagree. I believe when Vice President
17  Siegel needed to reach me he was able to reach me.
18      I am not terribly computer literate, so regarding
19  e-mails, I'm not very good on e-mails.
20      Q   Why is that?
21      A   I didn't grow up in the computer
22  generation. I never took any courses for it.
23      I recall back then the IBEW had all the reps in
24  Washington, DC. I believe at the time it was a
25  nationwide reps training. When President Hill took

33

1  over, he discussed going onto laptops and
2  computerizing all of us. I was one of the reps that
3  just was not really in favor of it.
4      I've always used a typewriter or word processor,
5  and I'm just not -- I'm still not very computer
6  literate. We were given cell phones when I came on
7  staff. I mean, we always had phones, home phones,
8  faxes. That's basically the way I did my
9  communication.
10      Q   So is it your testimony that you didn't
11  regularly check your laptop for e-mails?
12      A   Correct.
13      Q   You did not?
14      A   Did not.
15      Q   And that's because of what? For what
16  reason?
17      A   I am not very computer literate.
18      Q   Did you ever indicate that to
19  Vice President Siegel, you know, you were having a
20  problem with using e-mail?
21      A   I believe I had told him on one or two
22  occasions that I recall that I'm not very computer
23  literate. I had mentioned it when we were in the reps
24  training in Washington. Just not my cup of tea, so to
25  speak.

**Johnstown**
814-266-2042

**Nationwide**
866-565-1929

**Pittsburgh**
412-281-7908

## NETWORK DEPOSITION SERVICES
## Transcript of Steven Kamen

10 (Pages 34 to 37)

34

1    Q    Did he ever discuss that with you at all?
2    A    About e-mails?
3    Q    About the e-mails. yeah.
4    A    Just that the IBEW is attempting to get
5    more technologically advanced.
6        Maybe I'm from old school, even though I'm not
7    that old, but, you know, it's just -- it's kind of
8    difficult for me, when you're not used to something.
9    Q    Did you ever suggest to him that perhaps
10   it would be more efficient to send you faxes,
11   facsimile communications, rather than e-mails?
12   A    Certainly.
13   Q    You did suggest that to him?
14   A    Certainly. When I came on staff and to
15   the point I was terminated, I always had a fax,
16   separate line in my house, a fax machine, IBEW cell
17   phone, my own individual cell phone.
18   Q    Well, my question really is: Did you ever
19   say to Vice President Siegel what you just said a
20   moment ago: Look. I'm just not able -- I just can't
21   use this e-mail?
22   A    I believe I had when -- at some point.
23   Q    And did you ask him to make some sort of
24   an accommodation, try to communicate otherwise?
25   A    For the e-mails, absolutely not.

35

1    Q    You did not ask him to?
2    A    No.
3    Q    Why not?
4        THE WITNESS: How blunt can I be here?
5        MR. CHIVERS: Just tell whatever the
6    reason was.
7    A    There's no secrets here that
8    Vice President Siegel and I never got along from the
9    time that --
10   Q    Really?
11   A    -- he was a rep and I was a rep. He never
12   liked me. I don't know why. He never liked me. And
13   I truly feel from the time that he became vice
14   president he was gunning for me. Still believe that.
15   Singled me out.
16       In reading his deposition, that Vice President
17   Siegel gave, just re-reading it yesterday, his comment
18   about me not attending a meeting on Yom Kippur -- I'd
19   hope to say that I'm not the only Jew that ever worked
20   for the IBEW. But for him to single me out in his
21   deposition and say that I wouldn't attend a meeting on
22   the holiest day in the year in the Jewish religion I
23   think is just ignorant on his part. And that's,
24   basically, the kind of individual that I feel he is.
25       There's no love lost between him and I. Never

36

1    has been. And he was not the kind of individual -- He
2    was not the kind of vice president that I could
3    converse with. From the time that he became vice
4    president not only myself but other manufacturing reps
5    had an issue with Vice President Siegel. He never
6    liked manufacturing. He didn't like BA members. He
7    was a construction guy, and he's fine with his
8    construction reps.
9    Q    That cultural --
10   A    That whole culture, uh-huh.
11   Q    Again?
12   A    Again. So --
13   Q    I'm sorry. Go ahead.
14   A    No. Go ahead.
15   Q    You, I believe -- and you correct me if
16   I'm wrong. What I heard you say just now is that you
17   and Vice President Siegel -- but mostly Vice President
18   Siegel just didn't like you. Is that right?
19   A    Correct.
20   Q    And you don't know why -- or do you know
21   why? I should ask you.
22   A    I don't know why. I did the job to the
23   best of my ability. I think I did my job very well.
24   I was never one of these reps that did the ski outings
25   or the golf outings, and I wasn't, you know, one of

37

1    the players with the other reps that hangs out and
2    does the buddy-buddy thing.
3        I did my job to the best of my ability. I grew
4    up in the IBEW with my family, my parents, proud IBEW
5    members and business managers; and I tried to continue
6    on the same. And I felt -- I still feel that I was
7    hindered to perform my job once Vice President Siegel
8    became vice president.
9    Q    But you don't have even an opinion as to
10   what the source of that dislike is?
11   A    Antisemitism possibly.
12       I don't know if this is the right forum to raise
13   this, but I'm raising it. I'm telling you how I
14   feel. I mean, you're asking me a question. I'm
15   telling you how I feel. I know I was the only Jew on
16   staff in the Third District.
17   Q    Okay.
18   A    You know, there's no question about it. I
19   took every Yom Kippur off, the holiest day of the year
20   in the Jewish religion. It was not a secret to
21   President Barry, not a secret to President Hill.
22   Vice President Siegel had an issue with it. Vice
23   President Rossa never had an issue with it.
24       Certainly, I've worked enough Christmas Days --
25   being a Jew, it doesn't bother me -- being on a picket

**Johnstown**
814-266-2042

**Nationwide**
866-565-1929

**Pittsburgh**
412-281-7908

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

38

1  line Christmas Day with a whole local. I mean, you
2  know -- Working Good Friday, which is an IBEW holiday,
3  I don't believe I ever took off a Good Friday that I
4  can recall. Those are not holidays I celebrate. The
5  one holiday I choose to celebrate he had an issue
6  with, so --
7      Q    Is that the basis for your belief that
8  perhaps Vice President Siegel is antisemetic, because
9  he commented about the fact that you failed to attend
10 a meeting on Yom Kippur?
11     A    Possibly.
12     Q    Are there any other situations that you
13 can recall that leads you to that conclusion?
14     A    Well, I think, growing up Jewish -- I
15 think that's enough to -- You know, I've certainly
16 felt enough. I've been exposed to enough hatred over
17 my years from when I was a child in New York, so on.
18 I generally can sense antisemitism.
19     Q    So you're saying you just -- based upon
20 your life's experience, you feel like you can sense
21 that or detect it?
22     A    To a very small degree.
23     There's definitely -- For whatever reason,
24 there's always been a lot of tension between him and I
25 from the time that we were reps. We didn't really

39

1  discuss anything with each other, other than being
2  minimally cordial.
3      Q    Have you ever heard Vice President Siegel
4  make what you would consider to be an antisemitic
5  remark?
6      A    Other than his deposition that I perceived
7  to be antisemitic, no.
8      Q    "No"?
9      A    No.
10     Q    All right. Let's go back to the second
11 full paragraph. Vice President Hill's letter
12 indicates that -- he says, "I am advised that --" if you
13 see where I'm talking about, the fourth sentence
14 begins, "I am advised --" In the second paragraph, do
15 you see what I'm talking about?
16     A    Fourth sentence, second paragraph?
17     Q    Yeah. It begins, "I am advised that in
18 spite of repeated requests to do so you have failed to
19 clear a number of assignments from the Third District,
20 and you have three unfulfilled assignments in your
21 file that date back as far as 1999."
22     A    "I am advised that in spite of repeated
23 requests to do so, you have failed to clear a number
24 of assignments. . ."
25     I don't think three is "a number of

40

1  assignments." That's my opinion.
2      Q    I'm sorry. What?
3      A    I don't believe three is "a number of
4  assignments," a great number of assignments.
5  Yes, I had some open assignments. And, again, I'll
6  say, as other reps did. I can recall at a number of
7  staff meetings a list would be handed out to every rep
8  in attendance, individually. These are your open
9  assignments. These are your open assessments. Some
10 reps would have two pages of open assignments. I had
11 three open assignments. I don't think that's an
12 extraordinary number.
13     Q    Do you agree or disagree about the
14 characterization of at least one of those unfulfilled
15 assignments as dating back to 1999?
16     A    I agree with that.
17     Q    Is that the one that you mentioned?
18     A    That's the one with Palmatier in 1968 and
19 the former employee of the state AFL-CIO.
20     Q    In the next sentence he says, "Included in
21 your file is an April 21, 2003 letter from
22 Vice President Siegel to you, expressing his
23 displeasure with your being late in assignments and
24 not handing in work and expense reports."
25     Do you recall that letter?

41

1      A    I don't recall it offhand.
2      Q    Okay. "His letter was a clear warning to
3  you that improvement in your performance was
4  required."
5      A    I don't recall that.
6      Q    You don't remember the letter. Okay.
7      The next paragraph, second paragraph, it says,
8  "On one occasion, you failed to complete an assignment
9  for more than six months, and it became necessary for
10 Vice President Siegel to assign another
11 representative, who completed the assignment in less
12 than 30 days."
13     Do you know what he's referring to there, or do
14 you recall?
15     A    No, I don't.
16     Q    Would you disagree with the allegations in
17 that sentence?
18     MR. CHIVERS:  I object to the form. He
19 already answered he doesn't know what it refers
20 to.
21     MR. YELLIG:  Yeah, that's true.
22     Q    Next sentence, it says, "On another
23 occasion, you were assigned to assist Local Union 1968
24 in its scheduled bargaining negotiations."
25     Do you see that?

**Johnstown**
814-266-2042

**Nationwide**
866-565-1929

**Pittsburgh**
412-281-7908

**42**

1    A    Yes.
2    Q    "The local union at that time had a brand-
3    new business manager, who was in need of assistance
4    from an experienced international" rep. "Even though
5    you were scheduled to be at the local union for
6    negotiations, you failed to show up, and the local
7    union could not reach you."
8        Do you recall that incident?
9    A    Yes. I was in the hospital.
10    Q    And this was when?
11    A    I believe it was late February, early
12    March of 2004.
13    Q    2004. Okay.
14        And then he says, "On still another occasion, an
15    assignment that you received in April of 2002 was not
16    completed by you until January 2004."
17        Do you remember that assignment?
18    A    I don't recall the assignment. It's
19    possible. I don't recall the assignment.
20    Q    In the last sentence it says, "In
21    addition, there have been complaints about your work
22    from some of the locals that you service, which
23    required Vice President Siegel to reassign some of
24    your local unions to other members of his staff."
25        Was that ever communicated to you before --

**43**

1    A    No, it was not.
2    Q    -- this letter?
3    A    I am still, to this day, not aware of any
4    locals that ever complained about me. During my whole
5    career I worked very hard for the IBEW, whether I was
6    business manager, fund administrator, back in my local
7    union as an organizer. I think it's bogus, the
8    allegations made here.
9    Q    Is it your belief that perhaps this
10    characterization of your performance as an
11    international representative is a result of
12    antisemitism?
13    A    No. I believe it's about my disability
14    and my medical issues, thrown in a little touch of
15    antisemitism, thrown in a little fact that
16    Vice President Siegel never liked me for whatever
17    reason.
18    Q    Do you believe that Vice President Siegel
19    didn't like you because of your sexual orientation?
20    A    I don't believe that had any bearing. I
21    don't believe he was aware of my sexual orientation.
22    Q    Do you believe that Vice President Siegel
23    unfairly judged you because of your medical condition?
24    A    Yes.
25    Q    Do you have any basis for that other than

**44**

1    just your suspicion?
2    A    Just my suspicion.
3    Q    Do you believe that Vice President Siegel
4    knew that you were diagnosed as being HIV positive?
5    A    I do believe that, yes.
6    Q    You do?
7    A    Uh-huh.
8    Q    What's the basis for that belief?
9    A    I think the basis for my belief is the
10    fact that the IBEW is a self-insured organization.
11    And I had previously been a health fund
12    administrator. And they were getting medical reports
13    when I was hospitalized on what was going on. And I
14    think it's quite simple for any layman to put two and
15    two together. Again, reiterating that they're self-
16    insured, I think they had known.
17    Q    You testified that you acted or you were
18    employed as a fund administrator by Local 1968?
19    A    Correct.
20    Q    How long did you serve as fund
21    administrator?
22    A    Six years.
23    Q    And what fund or funds were you
24    administering?
25    A    The health and pension fund of Local 1968.

**45**

1    Q    I don't want to ask you just the broadest
2    question, but I will. Can you describe the medical
3    insurance plan that this fund, 1968's fund, provided
4    to its members?
5    A    It was a bought insurance plan. It was
6    not self-insured. It was not a self-insured fund.
7    Q    Can you explain the difference as far as
8    you're concerned?
9    A    As far as I'm concerned, I think a self-
10    insured fund -- I think the administrator or the
11    trustees oversee it, get to see, for each individual
12    and/or family, exorbitant medical costs, exorbitant
13    prescription costs that come in. And it's quite easy
14    for somebody that does that to really put two and two
15    together.
16        When I was fund administrator and we would see
17    the quarterly reports at the trustees meetings that
18    were supplied to us by the actuaries, you can see
19    which families -- and this is previous to
20    HIPAA -- which families --
21        MR. YELLIG: Excuse me just a second.
22    HIPAA is an acronym. Okay.
23    A    Previous to HIPAA you could see which
24    families were experiencing very high drug costs, very
25    high hospitalization costs, lab costs, and you could

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
Transcript of Steven Kamen

13 (Pages 46 to 49)

46

1  surmise -- or through the help of the actuaries and
2  the insurance consultants -- what issues might be
3  going on with those particular families, whether it be
4  a cancer, brain tumor, HIV/AIDS.
5      Q    When you were plan administrator for
6  Local 1968, was HIPAA in effect at that time?
7      A    No, it was not.
8      Q    Did you ever have an opportunity to see
9  how a self-insured medical insurance plan operates?
10     A    Yes.
11     Q    You did?
12     A    Yes.
13     Q    How did you come to have that information?
14     A    There were a number of times that we had
15 considered, as a fund, going self-insured.  We were
16 exploring those avenues.  Probably once a year we
17 would look at those avenues through our consultants
18 and actuaries.
19     Q    And what do you understand -- or can you
20 describe to me what you understand a self-insured
21 plan -- how it operates?
22     A    I think it's different for -- You know, I
23 don't know that I can answer that.  I think it's
24 different for any organization or any company even
25 that goes self-insured.  I mean, there's so many

47

1  different realms of possibility.
2      Basically, the risk is being taken by the
3  employer as opposed to paying to have the risk
4  absorbed by a Blue Cross or an Aetna or Prudential.
5  The employer, itself, is going to manage, maintain the
6  risk.
7      Q    You say that there were presentations made
8  when you were fund administrator for Local 1968?
9      A    Yes.
10     Q    Were there presentations made to you of
11 self-insured plans that you might consider undertaking
12 instead of an insured plan?
13     A    When I was fund administrator?
14     Q    When you were fund administrator.
15     A    No.  I was against the self-insurance.
16     Q    I'm saying, was a self-insured plan ever
17 presented to you as an option?
18     A    To the fund that I was administering?
19     Q    Yes.
20     A    Yes, it was.
21     Q    It was?
22     A    Yes.
23     Q    And was it described to you by anyone?
24     A    Yes.
25     Q    And how was it described, if you can

48

1  recall?
2      A    Basically, that the risk is now being held
3  by the fund as opposed to paying to have the risk
4  managed by an outside insurance company.
5      Q    So is it your understanding that under a
6  self-insured plan that the company or, in this case, a
7  union would actually receive all of the medical bills
8  submitted by the members, participants?
9      A    At the time, yes.
10     And to further elaborate, at the time when I was
11 fund administrator we were self-insured for vision.
12 We were self-insured for orthodontia.  We were self-
13 insured for eye -- ear care, hearing aids.  Those were
14 self-insured benefits through the fund that I
15 administered.  So we had our own claim forms that were
16 drafted, by the consultants, to be used.
17     And, again, this is pre-HIPAA.  And you could see
18 what kind of illnesses and so on of any given member.
19 I mean, it was confidential in the fund administered
20 office.  But, you know, as the administrator at the
21 time, we reviewed these documents at trustees
22 meetings.  And some of the claims that came in were
23 reviewed, or if there was an appeal on a claim.
24     I believe self-insured funds have a lot more
25 intimate knowledge of a member/patient/employee than a

49

1  nonself-insured fund.
2      Q    All right.
3      A    And I'll leave it at that.
4      Q    No.  That's fair enough.  That's a good
5  answer.
6      Is it your belief at least that the description
7  you just provided of a self-insured plan -- is it your
8  belief that that is how the IBEW medical plan is
9  administered?
10     A    I won't speculate on how their plan is
11 administered other than that, when I came on staff, we
12 were told that the benefit package is a self-insured
13 plan, self-insured fund.
14     Q    Did you ever confide in anyone or tell
15 anyone who is employed by the IBEW that you had been
16 diagnosed with the HIV virus?
17     A    No, I did not.
18     Q    You never did?
19     A    No.
20     MR. CHIVERS:  Do you want to take a
21 two-minute break?
22     MR. YELLIG:  Sure.
23     MR. CHIVERS:  Thanks.
24     (Recess in the proceedings)
25     Q    Mr. Kamen, what I'm going to do is --

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

50

1    We've covered this, so I think -- Pretty much we've
2    covered it. I just want to show you some documents.
3    And, in many instances, I believe, based upon the
4    question, we can just go on because you've pretty much
5    addressed the issues that I was going to ask you
6    about.
7        A    Okay.
8        Q    Let me show you this.
9        MR. YELLIG: And you can mark that as
10   Exhibit Number 2. The whole thing can be, I
11   believe, marked as Exhibit Number 2.
12       (Whereupon, Deposition Exhibit 2 was
13   marked for identification.)
14       Q    I'm not going to ask you if you can
15   identify the cover document, which has, in big, dark
16   letters, "Memo," because I assume, other than through
17   discovery, you haven't seen this before, the cover
18   memo. Is that correct?
19       A    Can you ask the question again, please.
20       Q    I'm saying, I am assuming that before this
21   litigation, at least through discovery, you had not
22   seen this cover memo before from Donald C. Siegel to
23   Edwin D. Hill. Is that correct?
24       A    No. I'm not sure I've even seen this
25   since discovery.

51

1        Q    Okay. All right. What I would like for
2    you to do, if you would, is to examine the documents
3    that are attached to the memo and which the memo
4    refers to.
5        A    Each one you want me to go through?
6        Q    Yeah. Sure. Just look at them. And I'm
7    going to ask you if you've ever seen these documents
8    before.
9        A    I believe I've seen some of them
10   since -- through discovery.
11       Q    For the record, can you identify these
12   documents, the attachments to this memo?
13       A    Can I identify them?
14       Q    Uh-huh.
15       MR. CHIVERS: I think you're asking, do
16   you know what these are.
17       A    It appears to be tracking reports for the
18   reps and their assignments -- and their weekly
19   reports.
20       Q    Prior to the discovery process in this
21   litigation were you aware that these tracking reports
22   were maintained by the Third District Office?
23       A    Sure. Not necessarily in this format.
24   But like I told you, at every staff meeting it was
25   always discussed about reports. It was raised at

52

1    almost every staff meeting by not only Vice President
2    Siegel but Vice President Rossa. It was an issue at
3    every staff meeting: reports, expense reports, per
4    capita objection reports, assignments.
5        Q    Tell me about the expense reports.
6        What exactly -- What is an expense report other
7    than the obvious?
8        A    It's a report that is filed twice monthly
9    to be reimbursed for expenses incurred while on the
10   business of the IBEW.
11       Q    So the IBEW doesn't provide you with -- or
12   does the IBEW provide you with a credit card?
13       A    For gas purchases they did. At one point
14   in time we had an airline charge card for any air
15   travel, and, then, that was -- airline travel was then
16   taken over within DC. It was handled in Washington,
17   DC.
18       Q    Well, for example, you're located in
19   Western Pennsylvania, but you had a number of
20   local -- well, at least one local union in New York.
21   Is that right?
22       A    Two.
23       Q    Two.
24       So I assume you -- Did you travel on the
25   Pennsylvania Turnpike very often?

53

1        A    Quite often, yes.
2        Q    And Pennsylvania Turnpike is a toll road?
3        A    Correct.
4        Q    Would you incur charges or expenses for
5    the tolls?
6        A    I don't know if the other reps did. I had
7    my own E-Z Pass, so every two months I would submit,
8    on an expense report, for toll reimbursements
9    specifically.
10       Q    But that is the kind of expenses that you
11   would seek reimbursement for?
12       A    Sure. It would be for tolls, certain
13   meals, if you were out of town or overnight, hotel
14   charges, if you had to incur any expenses for a
15   meeting room or for negotiations where the union was
16   paying half or the employer or the arbitrator,
17   whatever, and the expenses incurred on behalf of doing
18   business for the IBEW.
19       Q    So if you were delinquent in submitting
20   expense reports, in the meantime you would receive
21   bills for these expenses. Isn't that correct?
22       A    Sure. Yes.
23       Q    And did you pay those bills?
24       A    Yes.
25       Q    So you were out of money if you didn't

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
Transcript of Steven Kamen

---

54

1  submit the expense reports in a timely fashion.  Is
2  that correct?
3      A    Correct.
4      Q    So it was in your best interest to submit
5  the expense reports timely?
6      A    I'll agree with that.  Yes.
7      Q    Now, looking at these tracking charts that
8  I showed you, go back -- Unfortunately, they start --
9  or, fortunately, they start in November/December
10  2002.  Do you see that?
11      A    Yes, I see that.
12      Q    If you go back -- They're in chronological
13  order.  If you would, go back to the -- I'm not going
14  to count the sheets, but go back to February of 2004,
15  which would be January/February 2004.
16      A    Okay.
17      Q    All right.  Now, if you would look, your
18  name is listed there.  Is that correct?
19      A    Yes, it is.
20      Q    And if I'm reading this correctly, it
21  indicates that, for the week ending January 3, 2004,
22  you submitted a weekly activity report on January 3,
23  2004.  Is that correct?
24      A    It appears that way, yes.
25      Q    And, then, the next column, it says,

---

55

1  1/10/2004, January 10, 2004.  Going down, it appears
2  as though you submitted that weekly activity report on
3  May 11, 2004.  Is that correct?
4      A    It appears that way, yes.
5      Q    All right.  And, then, if you go across
6  the remainder of the columns, it appears as though you
7  submitted four reports on May 11 for January 10,
8  January 17, January 24, and January 31.  Is that
9  correct?
10      A    It appears that way, yes.  They were
11  received or logged in or tracked on that date.
12      Q    So was there -- Certainly, I think you
13  would agree -- I hope you would agree that there was a
14  period of time that elapsed between the actual
15  activities that were reported and the reporting of
16  those activities?
17      A    Correct.
18      Q    Some -- January, February, March, April,
19  May -- four months; right?
20      A    Correct.
21      Q    Okay.  Was there any particular reason
22  that you can recall for that delinquency?
23      A    That was when I was quite ill, very, very
24  sick, hospitalized.  I was out of work from -- I
25  believe it was the 19th, 20th, of February, and I did

---

56

1  not return until May 1 of 2004.
2      Q    Now, in the amended complaint you allege
3  that -- And we can look at the amended complaint, if
4  you want to -- you allege that you were diagnosed
5  during a hospital stay in February 20, 22, somewhere
6  around that time in 2004; you were diagnosed as having
7  the HIV virus.  Is that correct?
8      A    It was, I believe, around March or April
9  that that was diagnosed.  I was quite ill previous to
10  that.
11      Q    Uh-huh.
12      A    And the subsequent diagnosis was HIV.
13      Q    You were not diagnosed as having
14  contracted HIV in late February of 2004?
15      A    No, I was not.
16      Q    Okay.  Let's take a look at the complaint.
17          MR. YELLIG:  Mark that as Exhibit 3.
18          (Whereupon, Deposition Exhibit 3 was
19  marked for identification.)
20      Q    I believe it's 20.  Yes.  Look at
21  paragraphs 19, 20 -- yeah, 19 and 20 on page 4 of 13.
22      A    Okay.
23      Q    It says, "On or about February 20, 2004,
24  Plaintiff became ill and was hospitalized."  Correct?
25      A    Correct.

---

57

1      Q    And number 20 says, "Plaintiff was
2  diagnosed with human immunodeficiency virus (HIV)."
3      A    Correct.  There's no date there.  Nothing
4  that says --
5      Q    I see.  That's part of what I want to get
6  clear.  So it's your testimony that you were not
7  diagnosed at the time of that hospitalization,
8  February 20, as being HIV positive?
9      A    No, I was not.
10      Q    And it is your testimony now that you were
11  diagnosed in March?
12      A    I believe it was sometime in March, after
13  a number of hospitalizations and a number of
14  illnesses, that I went through the tests leading up to
15  determine.
16      Q    And you were informed in March --
17      A    Yes.
18      Q    -- of 2004?
19      A    It could possibly be April.  I mean, I was
20  very, very ill at that time.  I was in and out of the
21  hospital and virtually nonfunctioning, being cared for
22  by professionals, nursing staff coming into my house;
23  my sisters were down taking care of me.  But it wasn't
24  initially, at the onset, in February that I was
25  diagnosed.  It was later on.

58

1    Q   No. That straightens something out for me
2  because I got -- I see what you're saying. You're
3  absolutely correct. I jumped to that conclusion,
4  myself.
5    A   Okay.
6    Q   So is it your testimony that your
7  delinquency that's reflected in this January/February
8  2004 tracking sheet, under Exhibit Number 2 -- is it
9  your testimony that the delinquency that's indicated
10  in submitting your weekly activity reports from
11  January 10, 2004, that that was attributable to your
12  illness?
13    A   Yes.
14    Q   It is. Okay. I think perhaps I got ahead
15  of myself a little bit.
16       If you look at the column that shows February 7,
17  2004, February 14, 2004 -- 14 and 21 and 28 -- Do you
18  see those?
19    A   Yes.
20    Q   And it indicates, if I'm reading this
21  correctly, that you submitted the weekly activity
22  reports for those weeks in February on May 27, 2004.
23  Is that correct?
24    A   They were received on May 27, yes.
25    Q   Received?

59

1    A   Yes. The report states that, yes.
2    Q   If you switch -- If you would go to the
3  next page, which covers March/April 2004 -- Do you see
4  that?
5    A   Yes.
6    Q   And it indicates, also, that the weekly
7  activity reports for those two months worth of weeks
8  were all submitted on May 27, 2004. Is that correct?
9    A   Correct.
10    Q   And if you go to the next page, which is
11  labeled May/June 2004, you see it says -- In the first
12  column, it says, May 1, 2004, and it indicates that
13  the weekly activity report for that week was received
14  on May 27, 2004. Is that correct?
15    A   Correct.
16    Q   Now, you notice that for the weeks beyond
17  the week ending May 1, 2004, those are blank.
18    A   Okay.
19    Q   Did you submit weekly activity reports?
20  Did you ever submit weekly activity reports for those
21  subsequent weeks in May/June and, if you turn the
22  page, July/August?
23    A   Yes, I did.
24    Q   You did.
25       Now, is it your testimony that the delinquency --

60

1  which, if you go through September/October 2004,
2  they're blank, and all the way to, on the last page
3  here, November -- the week ending November 20, 2004
4  those are all blank. Is that correct?
5    A   Correct.
6    Q   Is it your testimony that you did
7  eventually submit weekly reports for those weeks?
8    A   Yes, I did.
9    Q   Was there any particular reason for the
10  delinquency in submitting these reports?
11    A   I was back to work, I believe, around
12  May 1. Shortly thereafter there was a conference
13  where I spoke with Vice President Siegel.
14    Q   Approximately when? Do you know?
15    A   Early in May.
16    Q   May?
17    A   Uh-huh.
18    Q   What conference was that? Do you
19  remember?
20    A   I think it was a progress meeting.
21    Q   Progress meeting?
22    A   Uh-huh. I asked him for my locals back,
23  and he said, no. It was a short discussion. And
24  during this time I'm still getting calls from the
25  locals that he had reassigned to other reps.

61

1    Q   Uh-huh.
2    A   And I continued to work through the
3  summer. I was assigned by Rep Welsh and
4  Vice President Siegel to work on the presidential
5  campaign.
6    Q   "Presidential campaign," you mean of the
7  United States presidency?
8    A   United States presidential campaign in
9  2004.
10       I put many, many week in, working here and
11  working in Beaver County out of Local 712. President
12  Hill was out. Vice President Siegel was out. I was
13  doing door to door. I was assigned to work strictly
14  on the campaign by Vice President Siegel, which I
15  did. I stayed very busy during those months.
16    Q   So is it your testimony that the
17  delinquencies in submitting your weekly reports after
18  May 1, 2004 was for -- was it on account of your
19  health condition?
20    A   It was on account of my health condition.
21  I was doing the best I could servicing my locals and
22  doing my daily routine while adjusting to many new
23  medications, various illnesses on and off, and just
24  doing the best I could servicing my locals, meetings,
25  negotiations, training sessions, then being assigned

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

17 (Pages 62 to 65)

62

1  to working on the campaign, the election campaign.
2      Q    The presidential campaign?
3      A    Yes.
4      Q    When you had a meeting with Vice President
5  Siegel in May 2004, I believe it's your testimony that
6  he -- my words -- admonished you about the delinquency
7  in submitting weekly reports. Is that correct?
8          MR. CHIVERS: Object to the form.
9          I put an objection like that on the record
10     to preserve.
11     A    In May of 2004, when I met with him,
12  during that month I had caught up on all my reports
13  while I was out. There was really nothing to report
14  while I was on medical leave except you put down "sick
15  leave" on a report. And I don't believe there was any
16  expenses incurred, maybe minimal expenses, during the
17  time that I was out on leave, and it was just a matter
18  of working and trying to get caught up on the
19  paperwork.
20     Q    Well, maybe I misunderstood. I thought
21  that your testimony was that, at the progress meeting
22  in May of 2004, that Vice President Siegel met with
23  you and discussed your delinquent reports.
24     A    I believe I said that was in 2003.
25     Q    Oh, okay. What, if anything, occurred in

63

1  your meeting with Vice President Siegel in the
2  progress meeting in 2004?
3      A    I asked him for my locals back --
4      Q    Okay.
5      A    -- he had reassigned while I was on
6  medical leave.
7      Q    Okay. I see. All right. I apologize. I
8  got it --
9      A    That's okay.
10     Q    I got it a little bit confused.
11     A    That's okay.
12     Q    All right. You asked him to reassign the
13  local unions that you had been relieved of
14  responsibility for. Is that correct?
15     A    Correct.
16     Q    Is that the Locals 2007, 1968, and 385?
17     A    Correct. And there might possibly be one
18  more, to the best of my recollection, but --
19     Q    And then it's your testimony that there
20  was no discussion about weekly activity reports at
21  that time?
22     A    No, not that I recall.
23     Q    Did you, physically, at that time provide
24  him with a number of weekly activity reports?
25     A    In May of 2004?

64

1      A    May of 2004.
2      A    No, I did not.
3      Q    You didn't. Okay.
4      A    No.
5      Q    All right. When you requested -- When you
6  made the request to Mr. Siegel in May of 2004 that
7  these local unions be reassigned to you, what did you
8  say to him specifically, if you can recall?
9      A    I believe the discussion was very short,
10  and it was that I had been seriously ill and I'm back
11  to work and working myself back up to full
12  performance, doing the best I could, and I wanted my
13  locals back. I mean, there was a rapport. He said,
14  no. That was it.
15     Q    Did he give you any explanation other than
16  deny it?
17     A    No.
18     Q    I gather, from your earlier testimony, you
19  did not tell Mr. Siegel at that time the nature of
20  your illness?
21     A    Mr. Siegel was aware of the nature of my
22  illness. While I was out on medical leave Mr. Siegel
23  had been receiving reports from my physicians that I
24  would send in to him with the cover letter, saying
25  this is enclosed or attached is a report from

65

1  Dr. Magill or Dr. Rocchi, any of my physicians,
2  stating, this is what's going on. He was kept abreast
3  of what was going on, in writing, while I was out.
4      Q    Did you tell Mr. Siegel at that time that
5  you were HIV positive?
6      A    No, I did not.
7      Q    Did you indicate to Mr. Siegel that the
8  health problems that were identified in these notes
9  from your physicians -- that they had been treated
10  successfully or that they would continue to be a
11  problem for you?
12     A    It was ongoing treatments and I was quite
13  ill. He was aware of that.
14     I should retract that. I shouldn't assume that
15  he was aware of it. Correspondence -- When I was able
16  to, I was sending correspondence into the district
17  office, which is here. On a number of occasions both
18  of my sisters spoke with Mike Welsh to tell him I was
19  hospitalized, to stay in contact with him while I was
20  so sick. So I shouldn't assume that Mr. Siegel knew
21  anything. I was ill. I was sick. Very sick.
22     Q    Yeah. I'm not really asking you if you
23  were ill. I guess what I'm asking you is: Did you
24  indicate to Mr. Siegel, in May of 2004, at your
25  meeting that your illnesses would continue to impair

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
Transcript of Steven Kamen

18 (Pages 66 to 69)

66

1 your ability to perform your job?
2    A    He didn't ask that question, and I didn't
3 offer any information other than to ask for my locals
4 back. I was getting back to speed and doing the best
5 that I could.
6    Q    Okay. Let me show you this, just to bring
7 this up to date.
8         MR. YELLIG: We'll mark this as Exhibit 4.
9         (Whereupon, Deposition Exhibit 4 was
10 marked for identification.)
11    Q    I don't know how else to do this other
12 than to ask you to look at Exhibit 3 and look
13 at the --
14         MR. CHIVERS: I only have 1 and 2. I
15 don't have 3. What's 3?
16 Oh, 3 is the complaint.
17         MR. YELLIG: Oh, I'm sorry.
18         MR. CHIVERS: Isn't 3 the complaint?
19         MR. YELLIG: Yeah. I'm sorry. The sheets
20 are Exhibit 2.
21         MR. CHIVERS: That's all right.
22         MR. YELLIG: I'm sorry. My mistake.
23    Q    I would ask you to look at the May/June
24 2004 from Exhibit Number 2 and the July/August 2004 in
25 the same exhibit and September/October 2004, the ones

67

1 that have the blanks beside your name. Do you see
2 where I'm talking about, in Exhibit Number 2, this one
3 here?
4    A    Okay. Where do you want to start?
5    Q    Well, May/June 2004.
6    A    Okay.
7    Q    All right. Where the blanks appear next
8 to your name.
9    A    Uh-huh.
10    Q    Now, I'd like for you to look at the
11 May/June 2004 in Exhibit 4 and the subsequent pages
12 through November. I guess November/December 2004.
13 Okay.
14    The dates, if you compare them, beginning with
15 May 8 -- That's interesting. There is no May 8 on the
16 Exhibit 4. Isn't that correct? It doesn't show a
17 May 8. It goes from May 1 to May 15.
18    A    Because the expense reports are twice
19 monthly.
20    Q    This is expense report. I see. Okay.
21 I'm screwing things up.
22    Did you submit reports eventually for the blanks,
23 the blank dates that appear on Exhibit 2 for May 2004
24 through December 2004?
25    A    I believe I testified to that already.

68

1 Yes, I did.
2    Q    Do you recall when you submitted them?
3    A    I don't recall the date, no.
4    Q    Oh, boy. I grabbed the wrong form because
5 they do indicate -- there is an activity -- a
6 supplemental activity report, tracking report, which
7 shows you have submitted everything on November 30.
8    A    Okay.
9    Q    I apologize. I didn't even notice. I
10 thought that's what I was looking at.
11    A    Okay.
12    Q    Now, I want to show you -- As I said, I
13 think, perhaps, we can move through this pretty
14 quickly. I'm going to show you a letter dated May 14,
15 2003, from Vice President Siegel, addressed to you,
16 regarding a letter that he had received from Patrick
17 Kinney of Local 2007. I'm going to show you that
18 letter.
19    A    Okay.
20         MR. YELLIG: There are several pieces of
21 correspondence, but, for purposes of
22 identification, since they're related, I'm just
23 going to mark them as one.
24         (Whereupon, Deposition Exhibit 5 was
25 marked for identification.)

69

1    Q    And I'll ask you to look at the last
2 document attached. There's three documents attached,
3 and the last one is -- Well, it's a fax, not a letter,
4 from -- Well, it is a letter, but it's a fax form --
5 addressed to Mr. Siegel from Patrick Kinney and ask
6 you if you recall this, having seen this letter
7 before.
8    A    I believe I've seen this.
9    Q    Well, take a look at the first document --
10 It's dated May 14, 2003.
11    A    Okay.
12    Q    -- which is part of Exhibit Number 5.
13 It's a letter from Mr. Siegel, addressed to you, dated
14 May 14, 2003.
15    A    Okay.
16    Q    And it indicates that there's a copy of a
17 letter from Patrick Kinney, a member of Local 2007,
18 which is self-explanatory. "Please arrange your
19 schedule to investigate this matter. . ."
20    Do you recall this matter at all, having
21 investigated it?
22    A    Vaguely. But I don't recall the outcome.
23    Q    You don't.
24    A    To elaborate, Local 2007 is an extremely
25 problematic local union, small membership, very

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

## NETWORK DEPOSITION SERVICES
### Transcript of Steven Kamen

19 (Pages 70 to 73)

70

1  problematic. I spent a lot of time there in my years
2  as an international rep.
3      Q    What do you mean, "problematic"?
4      A    Multiple problems between members,
5  management all the time, for a very small local,
6  required an awful lot of servicing.
7      Q    An awful what?
8      A    Lot of servicing. Excuse me.
9      Q    This is one of the local unions, right,
10 that you were relieved of responsibility for?
11     A    I believe so.
12     I had a situation at this local, early on, where
13 a female member had been accused of sexual conduct
14 with 14 male members, including four officers of a
15 local. This is a very problematic local and required
16 a lot of time and diligence on my behalf.
17     Q    Okay. All right.
18     A    So to remember a specific -- I had a lot
19 of reports on this local. A lot of reports were
20 submitted on Local 2007.
21     Q    Fair enough.
22     I'll show you -- Again, I'm lumping these
23 documents together for identification purposes as
24 Exhibit Number 6. There are three documents, I think
25 you'll see -- two -- No. I'm sorry -- two in this

72

1  at all.
2      A    Yes, I do.
3      Q    And what was the nature?
4      A    This was a situation that I told you I
5  should have closed out as a moot point. Annmarie
6  Polinsky's father was the president of the state AFL.
7  Bob Palmatier was vice president of 1968 while I was
8  the business manager. He continued to be vice
9  president manager after I left and came on staff
10 here. And she had some political issues with him. He
11 was on the private industry council in the county in
12 New York where she was on the private industry
13 council, and she didn't like the way he voted.
14     Subsequently, her father was no longer president
15 of the state AFL. She no longer had a job with the
16 private industry council. And it just kind of all
17 quietly went away. And I should have closed it out as
18 a moot point and did not.
19     MR. YELLIG:  Okay. All right. Let's
20 see. I got one more here.
21     Let's mark this as Exhibit Number 7.
22     (Whereupon, Deposition Exhibit 7 was
23 marked for identification.)
24     Q    And Exhibit Number 7 consists of three
25 separate documents, actually, but the first one is

71

1  particular group.
2      MR. YELLIG:  Mark that as Exhibit 6,
3  please.
4      (Whereupon, Deposition Exhibit 6 was
5  marked for identification.)
6      Q    If you notice, the cover -- the first
7  document is dated October 27, 1999, and it is from
8  Lawrence E. Rossa, International Vice President,
9  addressed to you. Correct?
10     A    Correct.
11     Q    And attached to that letter is another
12 document, which is a two-page document, signed by
13 Annmarie J. Polinsky. It's addressed to Lawrence E.
14 Rossa, Third District, International Vice President.
15 The only date that I see on it -- There's a stamp down
16 in the right-hand corner that says, "Received
17 October 29, 1999, IBEW Third District."
18     Do you see that?
19     A    Okay.
20     Q    I believe you may have testified about
21 this already, about this particular situation, but I'd
22 ask you to take a look at the letter from
23 Ms. Polinsky --
24     A    Polinsky.
25     Q    -- and ask you if you recall this matter

73

1  dated October 21, 2003. And it is from Donald C.
2  Siegel, International Vice President, addressed to
3  you, Steven Kamen. You see that?
4      A    Yes.
5      Q    Now, attached to that is another document,
6  dated October 21, 2003, from Mr. Siegel to Gary
7  Slovikosky -- Slovikosky I guess it is. And then the
8  third document, which is the one I want to ask you
9  about, is a letter from Mr. -- It appears to be, yeah,
10 from Mr. Slovikosky, dated December 22, 2003,
11 addressed to Donald C. Siegel, Vice President, Third
12 District.
13     Now, my question to you is:  Do you recall having
14 seen this correspondence that I've just described?
15     A    I believe so.
16     Q    What's this about?
17     A    The disgruntled member. I mean, I told
18 you, this is Local 2007, which is a very problematic
19 union, membership of about 62 at the time, and
20 constant complaints, member to member, member against
21 officers, members against the company, members against
22 me. Continual complaints.
23     Q    Now, in the October 21 letter from
24 Mr. Siegel to you, you see the second paragraph, the
25 second sentence -- I'm sorry -- first sentence in the

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

74

1  second paragraph, it says: "Please provide me with a
2  report on this matter."
3      A    Correct.
4      Q    Did you ever provide a report to
5  Mr. Siegel?
6      A    I don't recall.
7      Q    You may have, but you can't remember?
8      A    Correct. I may have, but I don't
9  remember.
10     Q    Okay.
11     A    When I was terminated, every file I had of
12  IBEW property was returned to the district office. I
13  don't have any files at all from my work with the
14  IBEW.
15          MR. YELLIG: Let's mark this as Exhibit
16  Number 8.
17          (Whereupon, Deposition Exhibit 8 was
18  marked for identification.)
19     Q    Exhibit Number 8 is a letter dated
20  November 17, 2002 from you, Mr. Kamen, addressed to
21  Donald C. Siegel, IVP, and it has a re line of "Labor
22  2002 Meetings."
23          Is this the episode that you were referring to
24  about Yom Kippur?
25     A    No. This was just me notifying him of why

75

1  I didn't attend the meetings, because they coincided
2  with Yom Kippur.
3          His comment about Yom Kippur was during his
4  deposition that was here.
5      Q    Yes. Correct.
6          And you regarded his comment at that time --
7  "his" being Mr. Siegel's comment at that time -- as
8  perhaps reflecting a bit of antisemitism. Is that
9  correct?
10     A    Possibly.
11     Q    Can I ask you a question. I understand
12  what you're saying. It's perfectly clear. But as I
13  understand this letter, you're saying, if I understand
14  it correctly, Vice President Siegel had assigned you,
15  I guess, on September 6, to attend a meeting out of
16  town. Is that correct?
17     A    It appears that way, yes.
18     Q    I see, ". . . The central Pennsylvania and
19  Allegheny meetings. . ." What is he referring to
20  there -- or what are you referring to there?
21     A    I'm not even sure.
22     Q    ". . .were scheduled for the 16th of
23  September. . ." Is that correct?
24     A    It appears so, yes.
25     Q    And without checking my calendar, I

76

1  gathered from your letter that the 16th of September
2  was Yom Kippur?
3      A    I would assume so, yes.
4      Q    So am I correct that you received that
5  assignment on or about September 6, to attend a
6  meeting on September 16, and you did not -- Did you
7  say anything to Vice President Siegel when you
8  received this, like, hey, this is Yom Kippur; I can't
9  attend?
10     A    I don't recall.
11          If I said anything to him, I don't recall. This
12  is confirmation that I did not attend and why I did
13  not. I don't recall if I sent anything to him.
14     Q    Beforehand?
15     A    The assignment would have been in the
16  mail.
17     Q    I'm sorry. Beforehand?
18     A    The assignment would have been in the
19  mail.
20     Q    But, presumably, you received the
21  assignment prior to September 16.
22     A    Presumably, yes.
23     Q    And you don't recall having contacted
24  Mr. Siegel to say, I can't attend this meeting because
25  that's Yom Kippur?

77

1      A    I might have. I don't recall.
2          MR. YELLIG: I believe you referred to
3  this before as well. We'll mark this as
4  Exhibit 9.
5          (Whereupon, Deposition Exhibit 9 was
6  marked for identification.)
7      Q    Now, this Exhibit 9 is a letter from
8  Mr. Siegel addressed to you, dated April 21, 2003. Is
9  that correct?
10     A    Correct.
11     Q    Do you recall receiving this letter from
12  Mr. Siegel?
13     A    I believe I did see this letter, yes.
14     Q    Now, I believe you testified earlier that
15  you met with Vice President Siegel in May of 2003. In
16  fact, I think I got it confused with May of 2004.
17     A    Yes.
18     Q    You had a meeting with Siegel. And did
19  Mr. Siegel discuss with you at that meeting
20  late -- well, delinquent completion of assignments
21  and/or delinquency in submitting weekly work reports?
22     A    As I recall, the meeting in May of '03 was
23  a follow-up to this letter. It was just a discussion.
24     Q    Were you --
25     A    Excuse me. At the time he had asked me if

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

78

1  everything was okay. I had lost my mother several
2  months before that, in December of '02, which he was
3  aware of. So getting my life back on track during
4  that period of time.
5      Q    But your testimony is that this letter was
6  followed up by a person-to-person conversation?
7      A    That was the first time we had seen each
8  other.
9      Q    Since your mother passed away?
10     A    Quite possibly. I didn't see
11  Vice President Siegel very often at all except maybe
12  at a progress meeting. That would be it.
13     Q    Just so the record is clear, you said,
14  "That was the first time we had seen each other."
15  Since when?
16     A    I don't recall. You asked me if it was
17  since my mother passed away. I said, it might very
18  well have been; I don't recall.
19     Q    One other question about Exhibit 9. At
20  this time, at the time that these matters were brought
21  up, brought up to your attention by Vice President
22  Siegel, were your health conditions in any way
23  contributory to your delinquency --
24     A    To the delinquency in the assignments --
25     Q    -- submitting weekly reports?

79

1      A    -- I don't believe at that time, no.
2          (Whereupon, Deposition Exhibit 10 was
3          marked for identification.)
4      Q    I'm going to show you -- This is Exhibit
5  Number 10. It is a letter dated January 20, 2004,
6  from you, Mr. Kamen, to Mr. Siegel, and the re line
7  says "LM-2 Reporting."
8      Do you recall having prepared this letter?
9      A    Yes.
10     Q    And what's the topic of discussion in this
11  letter?
12     A    It was new reporting assignments required
13  for the LM-2 reports.
14     Q    What is an LM-2 report?
15     A    Labor management report that's filed with
16  the Department of Labor.
17     Q    What's contained in the reports?
18     A    Income, expenses, officers, past,
19  current. It's a public disclosure document that local
20  unions must file annually. And there was some changes
21  in the reporting process. And, as I told him in this
22  letter, I had been ill. I was not able to attend a
23  meeting where they discussed it. But I only had one
24  local union that was -- Of all the local unions I
25  serviced, only one was responsible for the change in

80

1  reporting. I had spoke to the business manager. They
2  were aware of the changes. Discussed them with their
3  accountants.
4      This was basically completing an assignment,
5  other than to tell him I had the flu. I mean, I think
6  this is pretty good correspondence with me and my
7  boss, letting him know what's going on. You know, but
8  that's my opinion.
9      Q    I remember I had a question about this.
10  Why -- I notice you said, ". . .I believe the only
11  one --" referring to local unions "-- that will be
12  required to comply with the new filing is Local 86 in
13  Rochester, New York."
14     A    Correct.
15     Q    Can you explain to me why?
16     A    As I recall -- And I don't recall all the
17  particulars with the new LM reporting at the time. It
18  was for local unions with income over X number of
19  dollars. Most of my locals were small manufacturing
20  locals that have $10,000 or $15,000 in their general
21  account, where Local Union 86 is a construction
22  local. It has its own buildings, its own funds, six
23  or seven staff vehicles, with a staff of 20
24  employees. It's a much bigger organization. And they
25  were required to make the changes.

81

1      I believe it was at the time, with those
2  changes -- as I recall, it was for financial, locals
3  with income or expenses over X number of dollars.
4      Q    Okay.
5      A    And Local Union 86 also had their own
6  staff of accountants, so they were aware of it
7  and always had contact with Business Manager Auble.
8      Q    Mr. Auble, had he requested training? Had
9  Mr. Auble requested training?
10     A    On the LM reports?
11     Q    On the LM reports.
12     A    No. I did shop stewards training there at
13  Local 86, I believe. And I don't have it in front of
14  me. I believe the assignment from Vice President
15  Siegel was to attend this seminar by the Department of
16  Labor regarding LM reporting and then get in touch
17  with all my locals and make sure they were on track
18  for the new reports. I did that. It was completed.
19     Q    Unfortunately, I don't have --
20     A    It was completed. None of my locals
21  were -- Obviously, based on this letter, none of my
22  locals except for Local 86 had to comply with the new
23  requirements.
24     Q    I see.
25     Let me show you this document here.

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

# NETWORK DEPOSITION SERVICES
## Transcript of Steven Kamen

22 (Pages 82 to 85)

### 82

1    MR. YELLIG: We'll mark this as
2    Exhibit 11.
3    (Whereupon, Deposition Exhibit 11 was
4    marked for identification.)
5    Q    This appears to be a memorandum from -- it
6    says, "Town of Rochester Highway Employees" to the
7    "IBEW Third District," and it's dated February 27,
8    2004. Is that correct?
9    A    Yes. That's correct.
10    Q    Have you seen this document before?
11    A    I believe I have.
12    Q    I'm sorry?
13    A    Yes.
14    Q    You have?
15    A    Yeah. I don't recall if I saw it through
16    discovery or -- But I've seen it, yes.
17    Q    And can you relate to me the contents of
18    this memo?
19    A    It said there were three meetings. I
20    canceled out at the last minute and then didn't show
21    up. I was hospitalized at the time, so -- I told you
22    I was out from, I believe, February 19 of '04 until
23    May 1 on sick leave.
24    Q    This doesn't say -- This letter or memo
25    doesn't really say when those meetings were

### 83

1    scheduled. Correct?
2    A    Correct.
3    Q    Are you telling me that they were
4    scheduled at a time when you were hospitalized?
5    A    Definitely.
6    Q    Okay.
7    A    This was ongoing negotiations. To the
8    best of my recollection, the contract had expired in
9    December. We were working without a contract. And I
10    started to get sick -- As you can see by this letter,
11    I was starting to get sick in January already. By
12    third week in February I was seriously, seriously
13    ill. It was just progressing to the point, you know,
14    that, subsequently, I was hospitalized and that ill.
15    Q    Now, Local 1968, I believe, is one of
16    the -- Is that one of the locals that Vice President
17    Siegel relieved you of responsibility for providing
18    support services?
19    A    I believe so.
20    Q    I think you've pretty much covered the
21    statement in Vice President -- excuse me -- President
22    Hill's letter of December 8, 2004, on page 2, that I
23    had asked you about before. It says, "Vice President
24    Siegel, however, has frequently experienced an
25    inability to reach you at times when it was important

### 84

1    to do so, and you have on many occasions not responded
2    by e-mail to his office."
3    And I think your testimony is, basically, you're
4    not real comfortable using e-mail?
5    A    Correct.
6    MR. YELLIG: Let's mark this as Exhibit
7    Number 12.
8    (Whereupon, Deposition Exhibit 12 was
9    marked for identification.)
10    MR. YELLIG: I'm going to identify it
11    while you're looking at it. It says that it is a
12    correspondence of some sort from Michael D.
13    Welsh, W-e-l-s-h, that was sent on Tuesday,
14    December 30, 2003, at 10:34 a.m., to Steven
15    Kamen, and it says: "Subject: Call me."
16    Q    Right?
17    A    Correct.
18    Q    Do you recall ever receiving this
19    communication?
20    A    I don't recall.
21    Q    Do you know what it is, looking at it now?
22    A    It appears to be an e-mail, print of an
23    e-mail.
24    Q    Right. And you're saying you don't recall
25    ever having received this e-mail?

### 85

1    A    I might have. I don't recall.
2    Q    All right.
3    A    Yeah.
4    Q    I was going to ask you a question, whether
5    you responded to it, but if you don't recall if you've
6    seen it --
7    A    I don't recall.
8    MR. YELLIG: Yeah. Here's another. We'll
9    call this Exhibit 13.
10    (Whereupon, Deposition Exhibit 13 was
11    marked for identification.)
12    Q    Exhibit 13 is what appears to be a
13    printout of an e-mail from Donald Siegel to Steven
14    Kamen, sent on Friday, February 27, 2004, at 3:47 p.m.
15    A    Okay.
16    Q    And do you see it says: "Steve: Call me
17    ASAP. Don." Correct?
18    A    Correct.
19    Q    Do you recall ever receiving this e-mail?
20    A    I believe I did, but I don't believe I
21    checked it until sometime in April or May.
22    Q    Well, I was going to ask you -- You got a
23    little ahead of me.
24    A    Okay.
25    Q    You see, below there, it says "tracking"?

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

23 (Pages 86 to 89)

86

1    A    Uh-huh.
2    Q    And it indicates your name, Mr. Welsh, and
3    a Mr. John E. Malagise?
4    A    Uh-huh.
5    Q    Do you see it says "delivery" in the next
6    column?
7    A    Yes, I do.
8    Q    It says they were -- all are dated
9    February 27, and then it says "read," and there's a
10   blank next to your name, and next to the other two
11   gentlemen it says, "Read: February 28, 2004," and
12   next to Mr. Malagise, it says, "March 1, 2004."
13   Do you see that?
14   A    Correct.
15   Q    What do you understand that to be
16   indicating?
17   A    When it was read by the recipient.
18   Q    Correct. Right.
19   So this indicates you never read it?
20   A    This would indicate I was in the
21   hospital. So at some point I believe I did read it.
22   Q    This was sent to you when you were in the
23   hospital?
24   A    Yes.
25   Q    Is that correct?

87

1    A    Yes.
2    MR. CHIVERS: Object to the form. We
3    don't know what the date of this is -- or do we?
4    MR. YELLIG: February 27.
5    MR. CHIVERS: Yeah, I know, but we don't
6    know what that date of this document is, this
7    tracking document.
8    MR. YELLIG: That's true.
9    MR. CHIVERS: I mean, it could be March 3,
10   March 2. Correct?
11   MR. YELLIG: That's correct.
12   MR. CHIVERS: All right.
13   (Recess taken)
14   Q    I show you a document. We're going to
15   mark it as Exhibit Number 14.
16   (Whereupon, Deposition Exhibit 14 was
17   marked for identification.)
18   Q    And it appears to be another one of these
19   copies of an e-mail. And it says from Mr. Kamen, from
20   you, to Mr. Siegel. And it says it was sent April 8,
21   2004. It says, "Subject: Read." Is that correct?
22   A    It appears that way, yes.
23   Q    Now, if you look at that smaller print
24   there, I gather it appears as though you opened an e-mail that
25   recording of the date that you opened an e-mail that

88

1    was sent to you on February 27, 2004 at 3:47 p.m.
2    A    Okay.
3    Q    Is that fair?
4    And it appears that you opened it on April 8,
5    2004.
6    A    Okay.
7    Q    Now, how much time elapsed? This is well
8    over a month. Is that correct?
9    A    Correct.
10   Q    Do you have any explanation for why you
11   didn't open this e-mail in all that time?
12   A    Probably didn't have my laptop in the
13   hospital with me while I was sick.
14   Q    How much of the time that you were ill in
15   February, March, and April of 2004 -- how much of that
16   time were you actually in the hospital?
17   I know you were in in late February.
18   A    I believe I was in two different times. I
19   don't recall the amount of days. When I wasn't, I was
20   at home, being nursed, strictly in a chair, horrible
21   migraines, unbelievable pain from diverticulitis,
22   viral meningitis, a number of meds, morphine,
23   oxycodone. I mean, I really wasn't functioning at all
24   during that period of time.
25   MR. CHIVERS: Off the record.

89

1    (Discussion off the record)
2    A    Total maybe nine or ten days. I really
3    don't recall. Nine or ten days.
4    Q    I was going to ask you a little bit later
5    about hospital stays, you know, so maybe we can
6    explore that a little bit more.
7    MR. CHIVERS: Yeah. Whenever.
8    Q    Going back to Exhibit -- I believe it
9    would be 13 -- Yeah, Exhibit 13. This is the document
10   that says, "Sent: Friday, February 27, 2004 at
11   3:47 p.m." Do you see that?
12   A    Yes.
13   Q    And it indicates down below -- We were
14   talking about this, although Mr. Chivers made a good
15   point that we can't be sure when this report was
16   actually made, but it certainly must have been on or
17   after March 1, 2004 because of the "read" date for
18   Mr. Malagise.
19   Is it a fair assumption that this is the e-mail
20   that you opened and is reflected in Exhibit Number 14?
21   A    I would assume so. I mean, it doesn't
22   say. "Steve, Call me, Don." But I would assume so.
23   I mean, the dates and times appear to line up.
24   Q    Right. Yeah. The reason I'm making that
25   assumption is because the date -- not only is the date

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

# NETWORK DEPOSITION SERVICES
## Transcript of Steven Kamen

24 (Pages 90 to 93)

90

1  the same, but the time is 3:47, if you notice, on both
2  of them.
3      A    Yes, I do.
4      Q    So that's a reasonable assumption; is it
5  not?
6      A    Uh-huh.  Yes.
7      Q    And Exhibit Number 13 says, "Steve: Call
8  me ASAP.  Don."
9      Now, I may have asked you this already:  Do you
10 recall having opened this e-mail on April 8, 2004?
11     A    I don't think you asked me, but I believe
12 I did open it, yes.
13     Q    And so, presumably, you saw this e-mail
14 that says, "Steve:  Call me ASAP.  Don."
15     A    Yes.
16     Q    Did you call him, Mr. Siegel?
17     A    I don't recall.
18     I know during the time that I was out I was
19 sending correspondence in to Mr. Siegel.  I had some
20 contact with Mike Welsh, who was my go-to person here
21 in the office.  And my sisters had contact with
22 Mr. Welsh, both of my sisters, a number of times.
23     Q    I don't want to interrupt you.
24     A    I don't recall that I ever specifically
25 called Don.

91

1      Q    Okay.
2      A    Mike was my go-to person in the office.
3      Q    Okay.  Well, perhaps I'm --
4      A    I might have called him when I got this
5  e-mail.  I don't recall.
6      Q    I see.  Okay.  You don't know what
7  that -- Do you know what Mr. Siegel was anxious to
8  speak to you about ASAP?  Do you recall?
9      A    I could presume it's, based on this
10 document, from the town of Rochester, which is dated
11 February 27.  That's what I would presume it would be
12 about.
13     Q    Okay.
14     A    But I don't know for sure.  That's simply
15 by lining the dates up.
16     Q    Uh-huh.  Let's take a look at this one.
17     MR. YELLIG:  We'll mark this as
18 Exhibit 15.
19     (Whereupon, Deposition Exhibit 15 was
20 marked for identification.)
21     Q    Another copy of an e-mail.  It says,
22 "From:  Michael D. Welsh, To:  Donald Siegel," and
23 it's dated "Friday, March 12, 2004" at 10:44 a.m.
24 Correct?
25     A    Uh-huh.

92

1      Q    And the e-mail says -- This is addressed
2  to Don, presumably, Don Siegel.
3      "I spoke to Steve this morning and he did not
4  sound well.  He said he has been in and out of the
5  hospital this past week for tests and MRIs.  He said
6  they confirmed he has viral meningitis and now appears
7  he is having problems with his gallbladder.  He will
8  be undergoing more tests next week.  He said his
9  family doctor is coordinating his treatment and said
10 that the earliest he would be able to go back to work
11 is April 1.  He said he asked the doctor for a letter,
12 and he will forward that to us.  He said once he
13 begins to feel better he will catch up on his
14 reports.  I asked him to keep us informed.
15     Is that a fairly accurate description of the
16 conversation that you had by phone with Mr. Welsh on
17 or about March 12?
18     A    It sounds like it, yes.
19     Q    Is that the first time -- Now, you said
20 that there were -- You said other people had been in
21 contact with the Third District, your sisters.
22     A    My sisters.
23     Q    Is this the first time that you had been
24 in contact with the Third District?
25     A    I believe so.  I believe so.

93

1      Q    Since --
2      A    February 19.
3      Q    At least February 19.
4      A    Uh-huh.
5      (Discussion off the record)
6      A    Just to clarify --
7      Q    Sure.
8      A    -- when you asked me, contact with Third
9  District, contact verbally, by phone, or any way?
10     Q    Period.
11     A    I might have sent in documentation from my
12 doctors as to why I was out prior to that.  I don't
13 recall the dates of those notes.  I know, whenever I
14 saw a physician or got a note or found out more as to
15 what was going on, I would send it into the office.
16     Q    Uh-huh.  Okay.
17     A    And that was done via mail, first-class
18 mail.
19     Q    Do you recall that March 12 -- I'm going
20 to use that as a point of reference.  Do you recall,
21 when you had that conversation with Mr. Welsh, did you
22 call him or did Mr. Welsh call you?
23     A    I don't recall.
24     MR. YELLIG:  Now, this we're going to mark
25 as Exhibit 16, and it consists of two documents.

## NETWORK DEPOSITION SERVICES
### Transcript of Steven Kamen

94

1    (Whereupon, Deposition Exhibit 16 was
2   marked for identification.)
3    Q   Two documents, the cover document -- The
4   first document is dated March 16, 2004, and it is a
5   letter from you, Mr. Kamen, to Donald Siegel, Third
6   District International Vice President. Do you see
7   that?
8    A   Yes.
9    Q   Do you recall having sent that letter?
10   A   Yes.
11   Q   Now, you notice the date's March 16?
12   A   Yes.
13   Q   Okay. And that, obviously, is four days
14  later after March 12?
15   A   Okay.
16   Q   Right?
17   And attached to that you see a note, I guess is a
18  fair description of it, which has a date of March 11,
19  2004. And it's headed -- has your name, and it has a
20  signature of John R. -- How do you pronounce that last
21  name?
22   A   Rocchi.
23   Q   Rocchi, R-o-c-c-h-i. And he says,
24  Dr. Rocchi says, "Mr. Kamen is a long-time patient of
25  mine. He has been very ill since the end of February

95

1   and continues to have unexplained fevers and illness.
2   At one point during his illness he required
3   hospitalization. He continues to require frequent
4   doctor's visits and is by no means fit to return to
5   work. He has been unable to work since February 20,
6   2004. To my best approximation he will be able to
7   return to work April 1, 2004." Correct?
8    A   Correct.
9    Q   If you can remember or recall, is this the
10  first note from a doctor concerning your illness that
11  was submitted to the IBEW?
12   A   I don't recall.
13   Q   The reason I ask is because you had
14  mentioned, I believe, a doctor's name in addition to
15  Dr. Rocchi.
16   A   Uh-huh. Dr. Magill.
17   Q   Dr. Magill?
18   A   Yes. Dr. Rocchi was my primary care
19  physician.
20   Q   Who is Dr. Magill? What was his
21  specialty?
22   A   Infectious disease specialist.
23   Q   Is it your testimony that you believe
24  Dr. Magill submitted a note?
25   A   I don't recall. I think most of the notes

96

1   that were submitted -- I don't know how many -- were
2   from Dr. Rocchi. He was coordinating the care with
3   other physicians.
4    Q   Let me just ask you one question about
5   this note. Is there anything, as far as you're
6   concerned, in this note that indicates that you had
7   been diagnosed with HIV?
8    A   I don't believe so, no. And I don't
9   believe at this time that I was yet diagnosed.
10   Q   That was my next question. You may not
11  have been diagnosed as such at the time this letter
12  dated March 11 was sent. Is that correct?
13   A   Correct.
14   Q   Okay. That clears something up because I
15  was under the impression you had been diagnosed in
16  February.
17   MR. YELLIG: We'll mark the next one as
18  Exhibit Number 17, and it is -- I'll give it to
19  you first.
20   (Whereupon, Deposition Exhibit 17 was
21  marked for identification.)
22   Q   Now, it is a letter dated April 6, 2004
23  from you, Mr. Kamen, to Mr. Siegel. Correct?
24   A   Yes.
25   Q   And it says, "Re: Absence." And you say

97

1   in that letter, "I am enclosing a note from Dr. John
2   Rocchi, my primary physician, stating I may return to
3   full work by May 1." Is that correct?
4    A   Yes.
5    Q   You also say, "In the meantime, I will
6   catch up on reports. . ." "Reports" presumably meaning
7   weekly activity reports?
8    A   Presumably, yes.
9    Q   ". . .and I have been able to assist
10  Local 385, Local 1914, and Local 1968 with various
11  issues." Correct?
12   A   Correct.
13   Q   Now, let me ask you a question about
14  that. This is dated -- This letter is dated April 6,
15  2004. And I believe you indicated that you had been
16  relieved of responsibility for providing support
17  services to Local 385 and Local 1968.
18   A   Correct.
19   Q   Correct?
20   A   Uh-huh.
21   Q   Prior to April 6.
22   A   Not that I was notified of.
23   Q   So you did not know that you had been
24  relieved of those responsibilities?
25   A   Correct. Correct.

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
Transcript of Steven Kamen

26 (Pages 98 to 101)

98

1    Q    When did you find out?
2    A    I believe when I returned to work.
3    Q    After May 1?
4    A    I believe so.
5    Q    Okay. And you had a meeting with
6 Mr. Siegel sometime in May at a progress meeting?
7    A    Uh-huh.
8    Q    And at that time you took the opportunity
9 to ask him to reassign those three locals?
10    A    Correct.
11    Q    Two of which are Local 385 and 1968.
12 Correct?
13    A    Correct.
14    Q    And he said, no?
15    A    Correct.
16    I mean, just because he had reassigned me -- and
17 I don't know the period of time that he reassigned
18 me -- didn't stop the fact that I had a phone number
19 and I was fielding calls from other officers and
20 members and stewards from these locals. Whether
21 another rep might have been in there or not I don't
22 know, but I was still fielding phone calls at home.
23    Q    I see. Okay.
24    Did you bring those facts that you just
25 recited -- did you bring those to Mr. Siegel's

99

1 attention?
2    A    They're in this letter to Mr. Siegel.
3    Q    In the meeting you had in May of 2004.
4    A    It was a very short meeting.
5    Q    Uh-huh. You can understand why I'm asking
6 that.
7    A    In the past, when Don and I have had
8 conversations, it's been one- or two-word
9 conversations, very curt, very short, very formal.
10    Q    What do you mean by "very formal"?
11    A    Formal. No "Hello. How are you? How's
12 your family?" Just we don't get along.
13    And, you know, I was very sick. And, you know,
14 at no time did he ever -- was I ever threatened that I
15 was going to be suspended or fired.
16    I mean, it was common practice that reps were
17 behind in reports for years. I don't know if I can
18 make that clear enough. I don't recall any staff
19 meeting in attendance that it wasn't discussed about
20 weekly reports being timely, expense reports being
21 timely, eventually, per capita objection reports,
22 which was, you know, a later on item, and then
23 assignments. I mean, you know, this was a continuing
24 thing at every staff meeting.
25    Q    Uh-huh.

100

1    A    You know, then I get ill in 2004; and,
2 then, you know, no warning, no anything, I get fired
3 at the end of 2004 for what other reps had been doing
4 for years as a practice.
5    And it was knowledge within the Third District,
6 although they tried to keep it very quiet, about Wyatt
7 Earp and when he was suspended for untimely -- you
8 know, delinquent reports. It was tried to be kept
9 quiet, but it spread like wildfire within the
10 district.
11    For me to be terminated was a total, total shock.
12    Q    Shock?
13    A    Shock. And the timing of it, after I had
14 been sick for three months, you know, and continuing
15 to be ill, serious illnesses, you know, it clearly
16 adds up.
17    Q    It adds up to what?
18    A    Being discriminated against, being treated
19 differently.
20    Q    Because --
21    A    My illnesses.
22    Q    Take a look at the document that's
23 attached to your April 6, 2004 letter, Exhibit
24 Number 17. That's another note from Dr. Rocchi, dated
25 April 2, 2004. Correct?

101

1    A    Yes.
2    Q    And he says, "Please excuse Mr. Kamen from
3 work for the month of April while he continues to
4 recover from multiple serious health conditions,
5 including meningitis and diverticulitis. He is
6 intending to return to work on May 1 without
7 restrictions. Please do not hesitate to contact me
8 with any concerns."
9    A    Uh-huh.
10    Q    Now, once again, is there anything in this
11 letter or note from Dr. Rocchi that you believe would
12 convey to a person reading it that you had been
13 diagnosed with the HIV virus?
14    A    Is there anything in this note
15 specifically? No.
16    Q    Now, can you tell me -- I realize you're
17 not a medical practitioner, and neither am I. But
18 you, obviously, were treated for these ailments.
19    To the best of your ability, can you describe:
20 What is meningitis? What is the ailment?
21    A    Worse than any migraine you can imagine,
22 just horrible head pain, feeling like my head was
23 going to explode.
24    Q    Do you know what it's caused by?
25    A    I don't know what any of this was caused

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

NETWORK DEPOSITION SERVICES
Transcript of Steven Kamen

27 (Pages 102 to 105)

102

1  by except the onset of HIV, subsequently, I was told.
2      Q    Now, on April 2, 2004, had you been
3  diagnosed at that time with HIV?
4      A    It was around that time, March/April of
5  '04. I don't recall the exact date.
6      Q    Meningitis -- But you're saying meningitis
7  is what, a manifestation, an ailment that can result
8  from --
9      A    I don't know how to answer this.
10     Q    If you can't answer it, you can't answer
11  it.
12     MR. CHIVERS: If you don't know --
13     A    I don't know.
14     Q    The reason I ask is, I thought maybe a
15  doctor, a physician, had explained something to you.
16     A    Well, I mean, it seemed pretty evident to
17  most of the battery of doctors that were treating me
18  at that time, which was probably between eight and ten
19  different physicians, that it was all adding up to
20  look like that.
21     Q    How about the diverticulitis? What do you
22  know? What is that?
23     A    Horrible abdominal cramps, I mean, doubled
24  over in pain. I was cramping. Not being able to eat.
25     Q    That one I know something about. I have

103

1  some friends, and I have a relative, my mother, who
2  had diverticulitis.
3      A    Extremely painful.
4      Q    Yeah. How is that treated?
5      A    I don't recall at the time. I was on so
6  much medication.
7      Q    Let me ask you: Do you continue to suffer
8  from meningitis?
9      A    No.
10     Q    You do not?
11     A    I do not.
12     Q    How about the diverticulitis?
13     A    I do not.
14     Q    To the best of your knowledge, how was
15  that treated?
16     A    I was told that they're early onset
17  ailments associated with HIV, from an early onset.
18     Q    The reason I ask you: Diverticulitis, I
19  believe, is often -- not always, but often treated
20  through surgery.
21     A    Okay.
22     Q    Did you know that?
23     A    No, I did not.
24     Q    Now, these are the only two doctors notes
25  that I have seen.

104

1      A    Okay.
2      Q    Is it your testimony that other notes were
3  submitted other than the March and April notes from
4  Dr. Rocchi?
5      A    Not necessarily. That might be the only
6  two. I don't recall. I mean, I was that out of it at
7  the time, so -- I know that my sisters, when they had
8  came down to take care of me separately, had contacted
9  Mike Welsh to let him know what was going on by phone.
10     And then I was asking Dr. Rocchi for an update to
11  send in to my employer.
12     Q    Do you recall: Were you asked by
13  Mr. Welsh to submit or have your doctors submit a
14  note, or did you do that voluntarily?
15     A    Not that I know of. I did that
16  voluntarily.
17     Q    Give me a moment here because you covered
18  some of this.
19     Going back to Exhibit Number 2, the amended
20  complaint, paragraph 21, on page 4 of 13 -- Do you see
21  that?
22     A    Uh-huh.
23     Q    Now, it says, "Defendants were informed of
24  this diagnosis --" And "this diagnosis," I assume, is
25  referring to the allegation in paragraph 20 that says

105

1  that you were diagnosed with HIV.
2      A    Uh-huh.
3      Q    So defendants were informed of the
4  diagnosis that you had contracted HIV shortly after
5  plaintiff was informed -- after you were informed of
6  the diagnosis and prior to your termination.
7      That's your allegation. Is that correct?
8      A    Correct.
9      Q    So based upon your testimony, am I correct
10  in understanding that you believe -- or that you know
11  that a person or persons representing the
12  International Brotherhood of Electrical Workers became
13  aware sometime in April --
14     A    March/April.
15     Q    -- of 2004, March/April of 2004, that you
16  had been diagnosed with HIV?
17     A    Yes.
18     Q    And what is the basis for your belief?
19     A    Amount of claim forms that was being
20  submitted on my behalf through the IBEW for
21  reimbursement, the doctors, the hospitals, the labs;
22  and, subsequently, the diagnosis was put down on all
23  my claim forms.
24     Q    So you believe -- Is it correct you
25  believe that the IBEW had -- representatives of the

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

106

1   IBEW had access to these claim forms?
2       A   Yes, I do believe that.
3       Q   Do you have copies of these claim forms?
4       A   No, I do not.
5       Q   You do not?
6       A   I do not.
7       Q   Other than the IBEW, who would have copies
8   of them? The hospital?
9       A   Physicians, hospital. I mean, all my
10  medical records are all my medical records.
11  Obviously, the doctors were -- as any doctor was --
12  looking to be paid. I had insurance, and I had
13  coverage.
14      Q   You have not provided those claim forms to
15  the IBEW and Mr. Hill in the course of this litigation
16  through discovery?
17      A   I do not believe so.
18      Q   You don't have them, you said?
19      A   Correct.
20      Q   Is there any other basis for your
21  assertion in paragraph 21 that the -- I presume when
22  you say "defendants" you mean the IBEW and Edwin D.
23  Hill. Is that correct?
24      A   Uh-huh.
25      Q   Is there any other basis for this

107

1   allegation that someone in the IBEW and/or Mr. Hill
2   was informed of the diagnosis that you had contracted
3   HIV?
4       A   Can you repeat that, please.
5       Q   Yes. Is there any basis other than your
6   belief that Mr. Hill and/or other representatives of
7   the IBEW received copies of the claim forms for
8   reimbursement for payment for your treatment?
9           MR. CHIVERS: Object to the form.
10      A   I don't know. But I know that when I
11  initially got sick and I spoke to Dr. Rocchi I told
12  him, if my employer was to call, he could release
13  information to my employer, if they were to call to
14  verify what was going on.
15      I had never been sick like this. I didn't know
16  how long I was going to be out. Dr. Rocchi has been
17  my physician since I moved out here in 1997. In fact,
18  in all this correspondence he says, if you have any
19  questions, please feel free to call.
20      Q   Do you have any knowledge that anyone
21  representing the IBEW ever contacted Dr. Rocchi?
22      A   I don't know.
23      Q   Well, the purpose of my question was just
24  to ask you if there were any other reason or basis
25  that you have for believing that Mr. Hill or anyone

108

1   else in the IBEW became aware that you had been
2   diagnosed with HIV.
3       A   Other than the multiple diagnoses as this
4   went on and the bills that were submitted -- That's my
5   basis for the belief.
6       Q   Nothing else?
7       A   Nothing else.
8       Q   Have you ever informed anyone prior to
9   this litigation being initiated -- Had you ever
10  informed anyone related in any way, shape, or form to
11  the IBEW that you had been diagnosed with HIV?
12          MR. CHIVERS: Other than what he's already
13      answered?
14          MR. YELLIG: Yeah. When I say "informed,"
15      I mean, actually affirmatively --
16      A   I mean, all my illnesses were disclosed by
17  Dr. Rocchi. I mean, I see that you've produced two
18  notes. I don't recall if there was more than two
19  notes or not. You know, I thought there might have
20  been more additional that Dr. Rocchi had sent in.
21      Q   We will take another look.
22      A   Okay. There might not be.
23      Q   Yeah. That's all I've seen. Okay.
24  Looking at the amended complaint again, paragraph
25  number 24, on page 4 of 13, it says: "Plaintiff's

109

1   medical conditions significantly limit Plaintiff's
2   ability to perform major life activities (walking,
3   sleeping, working, engaging in strenuous activities)
4   as compared to the average person."
5       Do you see that?
6       A   Uh-huh. I see it. Yes, I do.
7       Q   Okay. Now, in the interrogatories, the
8   IBEW's interrogatories to you -- And I can show you
9   the IBEW interrogatories, if you would like.
10  Interrogatory number 6 and number 7 -- I asked in 6, I
11  said --
12      Do you want me to provide you with a copy? I can
13  provide it. I can make it an exhibit if you want.
14          THE WITNESS: Do I need to see this?
15          MR. CHIVERS: If you're going to ask him
16      about it --
17          MR. YELLIG: Yeah, I think I should.
18          MR. CHIVERS: Yeah. Why don't you do
19      that.
20          (Pause in the proceedings)
21      Q   The first set of interrogatories that were
22  submitted on behalf of the IBEW --
23      A   Okay.
24      Q   -- if you would look at -- We'll mark that
25  as 18. If you would, look at that document and read

110

1  questions -- interrogatories 6 and 7.
2     To facilitate this. I'll give you a copy of your
3  answers. We'll call those 19.
4        (Whereupon, Deposition Exhibit 18 was
5     marked for identification.)
6        (Whereupon, Deposition Exhibit 19 was
7     marked for identification.)
8   Q  Now, have you read that?
9   A  Yes.
10  Q  Okay. Number 6 says, "State each and
11 every fact which supports the allegation in
12 paragraph 24 of the amended complaint that 'your
13 medical conditions significantly limit your ability to
14 perform major life activities. . . as compared to the
15 average person.'"
16    Do you see that?
17    Then it asks: "State the name, address, and
18 telephone number of each person who has knowledge of
19 those facts; and identify each document that you
20 and/or anyone acting on your behalf believes supports
21 such facts."
22    Do you see that?
23  A  Yes.
24  Q  And your answer is, "Review medical
25 history." Do you see that?

111

1   A  Yes.
2   Q  I'm sorry. But I have to ask you: What
3  are you talking about?
4     I didn't understand what you mean by that.
5   A  I think my medical history speaks for
6  itself, what my diagnosis is. I'm not sure how to
7  answer that.
8     MR. CHIVERS: Yeah. I think what's
9  happened is -- Because some of this is really
10 terms of art, I think, if you just ask a direct
11 question, you'll get an answer, which is: Tell
12 me what you were experiencing. How did these
13 things affect you?
14    MR. YELLIG: Okay. Fair enough.
15    MR. CHIVERS: I mean, I think that's
16 really what the problem is with these cases.
17 That's what the average person probably
18 reacts -- doesn't understand what that means.
19  Q  Tell me how your medical conditions,
20 plural, significantly limit your ability to perform
21 major life activities.
22    MR. CHIVERS: During what period of time?
23    MR. YELLIG: Well, I suppose, in response
24 to the question -- or the statement in
25 paragraph 24, I would assume we're talking about

112

1  the winter and spring of 2004 into the fall,
2  actually.
3   A  Sleeping has been an issue for a number of
4  years. It's caused a number of my heart conditions.
5     MR. CHIVERS: Hold on a second, Steve,
6  because I want to make sure you answer it. You
7  got to answer during that period of time for
8  2004. Make that clear, though.
9   A  Okay. During 2004 sleeping has been an
10 issue, which has affected my heart disorders, ongoing.
11  Q  I'm sorry. I know you're not a physician,
12 but I have no idea what --
13  A  Sleep apnea.
14  Q  Sleep apnea?
15  A  Chronic obstructive sleep apnea.
16  Q  Okay. That I understand.
17  A  That creates weakening in my heart,
18 ongoing issue and was an ongoing issue in 2004 during
19 the time I was out unless I wasn't sleeping at all
20 because of the pain; engaging in strenuous activities,
21 because due to the HIV I'm susceptible to colds, flus,
22 pneumonias, doing anything strenuous weakens the
23 immune system, and it could cause me to be susceptible
24 to other things which a normal individual can easily,
25 you know, fight off. I think that's about it.

113

1   Q  The sleep apnea, did a physician ever
2  attribute that as a side effect, for want of a better
3  term -- It's not a very good term -- but as a side
4  effect from the HIV?
5   A  No. I've had that for -- It's been
6  ongoing for a long time.
7   Q  Now, in Interrogatory Number 7 it says,
8  "Describe each and every medical condition which you
9  allege in paragraph 24 of the amended complaint
10 significantly limited your ability to perform major
11 life activities --" And you again said, "Review
12 medical history."
13    Would your answer be the same as you just gave?
14  A  Yes.
15  Q  The sleep apnea?
16  A  The sleep apnea is just a part of it. I
17 mean, the fact that, if I was to work 80, 90 hours a
18 week and let myself get run down, I'm susceptible to
19 getting very sick. Obviously, as a rep of IBEW,
20 there's no stated hours. There's no 9:00 to 5:00. It
21 is what it is.
22  Q  It has been described to me on several
23 occasions over the last 30 years as that it is a 24/7
24 job.
25  A  Basically.

NETWORK DEPOSITION SERVICES
Transcript of Steven Kamen

114

1  Q   Is that fair?
2  A   Yeah, at times.
3  Q   Did you ever communicate to President
4  Siegel or Mr. Welsh or anyone else in a position of
5  responsibility with the IBEW -- did you ever
6  communicate the fact that your medical conditions were
7  such that you could not maintain the same workload or
8  the workload that would otherwise be expected of an
9  international representative?
10  A   This being during the time in 2004?
11  Q   Yes.
12  A   When I came back on, I believe it was
13  around -- on or around May 1, 2004, I told Mike I was
14  going to pick up my responsibilities -- Mike Welsh --
15  and that it might take me some time to get going at
16  full bore. And I lost a significant amount of
17  weight. My sleeping was still bad. And I said, you
18  know, I should be able to perform my job. If I'm not
19  able to, I'll reach out for help.
20  Q   You said that to Mr. Welsh?
21  A   I believe I said that to Mr. Welsh, not to
22  Mr. Siegel.
23  Q   That if you -- I'm sorry.
24  A   Yeah, to Mr. Welsh, not to Mr. Siegel.
25  Q   But you said to him, look, if I find that

115

1  I can't perform the functions of the job as
2  international representative completely --
3  A   I didn't say it quite so formally, the way
4  you're phrasing it. I said, you know, it's going to
5  take me a little while to get up to speed. I'm going
6  to do the best I can. If I have a problem, I'm going
7  to reach out.
8  Q   What did you mean by, "if I have a
9  problem"?
10  A   If I'm not feeling well, if I have to
11  postpone a meeting or cancel a meeting or something
12  along those lines or couldn't attend something
13  or -- You know, I had a lot of local, small locals,
14  compared -- I mean, a lot of the other reps on staff
15  have very large locals. I mean, for example, there's
16  a rep that I believe services Local 3, Jerry Comer.
17  That's basically a full-time position.
18  Q   Did you say Local 3?
19  A   Yeah.
20  Q   That's in New York City?
21  A   Sure. I mean, that's a full-time job.
22  I mean, I had a lot of little, small locals with
23  a lot of geography, you know, sort of requiring a lot
24  of different meetings set up and negotiations, ongoing
25  negotiations. For example, Local 385 has over 24

116

1  collective bargaining agreements. One local. So it's
2  a lot of juggling. So Mike knew that if I couldn't do
3  something --
4  Q   Local 385 is one of the locals that you
5  were relieved of responsibility --
6  A   Subsequently, yes.
7  Q   -- for providing support service.
8  Correct?
9  A   Yes.
10  As a side note, it's been three years since the
11  IBEW terminated me, and I still get calls from
12  Local 385 for advice and consultation. So I guess I
13  must have done something right at some point in time.
14  Q   Uh-huh. Well, apropos of that response,
15  is it your belief that you were relieved of
16  responsibility for Local 385 because you were doing a
17  poor job?
18  A   Not at all. I think I was relieved
19  because of my illness and no valid reason from
20  Mr. Siegel not to give it back to me when I was able
21  to return to work. And I wanted to and expected to
22  return to work, you know, to a workload that I felt
23  comfortable I could do.
24  And I felt, after my illnesses, I was -- and
25  still feel -- treated very differently after my

117

1  illnesses, you know, from that point on until
2  December.
3  Q   Can you expand on that? What you mean by
4  you were treated very differently?
5  A   After my illnesses he never gave me back
6  the locals that he had reassigned.
7  And, understandably, if an individual -- If one
8  of my business managers had to be out of work for
9  three or four months, somebody would have to step up
10  to the plate to do the job. If you had to miss your
11  position, someone has to step in, a partner, an
12  associate, to do your workload. I understand that
13  Why wasn't it given back to me in May when I
14  returned to work? You know, why wasn't I given my
15  full complement of workload to build up to my
16  workload?
17  Again, I recall it being a very quiet summer
18  without the locals that I had to service up until the
19  time I was assigned full-time -- not full-time but
20  24/7 on the presidential election of that year.
21  Q   Which was in addition to providing support
22  services for the remaining local unions --
23  A   Right.
24  Q   -- that you continued to --
25  A   That was given -- The presidential

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

31 (Pages 118 to 121)

118

1  election was given -- full bore onto the presidential
2  election, whatever it takes.
3      Q   When was that done?
4      A   Most of October of '04 through the
5  election.
6      Q   In the fall?
7      A   Yeah. September/October.
8      Q   So when you say "quiet summer" --
9      A   Yeah, very quiet summer.
10     Q   -- meaning that because you had been
11 relieved of --
12     A   Yes.
13     Q   -- some of these local unions you didn't
14 have quite as much to do?
15     A   Correct.
16 Quite frankly, that didn't sit well with me.
17     Q   It didn't?
18     A   Not at all. Build up a relationship with
19 a group that you're working with and --
20     Q   Did you, after the May 2004
21 progress -- Was that a progress meeting?
22     A   Okay.
23     Q   Because I know you said, in 2003, you had
24 a meeting, a conference, with Mr. Siegel --
25     A   Right.

119

1      Q   -- and a progress meeting in May of 2003.
2      A   2004.
3      Q   And I jumped to the conclusion, frankly,
4  that you did have a conference with Mr. Siegel in May
5  of 2004. Is that correct?
6      MR. CHIVERS: Objection to the form.
7      Q   Did you have a meeting with Mr. Siegel?
8      A   I believe that's when I asked him to give
9  me the locals back that I had previously serviced.
10     Q   Right. And he said, no?
11     A   Correct.
12     Q   Did you subsequently make a similar
13 request to Mr. Siegel or through Mr. Welsh to
14 Mr. Siegel that your locals -- those locals be
15 reassigned to you after your meeting with him in 2004?
16     A   I don't recall.
17     Q   You don't remember?
18     A   I don't recall.
19     Q   Might you?
20     A   I might have mentioned it, but I don't
21 recall. I don't recall.
22     Q   There's nothing in writing that you can
23 recall to that effect?
24     A   I don't believe so, no.
25     Q   And you don't recall any kind of a

120

1  telephone conversation or personal meeting where you
2  asked once again that those locals be reassigned to
3  you?
4      A   I don't recall.
5  I mean, I'm still -- I got a phone call last week
6  from the business manager of 1914. Last week. I
7  haven't been on staff for three years.
8      Q   Did you tell them, I don't work for the
9  IBEW?
10     A   They know that. They still call for my
11 advice and the history that I had with them.
12     Q   Where is 1914?
13     A   Harwick, PA.
14     Q   That's the Harwick, the one that you
15 participated in the picket line for 94 days?
16     A   Correct.
17     MR. YELLIG: This is a heck of a thing to
18 do, but I don't know how else to do it. I'm
19 going to ask that this pile of documents be
20 identified as Exhibit Number 20.
21     (Whereupon, Deposition Exhibit 20 was
22 marked for identification.)
23     Q   I'm going to represent to you that these
24 documents that we've identified collectively as
25 Exhibit Number 20 are copies of the materials that

121

1  were provided to the IBEW and Edwin D. Hill as initial
2  disclosures last spring, in May.
3      A   Okay.
4      Q   And I'm going to further represent to you
5  that this represents virtually -- with one exception,
6  which we'll talk about -- represents the sum total of
7  medical information concerning your health conditions
8  that you have provided to the IBEW.
9  The only thing that I have done, just in the
10 interest of clarity, is that I have taken these
11 documents and put them in chronological order to the
12 best of my ability.
13 Do you recognize these documents?
14     A   Do you want to give me time to go through
15 every one?
16 Was this given to you by my counsel?
17     Q   Correct.
18     THE WITNESS: So I could assume that
19 they're fine, or do you want me --
20     MR. CHIVERS: Yeah. They're all documents
21 that we've gotten from you and from your
22 physicians.
23     THE WITNESS: So I can assume they're
24 fine, or do you want me to flip through each
25 one?

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

122

1      MR. CHIVERS: No. Assume they're fine.
2      THE WITNESS: Okay.
3      Q     Now, I understand that you are not
4  conversant or familiar with these documents, you know,
5  chapter and verse. I understand that. But I would
6  appreciate it if you could look through them and tell
7  me or show me where in any of these documents there is
8  an indication of a medical opinion that any of your
9  health conditions that are disclosed in these
10 documents affects your ability to perform a major life
11 function, which you have testified to already.
12     MR. CHIVERS: Why don't you go off the
13 record.
14     (Discussion off the record)
15     Q     I think, perhaps, where my confusion arose
16 was the understanding -- and perhaps
17 misunderstanding -- that your claim is that anybody
18 who reviewed this medical information that you
19 provided would be able to glean from that your HIV
20 status prior to the statement that you referred to
21 that was made in June of 2006, which is a year and a
22 half after you were terminated.
23     A     Okay.
24     Q     But that's not what you're saying. Is
25 that correct?

123

1      A     What are you asking me?
2      Q     What I've understood your testimony now to
3  be is that your condition, as being HIV positive,
4  could be gleaned from a review of the payment claims
5  submitted by the various physicians treating you in
6  2004 and not from review of this medical information.
7      A     I didn't say payment claims. I said claim
8  forms submitted with diagnoses, with labs, lab tests,
9  lab test results that are on claim forms that are
10 submitted.
11     Q     None of which has been submitted -- is
12 provided or included in what we're calling
13 Exhibit 20?
14     A     I don't believe so.
15     MR. CHIVERS: I don't see them.
16     MR. YELLIG: I can't testify.
17     A     I don't believe there's any claim forms in
18 here. I believe they're submitted --
19     Q     I think you're correct. Yes.
20     A     There's medical reports in here, so on and
21 so forth, so --
22     Q     Let me ask you something, then, just to
23 follow up on that. I'm looking at -- I apologize, you
24 know, because it is difficult to pick out the dates.
25 I'm starting -- I'm looking at report notes from

124

1  Dr. Rocchi dated 12/02, December 2, 2003,
2  page -- because, if you look at the top here, these
3  all must have been reproduced on August 3 or
4  something.
5      A     Okay. So where did you find the date?
6      Q     Well, this one -- That's what took me a
7  while. If you take this document, for example, it
8  says it's two pages. And you have to go to the second
9  page, and then you see --
10     I spent way too much time organizing this.
11     MR. CHIVERS: I think you're looking at
12 the office --
13     A     There's no little stickies either to make
14 it easier.
15     Q     No. I apologize.
16     MR. CHIVERS: Steve, here, for example,
17 here, see there's an office visit 2/23/2004.
18     Which one are you looking at?
19     MR. YELLIG: I was using that one as a
20 point of reference. I think, like you said, we
21 ought to go --
22     THE WITNESS: 2/23/04. Okay.
23     Q     2/23/04, somewhere around there. Yeah,
24 that's the next document. That's the one after
25 December.

125

1      A     Okay.
2      Q     I just thought, if I broke these out, we
3  would be going on forever.
4      Yeah. You see the one that says, "signed by John
5  R. Rocchi, M.D. on 2/23/2004 at 4:16 p.m."?
6      A     Yes.
7      Q     And then I believe that everything behind
8  that -- below that would be subsequent to February 23,
9  2004.
10     A     Uh-huh.
11     Q     Now, what my question is: Looking just as
12 these documents, is there anything in these documents,
13 as far as you know, that you can point to that would
14 alert someone -- not necessarily a medical
15 practitioner -- to the fact that you've been diagnosed
16 with or being treat for HIV?
17     MR. CHIVERS: Go off the record a second,
18 if you would.
19     (Discussion off the record)
20     Q     Mr. Kamen, before we went off the record,
21 I believe you referred to Dr. Rocchi's report dated
22 March 17, 2004; and, specifically, under "history of
23 present illness," the third paragraph says -- in the
24 second sentence he says: He -- meaning Dr. Magill --
25 was concerned that his symptoms -- meaning your

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

33 (Pages 126 to 129)

126

1   symptoms -- may be consistent with primary HIV
2   infection. HIV is still pending.
3       A    Uh-huh.
4       Q    Were you made aware of this at that time?
5       A    Yes.
6       Q    "This" meaning this concern --
7       A    Yes.
8       Q    -- about HIV?
9       A    Yes.
10      Q    Okay. Is it your testimony that you were
11  informed at this time that you were HIV positive?
12      A    No. They were waiting for confirmatory
13  tests.
14      Q    Now, can you go through the remaining
15  reports here, through 2004, and refer me to anyplace
16  in these reports where it is indicated that, in fact,
17  you are HIV positive?
18      A    On the one dated 3/25, under "assessment
19  and plan," on page 2, it says, "viral illness,
20  awaiting viral lode for HIV. Follow up with
21  Dr. Magill."
22       He is the infectious disease specialist.
23      Q    What do you understand "awaiting viral
24  lode," l-o-d-e --
25      A    It should be l-o-a-d. It's a result, a

127

1   viral load. That's around the time that they
2   confirmed I had HIV. It was confirmed by Dr. Magill.
3       Q    Is it your testimony that this entry on
4   page 2 of Dr. Rocchi's March 25 notes -- that it
5   indicates that you had been diagnosed as being HIV
6   positive?
7       A    I can't testify to that. I mean --
8       Q    Who informed you that you were HIV
9   positive?
10      A    Dr. Magill.
11      Q    Dr. Magill?
12      A    Uh-huh.
13      MR. YELLIG: I don't believe we have any
14  medical information provided by -- prepared by
15  Dr. Magill; do we?
16      MR. CHIVERS: No. I think all we had was
17  the Dr. Rocchi, this. Yeah. But, I mean, the
18  question -- regardless of what we have now, the
19  question is, what was available then, I think.
20      THE WITNESS: Dr. Magill was treating
21  me -- Are we off the record?
22      MR. YELLIG: No. We're on the record.
23      THE WITNESS: Dr. Magill was treating me
24  while I was in the hospital along with
25  Dr. Rocchi, and they were hand in hand. When

128

1   Dr. Rocchi wasn't able to figure out what was
2   going on, that's when he brought Magill in, who
3   does infectious disease.
4       Q    Well, I suppose what I'm really driving
5   at, what I've been driving at, clumsily, I gather, is
6   that nothing in the materials that you provided to us,
7   to the IBEW and Mr. Hill, confirms or states
8   affirmatively that you had been diagnosed or you were
9   diagnosed as being HIV positive at least during the
10  time that you were employed by the IBEW until
11  December 8, 2004.
12      MR. CHIVERS: That's a legal -- That's an
13  argument you're making.
14      MR. YELLIG: I'm just asking if there's
15  anything he can point to.
16      MR. CHIVERS: I think he already did. I
17  mean, he pointed to the two references to HIV.
18  He also indicated that he wasn't sure what this
19  one on March --
20      MR. YELLIG: 25th?
21      MR. CHIVERS: Yeah, what that meant.
22      THE WITNESS: The August of '04, page 2.
23      Q    August 3?
24      A    Uh-huh. "HIV positive. Continue to
25  follow with Dr. Magill."

129

1       Q    Where is that on page 2?
2       A    Right on the top, under "assessment and
3   plan."
4       Q    I'm on page 3. Okay. All right.
5       THE WITNESS: Do you see that?
6       MR. CHIVERS: I'm looking. The August
7   one?
8       THE WITNESS: Yep.
9       MR. YELLIG: All right. I missed that
10  one.
11      THE WITNESS: Page 2.
12      MR. YELLIG: Okay. Good.
13      MR. CHIVERS: Uh-huh. Yeah.
14  Doctors are really cryptic; are they not?
15      MR. YELLIG: Is that a question for me?
16      MR. CHIVERS: I mean --
17      THE WITNESS: My sisters say the same
18  thing about attorneys.
19      MR. CHIVERS: It's the opposite. I mean,
20  we go on and on and on and on. We were
21  trained -- We're trained to be very precise and
22  very complete.
23      MR. YELLIG: Yes.
24      MR. CHIVERS: Not these guys.
25      MR. YELLIG: No. That's right.

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

130

1   BY MR. YELLIG:
2       Q    Let me ask you this question:  Do you have
3   any reason to believe that any of these reports,
4   -- and, more specifically, the report that you
5   referred to from August 3 -- I'm not saying, do you
6   know.  But do you have any reason to believe that any
7   of these reports, including the August 3, 2004 report
8   by Dr. Rocchi, which says "HIV positive" -- do you
9   have any reason to believe that any of these reports
10  were provided to the IBEW or Mr. Hill prior to your
11  disclosure in May of 2007?
12      A    Yes, via a claim form, when they were
13  submitted with claim forms from the doctors as a
14  primary diagnosis.
15      Q    Okay.
16      A    Yeah.  Clearly.
17          (Discussion off the record)
18      Q    On Exhibit 2, the amended complaint,
19  paragraph 27, alleges that plaintiff, meaning you, has
20  been perceived by defendant -- I'm assuming you mean
21  Mr. Hill and the IBEW -- as having a substantial
22  impairment.
23          And my question to you is:  What is the basis for
24  that allegation?  What are you basing that on, that
25  you were perceived as having a substantial impairment?

131

1       A    I think from my illnesses and my medical
2   records that were being paid for by Blue Cross/Blue
3   Shield, the amount of time that I was out of work, the
4   discussions that my sisters had with Mike Welsh, the
5   documentation that I sent in to Vice President Siegel,
6   it's clear that it was -- my illnesses were pretty
7   severe, and the onset was sudden and onset was more
8   severe.
9       Q    Am I correct in understanding that -- Is
10  your claim -- as far as you know, is your claim that
11  you were perceived as being substantially impaired not
12  simply because of having been -- well, having
13  contracted HIV?
14          Do you understand what I'm asking?
15      A    No.  No.
16      Q    What I'm asking you is --
17          MR. CHIVERS:  Be sure, if he asks you a
18  question -- because I thought the same thing,
19  that you didn't understand -- don't hesitate;
20  just tell him that you don't understand.
21      Q    Don't say, well, he must know what he's
22  talking about so, therefore, it must be me that's got
23  the problem.
24          What I'm asking you is, putting
25  aside -- Assuming, let's say -- without holding you to

132

1   it, assuming that no one in the IBEW knew that you
2   were HIV positive, is it, nevertheless, your claim
3   that, putting the HIV aside, that your other medical
4   conditions substantially impaired your ability to
5   perform your job?
6       A    Substantially impaired, no, I don't think
7   my other medical conditions substantially impaired.  I
8   mean, I did my job for a number of years with other
9   medical conditions.
10          I think once I got the HIV it substantially
11  impaired me from --
12          MR. CHIVERS:  He answered a different
13  question.  I'll object only --
14          MR. YELLIG:  I don't know.
15          MR. CHIVERS:  Yeah, he did.  Yeah, he
16  did.  He didn't understand your question.
17          You excluded the HIV, and Steve put it
18  right back in.  Steve put it right back in his
19  answer.
20          MR. YELLIG:  What I understood him to say
21  was that he had been experiencing -- for some
22  time prior to being diagnosed with HIV, he had
23  been experiencing a number of medical problems,
24  health problems, that he --
25      Q    I don't know the answer.  I don't want to

133

1   put words in your mouth.
2       But my question was:  Do you believe that these
3   other health problems that you had been experiencing
4   prior to being diagnosed with HIV have been perceived
5   or were perceived by Mr. Hill and/or the IBEW as
6   substantially impairing your ability to perform your
7   job?
8           MR. CHIVERS:  Object to the form.
9           Do you want to know why?
10          MR. YELLIG:  Uh-huh.
11          MR. CHIVERS:  Okay.  I was asked because
12  I'm really not supposed to say.
13          MR. YELLIG:  Yeah.  Yeah.
14          MR. CHIVERS:  Well, keep in mind that what
15  the testimony and the records have shown here
16  today is that Steve began experiencing severe
17  symptoms in January, went into the hospital in
18  February.
19          MR. YELLIG:  The operative word being
20  "severe."
21          MR. CHIVERS:  Yeah.  Well, yeah.
22          MR. YELLIG:  Yeah.
23          MR. CHIVERS:  Or whatever word you want to
24  use.  I mean, they were so severe that eventually
25  he had to be hospitalized.

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

35 (Pages 134 to 137)

---

134

1    But it wasn't until, I guess, almost two
2    months after he was first hospitalized that he
3    was diagnosed.
4        MR. YELLIG: Right.
5        MR. CHIVERS: If you think about the way
6    you asked the question, you're asking -- You
7    can't sort it out that way. Huh?
8        MR. YELLIG: Yeah. No.
9        MR. CHIVERS: Because I think -- I can put
10   this on the record or not. But I think it would
11   be fair to say that whatever he was experiencing,
12   the severe symptoms, in January, almost certainly
13   were HIV related. He just didn't know it --
14       MR. YELLIG: Uh-huh.
15       MR. CHIVERS: -- until he got the
16   diagnosis in what, April. That's why I'm
17   objecting to your question.
18       MR. YELLIG: You know what: I wanted to
19   avoid having to go through this, but, what I
20   perceive --
21       Let's go off the record.
22       (Discussion off the record)
23   Q    Mr. Kamen, according to the medical
24   records that you provided, which are marked as Exhibit
25   Number 20, you experienced a number of health problems

---

135

1    prior to -- well, back into the late '90s and prior to
2    January 2004. Is that correct?
3    A    Correct.
4    Q    Including sleep apnea, sinusitis --
5    A    Correct.
6    Q    -- and heart problems?
7    A    Correct.
8    Q    Gallbladder?
9    A    No.
10   Q    I thought it was gallbladder. I thought
11   there was a gallbladder in there.
12   A    No.
13   Q    Were there any other things that you can
14   think of?
15   A    No.
16       Hernia. Routine stuff. That's all.
17   Q    And my question to you is: Is it your
18   belief that the IBEW perceived you, prior to January
19   2004 -- that anyone in the IBEW, including Mr. Hill,
20   perceived you as -- well, perceived that these health
21   problems interfered with your ability to perform your
22   job?
23   A    Prior to 2004?
24   Q    Prior to January 2004.
25   A    No.

---

136

1    Q    No?
2    A    No.
3    Q    Now, subsequent to January 2004, is it
4    your testimony that the health problems you were
5    experiencing, as reported in these notes from
6    Dr. Rocchi, primarily --
7    A    Okay.
8    Q    -- that because of those health problems
9    you were perceived as not being able to perform your
10   job?
11   A    Yes.
12   Q    And it's your testimony that -- Is it your
13   testimony that you were able to perform your job with
14   or without a reasonable accommodation? Is that
15   correct?
16   A    I believe I was able to perform my job,
17   yes, to the best of my ability.
18   Q    All right. In your answer to
19   interrogatories -- I'm going to show you. Well, look
20   at the IBEW interrogatories to you, addressed to you,
21   number 10. Do you see number 10, the question?
22   A    Yes.
23   Q    It says, "State each and every fact that
24   supports the allegation in paragraph number 27 of the
25   amended complaint --" which is Exhibit Number 2

---

137

1    "-- that 'you have been perceived by defendant as
2    having a substantial impairment.'"
3        Now, there's an objection to that, "asks for a
4    legal conclusion." And it says, "Without waiving the
5    objection, it is averred Hill and Siegel terminated me
6    on the perception I could not do my job with or
7    without an accommodation."
8        Do you see that answer?
9    A    Yes.
10   Q    All right. Did anyone in the IBEW ever
11   express that opinion to you, "That opinion" being
12   that, Steve, we don't believe you can do your job
13   because you're ill?
14   A    Not because I was ill, just Mr. Siegel
15   always believed I could not do my job. I mean, he
16   stated that several times.
17   Q    So, in other words --
18   A    I guess it's come out, you know,
19   eventually, you know, whether it was because of
20   medical or nonmedical.
21   Q    That's fair enough. All right.
22       Can you look at the amended complaint,
23   paragraph 33. Do you see that?
24   A    Uh-huh.
25   Q    On page 5 of 13, it says, "Nevertheless,

---

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

138

1 upon" your "return to work in May 2004, plaintiff was
2 denied training opportunities; was not permitted to
3 assist at manufacturing conferences; was never given
4 back the duties plaintiff had been assigned prior to
5 plaintiff's going out on sick leave --" And we'll stop
6 there for the moment.
7     A    Okay.
8     Q    Now, I think maybe I've misinterpreted
9 something here. We'll see if we can find out.
10    This allegation refers to being denied training
11 opportunities. What training opportunities were you
12 denied?
13    A    I don't recall, looking at this. I'd have
14 to look at my original complaint, which I don't have
15 with me.
16    Q    I'm sorry. What are we referring to?
17    MR. CHIVERS: When you say your "original
18 complaint," what do you mean?
19    THE WITNESS: My handwritten complaint. I
20 mean early on with the EEOC.
21    MR. CHIVERS: You mean your charge of
22 discrimination?
23    THE WITNESS: Yeah. I think I might have
24 my notes in there.
25    MR. CHIVERS: I think you're probably

139

1 right.
2     You have that; don't you? I know you have
3 it as part of the discovery.
4     MR. YELLIG: I don't know if I --
5     A    Do you want me to continue answering?
6     Q    That's up to your --
7     A    Not being able to attend manufacturing
8 conference -- I always have. I was a manufacturing
9 rep. And I wasn't given the assignment that year to
10 attend the manufacturing conference.
11    MR. YELLIG: Okay. We're not talking
12 about the EEOC stuff right now, so we --
13    MR. CHIVERS: That's all right.
14    MR. YELLIG: No. I just want to make sure
15 you're aware we're not getting into that.
16    Q    All right. The manufacturing conference,
17 is it your testimony that you were not assigned to
18 attend the 2004 manufacturing conference?
19    A    Correct.
20    Q    Here, I'll refresh your recollection.
21    A    I'm thinking -- I'm wondering if I'm
22 thinking broadcast conference.
23    MR. YELLIG: This is Exhibit Number 21.
24    (Whereupon, Deposition Exhibit 21 was
25 marked for identification.)

140

1     Q    It's a document that's labeled as a "memo"
2 addressed to International Representatives Gino,
3 Kamen, and Macchia from Donald Siegel, dated
4 January 20, 2004, and the subject is "2004
5 Manufacturing Conference." Correct?
6     A    Correct.
7     Q    And can you read that for me, please.
8     A    "Enclosed are copies of correspondence
9 from International President Hill in connection with
10 the 2004 Manufacturing Conference scheduled for May 5
11 through 7, 2004 at the Frontier Hotel & Casino in Las
12 Vegas. Please arrange your schedules to attend.
13 Strongly encourage your locals to attend this
14 important conference as well."
15    Q    Is it fair to say you were assigned --
16    A    Yes.
17    Q    -- to attend the manufacturing conference?
18    A    Yes. I'll retract my earlier testimony.
19 I think the complaint should have read
20 "broadcasting conference."
21    Q    Okay. Was there a broadcast conference in
22 2004?
23    A    I believe so.
24    Q    Now, prior to 2004 had you attended
25 broadcast conferences?

141

1     A    Yes, I did.
2     Q    Do you recall Mr. Siegel's testimony
3 concerning attendance at broadcast conferences?
4     A    I don't recall it, but I read it
5 yesterday.
6     Q    Okay. Generally speaking, what did he
7 testify to as best --
8     A    I guess the short version would be that he
9 said President Hill was limiting the amount of reps
10 going to conferences.
11    Q    And he acknowledged that you were not
12 assigned --
13    A    Correct.
14    Q    -- to attend the 2004 broadcast
15 conference?
16    A    Correct.
17    Q    Correct?
18    Did he mention that other reps that had formerly
19 -- in prior years had attended the broadcast
20 conference were also not assigned that year?
21    A    I believe he mentioned Randy Keefer.
22    Q    So is it your testimony that you,
23 nevertheless, believe that you were not assigned to
24 attend the broadcast conference for some
25 discriminatory reason?

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

## NETWORK DEPOSITION SERVICES
### Transcript of Steven Kamen

142

1  A  Based on this complaint, yes.
2  Q  Uh-huh.
3  A  I mean, the subsequent documentation from
4  Vice President Siegel is after the fact of the
5  complaint that I wasn't given the opportunity to go to
6  the broadcast conference. It wasn't discussed to me
7  that the IBEW's cutting back or we're doing this;
8  we're not doing that. So based at the time this
9  complaint was filed, yes.
10  And only in reading Vice President or -- not
11  recalling this deposition and reading through this
12  deposition did I see the response to that.
13  Q  Do you believe that that's untrue, what he
14  said, his explanation?
15  A  No.
16  Q  You believe it's true?
17  A  Yes.
18  Q  Okay. All right.
19  A  You asked me if I believed it's untrue. I
20  said, no. I believe it to be true.
21  Q  I noticed that the broadcast -- Excuse
22  me -- the manufacturing conference was scheduled for
23  May 5 through 7, 2004. And looking at the tracking
24  sheets and other materials that you've provided, it
25  indicates that you returned to work after your two

143

1  plus months off with these various illnesses and the
2  hospitalizations, that you returned to work the first
3  week of May. Is that correct?
4  A  Correct.
5  Q  And we can -- I have them. I have your
6  activity reports from that week.
7  A  Okay.
8  Q  And I would represent to you that it
9  indicates that you spent each day that week, including
10  the 5th through the 7th, which was a Wednesday and
11  Thursday, Friday -- you were meeting with local union
12  representatives.
13  If you want me to get it, I will be happy to get
14  it.
15  A  Okay.
16  Q  Do you want me to?
17  A  No, no. I'm listening to you.
18  Q  All right. Do you have any recollection
19  as to why you didn't attend the manufacturing
20  conference even though you were assigned to do so?
21  A  No.
22  Q  Do you have any recollection that
23  Mr. Siegel or someone acting on his behalf, Mr. Welsh
24  perhaps, contacted you and said, for whatever reasons,
25  you are not to attend the manufacturing conference?

144

1  A  I recall that.
2  Q  It's your testimony that you were directed
3  not to attend?
4  A  Correct.
5  Q  Okay. And do you recall who told you
6  that?
7  A  I don't.
8  Q  You don't recall how it was communicated
9  to you?
10  A  I don't recall. I mean, I recall the memo
11  that you showed me that I believe you put into
12  evidence. I recall, you know, a standard assignment
13  to go.
14  THE WITNESS: Can we can off the record
15  for a minute?
16  MR. YELLIG: Sure.
17  (Discussion off the record)
18  A  I do recall being told by somebody not to
19  attend that conference. And it was while I was out
20  before I returned to work.
21  Q  But you can't right now --
22  A  I think it might have been Mike Welsh. I
23  might have questioned him about it, that I'm coming
24  back to work May 1; what about the conference.
25  Q  Okay. All right. I don't think there's

145

1  any need to put this -- I just saw that and wondered.
2  Was there any other training opportunities that
3  you were denied or that you requested that you weren't
4  permitted to undertake during this time during 2004?
5  A  I know there was one. I don't recall it
6  specifically now. I know there was one or I would not
7  have put it in my complaint. I just don't recall what
8  it is.
9  Q  If I look at your EEOC materials, I would
10  see something about that?
11  A  It should be in there, yes.
12  Q  But, clearly, is it fair to say, you
13  regard the broadcast conference and the manufacturing
14  conference as training. Is that correct?
15  A  No. That would not have been for
16  training, but -- You do learn at these conferences,
17  certainly, but that wasn't what I was alluding to in
18  the complaint --
19  Q  That's not what you were --
20  A  -- training opportunity.
21  Q  What were you --
22  A  I don't recall what it was, the training
23  opportunity. I mean, certainly, any conferences, you
24  do learn through the conferences.
25  Q  Do you recall receiving I'll call it a CD,

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

146

1 a CD ROM, which contained all the materials from the
2 manufacturing conference in 2004?
3    A    I don't recall.
4    Q    Do you recall ever receiving any CD ROMs
5 covering any of these manufacturing or broadcast
6 conferences?
7    A    A lot of CD ROMs I did receive over that
8 period of time, yes. I don't recall specifically what
9 they were.
10    Q    Okay. But you don't recall having
11 reviewed that CD ROM?
12    A    No, I do not.
13    Q    Do you recall having made arrangements to
14 attend that May 5 through 7, 2004 manufacturing
15 conference?
16    A    I don't recall.
17    Q    You know what I'm saying? Do you
18 understand what I mean by "arrangements"? Travel
19 arrangements.
20    A    Yes. Yes.
21    Q    Hotel reservation.
22    A    Yeah.
23    Q    Would that normally be -- What would be
24 your responsibility when informed or directed by the
25 vice president to attend one of these conferences?

147

1 What arrangements would be your responsibility as
2 opposed to taken care of by, say, the IBEW?
3    A    We would submit a registration fee as a
4 rep, conference fee, which would be a reimbursable
5 expense. At the time -- I believe it was around 2004,
6 2003 that the travel arrangements were no longer
7 being handled by Bradford Travel, which, by the way,
8 was in Local Union 385. Bradford Travel was no longer
9 handling flights. It was being handled by -- Oh,
10 boy -- President Barry's secretary. I can't remember
11 her name. She was handling, now, the flight --
12    Q    Nancy --
13    A    No, it wasn't Nancy.
14    Q    Okay. But you're saying Bradford doesn't
15 do that anymore?
16    A    They didn't at the time. No.
17 We then had to go to Washington to get our
18 flights. It was the former secretary for President
19 Barry. I can't think of her name.
20    Q    I know who you're talking about.
21    A    She was handling, I believe --
22    Q    I know who.
23    A    When it was taken away from Bradford,
24 there were some issues. Bradford refused to sign a
25 new collective bargaining agreement, so the flights

148

1 would be handled through Washington. And hotels, we
2 contacted the hotel.
3    Q    You did, directly, yourself?
4    A    Directly. We would be told where the
5 conference was going to be. We'd set up our own
6 reservations on our own credit cards, pay, and that
7 would be reimbursable expense.
8    Q    Do you have any recollection of having
9 made any of those arrangements for that 2004 meeting?
10    A    I don't recall. I was really sick during
11 that period of time. I don't recall.
12    Q    So there was a good chance you didn't make
13 arrangements. Is that correct?
14    A    I answered, "I don't recall." I mean --
15    Q    All right. Let's take a look at
16 interrogatory numbers 17 through 19. These are
17 interrogatories from the IBEW and your answers.
18    A    Okay.
19    Q    Now, in interrogatory 17, it says: "State
20 each and every fact which supports the allegations in
21 paragraph number 51 of the amended complaint --"
22 which, if you want to refer to that "-- that 'members
23 of the IBEW, including management, regularly mock and
24 ridicule homosexuals and express opposition to being
25 associated with homosexuals.'" Do you see that?

149

1    MR. CHIVERS: What paragraph?
2    MR. YELLIG: That's interrogatory
3 number 17, which I was quoting from paragraph 51
4 of the amended complaint.
5    MR. CHIVERS: Paragraph 51 of the amended
6 complaint?
7    MR. YELLIG: Yeah.
8    MR. CHIVERS: Do you have paragraph 51
9 there, Steve?
10    THE WITNESS: Yeah.
11    Q    Yeah. That's on page 7.
12 Do you see that allegation?
13 And your answer to number 17 was: "International
14 Representative Mike Flanagan, International
15 Representative Marie Peluso and others over the years
16 have mocked this activity --" "this activity" being --
17    A    Homosexuals.
18    Q    -- homosexuality?
19    A    Uh-huh.
20    Q    "-- and joked about inadvertently walking
21 into an all-gay Christmas party at Hershey Park during
22 a December Third District staff meeting/party held
23 there."
24 Can you tell me about that because I don't
25 know -- Who is, first of all, Mike Flanagan? Is he on

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

150

1  the Third District staff, or is he from another --
2      A   He was.
3      Q   He was.
4      Is he any longer?
5      A   I don't know.
6      Q   How about Marie Peluso?
7      A   She was. I don't know if she is any
8  longer.
9      Q   And do you recall -- Can you tell me what
10  year this might have been?
11      A   I believe it was starting in 1997 or '98.
12  Vice President Rossa, he held the staff meetings,
13  Christmas parties at Hershey Park. It was the first
14  time I attended. And they were there subsequent years
15  after.
16      Every year it was joked about, in the bar, about,
17  you know, the year that Mike Flanagan walked into an
18  all-fag party. It was always joked about. It was
19  brought up every year because, I guess, it was a
20  remembrance of being there. Other reps would joke
21  about it, how sick they thought it was and how can we
22  have our party at the same establishment that caters
23  to gays.
24      Q   Okay. Certainly, a homophobic attitude
25  was expressed?

151

1      A   No doubt.
2      Q   Yeah. Was that made in your presence?
3  Were those comments made in your presence?
4      A   My presence only or --
5      Q   Well, no. Your presence. Were you
6  present? Did you hear this?
7      A   Yes. Yes.
8      Q   Did you express any concern or, you
9  know --
10      A   Not at all.
11      Q   -- of being offended?
12      A   No.
13      Q   Shame on you.
14      A   What? What did you say?
15      Q   I said, "Shame on you." You should.
16  I assume it offended you?
17      A   A lot of things are offensive to people,
18  you know, whether it's based on religion or race or
19  gender or sexual orientation. You live with these
20  things.
21      Q   Was any officer of the IBEW present when
22  those comments were made?
23      A   Vice President Rossa was at the time. I
24  think it might have been joked about also when
25  Vice President Siegel -- at one or two of these

152

1  December --
2      Q   You're saying this is like --
3      A   Ongoing.
4      Q   Becomes a --
5      A   Yeah. Every year, well, there's always a
6  staff meeting in December, and it's always a staff
7  meeting slash Christmas party, bring the spouses and
8  that type of thing, so --
9      Q   But you didn't -- you never expressed
10  concern in any way, shape, or form to anyone with the
11  IBEW that this was inappropriate?
12      A   No. I kept my mouth shut.
13      Q   Why? Why did you keep your mouth shut?
14      A   It's the old boys' club, the IBEW. It's
15  what I was trained and raised.
16      Q   Please be a little more clear.
17      A   It's the old boys' club. You know, you
18  don't ruffle feathers.
19      Q   Grin and bear it, is that what you mean?
20      A   Yeah, basically. You don't ruffle
21  feathers.
22      Q   Is it your testimony that if you had
23  expressed some concern about this inappropriate
24  comment that it would have accomplished nothing?
25      A   My belief is, had I expressed any thoughts

153

1  or comments, it would have accomplished nothing except
2  to possibly stigmatize me or at that point people
3  would start wondering.
4      Q   Uh-huh. All right Let's take a look
5  at -- Let's see -- 18. "State each and every fact
6  which supports the allegation in paragraph 52 of the
7  amended complaint that, 'the IBEW has had and
8  continues to have a practice of systematic hostility
9  towards homosexuals.'"
10      Your answer is, "It is evident at all IBEW
11  functions that if you are not married or without a
12  potential spouse you were jeered as not being part of
13  the projected family friendly IBEW mentality."
14      First of all, when you say you were jeered, you
15  didn't really mean "jeered;" did you?
16      A   Well, whispered about, snickered about.
17  Yeah, anytime you were at an IBEW function at the
18  national level or at least at the district level, if
19  you didn't have a spouse with you, you know, if it
20  wasn't like a known divorce or you weren't re-dating
21  somebody quickly, yeah, it was -- you know, people
22  snickered.
23      One example is, every year they asked Pat Gino
24  how come he didn't bring his wife. Every single year
25  they would ask him. He had a very sick child at

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

154

1  home. Subsequently, he lost his wife. But, I mean,
2  it was asked every single time.
3      Why make an issue of things like that? Just --
4      Q    Well, I have to tell you that the
5  question -- the allegation that you made is that "'the
6  IBEW has had and continues to have a practice of
7  systematic hostility towards homosexuals.'"
8      You know, if I choose to come to meetings that
9  are regularly attended by husbands and wives or
10  couples, significant others, and I choose, for --
11  let's say because I am not the most -- What's the
12  word? I lack marital fidelity and I look for the
13  opportunity to spend time with other women other than
14  my wife, would I not -- would I be the focus of that
15  kind of ridicule or --
16      A    That's certainly talked about, too.
17      Q    Well, what I'm really driving at is that
18  I'm not seeing the connection between what you
19  described, frankly, and an attitude -- a "practice of
20  systematic hostility towards homosexuals."
21      Frankly, I don't see the connection. Perhaps you
22  can enlighten me.
23      A    I think, if only I had a tape recorder
24  during the years that we were at Hershey Park during
25  the Christmas staff meeting and, you know, recorded

155

1  the comments that were being made by some of the reps
2  and others, you know, it certainly would be evident of
3  hostility towards that sector of people.
4      You know, I do recall one year even the
5  comment -- somebody raised the comment that, you know,
6  what about if you were a rep of the food and
7  commercial workers; most of their members are gay?
8  I'd never be a goddamn rep for them, represent those
9  fags.
10      It's the IBEW. We're supposed to help the
11  people. We represent everybody.
12      Q    And, then, finally, number 19, "State each
13  and every fact which supports the allegation in
14  paragraph number 53 of the amended complaint that the
15  'systematic hostility towards homosexuals' alleged in
16  paragraph 52 of the amended complaint 'is embedded in
17  a culture fostered and sustained by senior management
18  in the IBEW, including Defendant Hill.'"
19      And your answer to that was, "See number 18,"
20  which, you know -- Well, just to make sure the record
21  is clear, your answer was, "It is evident at all IBEW
22  functions that if you are not married or without a
23  potential spouse you were jeered as not being part of
24  the projected family friendly IBEW mentality."
25      A    Quizzed, questioned, yeah.

156

1      Q    About where's your wife?
2      A    Yeah. Who are you dating now or -- They
3  try to project a family friendly, you know,
4  organization. And where I believe it should be all
5  inclusive, I don't think it is all inclusive.
6      Q    Now, in this -- here you've alleged that
7  this attitude, this at least anti-gay --
8      A    Right.
9      Q    -- attitude, mindset, culture is fostered
10  and sustained by senior management including
11  Mr. Hill. Do you have any basis for that?
12      A    Well, I believe that if it's discussed,
13  you know, joked around with reps and the
14  vice presidents are hearing it and not doing anything
15  about it, they are the arms, the ears, the mouthpiece
16  of President Hill. They're his representatives just
17  like a rep is a representative of the vice president.
18  Vice presidents are Hill's representatives. If it's
19  fostered in the rep -- If it's fostered -- Excuse
20  me -- you know, between the reps all the way up to the
21  vice presidents, then he's got to answer to it or not
22  answer to it. They're his vice presidents, his
23  choice. If they're going to tolerate it, that's, to
24  me, the same as him tolerating it.
25      Q    I see. So you don't have any knowledge

157

1  that Mr. Hill, himself, has ever condoned this kind
2  of behavior?
3      MR. CHIVERS:  Object to the form. I think
4  he was answering a moment ago.
5      MR. YELLIG:  Then I'm trying to confirm
6  that what he said was that he's sort
7  of attributing inappropriate behavior by --
8      A    If the vice presidents are going to
9  condone it, that's, to me, the same as President Hill
10  condoning it. I mean, they're his representatives.
11  The vice presidents, the 12, 13 of them, are his
12  representatives. They're his people.
13      The reps underneath the vice presidents are the
14  vice presidents'. You know, it all goes down, but
15  eventually it's got to reach somebody at the top.
16      Q    Okay. My question is -- I understand what
17  you're saying.
18      A    Okay.
19      Q    That's perfectly clear. But what I'm
20  interpreting -- and you correct me if I'm wrong -- I'm
21  interpreting that to mean that you don't have any
22  knowledge that Mr. Hill, himself, either knew about
23  these inappropriate comments that you generally
24  described or condoned them. Is that correct?
25      A    Correct.

**Johnstown**
814-266-2042

**Nationwide**
866-565-1929

**Pittsburgh**
412-281-7908

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

158

1    Q    Okay. All right. I'll ask the question:
2  Did you ever bring any of these matters to Mr. Hill's
3  attention?
4    A    The comments?
5    Q    Yes.
6    A    No.
7    Q    Mr. Hill, in his deposition, testified,
8  frankly, a bit vaguely.
9    A    I didn't hear you.
10    Q    A bit vaguely. He was vague in his
11  recollection about the time and the place and
12  everything. But he described an episode, in his
13  testimony, where he said that he was provided with a
14  copy of a note that he testified that you had provided
15  to someone. And I believe that the best of his
16  recollection was, it was a local union representative
17  attending a meeting in the Sixth District. He
18  couldn't give the time, the date, and he couldn't
19  testify as to who provided the note to him.
20    A    Okay.
21    Q    But that the note had been passed from --
22  this person had received this note from you, and it
23  had been passed to an IBEW representative or more than
24  one representative, in all probability, to the vice
25  president for that district and then eventually

159

1  provided to Mr. Hill.
2    A    Correct.
3    Q    Do you remember that testimony?
4    A    Yes.
5    Q    And Mr. Hill testified that subsequent to
6  that episode he took the opportunity to meet with you
7  and -- my words -- confront you with the contents of
8  this note. Do you recall that?
9    A    Yes.
10    Q    Do you remember when that was?
11    A    2001. 2002.
12    Q    And do you remember the location of the --
13    A    That President Hill confronted me?
14    Q    No. Where this note was passed.
15    A    In Chicago, I believe.
16    Q    In Chicago.
17  Which is in the Sixth District; correct?
18    A    Yes.
19    Q    Okay. And is his recollection fairly
20  accurate?
21    A    Yes, it is.
22    Q    Okay. And did he confront you subsequent
23  to that time?
24    A    Yes, he did.
25    Q    What did he say?

160

1    A    Keep it out of the Brotherhood, the short
2  and sweet of it.
3    Q    Did he express any -- give you -- Did
4  he express any opinion or attitude concerning
5  homosexuality?
6    A    He said, I really don't care what you do
7  out of the Brotherhood, but keep it out of the
8  Brotherhood. Those were his words verbatim.
9    Q    Pretty much what he testified to. Is that
10  correct?
11    A    Uh-huh. Yes.
12    Q    And what did he do with the note?
13    A    I don't recall.
14    Q    My recollection is, he testified that he
15  gave it to you.
16    A    I don't -- He might have. I don't recall.
17    Q    What did you say when he -- What did you
18  say to Mr. Hill?
19    A    At the time?
20    Q    Uh-huh.
21    A    I told him I would keep it out of the
22  Brotherhood. And then I followed it up with a
23  personal letter to him at home.
24    Q    Did you, really?
25    A    Yes, I did.

161

1    Q    Do you happen to have a copy of that?
2    A    No, I don't.
3    Q    What did you say in the letter, to the
4  best of your recollection?
5    A    That I was embarrassed that it happened
6  during a working situation; I was apologizing for it;
7  and it would never happen again.
8    Q    This is pretty much what he said. That
9  was his testimony. Correct?
10    A    Uh-huh. Yeah.
11    I don't think I disputed his testimony; did I?
12  No.
13    Q    That's what I'm trying to get on the
14  record.
15    A    He's a straightshooter. I mean, he always
16  has been. He's always been a man of his word the
17  entire career that I've known him.
18    Q    Are you familiar with the term "vicarious
19  liability"?
20    A    Not really.
21    Q    Okay. All right. I just want to make
22  sure I'm clear. In other words, I asked you this
23  before, I think, and perhaps it wasn't clear at that
24  time. I asked you: Do you believe that Mr. Hill
25  condones or encourages a negative attitude or

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

42 (Pages 162 to 165)

162

1    treatment of homosexuals?
2        A    Encourages, no. Condones -- I mean, it
3    goes on. It goes on.
4        Q    Uh-huh. But you've never observed any of
5    that kind of behavior in his presence; have you?
6        A    Not in his presence, no.
7        Q    Does that surprise you?
8            MR. CHIVERS: I'm going to object to the
9    form. I don't even understand the question.
10        Q    Well, I mean --
11        A    Does it surprise me?
12        Q    Uh-huh.
13        A    No. Most people fear Ed Hill. I don't.
14    I respect him. I don't fear him. Most people fear
15    him. They do. The average member fears him.
16        Q    And so is it fair --
17        A    I'm not talking out of school.
18        Q    No.
19        A    I mean, I've known Ed for 25, 27 years.
20    Most people fear him. I don't fear him. I respect
21    him.
22        That's why, again, I reiterate: I am shocked
23    that I am here. I should still be working for IBEW.
24    This should really be a moot point. This whole
25    process should not be occurring.

163

1        Q    At the time that you met with Mr. Hill
2    concerning this note you had been present -- had you
3    been present at one or more of these Third District
4    meetings, Christmas parties, where these homophobic
5    comments were made? You had been present at those at
6    the time?
7        A    Yes. Yes.
8        Q    Did you say to Mr. Hill: You know, we got
9    a problem here. This is supposed to be an all-
10    inclusive organization, and yet I don't believe that
11    the IBEW is -- at least the attitudes expressed by its
12    representatives or some of its representatives --
13        A    No.
14        Q    No?
15        A    No.
16        Q    Did you think about it?
17        A    Of saying something?
18        Q    Uh-huh.
19        A    No, not at the time. I was caught
20    completely off guard when he met with me. It wasn't
21    like I had prepared words or anything.
22        Q    Would you agree that you had the
23    opportunity, though -- presented you with the
24    opportunity?
25        A    At that time?

164

1        Q    Uh-huh.
2        A    No. Like I said, I was completely caught
3    off guard.
4            (Recess taken)
5        Q    I've asked you this, and just to tie it
6    up: Am I correct in understanding you never brought
7    any of these situations or circumstances that you've
8    described -- you've never brought them to anyone in a
9    position of responsibility with the IBEW; have you?
10        A    No.
11            (Whereupon, Deposition Exhibit 22 was
12    marked for identification.)
13        Q    Have you ever seen -- I'm going to show
14    you this document. I think it's the last one.
15        It's a document that has an effective date of
16    August 10, 1992; revision date, October 1, 1998. It
17    says, "Subject: Anti-harassment."
18        Have you ever seen this document?
19        A    No, I have not.
20        Q    You have no recollection of ever having
21    been provided a copy of this document?
22        A    Not that I recall, no.
23        Q    Would you take a moment to read that.
24        A    Okay.
25        Q    Your testimony is, you were not aware of

165

1    this policy?
2        A    I'm familiar with them. I drafted them
3    for a number of my local unions.
4        Q    You did?
5        A    Uh-huh.
6        Q    If you can recall, what prompted you to do
7    that?
8        A    I believe it was at the time -- It might
9    have been with Vice President Rossa -- that they
10    talked, at a staff meeting, about anti-harassment
11    policies and that local unions that are, in fact,
12    employers should also adopt them at the time.
13        I had all my local unions that I serviced adopt a
14    policy. I got several drafts of it from the attorney
15    in Pittsburgh that represented most of my local
16    unions. She provided me several different drafts.
17    And I went over it with my local union officers,
18    various local unions, and we hashed it around and
19    drafted it up, posted it in their main offices,
20    or some of them have offices at home, wherever it
21    would be.
22        Q    But you have no recollection about what
23    prompted this effort in the first place?
24        A    No, I don't.
25        Q    But Vice President Rossa assigned you to

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
Transcript of Steven Kamen

166

1  do that?
2     A    I believe it wasn't an assignment.  It was
3  discussed at a staff meeting that we should, you know,
4  things that we should --
5     Q    "We" meaning all the reps in the Third
6  District?
7     A    Yeah.  Yeah.  I believe it was back when
8  Larry Rossa was vice president.
9     Q    So it's possible that it was sometime on
10 or after October 1, 1998?
11    A    Yes.
12       If this revision did, in fact, come out in '98 --
13 Just as a time line, I came on staff in '97.  It
14 wasn't in the handbook that I'm aware of.  I don't
15 recall this being in the --
16    Q    Do you have a copy of or did you have a
17 copy of the IBEW handbook?
18    A    Yes, I did.
19    Q    Do you recognize -- This may be an unfair
20 question.  Do you recognize the number, the 4.3 at the
21 top?
22    A    I don't recognize it, but --
23    Q    I'll tell you this came out of the IBEW
24 handbook.
25    A    Did it?  Okay.

167

1     Q    Would you agree that this policy would
2  offer the opportunity or the vehicle for addressing
3  the kind of behavior that you described at these --
4     A    Sure.
5     Q    -- Third District meetings?
6     A    On a formal level, yeah.
7     Q    Your testimony is, you didn't know
8  anything about this?
9     A    I don't recall seeing this in my handbook.
10    Q    One final question.
11    A    Okay.
12    Q    IBEW's interrogatories to you, numbers 20
13 and 21, which -- it's on page -- I don't know what
14 page it is.  Do you see that?
15    A    Uh-huh.
16    Q    20 refers to an allegation in paragraph 54
17 of the amended complaint that the "systematic
18 hostility toward homosexuals alleged in paragraph 52
19 of the amended complaint is 'manifested in overtly
20 anti-homosexual language by IBEW employees and
21 management.'"
22       And the answer to that is -- You refer to
23 Mr. Flanagan and Ms. Peluso, which you related to me
24 before --
25    A    Right.

168

1     Q    -- and to the Buffalo local union utility
2  business manager for years.
3     A    Because I couldn't think of his name.  I
4  know it's Bill, and I couldn't think of his name.  I
5  don't -- I can't recall his last name.
6     Q    But am I correct in understanding this
7  answer to this question that this gentleman made
8  derogatory remarks about homosexuals on what, a
9  regular basis?
10    A    Anytime there was a conference.  God
11 forbid a man would wear a pink shirt to a conference,
12 an IBEW conference.  He would be just jeering him.
13 Yeah.
14    Q    And as far as you know, did anybody
15 admonish him about it?
16    A    He was cheered on.
17    Q    "Cheered on."  What do you mean "cheered
18 on"?
19    A    Goes back to my reference to the old boys'
20 club.  He was, you know, cheered on.
21    Q    Interrogatory 21 says, "State each and
22 every fact which supports the allegation in
23 paragraph 54 of the amended complaint that the
24 systematic hostility toward homosexuals is manifested
25 in anti-homosexual hiring practices."

169

1        It seems to me we're going beyond, you know,
2  inappropriate comments by various people.  This seems
3  to indicate that there's more of a formal attitude, a
4  negative attitude.  Is that correct?
5     A    They like to hire, you know, married guys
6  and married women predominantly.
7        That's what I said in my answer, disclose any
8  known homosexuals that work -- The IBEW has 450
9  employees, give or take.  I mean, you know, if
10 10 percent of the population is gay, well, then, there
11 should be 45, you know, homosexuals.  Whether they're
12 out or not is another question, but based on the
13 statistics and the numbers --
14    Q    45 out of 450?
15    A    If 10 percent of the population is gay, as
16 statistically is said, then, if the IBEW has 450
17 employees between Washington and all the districts,
18 then 45 of them, you would think, would be gay, if it
19 goes on the 10 percent.
20       I'm not aware of any number even close to that,
21 if at all.
22    Q    I didn't quite understand the answer that
23 you gave, which was "Disclose homosexuals prior to
24 this action."  I don't understand.
25    A    I mean, there are companies that pride

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

44 (Pages 170 to 173)

170

1  themselves -- and organizations that pride themselves
2  in hiring homosexuals, and they're proud of it.
3      That's certainly not the IBEW's take.
4      Q    Is it your belief that the IBEW doesn't
5  employee any homosexuals or, let's say, known, out
6  homosexuals?
7      A    Out?
8      Q    Yeah.
9      A    My belief would be that they would not
10  knowingly hire a homosexual that's out.
11      Q    That's your belief?
12      A    That's my belief.
13      Q    But you don't know that?
14      A    I do not, no.  Of course not.  I don't
15  know that.
16      Q    Well, would you be surprised if I told you
17  there are?
18      A    Probably.
19      Q    Okay.
20      A    But, again, you know, if your response is
21  going to be, well, there is two or three that we know
22  of out of 450, that's a very negligible number.
23      Again, in the past, it was very much about
24  appearances.  I don't know what it's like in the past
25  three years.  But in the past it's been very much

171

1  about appearances.
2      MR. YELLIG:  What did you mean by that
3  answer?  That was my last question, about --
4      THE WITNESS:  I'm trying to be honest with
5  you and forthright as I can possibly be.
6      MR. YELLIG:  That's fine.  I appreciate
7  it.  I appreciate it.
8      Q    So let me ask you one question.  22 says,
9  "State each and every fact which supports the
10  allegation in paragraph 55 of the amended complaint
11  that the 'systematic hostility toward homosexuals
12  alleged in paragraph 52 of the amended complaint'
13  continues unabated through the present time."
14      And your answer is, "Disclose homosexuals since
15  this action."
16      What did you mean?
17      A    I still don't believe they have a hiring
18  practice of, you know, all-inclusive hiring.  I don't
19  think anything's really changed.
20      Q    If I understand -- and correct me if I'm
21  wrong -- are you -- To my mind -- maybe I'm old-
22  fashioned because I go back a lot of years.
23      A    You're not that much older than I am.
24      Q    I am.  I am.
25      To my mind and my understanding, there is a

172

1  difference between affirmative action and
2  nondiscrimination.
3      A    I agree with that.
4      Q    Okay.  What I'm hearing from you is that
5  the IBEW does not practice a policy of affirmative
6  action as far as recruitment and employment of gays?
7      A    That's what you're hearing from me.
8  Correct.
9      Q    Are you alleging or claiming that the IBEW
10  actively discriminates against known homosexuals?
11      A    My claim is that I was discriminated
12  against based on my disability -- based on my
13  disability, based on my medical issues, you know,
14  which stem from me being a homosexual in the first
15  place.  That's how, to me, it filters down.
16      Q    Okay.
17      A    Okay.
18      Q    So am I correct --
19      A    I mean, theoretically -- I shouldn't say
20  "theoretically" because this would be wrong.
21      More of a probability of a gay man developing HIV
22  than a heterosexual man developing HIV.  So with my
23  medical ailments, illnesses, developing HIV, Ed Hill
24  knowing that I was gay for a number of years prior to
25  that, I think filtered down through Vice President

173

1  Siegel, determining, you've had medical illnesses; I'm
2  pulling all your locals; and I'm going to get rid of
3  you.  And he did.
4      Q    Because --
5      A    My medical illnesses and I'm not -- My
6  medical illnesses and my HIV.
7      Q    Because you're HIV --
8      A    Yeah.
9      Q    -- positive?
10      A    Yeah.  I mean, you know, if you look at
11  the timing of all of this, you know, I was out in
12  1997, when I first came on staff, as we discussed
13  earlier, from my car accident.  I was out for a period
14  of time.  None of my locals were reassigned.  None at
15  all.
16      Q    How long were you out?
17      A    As long as or longer than I was out in
18  2004.
19      And when I returned to work in '97 from my heart
20  ailments and being in the Cleveland Clinic, I was
21  returned light duty, 10, 15, 20, 25 hours a week, that
22  type of thing, three meetings a week, three days a
23  week, slowly building back up.  None of my locals were
24  ever reassigned at the time with Vice President Rossa.
25      So why did Siegel take all my locals away while I

174

1  was out, refuse to give them back to me? In the
2  summer 2004 I had very little work to do that summer
3  until I was assigned to the presidential campaign.
4  Like I said, that was 24/7, gung-ho.
5      Shortly after that I was involved in a car
6  accident, you know, which seemed to be suspect for
7  whatever reason when I'm rear-ended, stopped on a
8  highway.
9      Q    Why do you say "suspect"?
10     A    I think you raised it at one of the
11 depositions, why did they request copies of it from
12 the personnel department. I think Mr. Chivers had
13 asked a question of why Mr. Siegel had requested
14 copies of it from the personnel department. It's in
15 Mr. Siegel's deposition. You know, was it suspect
16 that I was in a car accident?
17     Q    So you would attribute that inquiry, if
18 there was an inquiry to --
19     A    There was inquiry. It's in the
20 documentation.
21         MR. YELLIG: I don't have any other
22 questions.
23         MR. CHIVERS: Let me just ask you a few to
24 clarify some points.
25                - - -

175

1              EXAMINATION
2  BY MR. CHIVERS:
3      Q    You testified that you and Siegel,
4  Vice President Siegel, didn't particularly get along.
5  Was that true from the time you started to work in
6  '97?
7      A    It was true before that, when I was
8  business manager and he was a rep.
9      Q    Even before then.
10     A    All right. Now, he became vice president about
11 when?
12     A    2002 maybe.
13     Q    Something like 2002?
14     A    Yeah.
15     Q    Really, in 2002, he became your boss?
16     A    Yes.
17     Q    From 2002, when he became your boss, until
18 the start of your medical leave in February of 2004
19 were you ever suspended?
20     A    No.
21     Q    Did you ever have any of your assignments
22 or work taken away?
23     A    No.
24     Q    For example, the locals that were taken
25 away, had anything like that happened to you before

176

1  your medical leave?
2      A    No.
3      Q    When you did return in May of 2004, you
4  indicated that you had -- I think the way you
5  described it was just a brief exchange with Siegel.
6  Is that what you recall?
7      A    Correct. Very brief, yes.
8      Q    And you testified that you'd asked him the
9  question, when were you going to get your assignments
10 back?
11     A    My locals.
12     Q    Your locals.
13     A    Yes.
14     Q    And did he give you an answer?
15     A    No.
16     Q    He didn't say a thing?
17     A    "No" was his answer.
18     Q    "No"?
19     A    "No."
20     Q    Did you ask him why he took away your
21 locals?
22     A    At the time I recall he walked out of the
23 room. He said, "no" and walked out of the room.
24     Q    At that brief exchange that you had in May
25 of 2004 did he say anything about his not being able

177

1  to reach you during your medical leave?
2      A    No, he did not.
3      Q    Did anybody say anything to you about not
4  being able to reach you during your medical leave?
5      A    No.
6      Q    Anybody criticize you or say there was
7  some problem with your alleged inaccessibility?
8      A    No.
9      Q    All right. Did anybody give you, in
10 writing, anything, when you returned to work on or
11 about May 1 of 2004, about your not being in
12 communication or not being able to communicate with
13 you?
14     A    No.
15     Q    Did anybody at any point before May 1 of
16 2004 tell you that you had a problem with your
17 unresponsiveness -- alleged unresponsiveness to
18 e-mails?
19     A    Yes.
20     Q    Who told you that?
21     A    It was discussed at staff meetings. They
22 had brought in -- I believe at one of the staff
23 meetings they brought in the computer director in
24 Washington, asking anybody if they were having issues
25 or problems with computers. And I indicated at the

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

178

1 time that, yes, I was. In fact, I believe I raised my
2 hand at one of the staff meetings to suggest that IBEW
3 offer a computer 101 course for those of us that
4 didn't grow up with computers.
5     I didn't grow up with a computer.
6     Q    Did you have a fax number at all times?
7     A    At all times, separate phone line for
8 strictly IBEW business.
9     Q    Did you have voice mail on your cell
10 phone?
11     A    Yes, I did.
12     Q    Did you have voice mail on your home
13 phone?
14     A    Yes, I do.
15     Q    In fact, prior to your medical leave in
16 the beginning of February of 2004 did IBEW,
17 specifically, the district office here, communicate
18 with you via a telefax?
19     A    Yes.
20     Q    Did they communicate with you via voice
21 mail?
22     A    Yes.
23     Q    Did anybody tell you prior to your medical
24 leave in February of 2004 that there was a problem in
25 not being able to reach you either by voice mail or by

179

1 telefax?
2     A    At times Mike said, you know, you need to
3 call in a little more often. Mike Welsh had said.
4     Q    And would you respond to that when he
5 would tell you that?
6     A    Yes. Yes.
7     Q    All right. Do you know which of your
8 sisters -- or was it both sisters who communicated
9 with Mike Welsh during --
10     A    Both sisters.
11     Q    That would be Randy --
12     A    And Deborah.
13     Q    -- and Deborah.
14     Have they at any point told you what they
15 communicated to Mike Welsh?
16     A    Basically, they told me that they were at
17 the time updating him on what was going on in the
18 hospital, out of the hospital, what tests, and that I
19 was still too ill to go into work or really even talk
20 on the phone or do anything. That's why they were
21 calling.
22     Q    Do they know how many times they
23 communicated, either one or the other had communicated
24 with Mike Welsh?
25     A    I believe Randy contacted him twice,

190

1 Debbie once.
2     Q    So that would be a total of three times?
3     A    Yes.
4     Q    All right. Now, prior to the start of
5 your medical leave in February of 2004 did anybody
6 warn you that you might be terminated?
7     A    No. Absolutely not.
8     Q    You saw the letter back in April of 2003
9 in which Mr. Siegel brought up the question of
10 timeliness of reports. Do you remember that?
11     A    Yes.
12     Q    All right. Did anybody -- Did Mr. Siegel,
13 at that meeting, the performance, I guess,
14 whatever -- What did you call it?
15     Did you call it a --
16     A    I believe it was just a letter that was
17 sent.
18     Q    All right. Did you have a meeting with
19 Siegel at or about that time to discuss the contents
20 of the letter?
21     A    There was some follow-up to that letter in
22 May of '03 at the progress meeting.
23     Q    All right. At the progress meeting did
24 Mr. Siegel ever tell you, if you didn't do what he
25 told you to do with respect to these reports, you were

181

1 going to be terminated?
2     A    No.
3     Q    Were you ever suspended?
4     A    No.
5     Q    Okay. Did Mr. Siegel ever tell you that
6 you'd be suspended?
7     A    No.
8     Q    When you came back in May of 2004, between
9 May of 2004 and December 8 of 2004 did anybody --
10 Mr. Siegel, Mr. Hill, Mr. Welsh, anybody -- tell you
11 that there was a problem with the timeliness of your
12 reports?
13     A    I believe Mike Welsh did.
14     Q    When?
15     A    Sometime during the summer we discussed --
16 he said, you got to get your reports in. My response
17 was, I know.
18     Q    You did eventually; did you not?
19     A    Yes.
20     Q    Did Mike Welsh, when he told you this in
21 the summer of 2004, tell you, if you didn't get the
22 reports in, you're going to be suspended?
23     A    No, he did not.
24     Q    He didn't tell you that if you didn't get
25 the reports in you were going to be terminated?

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

47 (Pages 182 to 185)

182

1    A    No.
2    Q    Describe, if you would, your activities
3    when you returned in the summer of 2004 and compare
4    those with the activities prior to your medical
5    leave.
6    A    It was a very quiet summer. I had very
7    little work to do.
8    Q    Now, you had three of the locals taken
9    away from you?
10    A    It was at least three, maybe four, yes.
11    Q    And were they big locals, small locals?
12    A    For the amount of members that I serviced,
13    pretty good-sized locals.
14    Q    If you had to describe, in terms of
15    percentage, how much your workload was reduced when
16    you came back in the summer of 2004, what percentage
17    would you put on that?
18    A    75 percent.
19    Q    Reduced 75 percent?
20    A    Uh-huh.
21    Q    So your workload was only 25 percent of
22    what it had been?
23    A    Uh-huh.
24    Q    Yes?
25    A    Yes.

183

1    Q    All right.
2    A    The only time I really got busy from that
3    point on, after returning, was when I was assigned to
4    the presidential election. I believe that assignment
5    came from Larry Nidek, Executive Assistant to
6    President Hill through Vice President Siegel.
7    It wasn't a written assignment. It was a verbal
8    assignment. But I believe it came through -- came
9    from Washington
10    Q    At any time from May 1 of 2004 until
11    December 8 of 2004 did Mr. Siegel or anybody else on
12    behalf of IBEW tell you there was a problem with
13    communicating with you?
14    A    No, other than the one time -- Mike Welsh
15    over the summer. That was it.
16    Q    Again, your testimony was that that wasn't
17    in the context of a warning?
18    A    No. Just to call in more often.
19    Q    All right. Did you do that?
20    A    Yes.
21    Q    All right. Did you attend any of
22    the -- What did you call it, a rep meeting or
23    something? What do you call those meetings of the
24    representatives?
25    A    Staff meeting.

184

1    Q    Staff meeting.
2    Did you attend any of the staff meetings in the
3    summer of 2004?
4    A    No. I don't believe there was one.
5    Q    There wasn't one?
6    A    Not that I recall.
7    Q    Now, you had testified that, apparently,
8    in some of the staff meetings -- I guess this would be
9    before February of 2004 -- Mr. Siegel would talk about
10    reports?
11    A    Yes.
12    Q    And was that -- How often would those
13    staff meetings be held?
14    A    Two to three times a year.
15    Q    All right. It just so happened there
16    weren't any staff meetings held between May 1 and
17    December of 2004?
18    A    Not that I recall.
19    Q    All right.
20    A    In fact, just as an aside, I was a little
21    upset because, for the December staff meeting, I was
22    asked to contribute $50 towards Vice President
23    Siegel's Christmas gift, of which I sent a check in
24    and they cashed it two days after they terminated me.
25    Nice politics.

185

1    Q    That's kind of nasty.
2    A    Uh-huh.
3    Q    In these staff meetings that you recall
4    from your years prior to 2004, is it your
5    recollection -- I assume it is from your
6    testimony -- that there was discussion in these staff
7    meetings about assignments that had not been completed
8    by the reps?
9    A    Yes.
10    Q    Do you recall any reps in particular by
11    name that had open assignments discussed by
12    Mr. Siegel?
13    A    Rich Redmond, Pat Gino, myself. There was
14    times, as a matter of fact, aside from assignments,
15    that local unions had to be contacted for an issue,
16    and like you check off that you contacted them. And
17    Dominic Macchia, a rep who's highly respected, would
18    have 80 names, 80 locals. I had four open
19    assignments.
20    It was just almost every rep at any given time
21    would be on the list of assignments either, you know,
22    not being in on time or reports. It was brought up at
23    almost every single staff meeting: weekly reports,
24    expense reports, assignments. Then they'd discuss
25    anything like these LM-2 reporting. It would be

**Johnstown**
**814-266-2042**

**Nationwide**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

## NETWORK DEPOSITION SERVICES
## Transcript of Steven Kamen

48 (Pages 186 to 189)

186

1  recommended to the reps to get on board with this or
2  get on board with the harassment policy.
3      Q   Now, do you recall any of those staff
4  meetings in any of the years prior to 2004 that any of
5  the reps were threatened or warned about disciplinary
6  action if they didn't get the reports in?
7      A   Not at all. No recollection of that.
8      Q   Do you recall there was some discussion --
9  or did you ever hear about any of the other reps being
10 suspended or otherwise disciplined for not doing their
11 assignments or not getting the reports in on time?
12     A   Just Wyatt Earp.
13     Q   Just Wyatt Earp. Other than Wyatt, nobody
14 else?
15     A   Nobody else. And as I said in my
16 testimony, that was -- attempted to be very quiet in
17 this district, and it came to all of the reps -- most
18 of us -- through other districts. It spread like
19 wildfire.
20     Q   Prior to your receipt of a letter -- By
21 the way, how were you told that you were going to be
22 terminated? Was that a meeting, somebody told you in
23 a meeting?
24     A   I was sent a letter by Federal Express
25 from President Hill.

187

1      Q   That was the December 8 letter?
2      A   Yes.
3      Q   And that's the first you knew of anything?
4      A   Yes. After my meeting I had with
5  Vice President Siegel I sent an e-mail to President
6  Hill and told him I'm going to -- I told him that -- I
7  don't recall my words. I said, you know, it was not a
8  cordial meeting myself Vice President Siegel,
9  but I would continue to do my work and stewards
10 training that I had scheduled. And that was an e-mail
11 I sent to President Hill. And then I was terminated
12 on the 8th, when I received a letter Federal Express.
13     Q   The reasons that were given for your
14 termination -- We've already addressed them in detail
15 here today. Did anybody give you an opportunity
16 before you were told you were being terminated to
17 address those issues?
18     A   No.
19     Q   Did anybody, prior to your receipt of that
20 letter of December 8, 2004, identify the specific
21 assignments they said you hadn't completed prior to
22 your being terminated?
23     A   Not that I recall. I don't believe so.
24     Q   All right. Had anybody told you prior to
25 the time that you received this letter of December 8

188

1  notifying you'd been terminated -- tell you that,
2  if you didn't get all your reports in on time, that
3  you were going to be either suspended or terminated?
4      A   I was never told that.
5          MR. CHIVERS: Any further questions?
6          RE-EXAMINATION
7  BY MR. YELLIG:
8      Q   My understanding is that you did
9  submit -- You met with Vice President Siegel on
10 November 30, 2004. Is that correct?
11     A   Yes.
12     Q   And at that time did you not submit to him
13 copies of the delinquent weekly activity reports from
14 sometime in May through the end of November?
15     A   I turned in a number of reports at that
16 time. I don't recall the exact dates, but, yes.
17     Q   So at the time that you met with
18 Mr. Siegel you were not -- you were no longer
19 delinquent. Is that correct?
20     A   Maybe one or two weeks. I don't recall
21 the exact dates.
22     Q   Is it your testimony -- Did I understand
23 you to say that Mr. Siegel did not discuss with you
24 his perceived problems with your performance at that
25 time on November 30, 2004?

189

1      A   He did discuss them on November 30. His
2  perception was that I don't perform to his abilities.
3      Q   Did he mention delinquent activity
4  reports?
5      A   Yes.
6      Q   Did he mention delinquent performance of
7  assignments?
8      A   I don't recall that he discussed
9  assignments. I only had three outstanding
10 assignments.
11     Q   But you don't recall him mentioning --
12     A   Assignments, no. Weekly reports, yes.
13     Q   -- assignments.
14 Did he tell you at that time that he was going to
15 recommend that you be terminated?
16     A   He told me at that time -- It was a very
17 curt meeting. He said, I do not want you on my staff
18 any longer. That was the end of it.
19     Q   Before or after he discussed these
20 shortcomings, what he considered shortcomings in your
21 performance?
22     A   He said, I do not want you on my staff any
23 longer.
24     Q   What I'm asking you is: Was that the
25 conclusion following his discussion of what he

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Kamen**

49 (Pages 190 to 193)

190

1  perceived to be your shortcomings?
2      A    Yes.
3      Q    So it wasn't stated in a vacuum.  It was
4  the conclusion of --
5      A    Right.
6      Q    In other words, therefore, I can no
7  longer --
8      A    Right.
9      Q    Okay.  Did you do anything after that
10 meeting?  Did you take any action?  Did you
11 communicate or attempt to communicate with anybody in
12 the IBEW?
13     A    I sent an e-mail to President Hill.
14     Q    Why did you do that?
15     A    To let him know that I was going to
16 continue my duties.  I believe Vice President Siegel
17 said I would hear from Ed Hill after the meeting here.
18     Q    Okay.  And you then communicated to
19 Mr. Hill?
20     A    Yes, I did.
21     Q    How did you communicate with him?
22     A    I sent him an e-mail.
23     Q    An e-mail?
24     A    Uh-huh.
25     I didn't say I didn't know how to do it.  I told

191

1  you earlier, I'm not comfortable with the whole e-mail
2  process.
3      Q    And what did you say in the e-mail?
4      A    I told him that I had a meeting with
5  Vice President Siegel, and I think, the short and
6  sweet of it, the meeting was ugly, but I was going to
7  continue my duties.  I had shop stewards training
8  seminars scheduled and would continue with them.
9      Q    In your mind, what was the purpose of
10 doing that?
11     A    Because --
12     Q    Did you have a purpose?
13     A    -- I didn't know where I stood.  I didn't
14 know if I was going to be reassigned or brought down
15 to Washington.
16     Q    You know what --
17     A    The last I left off with Mr. Siegel was,
18 you would hear from President Hill.
19     Q    Okay.  So that's what prompted the e-mail
20 to Mr. Hill?
21     A    Yeah.
22     Q    Did Mr. Hill respond to you?
23     A    I believe he did.  He said he'd get back
24 to me shortly.
25     Q    And did he?

192

1      A    I think I sent him the e-mail on
2  December 1.  He sent me back an e-mail on the 6th or
3  7th, said he'd get back to me shortly.
4      I was continuing to work at that time, and then I
5  was terminated on the 8th.
6      Q    On the 8th.
7      You know, I apologize, but I did want to ask you
8  one other area.
9      You alleged in the complaint that you were denied
10 a promotion to a position as a director --
11     A    Correct.
12     Q    -- and that you had had a conversation of
13 some kind with a Pat Reilly.  Is that correct?
14     A    Correct.
15     Q    Can you give me some specifics as to the
16 circumstances of that conversation, you know, when it
17 occurred, where?
18     A    I don't recall the dates.  It was when the
19 reps were being trained in Washington, DC, all the
20 reps, which only happened one time during my tenure,
21 so it's not a common thing.  I mean, every rep was
22 brought to Washington.
23     Q    Was that a meeting that was held at the --
24 I think it was a Marriott Hotel up on --
25     A    Every rep was brought in from every

193

1  district.
2      Q    August 2003?
3      A    Yeah.  It was at that meeting where we
4  were learning -- we were going through the reps, you
5  know, the manuals that they supplied.  We went through
6  the business manager's manuals and all the other
7  stuff.
8      And I had always been conversationally friendly
9  with Pat Reilly.  And he told me there was going to be
10 an opening.  We talked about it.  I believe he said
11 Pete Potenza was going to be retiring.
12     Q    Maybe you better spell that for the
13 court reporter.
14     A    P-o-t-e-n-z-a.  Peter Potenza.
15     I believe he said Peter was going to be retiring.
16     Q    What job -- what position did --
17     A    Director of inventory -- purchasing and
18 inventory control.
19     Q    Okay.
20     A    Okay.  We talked about it.  And I said --
21 I told him, I said, well, I've recently divorced.  I
22 said, I would be interested in that position.  He
23 said: You're kidding.  I said: Not at all.  He
24 said: Fantastic.  He said: Nobody wants to transfer
25 into Washington, the expense of living here.

Johnstown
814-266-2042

Nationwide
866-565-1929

Pittsburgh
412-281-7908

NETWORK DEPOSITION SERVICES
**Transcript of Steven Kamen**

50 (Pages 194 to 197)

194

1    He said the director's position, I believe, at the
2    time, he said, was like $13,000 a year more. We
3    discussed that.
4        Q    Than a representative's salary?
5        A    Yeah.
6        And I said I wasn't really looking for -- You
7    know, the salary increase wasn't important to me. I
8    said, you know, I wouldn't mind getting off the road.
9    I wasn't looking -- Money wasn't the whole issue. I
10   wouldn't mind getting off the road. You know, I had
11   put on -- A number of years while I was a rep in this
12   district I put on the most mileage of any rep or the
13   second most of any rep in this district other than
14   Mike Welsh. A lot of driving, a lot of running
15   around. And I said, I really wouldn't mind even
16   moving or relocating down to DC.
17       He said: Fantastic, because we have nobody that
18   wants to transfer into the position. Nobody wants to
19   move to DC. We're having trouble filling vacancies
20   within, you know, the IBEW corporate structure down
21   here because nobody wants to -- cost of living, so on
22   and so forth. And he said: As far as I know, the
23   job's going to be yours.
24       Q    Really?
25       A    Yeah. That's the way we left off.

195

1        There was no formal training required for it. He
2    didn't ask whether I had college or not. I mean, he
3    knew what my history was and so on. He said they were
4    going to -- you know, they needed to fill that
5    position.
6        Q    You said -- I forget the term you used,
7    but that you had a conversational -- What did you say,
8    a conversational relationship or something like that?
9        A    Yeah.
10       Q    Meaning what?
11       A    I mean, I never knew him really more
12   friendly than that in terms of other than his position
13   and me as a rep or anything. Back when I was business
14   manager my mom had known him.
15       Q    What position did Mr. Reilly have?
16       A    I believe he was executive assistant to
17   the international secretary. I believe.
18       Q    Okay. Did you broach the issue about the
19   job opening with Mr. Reilly, or did he approach you?
20       A    He was talking to me about it. I didn't
21   approach it with him.
22       Q    He brought it up?
23       A    Yes.
24       Q    And what, asked you if you might be
25   interested?

196

1        A    I think we were just talking about it. I
2    think it started out, the conversation, we were
3    sitting together, and he said, you know, are you
4    getting tired of being a field rep yet. And I said,
5    well, you know, if there was something, you know,
6    more, not being on the road -- And that's how the
7    discussion came up over that position.
8        Q    Okay. And he represented to you that the
9    job would be yours?
10       A    He said there was no other qualified
11   candidates. Nobody wanted to move into Washington.
12   He was pretty up front about that.
13       (Discussion off the record)
14       Q    Do you know who ultimately filled that
15   position?
16       A    No, I don't.
17       And just so you know, it wasn't a formal
18   interview or anything.
19       Q    No.
20       A    We were sitting at one of the tables and
21   talking. And he said, you know, we should -- He said,
22   I know they're having trouble filling the position,
23   so, as far as I'm concerned, the job is yours.
24       Q    He said, as far as I'm concerned, the job
25   is yours?

197

1        A    The job is yours, yeah.
2        Q    So you walked away -- you went away from
3    that conversation, thinking, gee, I'm going to get
4    this position. Is that correct?
5        A    I was hopeful that I would, yes.
6        Q    And what happened?
7        A    Nothing. Never heard anything about it.
8        Q    Never heard a word?
9        A    No.
10       MR. YELLIG:  That's all.
11       RE-EXAMINATION
12   BY MR. CHIVERS:
13       Q    I just wanted to clarify something. I'd
14   asked you a series of questions about what, if
15   anything, had occurred or what you'd been told between
16   May 1 -- and I used the date December 8.
17       Let me change that date, that end date, to
18   November 30 because I understand you did talk to
19   Siegel on November 30.
20       A    Yes.
21       Q    All those questions that I asked you about
22   whether you had been informed of any problems,
23   communications, performance, reports, anything like
24   that, change the end date to November 30.
25       Would your answers change at all?

**Johnstown**
814-266-2042

**Nationwide**
866-565-1929

**Pittsburgh**
412-281-7908

### 198

1  A  No, they would not.
2     MR. CHIVERS:  All right.  That's all I
3  have.
4        - - -
5     (Thereupon, at 2:53 o'clock p.m., the
6  deposition was concluded.)
7        - - -

### 200

1
2  December 4, 2007
3
   Joseph H. Chivers, Esq.
4  312 Boulevard of the Allies
   Pittsburgh, Pennsylvania 15219
5
6        NOTICE OF NON-WAIVER OF SIGNATURE
7  Please have the deponent read his deposition
   transcript.  All corrections are to be noted on the
8  preceding Errata Sheet.
9  Upon completion of the above, the deponent must affix
   his signature on the Errata Sheet, and it is to then
10 be notarized.
11 Please forward the signed original of the Errata Sheet
   to Terry R. Yellig, Esq., for attachment to the
12 original transcript, which is in his possession,
   copying myself.
13
   As per the rules, if the witness does not sign the
14 signature page within 30 days after receipt of the
   transcript, signature is deemed waived.
15
16
17
18 Rebecca L. Schnur
   Court Reporter
19
20 CC: Terry R. Yellig, Esq.
21
22
23
24
25

### 199

1
2        CERTIFICATE
3  COMMONWEALTH OF PENNSYLVANIA, )
                           ) SS:
   COUNTY OF ALLEGHENY.        )
4
5     I, Rebecca L. Schnur, do hereby certify that
   before me, a Notary Public in and for the Commonwealth
6  aforesaid, personally appeared STEVEN KAMEN, who then
   was by me first duly cautioned and sworn to testify
7  the truth, the whole truth, and nothing but the truth
   in the taking of his oral deposition in the cause
8  aforesaid; that the testimony then given by him as
   above set forth was by me reduced to stenotype in the
9  presence of said witness, and afterwards transcribed
   by means of computer-aided transcription.
10    I do further certify that this deposition was
   taken at the time and place in the foregoing caption
11 specified, and was completed without adjournment.
12    I do further certify that I am not a relative,
   counsel, or attorney of either party, or otherwise
13 interested in the event of this action.
14    IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office at Pittsburgh,
15 Pennsylvania, on this 4th day of December, 2007.
16
17
   _____
18 Rebecca L. Schnur
   Notary Public in and for the
   Commonwealth of Pennsylvania
19 My Commission expires:  June 16, 2009
20        - - -
21
22
23
24
25

### 201

1  COMMONWEALTH OF PENNSYLVANIA )
                          )  ERRATA SHEET
2  COUNTY OF ALLEGHENY        )
3     I hereby make the following changes in my
   deposition transcript.
4  PAGE  LINE     CHANGE FROM        CHANGE TO
5
6
7
8
9
10
11
12
13
14
15        CERTIFICATE OF READING
16
   I, _____ hereby acknowledge that I
17 have read the foregoing deposition transcript this
   _____ day of _____ 2007.  I further certify
18 that the answers are true and correct as described
   unless otherwise noted on the Errata Sheet.
19
   Witness name _____
20
21
22 Subscribed and sworn to before me this _____ day
23 of _____ 2007.
24        _____
25        Notary Public

**Johnstown**
814-266-2042

**Nationwide**
866-565-1929

**Pittsburgh**
412-281-7908



**INTERNATIONAL
BROTHERHOOD
OF ELECTRICAL
WORKERS**

1125 Fifteenth Street, N.W.
Washington, DC 20005
(202) 833-7000
http://ibew.org

EDWIN D. HILL
International
President

JEREMIAH J. O'CONNOR
International
Secretary-Treasurer

December 8, 2004

Mr. Steven Kamen
605 Slippery Rock Road
Slippery Rock, PA 16057

Dear Brother Kamen:

Under date of June 26, 1997, you received a letter from International President Barry notifying you of your employment as an International Representative of the IBEW, effective July 1, 1997. The letter stated that you were being employed by the International President, and it added that the letter "does not constitute a contract of employment, nor does it establish a fixed term of employment, inasmuch as you serve at the pleasure of the International President." That statement is consistent with Article IV, Section 3(d) of the IBEW Constitution, which states that the International President has the power to employ International Representatives and that "he has the power to discharge them."

Since the date of your employment, you have been working under the supervision of the International Vice President for the Third District, who is currently Donald C. Siegel. Based on a report of your performance as an International Representative that I have received from Vice President Siegel under date of November 30, 2004, I find that it is necessary to exercise my authority to discharge you from your position as an International Representative of the IBEW. Vice President Siegel's report demonstrates that you have been seriously delinquent in the filing of your required reports over a period of years, and that you have failed on a number of occasions to complete the assignments you have received from the Third District Office.

With respect to the former, Vice President Siegel advises me that he has had several conversations with you about your failure to file required reports in a timely manner. On some occasions, the reports are weeks late, and on other occasions they have been late by several months. For the period beginning May 1 of this year, no reports were received by Vice President Siegel until you delivered them to him late last month. Additionally, even when reports are turned in, you have frequently failed to provide all of the required information on the back of the form. Vice President Siegel also advises me that you have acknowledged several times that you had failed to file your reports as required, and that you have apologized for the failure on each occasion. Your failure with respect to the required reports is not new, and

DEPOSITION
EXHIBIT
Kamen   1
11/28/07



**INTERNATIONAL
BROTHERHOOD
OF ELECTRICAL
WORKERS**

actually goes back a number of years. In fact, I am advised that there are several letters of apology, dating back to 1999, from you to me and to then Vice President Rossa in your file about this very issue.

Perhaps even more serious has been your inability on numerous occasions to carry out assignments received from the Third District Office. As you know, International Representatives are expected to perform their duties with a minimum of supervision, and they are expected to service their local unions and to complete assignments from the Third District Office on a timely basis. Vice President Siegel, however, has frequently experienced an inability to reach you at times when it was important to do so, and you have on many occasions not responded to e-mails from his office. I am advised that in spite of repeated requests to do so, you have failed to clear a number of assignments from the Third District, and you have three unfulfilled assignments in your file that date back as far as 1999. Included in your file is an April 21, 2003, letter from Vice President Siegel to you, expressing his displeasure with your being late in assignments and not handing in work and expense reports. His letter was a clear warning to you that improvement in your performance was required.

On one occasion, you failed to complete an assignment for more than six months, and it became necessary for Vice President Siegel to assign another Representative, who completed the assignment in less than thirty days. On another occasion, you were assigned to assist Local Union 1968 in its scheduled bargaining negotiations. The Local Union at that time had a brand new business manager, who was in need of assistance from an experienced International Representative. Even though you were scheduled to be at the Local Union for the negotiations, you failed to show up, and the Local Union could not reach you. On still another occasion, an assignment that you received in April of 2002 was not completed by you until January 2004. In addition, there have been complaints about your work from some of the locals that you service, which required Vice President Siegel to reassign some of your local unions to other members of his staff.

In sum, your performance as an International Representative has, for some time, been unacceptable. Vice President Siegel has spoken to you about these problems on several occasions, most recently in Atlantic City in May of this year. You assured him at that time that you would bring your reports up to date and complete your assignments on time in the future. According to Vice President Siegel, you have not followed through with those and earlier commitments you made, and the problems with your assignments and reports have only gotten worse. For all of these reasons, Vice President Siegel advised



**INTERNATIONAL
BROTHERHOOD
OF ELECTRICAL
WORKERS®**

you, when he met with you on November 30, 2004, that because of your failings, he no longer wished to retain you on the Third District staff.

In view of the lengthy history of your failings, and your inability to improve your performance as an International Representative in spite of warnings to you to improve and your commitments to do so, I must, in order to fulfill my obligations as International President of the IBEW, terminate you from employment as an International Representative of the IBEW, effective December 31, 2004.

You are to return all IBEW furnished credit cards and any property of the IBEW to Vice President Siegel upon receipt of this letter. Arrangements will be made by the Third District Office to pick up your IBEW leased vehicle.

Fraternally yours,

Edwin D. Hill
International President

EDH:nlc
Copy to International Vice President Donald Siegel, IBEW Third District

FROM IBEW 3RD DISTRICT OFC    (MON)DEC 6 2004 11:21/ST. 11:21/NO. 6360061669 P 1



# International Brotherhood
## of Electrical Workers



**Donald C. Siegel**, International Vice President
500 CHERRINGTON PARKWAY, SUITE 325
CORAOPOLIS, PA 15108
(412) 269-4963  •  Fax (412) 269-4954

**Edwin D. Hill**, International President
**Jeremiah J. O'Connor**, International Secretary-Treasurer

| New York | New Jersey | Pennsylvania | Delaware |
|---|---|---|---|

# Memo

**To:**  Edwin D. Hill

**From:**  Donald C. Siegel

**Date:**  November 30, 2004

**Re:**  Steven Kamen

---

Enclosed for your review are copies of tracking sheets used to record the dates International Representative Weekly Reports are received in this office. To the right of each representative's name is the date each weekly report was received. The attached reports are for the weeks ending November 2, 2002 through November 20, 2004.

If you have any questions, please feel free to contact me.

DCS:jm

Enclosure



DEPOSITION
EXHIBIT
Kamen 2
11/28/07

FROM IBEW 3RD DISTRICT OFC    (MON)DEC  6 2004 11:21/ST. 11:21/NO. 6360061869 P  2

## International Representative's Weekly Reports - Date Received
### November / December 2002

| Week Ending: | 11/2/2002 | 11/9/2002 | 11/16/2002 | 11/23/2002 | 11/30/2002 | 12/7/2002 | 12/14/2002 | 12/21/2002 | 12/28/2002 |
|---|---|---|---|---|---|---|---|---|---|
| John Amodeo | 8-Nov | 27-Nov | 18-Nov | 27-Nov | 2-Dec | 12-Dec | 18-Dec | 26-Dec | 30-Dec |
| Brian Brennan | 4-Nov | 13-Nov | 21-Nov | 25-Nov | 2-Dec | 9-Dec | 17-Dec | 23-Dec | 2-Jan |
| Jerry Comer | 8-Nov | 14-Nov | 20-Nov | 27-Nov | 5-Dec | 13-Dec | 23-Dec | 26-Dec | 2-Jan |
| Larry Davis | 7-Nov | 15-Nov | 20-Nov | 25-Nov | 6-Dec | 9-Dec | 18-Dec | 26-Dec | 2-Jan |
| Keenan Eagen | 5-Nov | 15-Nov | 19-Nov | 27-Nov | 5-Dec | 11-Dec | 17-Dec | 26-Dec | 2-Jan |
| Wyatt Earp | 15-Nov | 15-Nov | 20-Nov | 2-Dec | 9-Dec | 12-Dec | 30-Dec | 30-Dec | 6-Jan |
| Mike Flanagan | 6-Nov | 15-Nov | 21-Nov | 2-Dec | 2-Dec | 12-Dec | 18-Dec | 30-Dec | 2-Jan |
| Pat Gino | 4-Nov | 12-Nov | 18-Nov | 26-Nov | 2-Dec | 9-Dec | 16-Dec | 30-Dec | 30-Dec |
| Steve Kamen | 21-Nov | 2-Jan | 2-Jan | 2-Jan | 2-Jan | 2-Jan | 2-Jan | 2-Jan | 30-Dec |
| Randy Kieffer | 6-Nov | 18-Nov | 20-Nov | 27-Nov | 6-Dec | 16-Dec | 16-Dec | 2-Jan | 30-Dec |
| Don Macchia | 6-Nov | 14-Nov | 20-Nov | 2-Dec | 4-Dec | 11-Dec | 18-Dec | 2-Jan | 2-Jan |
| John Malagise | 5-Nov | 12-Nov | 18-Nov | 25-Nov | 2-Dec | 9-Dec | 16-Dec | 23-Dec | 30-Dec |
| Marie Peluso | 4-Nov | 12-Nov | 18-Nov | 25-Nov | 2-Dec | 9-Dec | 16-Dec | 23-Dec | 30-Dec |
| Rich Redmond | 6-Nov | 13-Dec | 13-Dec | 13-Dec | 13-Dec | 13-Dec | 8-Jan | 23-Dec | 30-Dec |
| Jim Schlosser | 6-Nov | 13-Nov | 21-Nov | 26-Nov | 2-Dec | 10-Dec | 18-Dec | 27-Jan | 27-Jan |
| Paul Simon | 12-Nov | 18-Nov | 22-Nov | 25-Nov | 6-Dec | 10-Dec | 18-Dec | 26-Dec | 30-Dec |
| Mike Welsh | 4-Nov | 12-Nov | 18-Nov | 25-Nov | 2-Dec | 10-Dec | 16-Dec | 23-Dec | 30-Dec |

FROM IBEW 3RD DISTRICT OFC    (MON)DEC  6 2004 11:22/ST. 11:21/NO. 6360061669 P  3

## International Representative's Weekly Reports – Date Received
### January / February 2003

| Week Ending: | 1/4/2003 | 1/11/2003 | 1/18/2003 | 1/25/2003 | 2/1/2003 | 2/8/2003 | 2/15/2003 | 2/22/2003 |
|---|---|---|---|---|---|---|---|---|
| John Amodeo | 8-Jan | 13-Jan | 21-Jan | 27-Jan | 7-Feb | 10-Feb | 18-Feb | 26-Feb |
| Brian Brennan | 8-Jan | 13-Jan | 21-Jan | 27-Jan | 5-Feb | 12-Feb | 20-Feb | 26-Feb |
| Jerry Comer | 8-Jan | 16-Jan | 21-Jan | 27-Jan | 5-Feb | 10-Feb | 21-Feb | 24-Feb |
| Larry Davis | 8-Jan | 15-Jan | 23-Jan | 29-Jan | 6-Feb | 12-Feb | 20-Feb | 26-Feb |
| Keenan Eagen | 8-Jan | 15-Jan | 5-Feb | 29-Jan | 5-Feb | 10-Feb | 19-Feb | 26-Feb |
| Wyatt Earp | 16-Jan | 27-Jan | 27-Jan | 7-Feb | 21-Feb | 21-Feb | 3-Mar | 21-Mar |
| Mike Flanegan | 10-Jan | 16-Jan | 21-Jan | 30-Jan | 6-Feb | 13-Feb | 18-Feb | 26-Feb |
| Pat Gino | 6-Jan | 13-Jan | 23-Jan | 27-Jan | 3-Feb | 10-Feb | 18-Feb | 26-Feb |
| Steve Kamen | 6-Jan | 3-Feb | 12-Feb | 12-Feb | 18-Feb | 18-Feb | 18-Feb | 26-Feb |
| Randy Kieffer | 13-Jan | 17-Jan | 23-Jan | 30-Jan | 6-Feb | 13-Feb | 21-Feb | 27-Feb |
| Dom Mecchia | 9-Jan | 15-Jan | 23-Jan | 29-Jan | 6-Feb | 13-Feb | 27-Feb | 27-Feb |
| John Malagise | 6-Jan | 13-Jan | 21-Jan | 27-Jan | 3-Feb | 10-Feb | 18-Feb | 24-Feb |
| Marie Peluso | 6-Jan | 13-Jan | 21-Jan | 29-Jan | 5-Feb | 12-Feb | 18-Feb | 26-Feb |
| Rich Redmond | 27-Jan | 27-Jan | 3-Feb | 3-Feb | 6-Feb | 12-Feb | 12-Mar | 12-Mar |
| Jim Schlosser | 6-Jan | 13-Jan | 22-Jan | 28-Jan | 3-Feb | 11-Feb | 18-Feb | 25-Feb |
| Paul Simon | 6-Jan | 17-Jan | 23-Jan | 30-Jan | 5-Feb | 12-Feb | 26-Feb | 26-Feb |
| Mike Welsh | 8-Jan | 13-Jan | 21-Jan | 29-Jan | 3-Feb | 11-Feb | 18-Feb | 24-Feb |
| Rick Fridell | N/A | N/A | N/A | N/A | N/A | 12-Feb | 18-Feb | 27-Feb |

FROM IBEW 3RD DISTRICT OFC        (MON)DEC  6 2004 11:22/ST. 11:21/NO. 6360061669 P  4

**International Representative's Weekly Reports - Data Received**

**March / April 2003**

| Week Ending: | 3/1/2003 | 3/8/2003 | 3/15/2003 | 3/22/2003 | 3/29/2003 | 4/5/2003 | 4/12/2003 | 4/19/2003 | 4/26/2003 |
|---|---|---|---|---|---|---|---|---|---|
| John Amodeo | 6-Mar | 12-Mar | 18-Mar | 26-Mar | 1-Apr | 7-Apr | 14-Apr | 21-Apr | 28-Apr |
| Brian Brennan | 3-Mar | 12-Mar | 18-Mar | 26-Mar | 1-Apr | 9-Apr | 16-Apr | 23-Apr | 30-Apr |
| Jerry Comer | 5-Mar | 17-Mar | 20-Mar | 26-Mar | 2-Apr | 7-Apr | 17-Apr | 24-Apr | 30-Apr |
| Larry Davis | 6-Mar | 10-Mar | 18-Mar | 26-Mar | 2-Apr | 16-Apr | 16-Apr | 24-Apr | 1-May |
| Keenan Eagen | 5-Mar | 13-Mar | 18-Mar | 26-Mar | 3-Apr | 9-Apr | 16-Apr | 23-Apr | 1-May |
| Wyatt Earp | 21-Mar | 24-Mar | 24-Mar | 31-Mar | 4-Apr | 10-Apr | 17-Apr | 5-May | 30-Apr |
| Mike Flanagan | 5-Mar | 12-Mar | 18-Mar | 27-Mar | 2-Apr | 9-Apr | 16-Apr | 23-Apr | 5-May |
| Rick Fridell | 21-Mar | 21-Mar | 4-Apr | 4-Apr | 4-Apr | 10-Apr | 24-Apr | 1-May | 30-Apr |
| Pat Gino | 3-Mar | 10-Mar | 17-Mar | 24-Mar | 31-Mar | 7-Apr | 14-Apr | 21-Apr | 1-May |
| Steve Kamen | 4-Mar | 13-Mar | 29-Apr | 29-Apr | 8-May | 8-May | 14-Apr | 21-Apr | 30-Apr |
| Randy Kieffer | 10-Mar | 10-Mar | 20-Mar | 27-Mar | 4-Apr | 10-Apr | 21-Apr | 25-Apr | 2-Jun |
| Dom Macchia | 5-Mar | 12-Mar | 18-Mar | 28-Mar | 2-Apr | 9-Apr | 16-Apr | 24-Apr | 28-Apr |
| John Malagise | 3-Mar | 10-Mar | 17-Mar | 24-Mar | 31-Mar | 7-Apr | 14-Apr | 24-Apr | 1-May |
| Marie Peluso | 3-Mar | 10-Mar | 18-Mar | 24-Mar | 2-Apr | 8-Apr | 14-Apr | 21-Apr | 28-Apr |
| Rich Redmond | 12-Mar | 20-Mar | 20-Mar | 24-Mar | 2-Apr | 10-Apr | 17-Apr | 23-Apr | 28-Apr |
| Jim Schlosser | 3-Mar | 12-Mar | 18-Mar | 26-Mar | 1-Apr | 8-Apr | 15-Apr | 21-Apr | 30-Apr |
| Paul Simon | 5-Mar | 12-Mar | 24-Mar | 24-Mar | 2-Apr | 10-Apr | 17-Apr | 23-Apr | 29-Apr |
| Mike Welsh | 3-Mar | 10-Mar | 18-Mar | 24-Mar | 31-Mar | 7-Apr | 14-Apr | 21-Apr | 29-Apr |

### International Representative's Weekly Reports - Date Received

| Week Ending: | 5/3/2003 | 5/10/2003 | 5/17/2003 | 5/24/2003 | 5/31/2003 | 6/7/2003 | 6/14/2003 | 6/21/2003 | 6/28/2003 |
|---|---|---|---|---|---|---|---|---|---|
| John Amodeo | 7-May | 14-May | 21-May | 30-May | 4-Jun | 12-Jun | 18-Jun | 30-Jun | 3-Jul |
| Brian Brennan | 8-May | 14-May | 21-May | 27-May | 2-Jun | 9-Jun | 17-Jun | 23-Jun | 30-Jun |
| Jerry Comer | 21-May | 14-May | 19-May | 29-May | 4-Jun | 11-Jun | 19-Jun | 26-Jun | 2-Jul |
| Larry Davis | 7-May | 14-May | 21-May | 2-Jun | 4-Jun | 11-Jun | 19-Jun | 26-Jun | 2-Jul |
| Keenan Eagen | 7-May | 14-May | 20-May | 27-May | 4-Jun | 11-Jun | 18-Jun | 25-Jun | 3-Jul |
| Wyatt Earp | 12-May | 19-May | 29-May | 11-Jun | 11-Jun | 2-Jul | 2-Jul | 10-Jul | 1-Aug |
| Mike Flanagan | 8-May | 15-May | 21-May | 29-May | 5-Jun | 10-Jun | 18-Jun | 25-Jun | 3-Jul |
| Rick Fridell | 12-May | 19-May | 27-May | 2-Jun | 5-Jun | 10-Jun | 18-Jun | 25-Jun | 3-Jul |
| Pat Gino | 7-May | 12-May | 19-May | 27-May | 9-Jun | 20-Jun | 20-Jun | 11-Jul | 11-Jul |
| Steve Karnen | 2-Jun | 3-Jun | 3-Jun | 3-Jun | 2-Jun | 11-Jun | 18-Jun | 23-Jun | 1-Jul |
| Randy Kieffer | 12-May | 19-May | 29-May | 29-May | 11-Jun | 24-Jun | 24-Jun | 24-Jun | 16-Jul |
| Dom Macchia | 7-May | 14-May | 21-May | 29-May | 5-Jun | 11-Jun | 26-Jun | 23-Jun | 7-Jul |
| John Malagise | 5-May | 12-May | 19-May | 27-May | 2-Jun | 5-Jun | 16-Jun | 25-Jun | 3-Jul |
| Marie Peluso | 5-May | 12-May | 19-May | 27-May | 2-Jun | 9-Jun | 16-Jun | 23-Jun | 30-Jun |
| Rich Redmond | 14-May | 14-May | 2-Jun | 29-May | 5-Jun | 11-Jun | 18-Jun | 23-Jun | 30-Jun |
| Jim Schlosser | 6-May | 15-May | 22-May | 29-May | 5-Jun | 25-Jun | 25-Jun | 25-Jun | 10-Jul |
| Paul Simon | 8-May | 22-May | 22-May | 29-May | 5-Jun | 17-Jun | 17-Jun | 2-Jul | 2-Jul |
| Mike Welsh | 5-May | 12-May | 19-May | 27-May | 4-Jun | 11-Jun | 23-Jun | 30-Jun | 7-Jul |
| | | | | | 2-Jun | 9-Jun | 16-Jun | 23-Jun | 30-Jun |
| Joseph Mastrogiovanni | | 15-May | 21-May | 29-May | 6-Jun | 12-Jun | 27-Jun | 27-Jun | |
| Sal Clemente | | 16-Jun | | | | | | 25-Jun | 30-Jun |

FROM IBEW-3RD DISTRICT OFC    (MON)DEC  6 2004 11:22/ST.11:21/NO. 6360061669 P  6

**International Representative's Weekly Reports - Date Received**
**July / August 2003**

| Week Ending: | 7/5/2003 | 7/12/2003 | 7/19/2003 | 7/26/2003 | 8/2/2003 | 8/9/2003 | 8/16/2003 | 8/23/2003 | 8/30/2003 |
|---|---|---|---|---|---|---|---|---|---|
| John Amodeo | 9-Jul | 16-Jul | 24-Jul | 28-Jul | 6-Aug | 13-Aug | 21-Aug | 25-Aug | 4-Sep |
| Brian Brennan | 7-Jul | 14-Jul | 24-Jul | 28-Jul | 4-Aug | 14-Aug | 20-Aug | 29-Aug | 2-Sep |
| Jerry Comer | 9-Jul | 23-Jul | 23-Jul | 30-Jul | 6-Aug | 13-Aug | 21-Aug | 25-Aug | 2-Sep |
| Larry Davis | 11-Jul | 16-Jul | 25-Jul | 31-Jul | 6-Aug | 14-Aug | 21-Aug | 25-Aug | 5-Sep |
| Keenan Eagen | 11-Jul | 16-Jul | 22-Jul | 31-Jul | 6-Aug | 12-Aug | 20-Aug | 27-Aug | 5-Sep |
| Wyatt Earp | 1-Aug | 1-Aug | 1-Aug | 1-Aug | 8-Aug | 20-Aug | 5-Sep | 29-Aug | 5-Sep |
| Mike Flanagan | 9-Jul | 16-Jul | 24-Jul | 1-Aug | 8-Aug | 18-Aug | 5-Sep | 5-Sep | 8-Sep |
| Rick Fridell | 28-Jul | 28-Jul | 28-Jul | 4-Aug | 8-Aug | 18-Aug | 21-Aug | 27-Aug | 5-Sep |
| Pat Gino | 9-Jul | 16-Jul | 23-Jul | 28-Jul | 18-Aug | 18-Aug | 29-Aug | 29-Aug | 11-Sep |
| Steve Kamen | 16-Jul | 13-Aug | 6-Oct | 6-Oct | 6-Oct | 11-Aug | 20-Aug | 25-Aug | 2-Sep |
| Randy Kieffer | 17-Jul | 17-Jul | 25-Jul | 4-Aug | 11-Aug | 11-Aug | 27-Aug | 27-Aug | 8-Sep |
| Dom Macchia | 9-Jul | 16-Jul | 23-Jul | 30-Jul | 6-Aug | 13-Aug | 27-Aug | 27-Aug | 7-Oct |
| John Malagise | 8-Jul | 14-Jul | 21-Jul | 28-Jul | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 4-Sep |
| Marie Peluso | 7-Jul | 15-Jul | 21-Jul | 30-Jul | 6-Aug | 11-Aug | 18-Aug | 25-Aug | 2-Sep |
| Rich Redmond | 10-Jul | 18-Jul | 23-Jul | 31-Jul | 15-Aug | 15-Aug | 2-Sep | 25-Aug | 4-Sep |
| Jim Schlosser | 7-Jul | 15-Jul | 23-Jul | 29-Jul | 5-Aug | 13-Aug | 19-Aug | 2-Sep | 5-Sep |
| Paul Simon | 9-Jul | 17-Jul | 23-Jul | 4-Aug | 6-Aug | 13-Aug | 20-Aug | 26-Aug | 2-Sep |
| Mike Welsh | 7-Jul | 14-Jul | 21-Jul | 28-Jul | 4-Aug | 11-Aug | 25-Aug | 25-Aug | 8-Sep |
| | | | | | | | | | 2-Sep |
| Salvatore Clemen | 25-Aug | 14-Aug | 23-Jul | 25-Aug | | 11-Aug | 18-Aug | 25-Aug | |

FROM IBEW-3RD DISTRICT OFC                    (MON)DEC  6 2004 11:22/ST.11:21/NO. 6360061669 P  7

## International Representative's Weekly Reports - Date Received
### September / October 2003

| Week Ending: | 9/6/2003 | 9/13/2003 | 9/20/2003 | 9/27/2003 | 10/4/2003 | 10/11/2003 | 10/18/2003 | 10/25/2003 |
|---|---|---|---|---|---|---|---|---|
| John Amodeo | 10-Sep | 17-Sep | 24-Sep | 1-Oct | 8-Oct | 17-Oct | 27-Oct | 29-Oct |
| Brian Brennan | 10-Sep | 17-Sep | 24-Sep | 1-Oct | 6-Oct | 16-Oct | 20-Oct | 27-Oct |
| Jerry Comer | 10-Sep | 17-Sep | 24-Sep | 29-Sep | 9-Sep | 16-Oct | 24-Oct | 30-Oct |
| Larry Davis | 10-Sep | 18-Sep | 24-Sep | 1-Oct | 8-Oct | 16-Oct | 24-Oct | 30-Oct |
| Keenan Eagen | 10-Sep | 18-Sep | 25-Sep | 1-Oct | 8-Oct | 15-Oct | 22-Oct | 29-Oct |
| Wyatt Earp | 18-Sep | 22-Sep | 6-Oct | 16-Oct | 27-Oct | 21-Nov | 21-Nov | 1-Dec |
| Mike Flanagan | 22-Sep | 22-Sep | 25-Sep | 10-Oct | 10-Oct | 16-Oct | 30-Oct | 30-Oct |
| Rick Fridell | 11-Sep | 24-Sep | 24-Sep | 14-Oct | 14-Oct | 23-Oct | 23-Oct | 6-Nov |
| Pat Gino | 10-Sep | 17-Sep | 24-Sep | 29-Sep | 8-Oct | 14-Oct | 22-Oct | 27-Oct |
| Steve Kamen | 8-Oct | 8-Oct | 8-Oct | 8-Oct | 9-Oct | 15-Oct | 4-Nov | 4-Nov |
| Randy Kieffer | 8-Sep | 17-Sep | 25-Sep | 8-Oct | 8-Oct | 20-Oct | 27-Oct | 3-Nov |
| Dom Macchia | 10-Sep | 17-Sep | 24-Sep | 29-Sep | 8-Oct | 22-Oct | 22-Oct | 29-Oct |
| John Malagise | 8-Sep | 15-Sep | 22-Sep | 29-Sep | 6-Oct | 14-Oct | 20-Oct | 27-Oct |
| Marie Peluso | 10-Sep | 17-Sep | 22-Sep | 29-Sep | 8-Oct | 14-Oct | 20-Oct | 27-Oct |
| Rich Redmond | 10-Sep | 17-Sep | 25-Sep | 9-Oct | 9-Oct | 17-Oct | 24-Oct | 6-Nov |
| Jim Schlosser | 9-Sep | 18-Sep | 24-Sep | 30-Sep | 7-Oct | 16-Oct | 22-Oct | 29-Oct |
| Paul Simon | 10-Sep | 17-Sep | 24-Sep | 1-Oct | 8-Oct | 17-Oct | 23-Oct | 29-Oct |
| Mike Welsh | 8-Sep | 15-Sep | 22-Sep | 29-Sep | 6-Oct | 14-Oct | 20-Oct | 27-Oct |

FROM IBEW 3RD DISTRICT OFC                    (MON)DEC  6 2004 11:22/ST. 11:21/NO. 6360061669 P  8

## International Representative's Weekly Reports - Date Received
### November / December 2003

| Week Ending: | 11/1/2003 | 11/8/2003 | 11/15/2003 | 11/22/2003 | 11/29/2003 | 12/6/2003 | 12/13/2003 | 12/20/2003 | 12/27/2003 |
|---|---|---|---|---|---|---|---|---|---|
| John Amodeo | 3-Nov | 12-Nov | 20-Nov | 1-Dec | 3-Dec | 11-Dec | 18-Dec | 22-Dec | 7-Jan |
| Brian Brennan | 5-Nov | 12-Nov | 17-Nov | 24-Nov | 3-Dec | 10-Dec | 17-Dec | 22-Dec | 5-Jan |
| Jerry Comer | 5-Nov | 14-Nov | 17-Nov | 24-Nov | 19-Dec | 10-Dec | 18-Dec | 29-Dec | 5-Jan |
| Larry Davis | 5-Nov | 13-Nov | 19-Nov | 1-Dec | 4-Dec | 11-Dec | 19-Dec | 29-Dec | 5-Jan |
| Keenan Eagen | 5-Nov | 12-Nov | 20-Nov | 26-Nov | 3-Dec | 8-Dec | 19-Dec | 22-Dec | 5-Jan |
| Wyatt Earp | 1-Dec | 5-Dec | 5-Dec | 10-Dec | 12-Dec | 12-Dec | 29-Dec | 29-Dec | 15-Jan |
| Mike Flanagan | 10-Nov | 13-Nov | 20-Nov | 1-Dec | 4-Dec | 10-Dec | 29-Dec | 29-Dec | 5-Jan |
| Rick Fridell | 6-Nov | 20-Nov | 20-Nov | 4-Dec | 4-Dec | 22-Dec | 18-Dec | 5-Jan | 5-Jan |
| Pat Gino | 3-Nov | 17-Nov | 17-Nov | 24-Nov | 1-Dec | 8-Dec | 17-Dec | 22-Dec | 29-Dec |
| Steve Kamen | 5-Jan | 5-Jan | 5-Jan | 5-Jan | 5-Jan | 5-Jan | 5-Jan | 5-Jan | 29-Dec |
| Randy Kieffer | 14-Nov | 14-Nov | 21-Nov | 3-Dec | 3-Dec | 22-Dec | 22-Dec | 22-Dec | 8-Jan |
| Dom Macchia | 5-Nov | 12-Nov | 19-Nov | 3-Dec | 3-Dec | 22-Dec | 22-Dec | 22-Dec | 8-Jan |
| John Malagise | 3-Nov | 10-Nov | 17-Nov | 24-Nov | 1-Dec | 11-Dec | 17-Dec | 29-Dec | 7-Jan |
| Marie Peluso | 5-Nov | 10-Nov | 19-Nov | 24-Nov | 1-Dec | 8-Dec | 15-Dec | 22-Dec | 29-Dec |
| Rich Redmond | 10-Nov | 20-Nov | 20-Nov | 4-Dec | 4-Dec | 10-Dec | 17-Dec | 22-Dec | 5-Jan |
| Jim Schlosser | 4-Nov | 12-Nov | 17-Nov | 1-Dec | 4-Dec | 15-Dec | 18-Dec | 12-Jan | 12-Jan |
| Paul Simon | 12-Nov | 12-Nov | 17-Nov | 3-Dec | 4-Dec | 11-Dec | 16-Dec | 23-Dec | 30-Dec |
| Mike Welsh | 3-Nov | 10-Nov | 17-Nov | 26-Nov | 1-Dec | 8-Dec | 15-Dec | 5-Jan | 29-Dec |

**International Representative's Weekly Reports - Date Received**

**January / February 2004**

| Week Ending: | 1/3/2004 | 1/10/2004 | 1/17/2004 | 1/24/2004 | 1/31/2004 | 2/7/2004 | 2/14/2004 | 2/21/2004 | 2/28/2004 |
|---|---|---|---|---|---|---|---|---|---|
| John Amodeo | 7-Jan | 14-Jan | 22-Jan | 28-Jan | 4-Feb | 11-Feb | 19-Feb | 25-Feb | 3-Mar |
| Brian Brennan | 7-Jan | 14-Jan | 20-Jan | 26-Jan | 4-Feb | 9-Feb | 17-Feb | 23-Feb | 1-Mar |
| Jerry Comer | 7-Jan | 14-Jan | 22-Jan | 28-Jan | 4-Feb | 9-Feb | 17-Feb | 25-Feb | 3-Mar |
| Larry Davis | 8-Jan | 14-Jan | 22-Jan | 28-Jan | 4-Feb | 12-Feb | 19-Feb | 25-Feb | 8-Mar |
| Keenan Eagen | 8-Jan | 14-Jan | 22-Jan | 28-Jan | 5-Feb | 11-Feb | 19-Feb | 25-Feb | 8-Mar |
| Wyatt Earp | 2-Feb | 2-Feb | 1-Mar | 1-Mar | 3-Mar | 3-Mar | 11-Mar | 17-Mar | 17-Mar |
| Mike Flanagan | 7-Jan | 15-Jan | 26-Jan | 29-Jan | 6-Feb | 11-Feb | 19-Feb | 25-Feb | 4-Mar |
| Rick Fridell | 12-Jan | 12-Jan | 28-Jan | 28-Jan | 17-Feb | 17-Feb | 27-Feb | 27-Feb | 9-Mar |
| Pat Gino | 5-Jan | 12-Jan | 20-Jan | 26-Jan | 2-Feb | 9-Feb | 17-Feb | 23-Feb | 27-May |
| Steve Kamen | 3-Jan | 11-May | 11-May | 11-May | 11-May | 27-May | 27-May | 27-May | 27-May |
| Randy Kieffer | 8-Jan | 22-Jan | 22-Jan | 9-Feb | 9-Feb | 13-Feb | 25-Feb | 25-Feb | 11-Mar |
| Dom Macchia | 7-Jan | 28-Jan | 28-Jan | 28-Jan | 4-Feb | 11-Feb | 19-Feb | 25-Feb | 3-Mar |
| John Malagise | 5-Jan | 12-Jan | 20-Jan | 26-Jan | 2-Feb | 9-Feb | 17-Feb | 23-Feb | 1-Mar |
| Marie Peluso | 5-Jan | 12-Jan | 20-Jan | 28-Jan | 4-Feb | 11-Feb | 19-Feb | 25-Feb | 2-Mar |
| Joe Penna | | | | | | | | | |
| Rich Redmond | | 20-Jan | 26-Jan | 28-Jan | 6-Feb | 23-Feb | 18-Feb | 25-Feb | 3-Mar |
| Jim Schlosser | 6-Jan | 15-Jan | 20-Jan | 26-Jan | 3-Feb | 10-Feb | 23-Feb | 27-Feb | 12-Mar |
| Paul Simon | 8-Jan | 15-Jan | 22-Jan | 29-Jan | 6-Feb | 11-Feb | 18-Feb | 24-Feb | 2-Mar |
| Mike Welsh | 5-Jan | 12-Jan | 20-Jan | 26-Jan | 4-Feb | 9-Feb | 17-Feb | 23-Feb | 1-Mar |

**International Representative's Weekly Reports - Date Received**

**March / April 2004**

| Week Ending: | 3/6/2004 | 3/13/2004 | 3/20/2004 | 3/27/2004 | 4/3/2004 | 4/10/2004 | 4/17/2004 | 4/24/2004 |
|---|---|---|---|---|---|---|---|---|
| John Amodeo | 10-Mar | 15-Mar | 22-Mar | 29-Mar | 5-Apr | 19-Apr | 21-Apr | 28-Apr |
| Brian Brennan | 8-Mar | 15-Mar | 22-Mar | 29-Mar | 7-Apr | 14-Apr | 19-Apr | 28-Apr |
| Jerry Comer | 12-Mar | 17-Mar | 24-Mar | 5-Apr | 5-Apr | 14-Apr | 22-Apr | 30-Apr |
| Larry Davis | 10-Mar | 17-Mar | 25-Mar | 12-Apr | 12-Apr | 15-Apr | 22-Apr | 28-Apr |
| Keenan Eagen | 10-Mar | 17-Mar | 26-Mar | 31-Mar | 7-Apr | 16-Apr | 22-Apr | 28-Apr |
| Wyatt Earp | 17-Mar | 17-Mar | 29-Mar | 8-Apr | 8-Apr | 21-Apr | 19-Apr | 3-May |
| Mike Flanagan | 11-Mar | 17-Mar | 25-Mar | 1-Apr | 7-Apr | 16-Apr | 22-Apr | 26-Apr |
| Rick Fridell | 9-Mar | 25-Mar | 25-Mar | 7-Apr | 7-Apr | 28-Apr | 28-Apr | 5-May |
| Pat Gino | 8-Mar | 15-Mar | 24-Mar | 29-Mar | 5-Apr | 12-Apr | 29-Apr | 29-Apr |
| Steve Kamen | 27-May | 27-May | 27-May | 27-May | 27-May | 27-May | 27-May | 27 Ma7 |
| Randy Kieffer | 11-Mar | 24-Mar | 24-Mar | 8-Apr | 8-Apr | 19-Apr | 22-Apr | 29-Apr |
| Dom Macchia | 10-Mar | 17-Mar | 26-Mar | 31-Mar | 7-Apr | 15-Apr | 22-Apr | 28-Apr |
| John Malagisa | 8-Mar | 15-Mar | 22-Mar | 29-Mar | 5-Apr | 12-Apr | 19-Apr | 26-Apr |
| Marte Peluso | 10-Mar | 17-Mar | 22-Mar | 31-Mar | 5-Apr | 12-Apr | 21-Apr | 28-Apr |
| Joe Penna | 8-Mar | 15-Mar | 24-Mar | 29-Mar | 5-Apr | 12-Apr | 21-Apr | 26-Apr |
| Rich Redmond | 12-Mar | 18-Mar | 24-Mar | 31-Mar | 2-Apr | 26-Apr | 26-Apr | 29-Apr |
| Jim Schlosser | 8-Mar | 16-Mar | 23-Mar | 31-Mar | 7-Apr | 13-Apr | 21-Apr | 26-Apr |
| Paul Simon | 11-Mar | 18-Mar | 22-Mar | 31-Mar | 14-Apr | 14-Apr | 19-Apr | 28-Apr |
| Mike Welsh | 8-Mar | 15-Mar | 22-Mar | 30-Mar | 5-Apr | 12-Apr | 19-Apr | 26-Apr |

**International Representative's Weekly Reports - Date Received**

**May / June 2004**

| Week Ending: | 5/1/2004 | 5/8/2004 | 5/15/2004 | 5/22/2004 | 5/29/2004 | 6/5/2004 | 6/12/2004 | 6/19/2004 | 6/26/2004 |
|---|---|---|---|---|---|---|---|---|---|
| John Amodeo | 5-May | 12-May | 17-May | 26-May | 1-Jun | 9-Jun | 14-Jun | 21-Jun | 30-Jun |
| Brian Brennan | 5-May | 17-May | 17-May | 26-May | 1-Jun | 18-Jun | 16-Jun | 23-Jun | 30-Jun |
| Jerry Comer | 5-May | 12-May | 17-May | 9-Jun | 9-Jun | 9-Jun | 16-Jun | 23-Jun | 1-Jul |
| Larry Davis | 6-May | 12-May | 19-May | 27-May | 3-Jun | 9-Jun | 16-Jun | 23-Jun | 30-Jun |
| Keenan Eagen | 6-May | 13-May | 18-May | 18-Jun | 3-Jun | 9-Jun | 16-Jun | 24-Jun | 30-Jun |
| Wyatt Earp | 1-Jun | 1-Jun | 21-Jun | 21-Jun | 6-Jul | 6-Jul | 9-Jul | 9-Jul | 30-Jun |
| Mike Flanagan | 6-May | 13-May | 20-May | 26-May | 3-Jun | 14-Jun | 17-Jun | 24-Jun | 30-Jun |
| Rick Fridell | 5-May | 19-May | 19-May | 9-Jun | 9-Jun | 17-Jun | 17-Jun | 30-Jun | 30-Jun |
| Pat Gino | 3-May | 10-May | 17-May | 24-May | 1-Jun | 7-Jun | 14-Jun | 21-Jun | 28-Jun |
| Steve Kamen | 27-May | | | | | | | | |
| Randy Kieffer | 10-May | 10-May | 24-May | 7-Jun | 7-Jun | 14-Jun | 18-Jun | 24-Jun | 6-Jul |
| Dom Macchia | 5-May | 27-May | 27-May | 4-Jun | 4-Jun | 9-Jun | 23-Jun | 23-Jun | 30-Jun |
| John Malagise | 3-May | 10-May | 17-May | 24-May | 1-Jun | 7-Jun | 14-Jun | 21-Jun | 28-Jun |
| Marie Peluso | 5-May | 10-May | 17-May | 24-May | 1-Jun | 9-Jun | 14-Jun | 21-Jun | 28-Jun |
| Joe Penna | 5-May | 12-May | 27-May | 27-May | 4-Jun | 16-Jun | 16-Jun | 30-Jun | 30-Jun |
| Rich Redmond | 17-May | 17-May | 17-May | 1-Jun | 14-Jun | 21-Jun | 18-Jun | 30-Jun | 30-Jun |
| Jim Schlosser | 5-May | 10-May | 21-May | 25-May | 2-Jun | 9-Jun | 17-Jun | 6-Jul | 7-Jul |
| Paul Simon | 7-May | 14-May | 19-May | 26-May | 3-Jun | 10-Jun | 21-Jun | 23-Jun | 30-Jun |
| Mike Welsh | 3-May | 17-May | 17-May | 24-May | 1-Jun | 8-Jun | 16-Jun | 21-Jun | 28-Jun |

**International Representative's Weekly Reports - Date Received**

**July / August 2004**

| Week Ending: | 7/3/2004 | 7/10/2004 | 7/17/2004 | 7/24/2004 | 7/31/2004 | 8/7/2004 | 8/14/2004 | 8/21/2004 | 8/28/2004 |
|---|---|---|---|---|---|---|---|---|---|
| John Amodeo | 6-Jul | 12-Jul | 21-Jul | 28-Jul | 4-Aug | 9-Aug | 18-Aug | 25-Aug | 2-Sep |
| Brian Brennan | 6-Jul | 19-Jul | 23-Jul | 28-Jul | 4-Aug | 11-Aug | 16-Aug | 23-Aug | 2-Sep |
| Jerry Conner | 8-Jul | 12-Jul | 23-Jul | 29-Jul | 4-Aug | 18-Aug | 18-Aug | 25-Aug | 2-Sep |
| Larry Davis | 8-Jul | 14-Jul | 21-Jul | 28-Jul | 5-Aug | 11-Aug | 18-Aug | 25-Aug | 2-Sep |
| Keenan Eagen | 8-Jul | 14-Jul | 21-Jul | 28-Jul | 2-Aug | 16-Aug | 18-Aug | 26-Aug | 2-Sep |
| Wyatt Earp | 30-Aug | 30-Aug | 30-Aug | 30-Aug | 30-Aug | 30-Aug | 30-Aug | 30-Aug | 1-Nov |
| Mike Flanagan | 8-Jul | 15-Jul | 23-Jul | 29-Jul | 4-Aug | 11-Aug | 18-Aug | 23-Aug | 2-Sep |
| Rick Fridell | 14-Jul | 14-Jul | 29-Jul | 29-Jul | 12-Aug | 12-Aug | 23-Aug | 23-Aug | 2-Sep |
| Pat Gino | 6-Jul | 12-Jul | 19-Jul | 26-Jul | 2-Aug | 9-Aug | 16-Aug | 23-Aug | |
| Steve Kamen | | | | | | | | | |
| Randy Kieffer | 12-Jul | 23-Jul | 23-Jul | 29-Jul | 11-Aug | 11-Aug | 26-Aug | 26-Aug | |
| Dom Macchia | 8-Jul | 14-Jul | 23-Jul | 28-Jul | 4-Aug | 11-Aug | 25-Aug | 25-Aug | 9-Sep |
| John Malagise | 6-Jul | 12-Jul | 19-Jul | 26-Jul | 2-Aug | 9-Aug | 16-Aug | 23-Aug | 30-Aug |
| Marie Peluso | 6-Jul | 12-Jul | 19-Jul | 26-Jul | 2-Aug | 9-Aug | 16-Aug | 23-Aug | 2-Sep |
| Joe Penna | 6-Jul | 19-Jul | 19-Jul | 28-Jul | 11-Aug | 11-Aug | 18-Aug | 23-Aug | 30-Aug |
| Rich Redmond | 19-Jul | 23-Jul | 29-Jul | 2-Aug | 4-Aug | 23-Aug | 23-Aug | 9-Sep | 9-Sep |
| Jim Schlosser | 9-Jul | 13-Jul | 20-Jul | 27-Jul | 4-Aug | 9-Aug | 17-Aug | 24-Aug | 2-Sep |
| Paul Simon | 12-Jul | 15-Jul | 21-Jul | 4-Aug | 4-Aug | 16-Aug | 16-Aug | 1-Sep | 1-Sep |
| Mike Welsh | 6-Jul | 12-Jul | 20-Jul | 26-Jul | 2-Aug | 9-Aug | 23-Aug | 23-Aug | 30-Aug |

**International Representative's Weekly Reports - Date Received**
**September / October 2004**

| Week Ending: | 9/4/2004 | 9/11/2004 | 9/18/2004 | 9/25/2004 | 10/2/2004 | 10/9/2004 | 10/16/2004 | 10/23/2004 | 10/30/2004 |
|---|---|---|---|---|---|---|---|---|---|
| John Amodeo | 9-Sep | 13-Sep | 22-Sep | 27-Sep | 4-Oct | 18-Oct | 18-Oct | 25-Oct | 3-Nov |
| Brian Brennan | 9-Sep | 15-Sep | 22-Sep | 4-Oct | 6-Oct | 14-Oct | 18-Oct | 25-Oct | 1-Nov |
| Jerry Comer | 10-Sep | 17-Sep | 22-Sep | 30-Sep | 7-Oct | 14-Oct | 20-Oct | 27-Oct | 3-Nov |
| Larry Davis | 13-Sep | 13-Sep | 22-Sep | 29-Sep | 6-Oct | 20-Oct | 20-Oct | 27-Oct | 1-Nov |
| Keenan Eagen | 10-Sep | 16-Sep | 22-Sep | 27-Sep | 6-Oct | 18-Oct | 20-Oct | 27-Oct | 1-Nov |
| Wyatt Earp | 1-Nov | 1-Nov | | | | 14-Oct | 20-Oct | 25-Oct | 5-Nov |
| Mike Flanagan | 9-Sep | 15-Sep | 23-Sep | 6-Oct | 6-Oct | 18-Oct | 25-Oct | 1-Nov | 4-Nov |
| Rick Fridell | 9-Sep | 23-Sep | 23-Sep | 7-Oct | 7-Oct | 28-Oct | 28-Oct | 10-Nov | 10-Nov |
| Pat Gino | 7-Sep | 13-Sep | 22-Sep | 27-Sep | 4-Oct | 13-Oct | 18-Oct | 25-Oct | 1-Nov |
| Steve Kamen | | | | | | | | | |
| Randy Kieffer | 13-Sep | 22-Sep | 22-Sep | 6-Oct | 6-Oct | 14-Oct | 20-Oct | 5-Nov | 5-Nov |
| Dom Macchia | 9-Sep | 16-Sep | 22-Sep | 6-Oct | 6-Oct | 20-Oct | 20-Oct | 4-Nov | 4-Nov |
| John Malagise | 7-Sep | 13-Sep | 20-Sep | 27-Sep | 4-Oct | 12-Oct | 18-Oct | 25-Oct | 1-Nov |
| Marie Peluso | 7-Sep | 15-Sep | 22-Sep | 6-Oct | 6-Oct | 14-Oct | 20-Oct | 25-Oct | 1-Nov |
| Joe Penna | 7-Sep | 13-Sep | 23-Sep | 7-Oct | 12-Oct | 14-Oct | 18-Oct | 1-Nov | 1-Nov |
| Rich Redmond | 9-Sep | 22-Sep | 22-Sep | 7-Oct | 7-Oct | 12-Oct | 20-Oct | 8-Nov | 1-Nov |
| Jim Schlosser | 9-Sep | 15-Sep | 21-Sep | 28-Sep | 5-Oct | 18-Oct | 20-Oct | 8-Nov | 8-Nov |
| Paul Simon | 13-Sep | 13-Sep | 22-Sep | 12-Oct | 12-Oct | 14-Oct | 19-Oct | 26-Oct | 2-Nov |
| Mike Welsh | 8-Sep | 13-Sep | 20-Sep | 27-Sep | 7-Oct | 18-Oct | 18-Oct | 25-Oct | 3-Nov |

FROM IBEW-3RD DISTRICT OFC    (MON)DEC  6 2004 11:23/ST.11:21/NO. 8360061669 P 14

**International Representative's Weekly Reports - Date Received**

**November / December 2004**

| Week Ending: | 11/6/2004 | 11/13/2004 | 11/20/2004 | 11/27/2004 | 12/4/2004 | 12/11/2004 | 12/18/2004 | 12/25/2004 |
|---|---|---|---|---|---|---|---|---|
| John Amodeo | 8-Nov | 17-Nov | | | | | | |
| Brian Brennan | 8-Nov | 15-Nov | | | | | | |
| Jerry Conner | 8-Nov | 15-Nov | | | | | | |
| Larry Davis | 9-Nov | 15-Nov | | | | | | |
| Keenan Eagen | 10-Nov | 15-Nov | 22-Nov | | | | | |
| Wyatt Earp | | | | | | | | |
| Mike Flanagan | 10-Nov | 17-Nov | | | | | | |
| Rick Fridell | 10-Nov | 17-Nov | | | | | | |
| Pat Gino | 8-Nov | 15-Nov | 22-Nov | | | | | |
| Steve Kamen | | | | | | | | |
| Randy Kieffer | 15-Nov | 15-Nov | | | | | | |
| Dom Macchia | 17-Nov | 17-Nov | | | | | | |
| John Malagise | 8-Nov | 15-Nov | 22-Nov | | | | | |
| Marie Peluso | 10-Nov | 16-Nov | | | | | | |
| Joe Penna | 17-Nov | 17-Nov | 22-Nov | | | | | |
| Rich Redmond | 15-Nov | | | | | | | |
| Jim Schlosser | 8-Nov | 16-Nov | | | | | | |
| Paul Simon | 10-Nov | 22-Nov | | | | | | |
| Mike Welsh | 9-Nov | 17-Nov | 22-Nov | | | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(Electronically Filed)

| | |
|---|---|
| STEVEN A. KAMEN | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:06cv01063 (RMC) |
| | ) |
| INTERNATIONAL BROTHERHOOD OF | ) AMENDED COMPLAINT |
| ELECTRICAL WORKERS (IBEW) | ) |
| and EDWIN D. HILL, an individual, | ) JURY TRIAL DEMANDED |
| Defendants. | ) |
| | ) |

## AMENDED COMPLAINT

## NATURE OF THE ACTION, JURISDICTION AND VENUE

1.  This is an individual action under the Americans With Disabilities Act of 1990, as amended (ADA)(42 U.S.C. 12101 et seq.), the Employee Retirement Income Security Act (ERISA)(29 U.S.C. §1001 et seq.), the Pennsylvania Human Relations Act (PHRA), as amended (43 Pa. C.S.A. §951 et seq.), the D.C. Human Rights Act of 1977 (DCHRA), as amended (D.C. Official Code Ann. §2.1401 et seq.), and Pennsylvania common law to recover damages for illegal actions against Plaintiff by Defendants and to make Plaintiff whole.

2.  Jurisdiction of this court is invoked pursuant to 28 U.S.C. §1331 for federal claims; 28 U.S.C. §1367 for supplemental state claims; and, 28 U.S.C. §1332 for diversity jurisdiction.

3.  The Parties are citizens of different states.

4.  The amount in controversy exceeds $75,000.



DEPOSITION
EXHIBIT
Kamen  3
11/28/07

5.   This action is authorized and instituted pursuant to the ADA, ERISA, PHRA, the DCHRA and Pennsylvania common law.

6.   The actions and policies alleged to be unlawful were committed in part in and around Washington, D.C., where Defendant IBEW has its headquarters, and where Defendant Hill has his regular office and, therefore, this action is within the jurisdiction of the United States District Court for the District of Columbia and the venue is proper.

7.   Plaintiff exhausted his administrative remedies by filing with the Equal Employment Opportunity Commission (EEOC) (April 26, 2005); the Pennsylvania Human Relations Commission (PHRC) (April 26, 2005); and, the D.C. Office of Human Rights (May 9, 2005) within the statutory periods (300 days / 180 days / one year, respectively) following the complained-of acts. The EEOC issued a Right to Sue, and Plaintiff filed the initial Complaint within ninety days of having received the Right to Sue, and more than one year after filing his PHRA Charge, and within one year of defendants' continuing violation of the DCHRA.

<u>PARTIES</u>

8.   Plaintiff, Steven A. Kamen (hereinafter referred to as "Plaintiff" or "Kamen") (D.O.B.: 7/28/57), resided at all relevant times at 3 Fincher Lane, Butler, PA 16001, and currently resides at 711 West Penn Street, Butler, PA 16001-4141. Plaintiff was employed by Defendant as a Senior International Representative from on or about July 1, 1997, until on or about December 8, 2004.

9.   Defendant International Brotherhood of Electrical Workers (hereinafter referred to as

Page 2 of 13

"Defendant IBEW" or "IBEW"), is an organized labor union with its administrative offices and headquarters located at 900 Seventh Street, N.W., Washington, D.C. 20001 and is a citizen of the District of Columbia.

10.    Defendant IBEW also maintains a continuous business presence in Pennsylvania.

11.    Defendant Hill regularly conducts business on behalf of Defendant in Pennsylvania.

12.    Defendant Edwin D. Hill (hereinafter referred to as "Defendant Hill" or "Hill"), is a citizen of Virginia and resides at 6662 Avignon Boulevard, Falls Church, VA 22043. He is the President of Defendant IBEW.

13.    Defendant IBEW is an employer within the meaning of the ADA, the PHRA, the DCHRA and ERISA, and a fiduciary within the meaning of ERISA.

14.    Defendant IBEW engages in interstate commerce.

15.    Defendant Hill is an employer and fiduciary within the meaning of ERISA, and a covered person within the meaning of the PHRA and DCHRA.

## BACKGROUND AND STATEMENT OF CLAIMS

16.    Defendant IBEW hired Plaintiff as an International Representative on or about July 1, 1997, and Plaintiff was eventually promoted to the position of Senior International Representative.

17.   Plaintiff consistently performed his duties in a satisfactory manner.

18.   Plaintiff's office was in Western Pennsylvania; IBEW is located in D.C.; Plaintiff reported to Edwin Hill, whose primary office is at the IBEW headquarters in D.C..

19.   On or about February 20, 2004, Plaintiff became ill and was hospitalized.

20.   Plaintiff was diagnosed with human immunodeficiency virus (HIV).

21.   Defendants were informed of this diagnosis shortly after Plaintiff was informed of the diagnosis, and prior to Plaintiff's termination.

22.   Plaintiff is homosexual.

23.   Defendants became aware of Plaintiff's homosexuality at or about the same time they became aware of his diagnosis.

24.   Plaintiff's medical conditions significantly limit Plaintiff's ability to perform major life activities (walking; sleeping; working; engaging in strenuous activities) as compared to the average person.

25.   Plaintiff's conditions are a substantial impairment within the meaning of the ADA.

26.   Plaintiff has a history of a substantial impairment.

27.   Plaintiff has been perceived by Defendant as having a substantial impairment.

28.     On or about May 1, 2004, Plaintiff was able to return to work.

29.     During his medical leave Plaintiff's work load was reduced, but he continued to do work

        from his home.

30.     Upon Plaintiff's return to work not all of his regular duties were restored to him.

31.     Plaintiff requested his regular duties be restored; Defendants denied the request.

32.     Plaintiff was capable of performing the essential functions of his position as a Senior

        International Representative from the time he returned to work from his medical leave

        either with or without a reasonable accommodation.

33.     Nevertheless, upon his return to work in May 2004, Plaintiff was denied training

        opportunities; was not permitted to assist at manufacturing conferences; was never given

        back the duties Plaintiff had been assigned prior to Plaintiff's going out on sick leave; and,

        was not promoted to a position (Director) that became available despite his being the most

        qualified candidate.

34.     Plaintiff was not promoted to the position of Director in Washington, D.C., even though

        Plaintiff was the only candidate for the position, and despite Defendants having told

        Plaintiff prior to his medical leave that the position would be his.

35.     Notwithstanding the time off for medical leave and notwithstanding his medical condition,

        Plaintiff was still able to perform satisfactorily as compared to other International

Representatives.

36.    Plaintiff continued to work until he received a termination letter from Defendants, signed by Edwin Hill, dated December 8, 2004.

37.    Defendants alleged in the letter that Plaintiff was terminated for performance reasons, including failure to file certain expense reports in a timely fashion and to complete his assignments acceptably.

38.    The reasons were false, either to the extent the facts alleged were simply not true or to the extent these facts were taken out of context for the purpose of creating false impressions and supporting false conclusions.

39.    Defendant Hill made these false statements about Plaintiff and about Plaintiff's competence maliciously and for the purpose of interfering with Plaintiff's continuing business relationship with IBEW.

40.    Defendant Hill made these false statements both in writing and verbally to other employees of IBEW.

41.    None of Defendants' other International Representatives, whose work was inferior to Plaintiff's, have ever been terminated for performance.

42.    Moreover, other International Representatives whose expense reports were late, had incomplete paperwork, and who were late with their assignments were not terminated as Plaintiff was.

43.    Plaintiff was fully qualified to perform the essential functions of his existing position, or other positions available with IBEW, with or without a reasonable accommodation.

44.    Non-disabled and heterosexual individuals are treated better in similar circumstances.

45.    Defendants maintain an employee welfare benefit plan for qualified employees.

46.    This plan provides a variety of benefits (medical, dental, surgical, disability).

47.    This plan is covered by ERISA.

48.    Plaintiff was an eligible employee.

49.    As a result of Plaintiff's medical condition, and treatment for that condition, Plaintiff incurred significant medical expenses that were paid under Defendants' plan.

50.    Defendants terminated Plaintiff in order to interfere with his continuing receipt of these health benefits, and also to interfere with Plaintiff's ability to receive certain disability benefits (monthly payments, coverage of COBRA payments).

51.    Members of the IBEW, including management, regularly mock and ridicule homosexuals, and express opposition to being associated with homosexuals.

52.    The IBEW has had and continues to have a practice of systematic hostility toward homosexuals.

53.     This hostility is embedded in a culture fostered and sustained by senior management in IBEW, including Defendant Hill.

54.     This hostility manifested itself not only in overtly anti-homosexual language by IBEW employees and management, but in anti-homosexual hiring practices.

55.     This hostility continued unabated during Plaintiff's employment with IBEW, and continues unabated through the present time.

56.     Plaintiff was terminated because of his medical condition (disability), because of Defendants' unwillingness to accommodate Plaintiff, because of Plaintiff's sexual orientation, and in order to interfere with Plaintiff's continuing receipt of medical benefits.

57.     Defendant Hill aided and abetted in the commission of the disability discrimination within the meaning of the PHRA.

## COUNT I:  DISABILITY DISCRIMINATION (ADA) - DEFENDANT IBEW

58.     Plaintiff hereby incorporates Paragraphs 1 through 57 of his Amended Complaint as though the same were more fully set forth at length herein.

59.     Plaintiff is a qualified individual with a disability.

60.     Defendant IBEW terminated Plaintiff because of his disability.

61.     Defendant also terminated Plaintiff because of its unwillingness to accommodate

Plaintiff's known disability.

62.     Defendant IBEW's actions were in violation of the ADA's prohibition against discrimination based on disability.

63.     Defendant knew its actions against Plaintiff were in violation of the ADA.

64.     Plaintiff has suffered tangible and intangible losses resulting from Defendant's violation of the law: loss of job and pay; loss of promotional opportunities; humiliation; mental anguish; and, damage to reputation.

65.     Plaintiff is seeking lost wages, compensation for pain and suffering, attorney's fees and costs, compensatory and punitive damages, and equitable relief (reinstatement in his previous position).

## COUNT II:  DISABILITY DISCRIMINATION (PHRA) - DEFENDANTS IBEW AND EDWIN HILL

66.     Plaintiff hereby incorporates Paragraphs 1 through 65 of his Amended Complaint as though the same were more fully set forth at length herein.

67.     Plaintiff is a qualified individual with a disability.

68.     Defendants IBEW and Edwin Hill terminated Plaintiff because of his disability.

69.     Defendants also terminated Plaintiff because of their unwillingness to accommodate Plaintiff's known disability.

70.    Defendant Hill aided and abetted in the commission of the disability discrimination within the meaning of the PHRA.

71.    Defendants' actions were in violation of the PHRA's prohibition of discrimination based on disability.

72.    Defendants knew their actions against Plaintiff were in violation of the PHRA.

73.    Plaintiff has suffered tangible and intangible losses resulting from Defendants' violation of the law: loss of job and pay; loss of promotional opportunities; humiliation; mental anguish; and, damage to reputation.

74.    Plaintiff is seeking lost wages, compensation for pain and suffering, attorney's fees and costs, compensatory damages, and equitable relief (reinstatement in his previous position).

## COUNT III:  ERISA (INTERFERENCE WITH BENEFITS) - DEFENDANTS IBEW AND EDWIN HILL

75.    Plaintiff hereby incorporates by reference herein Paragraphs 1 through 74 of his Amended Complaint as though the same were more fully set forth within.

76.    Defendants terminated Plaintiff in order to interfere with his continuing receipt of medical and other benefits included in Defendants' employee welfare benefit plan.

77.    Defendants' actions were in violation of ERISA.

78.    Defendants' violation of the law was knowing, willful and malicious.

79.    Plaintiff is seeking lost benefits, reimbursement for out-of-pocket expenses, liquidated damages, attorney's fees and costs, and equitable relief (reinstatement in his previous position).

### COUNT IV: SEXUAL ORIENTATION DISCRIMINATION (D.C. HUMAN RIGHTS ACT OF 1977) - DEFENDANTS IBEW AND HILL

80.    Plaintiff hereby incorporates Paragraphs 1 through 79 of his Amended Complaint as though the same were more fully set forth at length herein.

81.    Defendants' termination of Plaintiff based on his sexual orientation was in violation of the D.C. Human Rights Act's prohibition against discrimination based on sexual orientation.

82.    Defendants knew their actions against Plaintiff were in violation of the D.C. Human Rights Act.

83.    Defendants have had and continue to maintain through the present a policy and practice of hostility and prejudice toward homosexuals.

84.    This policy and practice is a continuing violation of the DCHRA.

85.    Plaintiff has suffered tangible and intangible losses resulting from Defendants' violations of the law: loss of job and pay; loss of promotional opportunities; humiliation; mental anguish; and, damage to reputation.

86.    Plaintiff is seeking lost wages, compensation for pain and suffering, attorney's fees and

costs, compensatory and punitive damages, and equitable relief (reinstatement in his previous position, cessation of the policy and practice of prejudice against homosexuals).

## COUNT V: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP - DEFENDANT HILL

87.  Plaintiff hereby incorporates by reference Paragraphs 1 through 86 of his Amended Complaint as though the same were more fully set forth at length herein.

88.  Defendant Hill made knowingly false statements in writing and verbally about Plaintiff's performance and his competence as a Senior International Representative.

89.  Hill communicated these false statements to numerous members of the IBEW.

90.  These communications were not privileged.

91.  Defendant Hill's purpose in making these knowingly false statements was to interfere with Plaintiff's existing business relationship with Defendant IBEW and to harm Plaintiff's reputation in the field of union representation.

92.  The false statements in fact interfered with Plaintiff's business relations with IBEW (resulting in his termination), and have resulted in diminished earning potential in the field of union representation generally.

93.  The harm to Plaintiff's past and future earnings, and to his reputation in the field of union representation, exceeds $75,000.00.

<u>GENERAL PRAYER FOR RELIEF</u>

94.     WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Order Defendants to make whole Plaintiff by paying monetary damages <u>in excess of $75,000.00</u>, reinstating Plaintiff and providing affirmative relief necessary to eradicate the effects of their deprivation of Plaintiff's civil rights and their other unlawful actions.

B.      Order Defendants to compensate Plaintiff for the injuries to his reputation, and the emotional distress, sustained as a result of Defendants' illegal actions.

C.      Order Defendants to pay compensatory and punitive damages.

D.      Order Defendants to pay the costs and reasonable attorney's fees incurred by Plaintiff.

E.      Enjoin Defendants from the ongoing deprivation of Plaintiff's civil rights, and from their continuing policy and practice of prejudice against homosexuals.

F.      Grant such further relief as the Court deems necessary and proper.

Respectfully submitted,

 s/Joseph H. Chivers
Joseph H. Chivers, Esquire
DC ID No. 388350
PA ID No. 39184
Suite 600, 312 Boulevard of the Allies
Pittsburgh, PA  15222
(412) 281-1110 / (412) 281-8481 FAX

 s/Bart T. Valad
Bart T. Valad, Esquire
DC ID No. 462814
John Vecchione, Esquire
The Law Firm of Bart T. Valad, PLLC
Suite 200, 10640 Main Street
Fairfax, VA  22030
(703) 352-4800

Counsel for Plaintiff
Steven A. Kamen

DATED: <u>August 14, 2006</u>



US EXHIBIT
Kamen 4
11/28/07
PENGAD 800-631-6989

## International Representative's Expense Reports - Date Received

### May / June 2004

| Week Ending: | 5/1/2004 | 5/15/2004 | 5/29/2004 | 6/12/2004 | 6/26/2004 |
|---|---|---|---|---|---|
| John Amodeo | 5-May | 17-May | 1-Jun | 14-Jun | 30-Jun |
| Brian Brennan | 5-May | 17-May | 1-Jun | 16-Jun | 30-Jun |
| Jerry Comer | 5-May | 21-May | 9-Jun | 1-Jul | 6-Jul |
| Larry Davis | 6-May | 19-May | 3-Jun | 16-Jun | 30-Jun |
| Keenan Eagen | 6-May | 18-May | 3-Jun | 16-Jun | 30-Jun |
| Wyatt Earp | 2/17/2005 | 2/17/2005 | 2/17/2005 | 2/17/2005 | 17-Feb |
| Mike Flanagan | 6-May | 20-May | 3-Jun | 17-Jun | 30-Jun-04 |
| Rick Fridell | 5-May | 19-May | 9-Jun | 17-Jun | 30-Jun |
| Pat Gino | 3-May | 17-May | 1-Jun | 14-Jun | 28-Jun |
| Steve Kamen | 28-May | 30-May | 30-Nov | 30-Nov | 30-Nov |
| Randy Kieffer | 10-May | 21-May | 7-Jun | 18-Jun | 6-Jul |
| Dom Macchia | 5-May | 27-May | 4-Jun | 16-Jun | 30-Jun |
| John Malagise | 3-May | 19-May | 1-Jun | 14-Jun | 28-Jun |
| Marie Peluso | 5-May | 17-May | 1-Jun | 14-Jun | 28-Jun |
| Joe Penna | 5-May | 27-May | 16-Jun | 16-Jun | 30-Jun |
| Rich Redmond | 17-May | 17-May | 21-Jun | 18-Jun | 7-Jul |
| Jim Schlosser | 5-May | 21-May | 2-Jun | 17-Jun | 30-Jun |
| Paul Simon | 7-May | 19-May | 3-Jun | 21-Jun | 12-Jul |
| Mike Welsh | 3-May | 20-May | 1-Jun | 21-Jun | 28-Jun |

## International Representative's Expense Reports - Date Received
### July / August 2004

| Week Ending: | 7/10/2004 | 7/24/2004 | 8/7/2004 | 8/21/2004 |
|---|---|---|---|---|
| John Amodeo | 12-Jul | 28-Jul | 9-Aug | 25-Aug |
| Brian Brennan | 19-Jul | 28-Jul | 11-Aug | 23-Aug |
| Jerry Comer | 20-Jul | 5-Aug | 20-Aug | 25-Aug |
| Larry Davis | 14-Jul | 28-Jul | 11-Aug | 25-Aug |
| Keenan Eagen | 14-Jul | 28-Jul | 16-Aug | 26-Aug |
| Wyatt Earp | 2/17/2005 | 2/17/2005 | 2/17/2005 | 2/17/2005 |
| Mike Flanagan | 15-Jul | 29-Jul | 11-Aug | 25-Aug |
| Rick Fridell | 14-Jul | 29-Jul | 12-Aug | 23-Aug |
| Pat Gino | 12-Jul | 26-Jul | 9-Aug | 23-Aug |
| Steve Kamen | 30-Nov | 30-Nov | 30-Nov | 30-Nov |
| Randy Kieffer | 23-Jul | 29-Jul | 11-Aug | 26-Aug |
| Dom Macchia | 14-Jul | 28-Jul | 11-Aug | 25-Aug |
| John Malagise | 12-Jul | 26-Jul | 9-Aug | 24-Aug |
| Marie Peluso | 12-Jul | 26-Jul | 9-Aug | 23-Aug |
| Joe Penna | 19-Jul | 28-Jul | 11-Aug | 23-Aug |
| Rich Redmond | 23-Jul | 2-Aug | 23-Aug | 22-Sep |
| Jim Schlosser | 13-Jul | 27-Jul | 9-Aug | 24-Aug |
| Paul Simon | 15-Jul | 4-Aug | 16-Aug | 2-Sep |
| Mike Welsh | 12-Jul | 30-Jul | 11-Aug | 8-Sep |

| International Representative's Expense Reports - Date Received | | | | | |
| September / October 2004 | | | | | |
| Week Ending: | 9/4/2004 | 9/18/2004 | 10/2/2004 | 10/16/2004 | 10/30/2004 |
| John Amodeo | 9-Sep | 22-Sep | 4-Oct | 18-Oct | 4-Nov |
| Brian Brennan | 9-Sep | 27-Sep | 6-Oct | 18-Oct | 1-Nov |
| Jerry Comer | 23-Sep | 7-Oct | 7-Oct | 12-Nov | 12-Nov |
| Larry Davis | 13-Sep | 22-Sep | 6-Oct | 20-Oct | 1-Nov |
| Keenan Eagen | 10-Sep | 22-Sep | 6-Oct | 20-Oct | 5-Nov |
| Wyatt Earp | 17-Feb | 17-Feb | 17-Feb | 2/17/2005 | 2/17/2005 |
| Mike Flanagan | 9-Sep | 23-Sep | 6-Oct | 25-Oct | 4-Nov |
| Rick Fridell | 9-Sep | 23-Sep | 7-Oct | 28-Oct | 17-Nov |
| Pat Gino | 7-Sep | 24-Sep | 4-Oct | 18-Oct | 1-Nov |
| Steve Kamen | 30-Nov | 30-Nov | 30-Nov | 30-Nov | 30-Nov |
| Randy Kieffer | 13-Sep | 22-Sep | 6-Oct | 20-Oct | 5-Nov |
| Dom Macchia | 9-Sep | 22-Sep | 6-Oct | 20-Oct | 4-Nov |
| John Malagise | 7-Sep | 20-Sep | 4-Oct | 18-Oct | 1-Nov |
| Marie Peluso | 7-Sep | 22-Sep | 6-Oct | 20-Oct | 1-Nov |
| Joe Penna | 7-Sep | 23-Sep | 7-Oct | 18-Oct | 1-Nov |
| Rich Redmond | 22-Sep | 22-Sep | 7-Oct | 20-Oct | 8-Nov |
| Jim Schlosser | 9-Sep | 21-Sep | 5-Oct | 19-Oct | 2-Nov |
| Paul Simon | 13-Sep | 24-Sep | 14-Oct | 20-Oct | 3-Nov |
| Mike Welsh | 20-Sep | 20-Sep | 18-Oct | 19-Oct | 4-Nov |

| International Representative's Expense Reports - Date Received | | | | | |
|---|---|---|---|---|---|
| | | November / December 2004 | | | |
| Week Ending: | 11/13/2004 | 11/27/2004 | 12/11/2004 | 12/25/2004 | |
| John Amodeo | 17-Nov | 1-Dec | 15-Dec | | |
| Brian Brennan | 15-Nov | 29-Nov | 17-Dec | 29-Dec | |
| Jerry Comer | 24-Nov | 29-Nov | 27-Dec | 29-Dec | |
| Larry Davis | 15-Nov | 1-Dec | 16-Dec | 20-Jan | |
| Keenan Eagen | 15-Nov | 1-Dec | 15-Dec | 3-Jan | |
| Wyatt Earp | 17-Feb | 2/17/2005 | 17-Feb | 29-Dec | |
| Mike Flanagan | 17-Nov | 17-Feb | 16-Dec | 2/17/2005 | |
| Rick Fridell | 17-Nov | 2-Dec | 17-Dec | 27-Dec | |
| Pat Gino | 15-Nov | 1-Dec | 15-Dec | 3-Jan | |
| Steve Kamen | | 29-Nov | | 29-Dec | |
| Randy Kieffer | 15-Nov | 6-Dec | 20-Dec | | |
| Dom Macchia | 17-Nov | 1-Dec | 15-Dec | 3-Jan | |
| John Malagise | 15-Nov | 1-Dec | 14-Dec | 29-Dec | |
| Marie Peluso | 16-Nov | 1-Dec | 16-Dec | 3-Jan | |
| Joe Penna | 17-Nov | 29-Nov | 13-Dec | 27-Dec | |
| Rich Redmond | 1-Dec | 1-Dec | 27-Dec | 7-Jan | |
| Jim Schlosser | 16-Nov | 6-Dec | 14-Dec | 7-Jan | |
| Paul Simon | 3-Dec | 3-Dec | 15-Dec | 28-Dec | |
| Mike Welsh | 22-Nov | 1-Dec | 13-Dec | 3-Jan | |
| | | | | 5-Jan | |

COPY

May 14, 2003

Steven A. Kamen
140 Geibel Road
Butler, PA  16002

Dear Sir and Brother:

Enclosed is a copy of a letter from Patrick Kinney, a member of IBEW Local Union #2007, which is self-explanatory.

Please arrange your schedule to investigate this matter as requested and report your findings to this office.

Best wishes.

Fraternally yours,

Donald C. Siegel
International Vice President

DCS:jm

Enclosure

EXHIBIT
Kamen 5
11/28/07

May 14, 2003

Patrick Kinney
2900 Fourth Avenue
Altoona, PA 16601

Dear Sir and Brother:

This will acknowledge receipt of your letter dated May 8, 2003 wherein you voice a complaint about the manner in which you feel IBEW Local Union #2007 is representing you.

At the outset, I would like to clarify my role in a situation such as this. The appeals procedure in the IBEW Constitution only encompasses actions taken under and pursuant to the IBEW Constitution. The Collective Bargaining Agreement, however, is a contract between the Local Union and the employer. It is important to note, in this regard, that it is the Local Union and not the International that serves as your exclusive bargaining representative for Collective Bargaining purposes. In short, the IBEW Constitution does not provide a mechanism for appealing issues related to a negotiated and ratified agreement between a company and a Local Union.

For these reasons, there is no formal procedure under which I can entertain your complaint against the Local Union. Moreover, since the International has no bargaining relationship or status with your employer, I am not able to intervene on your behalf with the company. Nevertheless, in order to attempt to assist you in an informal way, I will assign an International Representative to look further into this matter.

Best wishes.

Fraternally yours,

Donald C. Siegel
International Vice President

DCS:jm

cc:    Steven Kamen, International Representative

May 08 03 07:51p

2007/m

# FAX

**To:**      Don Segal
**From:**    Patrick Kinney, Local 2007
**Date:**    May 8, 2003

On Wednesday May 7, 2003, I was scheduled to meet with Jeff Sponsler (VP of Lumax Industries) and Jeff McConnell (Local 2007 President). When I attended the meeting, Jeff Sponsler informed me that Jeff McConnell went home for the day, and would not be attending this meeting.

Jeff Sponsler then informed me that I was being downgraded in pay from Labor Grade 8 to a Labor Grade 1. When I asked why, Jeff Sponsler told me that I was "mentally unable to function at my job." He also alleged other incidences, but could not substantiate them. He (Jeff Sponsler), also stated I "will never go back to that job." The day before this meeting, Jeff McConnell gave me a different story, and said, "There is not much we can do."

I have performed my Labor Grade 8 job for the last three years. I have had excellent reviews and performance. There is nothing in my employee files that deserves this kind of demotion. In fact, I have not been written up before May 7, 2003.

I need to have someone from my Union represent me fairly. Someone to determine what has change from Friday May 2, 2003 to Monday May 5, 2003.

Please get back to me at your earliest convenience. I can be reached at my home phone number 814-942-8973.

Thank you for your consideration in this matter.

Sincerely

*Patrick Kinney*

Patrick Kinney (Local 2007)

RECEIVED

MAY - 9 2003

FAX-IBEW THIRD DISTRICT · FA

*Kamen*
*Pending*

October 27, 1999

Steven A. Kamen
106 Seminole Trail
Butler, PA  16001

Dear Sir and Brother:

I am in receipt of the undated letter from Annmarie Polinsky regarding Robert
Palmatier, Vice President of IBEW Local Union #1968, which you faxed to
International Representative Simon on October 13, 1999.

Please arrange your schedule to investigate this matter and report your findings to
this office.

Best wishes.

Fraternally yours,

Lawrence E. Rossa
International Vice President

LER/scm
Enclosure

EXHIBIT
Kamen 6
11/28/07



COPY

Lawrence E. Rossa
Third District International VP
International Brotherhood of Electrical Workers
200 Corporate Center Drive, suite 301
Coraopolis, Pennsylvania 15108

Dear Sir and Brother:

Until recently, I was a union representative on the Fulton Montgomery Schoharie
Co. Private Industry Council. Appointed by the Central Labor council five years
ago, I was the only union representative until 18 months ago when IBEW Local
1968 Vice President Bob Palmatier accepted appointment from the same council. It
is difficult getting on the board and keeping your seat as this region is violently anti-
union, anti-worker. Bob's participation was greatly appreciated as the board is
comprised of 30 members, most business owners, who regard workers as a
commodity to be replaced or eliminated. With two union advocates on the board, I
was confident that workers in the region would be better represented. I was very
disappointed in what actually transpired. Bob, it turns out, is not the voice of labor.
Briefly, let me describe what has happened since his appointment.

- Thirty employees of the PIC sign cards for a union. Bob voted *against* card recognition
because he "is not sure that the workers were not coerced into signing them." (September,
1998)

- Bob votes with majority for the PIC to continue paying anti-union law firm to deal with
organizing issues. He agrees to retaining the law firm after he finds out that the cost of
the attorneys is a prohibited expense by both federal and state government. As board
members, we are responsible for the fiduciary integrity of the PIC. (October, 1998)

- Bob is overheard discussing how best to rid the board of that "union agitator" (me, and I
have cleaned up the language that was actually used) with the executive director, board
chairman, and business representative from the community. (February, 1999)

- The board meets to discuss whether we should go for an NLRB election or just accept
cards. Bob votes for election. (February, 1999)

- PEF is the recognized union. The PIC is transitioning from PIC to Workforce Investment
Board. The executive director is asked to head the WIB, taking him out of the PIC and
out of contract negotiations. Bob wanted to know "why you would reward those union
agitators by getting executive director out of their hair?" When the attorney laughed and
said, "if you give those union people an inch, they'll take a mile," Palmatier's answer to
that was "Amen to that, brother." (September, 1999)

RECEIVED

OCT 29 1999

I.B.E.W. THIRD DISTRICT

*Annmarie J. Polinsky RD #4 Box 2995 Amsterdam, NY 12010  (518) 843-2806 Email Annary54@aol.com*

There is much work to be done in this region, and Bob's actions have caused some major setbacks for us. The area is one of the hardest hit economically and it will be difficult to build worker organizations if union members don't support union issues.

I apologize for the length of this missive. It was not an easy thing to write. As a third generation former member of IBEW Local #3 and the proud mother of a son who is a 4th year apprentice in the same, I feel an obligation and dedication to protect and promote that which has supported my family for generations. If you have any concerns or comments, please feel free to contact me at work (518) 436-8516 or at home (518) 843-2806. Thank you for taking the time to read this.

In unity,

*Annmarie Polinsky*

Annmarie J. Polinsky
Copy to:      Steven Kamen

AJP/

Enc.

*Annmarie J. Polinsky RD #4 Box 2995 Amsterdam, NY 12010  (518) 843-2806 Email Annary54@aol.com*

**COPY**

October 21, 2003

Steven A. Kamen
605 Slippery Rock Road
Slippery Rock, PA 16057

Dear Sir and Brother:

Enclosed is a copy of a letter received in the Third District Office from Gary Slovikosky, a member of Local Union #2007, IBEW, which is self-explanatory.

Please provide me with a report on this matter. Upon review of your report, I will decide if an investigation is warranted.

Best wishes.

Fraternally yours,

Donald C. Siegel
International Vice President

DCS:jm

Enclosure

EXHIBIT
Kamen 1
11/28/07

October 21, 2003

Gary Slovikosky
331 Spindly Road
Gallitzin, PA  16641

Dear Sir and Brother:

This is in response to your letter dated September 22, 2003 wherein you voice your complaint about the manner in which you feel Local Union #2007 handled your grievance with Lumax Industries Inc.

Please be advised that your request is under review and you will hear from this office in the near future concerning the same.

Best wishes.

Fraternally yours,


Donald C. Siegel
International Vice President

DCS:jm

cc:     Steven Kamen, International Representative

September 22, 2003

Donald C. Siegel
Vice President 3rd District
500 Cherrington Pkwy.
Suite 325
Coraopolis, PA 15108

Dear Sir and Brother:

My name is Gary Slovikosky and I am a member of Local Union 2007 of the
International Brotherhood of Electrical Workers. I am employed by Lumax Industries
Inc. Chestnut Ave & 4th Street Altoona, PA 16601.

I was suspended on August 19, 2003 for two days , August 20-21, 2003. I was falsely
accused by the company of storing company property in an unauthorized area. I filed a
grievance and went through the grievance procedure. At step 3, Jeff McConnell, Local
2007 President and Steve Kamen, International Representative and myself along with the
company and their attorney present. During this meeting the company said that a fellow
brother and union official, Jeff Blaizer, employed by Lumax Industries, went to the
company and said that I was the one that put the items in an unauthorized area. At no
time during this meeting did Jeff McConnell or Steve Kamen mention about having Jeff
Blaizer brought in and questioned. After the 3rd step meeting, I requested to have Jeff
Blaizer brought in and questioned in front of the company and union officials. Jeff
McConnell said that he would not bring him in and question him. When Jeff Blaizer
went to the company, he was lying. Since this incident, I came back from my suspension
on August 22, 2003. I was displaced from the maintenance department, where I was a
labor grade 9. According to our labor agreement, I should have the right to filter down
through the labor grades with my seniority and the company is denying me the right to do
so by not giving me ten days to qualify for such jobs as stated in our labor agreement.
Also the company has brought outside vendors in to do work that can be done by our
maintenance department. I feel that I should be asked to do the work before anyone is
brought in to do the work.

Resolution: I would like you to send a representative from the International to investigate
this matter.

I am also forwarding a copy of this letter to:
Jerimiah J. O'Connor
International Secretary/Treasurer
1125-15th Street N.W.
Washington, D.C. 20005

RECEIVED
SEP 2 5 2003
I.B.E.W. THIRD DISTRICT

Fraternally yours,
Gary Slovikosky
331 Spindly Road
Gallitzin, PA 16641
Home Phone #: 814-886-9629
Cell Phone: 814-934-3272

EDWIN D. HILL
*International President*

JEREMIAH J. O'CONNOR
*International*
*Secretary-Treasurer*

# INTERNATIONAL BROTHERHOOD ELECTRICAL WORKERS®

*Address of Writer*

PO Box 123
Herman, PA 16039
thirddistrictrep@aol.com

November 17, 2002

Mr. Donald C. Siegel, IVP
International Brotherhood of Electrical Workers
Third District
500 Cherrington Parkway
Suite 325
Coraopolis, PA    15108

**RE: Labor 2002 Meetings**

Dear Brother Siegel,

Pursuant to the assignment dated September 6, 2002, I wanted to send you a note of apology for not being able to attend any of the scheduled meetings. Both the Central PA and the Allegheny meetings were scheduled for the 16th of September, which coincided with the Yom Kippur Holiday, and I didn't think the meeting warranted a trip to Philadelphia. I trust you understand the situation and I thank you for your understanding.

Fraternally,

Steven A. Kamen
IBEW International Representative

SAK:jrd

EXHIBIT
Kamen 8
11/28/07

**RECEIVED**

NOV 1 9 2002

I.B.E.W. THIRD DISTRICT

FORM 240



# International Brotherhood
## of Electrical Workers



**Donald C. Siegel,** International Vice President
500 CHERRINGTON PARKWAY, SUITE 325
CORAOPOLIS, PA 15108
(412) 269-4963 • Fax (412) 269-4964

**Edwin D. Hill,** International President
**Jeremiah J. O'Connor,** International Secretary-Treasurer

| New York | New Jersey | Pennsylvania | Delaware |
| --- | --- | --- | --- |

April 21, 2003



Steven A. Kamen
140 Geibel Road
Butler, PA 16002

Dear Steve:

On Friday, April 11, 2003, I received your three pending assignment reports. Needless to say, I am very displeased with the time span. These reports are so late that I will need to consider how to respond, or even if I should. Upon further review of your pending file, I find that you still have an open assignment from October 1999. If this is the case, this is totally unacceptable.

You are not only late with your assignments but you are also behind on your weekly work reports and expense reports. I cannot stress enough the importance of your responsibility as an International Representative to file a weekly work report and an expense report every two weeks.

I hope that my bringing these issues to your attention will prompt you to get up to date and remain current with all of your assignments, weekly work reports and expense reports and no further action will be needed.

Fraternally yours,

Donald C. Siegel
International Vice President

DCS:jm

bcc:  Edwin D. Hill, International President

**EXHIBIT**
Kamen 9
11/28/07

EDWIN D. HILL
*International President*

JEREMIAH J. O'CONNOR
*International
Secretary-Treasurer*

# INTERNATIONAL BROTHERHOOD ELECTRICAL WORKERS.®

605 Slippery Rock Road
Slippery Rock, PA 16057
Steven_Kamen@ibew.org

*Address of Writer*

January 20, 2004

Mr. Donald C. Siegel, IVP
Third District - IBEW
500 Cherrington Parkway
Suite 325
Coraopolis, PA     15108

**RE: LM-2 Reporting**

Dear Brother Siegel,

Pursuant to the assignment dated November 5, 2003(copy attached), Although I had registered for the seminar, between having the flu and issues with my heart, I was unable to complete this informational meeting. I have called the DOL in Pittsburgh and requested that I be notified directly if they should have additional seminars scheduled. Also, in checking with the Locals that I service, I believe the only one that will be required to comply with the new filing is LU 86 in Rochester, NY. Brother Bill Auble is aware of the changes and has discussed the issue with the LU accountants. Should you have any additional questions, please contact me.

Fraternally,

Steven A. Kamen
IBEW International Representative

SAK: rde
Enc. (1)



DEPOSITION
EXHIBIT
Kamen 10
11/28/07

RECEIVED
JAN 2 1 2004
I.B.E.W. THIRD DISTRICT

FORM 240



*Attn: Donald Siegel*

TO:   IBEW 3rd District

FROM:  Town of Rochester Highway Eemployees

DATE:  February 27, 2004

VIA FAX:  412-269-4964

We, as members of Local 1968 IBEW are writing this letter because we feel we are not being represented properly by our International Representative Steve Kamen. We have scheduled three meetings with Mr. Kamen of which he has not shown and has cancelled out at the last minute. We are in the middle of negotiations and feel we are not being represented at this crucial time

We address this as a formal complaint and would appreciate an immediate response

Thank you,


Eric C. Eck

Jeffrey Frey

Steve Ballard

Eric R  Eck

Harm Miedema

Arthur Davis

Terry Paddock

Vernon Bush


Town of Rochester Highway
P.O. Box 65
Accord, New York  12404
845-626-7221
845-626-0172 (Fax)

FEB 27 2004

FAX-IBEW THIRD DISTRICT - FAX

DEPOSITION EXHIBIT
Kamen 11
11/28/07

**Siegel, Donald C.**

| | |
|---|---|
| **From:** | Welsh, Michael D. |
| **Sent:** | Tuesday, December 30, 2003 10:34 AM |
| **To:** | Kamen, Steven |
| **Subject:** | call me |

Hi Steve,

Hope your Holidays are going well.

I need you to call me as soon as you get this message. I will be in the office today until 5:00 pm and back in the office Friday. If it is after hours or Wednesday/Thursday, call me on my cell phone (412-215-2069). Don asked me to contact you yesterday and he asked me again this morning if I heard from you. Unfortunately I had to say you did not call back yet

Mike

1

DEPOSITION
EXHIBIT
Kamen 12
11/28/07

**Siegel, Donald C.**

**From:**     Siegel, Donald C.
**Sent:**     Friday, February 27, 2004 3:47 PM
**To:**     Kamen, Steven

Steve:

Call me ASAP

Don
**Tracking:**

| Recipient | Delivery | Read |
|---|---|---|
| Kamen, Steven | Delivered: 2/27/2004 3:47 PM | Read: 2/28/2004 3:51 PM |
| Welsh, Michael D. | Delivered: 2/27/2004 3:47 PM | Read: 3/1/2004 7:38 AM |
| Malagise, John E. | Delivered: 2/27/2004 3:47 PM | |

1

DEPOSITION
EXHIBIT
Kamen 13
11/28/07
PENGAD 800-631-

**Siegel, Donald C.**

| | |
|---|---|
| **From:** | Kamen, Steven |
| **To:** | Siegel, Donald C. |
| **Sent:** | Thursday, April 08, 2004 7:11 AM |
| **Subject:** | Read: |

Your message

| | |
|---|---|
| To: | Kamen, Steven |
| Subject: | |
| Sent: | 2/27/2004 3:47 PM |

was read on 4/8/2004 7:11 AM.

DEPOSITION
EXHIBIT
Kamen 14
11/28/07

1

**Siegel, Donald C.**

| | |
|---|---|
| **From:** | Welsh, Michael D. |
| **Sent:** | Friday, March 12, 2004 10:44 AM |
| **To:** | Siegel, Donald C. |
| **Subject:** | Steve Kamen's status |

Don,

I spoke to Steve this morning and he did not sound well. He said he has been in and out of the hospital this past week for tests and MRI's. He said they confirmed he has viral meningitis and now appears he is having problems with his gall bladder. He will be under going more test next week. He said his family doctor is coordinating his treatment and said the earliest he would be able to go back to work is April 1st. He said he asked the doctor for a letter and he will forward that to us. He said once he begins to feel better he will catch up on his reports. I asked for him to keep us informed.

Mike

1


DEPOSITION
EXHIBIT
Kamen 15
11/28/07



EDWARD J. HILL
*International President*

JEREMIAH J. O'CONNOR
*International Secretary-Treasurer*

605 Slippery Rock Road
Slippery Rock, PA 16057
Steven_Kamen@ibew.org

*Address of Writer*

March 16, 2004

Mr. Donald C. Siegel, IVP
Third District - IBEW
500 Cherrington Parkway
Suite 325
Coraopolis, PA    15108

## RE: Absence

Dear Brother Siegel,

I hope this note finds you well. As you know, I have been off work for some time and in the hospital part of that time. I enclose a note from my Doctor. I am sorry that I didn't send this sooner and that I haven't been able to call in.

I don't remember ever being this sick before. Unfortunately although my original illness ( viral meningitis ), seems to finally be ending, they now think I may have a gall bladder problem. I am going in this Thursday for a scan and will find out if this will require surgery. Hopefully not.

I know this has put a burden on you and my fellow Representatives. I will continue to keep you posted and please feel free to call me if you or any of the Representatives need any help or information.

Fraternally,

Steven A. Kamen
IBEW International Representative

SAK: de
Enc. (1)



DEPOSITION
EXHIBIT
Kamen 16
11/28/07



RECEIVED
MAR 17 2004
I.B.E.W. THIRD DISTRICT

FORM 240

## William A. DiCuccio M.D. & Associates
### 480 E. Jefferson Street   Butler, PA 16001
### 724-282-1530

Steven A Kamen

Mr. Kamen is a long time patient of mine.  He has been very ill since the end of February and continues to have unexplained fevers and illness.  At one point during his illness he required hospitalization.  He continues to require frequent doctor's visits and is by no means fit to return to work.  He has been unable to work since 2/20/04.  To my best approximation he will be able to return to work 4/01/04.

Please do not hesitate to contact me with any questions or concerns.

Sincerely,

John R. Rocchi MD                        March 11, 2004

JEREMIAH J. O'CONNOR
International
Secretary-Treasurer

International President

# INTERNATIONAL BROTHERHOOD ELECTRICAL WORKERS®

605 Slippery Rock Road
Slippery Rock, PA 16057
Steven_Kamen@ibew.org

*Address of Writer*

April 6, 2004

Mr. Donald C. Siegel, IVP
Third District - IBEW
500 Cherrington Parkway
Suite 325
Coraopolis, PA    15108

**RE: Absence**

Dear Brother Siegel,

I am enclosing a note from Dr. John Rocchi, my primary physician stating I may return to full work by May 1st. This is certainly better news than when I last spoke with you. In the meantime, I will catch up on reports, and I have been able to assist LU 385, LU 1914, and LU 1968 with various issues. Please feel free to contact me if further information is needed.

Fraternally,

Steven A. Kamen
IBEW International Representative

SAK: de
Enc. (1)

DEPOSITION
EXHIBIT
Kamen 17
11/28/07

RECEIVED
APR - 8 2004
I.B.E.W. THIRD DISTRICT

FORM 240

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street   Butler, PA 16001
724-282-1530

Steven A Kamen

Please excuse Mr. Kamen from work for the month of April while he continues to recover from multiple serious health conditions including meningitis and diverticulitis. He is intending to return to work on May 1st without restrictions. Please do not hesitate to contact me with any concerns.

_____
John R. Rocchi MD                        April 2, 2004

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STEVEN A. KAMEN,                 )

                        Plaintiff,      )     Case No. 1:06CV01063(RMC)

                                           )

          v.                                )

                                         )

INTERNATIONAL BROTHERHOOD OF      )

ELECTRICAL WORKERS, AFL-CIO, and   )

EDWIN D. HILL, an individual,         )

                                         )

                      Defendants.     )

_____ )

### FIRST SET OF INTERROGATORIES SUBMITTED ON BEHALF
### OF DEFENDANT INTERNATIONAL BROTHERHOOD
### OF ELECTRICAL WORKERS TO PLAINTIFF STEVEN A. KAMEN

Defendant International Brotherhood of Electrical Workers, AFL-CIO, requests that Plaintiff Steven A. Kamen, answer all of the following interrogatories, in writing and under oath, within the time prescribed by Rule 33, Fed. R. Civ. P. According to Rule 33, a copy of your written response to these interrogatories must be served on Terry R. Yellig, the attorney for defendant International Brotherhood of Electrical Workers, AFL-CIO, at the address listed in this document.

### INSTRUCTIONS TO ANSWERING PARTY

1.      Each answer to the following interrogatories must be as complete and straightforward as the information reasonably available to you as well as your agents, representatives, and, unless privileged, attorneys permits.

2.      State whether the information that you furnish in response to each interrogatory is within your personal knowledge and, if you do not have enough personal knowledge to answer



DEPOSITION EXHIBIT

Kamen 18

11/28/07

an interrogatory fully, say so, but make a reasonable and good faith effort to obtain the information by asking other persons or organizations, unless the information is equally available to the Defendants, and state the name, if known, of each person to whom the requested information is a matter of personal knowledge.

3.    Notwithstanding, answer each interrogatory to the maximum extent possible even if you can not answer it completely.

4.    Whenever an address and telephone number for the same person are requested in more than one interrogatory, you are required to furnish them in answering only the first interrogatory asking for that information.

5.    These interrogatories are continuing, so as to require that supplemental answers be submitted if further or different information is obtained with respect to any interrogatory.

6.    Identify each person who assisted you or participated in preparing or supplying any of the information given in response to or relied on in preparing answers to these interrogatories.

7.    If you maintain that any document or record that refers to or relates to anything about which these interrogatories ask has been destroyed, set forth the content of that document, the location of any copies of that document, the date of the destruction, and the name of the person who ordered or authorized the destruction.

8.    If you make an objection to an interrogatory, you must specifically state the objection in your written response.

9.    If you withhold any information requested in an interrogatory, or part thereof, based on a claim of privilege or work product in accordance with Fed. R. Civ. P. 26(b)(5), state

the nature of the privilege claimed, and state the basis on which you claim you are entitled to withhold the information.

a. In asserting the privilege, you shall, in the objection to the interrogatory, or part thereof, identify with specificity the nature of the privilege (including work product) that is being claimed;

b. The following information should be provided in the objection, if known or reasonably available, unless divulging such information would cause disclosure of the allegedly privileged information:

   i. For oral communications:

      1. the name of the person making the communication and the names of persons present while the communication was made, and, where not apparent, the relationship of the persons present to the person making the communication;

      2. the date and place of the communication; and

      3. the general subject matter of the communication

   ii. For documents:

      1. the type of document;

      2. the general subject matter of the document;

      3. the date of the document; and

      4. such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document, and where not apparent, the

relationship of the author, addressee, custodian, and any other recipient to each other.

10.    If, in answering these interrogatories, you encounter any ambiguities when construing a question, instruction, or definition, your answer should set forth the matter deemed ambiguous and the construction used in answering.

## DEFINITIONS

1.    "Person" includes a natural person, firm, association, organization, partnership, business, trust, limited liability company, corporation, or public entity.

2.    "You and/or anyone acting on your behalf" includes you, your agents, your insurance companies, their agents, their employees, your attorneys, your accountants, your investigators, and anyone else acting on your behalf.

3.    "Employment" means a relationship in which an "Employee" provides services requested by or on behalf of an "Employer."

4.    "Employee" means a "Person" who provides services in an "Employment" relationship and who is a party to this lawsuit.

5.    "Employer" means a "Person" who employs an "Employee" to provide services in an "Employment" relationship.

6.    "Termination" means the actual or constructive cessation of employment and includes a discharge, firing, layoff, resignation, or completion of the term of the employment agreement.

7.    "Document" means the original or a copy of handwriting, typewriting, printing, photostats, photographs, electronically stored information, and every other means of recording upon any tangible thing and form of communicating or representation, including letters, words,

pictures, sounds, or symbols, or combinations thereof.

8.      "Address" means the street address, including the city, state, and zip code.

9.      "Identify," as it applies to a "Document," means to describe the: (i) type of "Document," including, where applicable, that the "Document" was provided to Defendants on May 1, 2007 pursuant to Rule 26(a)(1), Fed. R. Civ. P.; (ii) general subject matter; (iii) date of the "Document;" (iv) author(s), (v) recipient(s) or addressee(s), (vi) custodian of the "Document;" and (vii) location of the "Document;" or, alternatively, to produce the "Document" (If the "Document" has more than one page, refer to the page and section where the answer to the interrogatory can be found).

10.     "Identify," as it applies to a "Person," means to state his/her name, title or organization affiliation (if any), address, and telephone number.

11.     The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "All" means "Any and All"; "Any" means "Any and All."

## INTERROGATORIES

1.      State each and every fact, which supports the allegation in Paragraph No. 17 of the Amended Complaint that the "[you] consistently performed [your] duties [as an International Representative while employed by the IBEW] in a satisfactory manner;"

     a.    state the name, address, and telephone number of each person who has knowledge of those facts; and

     b.    identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

2.    State each and every fact, which supports the allegation in Paragraph No. 19 of the Amended Complaint that "[o]n or about February 20, 2004, [you] became ill and [were] hospitalized;"

    a.    state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.    identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

3.    State each and every fact, which supports the allegation in Paragraph No. 20 of the Amended Complaint that "[you were] diagnosed with human immunodeficiency virus (HIV);"

    a.    state the name, address, and telephone number of each person who has knowledge of those facts, and

    b.    identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

4.    State each and every fact, which supports the allegation in Paragraph No. 21 of the Amended Complaint that "Defendants were informed [that you were diagnosed as having contracted the human immunodeficiency virus] shortly after [you were] informed of the diagnosis, and prior to [your] termination;"

    a.    state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.    identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

5.    State each and every fact, which supports the allegation in Paragraph No. 22 of the Amended Complaint that "[you are] homosexual;"

      a.    state the name, address, and telephone number of each person who has knowledge of those facts; and

      b.    identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

6.    State each and every fact, which supports the allegation in Paragraph No. 24 of the Amended Complaint that "[your] medical conditions significantly limit [your] ability to perform major life activities . . . as compared to the average person;"

      a.    state the name, address, and telephone number of each person who has knowledge of those facts; and

      b.    identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

7.    Describe each and every medical condition, which you allege in Paragraph No. 24 of the Amended Complaint significantly limited your ability to perform major life activities as compared to the average person.

8.    State each and every fact, which supports the allegation in Paragraph No. 25 of the Amended Complaint that "[your] conditions are a substantial impairment within the meaning of the [Americans with Disabilities Act];"

      a.    state the name, address, and telephone number of each person who has knowledge of those facts; and

      b.    identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

9.    State each and every fact, which supports the allegation in Paragraph No. 26 of the Amended Complaint that "[you have] a history of a substantial impairment;"

    a.  state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.  identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

10.    State each and every fact, which supports the allegation in Paragraph No. 27 of the Amended Complaint that "[you have] been perceived by Defendant as having a substantial impairment;"

    a.  state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.  identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

11.    State each and every fact, which supports the allegation in Paragraph No. 29 of the Amended Complaint that you continued to "do work from [your] home" during your medical leave;

    a.  state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.  identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

12.    State each and every fact, which supports the allegation in Paragraph No. 31 of the Amended Complaint that Defendants denied your request to have all of your regular duties be reassigned to you when you returned to work from your medical leave of absence on or about

- 8 -

May 1, 2004;

   a.  state the name, address, and telephone number of each person who has knowledge
       of those facts; and

   b.  identify each document that you and/or anyone acting on your behalf believes
       supports such fact(s).

13.    State each and every fact, which supports the allegation in Paragraph No. 32 of
the Amended Complaint that "[you were] capable of performing the essential functions of [your]
position as a Senior International Representative from the time [you] returned from [your]
medical leave either with or without a reasonable accommodation;"

   a.  state the name, address, and telephone number of each person who has knowledge
       of those facts; and

   b.  identify each document that you and/or anyone acting on your behalf believes
       supports such fact(s).

14.    State each and every fact, which supports the allegation in Paragraph No. 33 of
the Amended Complaint that you were denied training opportunities after you returned to work
from your medical leave on or about May 1, 2004;

   a.  state the name, address, and telephone number of each person who has knowledge
       of those facts; and

   b.  identify each document that you and/or anyone acting on your behalf believes
       supports such fact(s).

15.    State each and every fact, which supports the allegation in Paragraph No. 33 of
the Amended Complaint that you were not permitted to assist at manufacturing conferences after
you returned to work from his medical leave on or about May 1, 2004;

    a.   state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.   identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

16.    State each and every fact, which supports the allegation in Paragraph No. 35 of the Amended Complaint that "[you were] still able to perform [your job] satisfactorily as compared to other International Representatives" notwithstanding your medical leave and notwithstanding your medical condition;

    a.   state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.   identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

17.    State each and every fact, which supports the allegation in Paragraph No. 51 of the Amended Complaint that "[m]embers of the IBEW, including management, regularly mock and ridicule homosexuals, and express opposition to being associated with homosexuals;"

    a.   state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.   identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

18.    State each and every fact, which supports the allegation in Paragraph No. 52 of the Amended Complaint that "[t]he IBEW has had and continues to have a practice of systematic hostility toward homosexuals;"

    a.   state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.   identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

19.    State each and every fact, which supports the allegation in Paragraph No. 53 of the Amended Complaint that the "systematic hostility toward homosexuals" alleged in Paragraph No. 52 of the Amended Complaint "is embedded in a culture fostered and sustained by senior management in [the] IBEW, including Defendant Hill;"

    a.   state the name, address, and telephone number of each Person who has knowledge of those facts; and

    b.   identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

20.    State each and every fact, which supports the allegation in Paragraph No. 54 of the Amended Complaint that the "systematic hostility toward homosexuals" alleged in Paragraph No. 52 of the Amended Complaint is "manifested . . . in overtly anti-homosexual language by IBEW employees and management;"

    a.   state the name, address, and telephone number of each person who has knowledge of those facts; and

    b.   identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

21.    State each and every fact, which supports the allegation in Paragraph No. 54 of the Amended Complaint that the "systematic hostility toward homosexuals" alleged in Paragraph No. 52 of the Amended Complaint is "manifested . . . in anti-homosexual hiring practices;"

- 11 -

a. state the name, address, and telephone number of each person who has knowledge of those facts; and

b. identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

22.    State each and every fact, which supports the allegation in Paragraph No. 55 of the Amended Complaint that the "systematic hostility toward homosexuals" alleged in Paragraph No. 52 of the Amended Complaint "continues unabated through the present time;"

a. state the name, address, and telephone number of each person who has knowledge of those facts; and

b. identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

23.    State each and every fact, which supports the allegation in Paragraph No. 82 of the Amended Complaint that "Defendants knew their actions against [you] were in violation of the D.C. Human Rights Act;"

a. state the name, address, and telephone number of each person who has knowledge of those facts; and

b. identify each document that you and/or anyone acting on your behalf believes supports such fact(s).

24.    State each and every fact, which supports the allegation in Paragraph No. 84 of the Amended Complaint that the "policy and practice of hostility and prejudice toward homosexuals" alleged in Paragraph No. 83 "is a continuing violation of the [D.C. Human Rights Act];"

- 12 -

a.  state the name, address, and telephone number of each person who has knowledge

of those facts; and

b.  identify each document that you and/or anyone acting on your behalf believes

supports such fact(s).

Dated: August 23, 2007

TERRY R. YELLIG (D.C. Bar No. 946095)

SHERMAN, DUNN, COHEN, LEIFER & YELLIG, P.C.
900 SEVENTH STREET, N.W.
SUITE 1000
WASHINGTON, D.C. 20001
TELEPHONE NO. (202) 785-9300

Attorneys for Defendants International Brotherhood of
Electrical Workers, AFL-CIO, and Edwin D. Hill

- 13 -

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2007, the foregoing First Set of Interrogatories Submitted on Behalf of Defendant International Brotherhood of Electrical Workers to Plaintiff Steven A. Kamen was served upon the parties in this action by placing a copy thereof in a sealed envelope, and delivering it to the United Parcel Service for next-day delivery to the parties addressed as follows:

> Joseph H. Chivers, Esquire
> Suite 600
> 312 Boulevard of the Allies
> Pittsburgh, PA 15222-1923

> Bart T. Valad, Esquire
> John Vecchione, Esquire
> 3863 Plaza Drive
> Fairfax, VA 22030

Terry R. Yellig

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEVEN A. KAMEN            )
                          )
        Plaintiff,        )        Civil Action No.  1:06cv01063 (RMC)
                          )
        v.                )        JUDGE ROSEMARY M. COLLYER
                          )
INTERNATIONAL BROTHERHOOD OF  )
    ELECTRICAL WORKERS (IBEW) )
and EDWIN D. HILL, an individual,  )
                          )
        Defendants.       )

### PLAINTIFF'S ANSWERS TO DEFENDANT INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS' FIRST SET OF INTERROGATORIES

**AND NOW COMES** Plaintiff, Steven A. Kamen, by and through his counsel, Joseph H.

Chivers, Esquire, and hereby answers and otherwise responds to Defendant International

Brotherhood of Electrical Workers' First Set of Interrogatories.

Pursuant to the discovery provisions of the Federal Rules of Civil Procedure, and the

rules, definitions and instructions proscribed by Defendant IBEW in its discovery requests,

Plaintiff answers and responds as follows, with numbered Answers corresponding to Defendant

IBEW's numbered requests:

Page 1 of 6



## ANSWERS TO INTERROGATORIES

1.

ANSWER:

By virtue of the fact that I performed my job to the best of my ability and worked very hard for the betterment of the due paying members in the IBEW, which I proudly served.

2.

ANSWER:

I became ill on Friday evening, February 20, 2004, subsequently under the care of Drs. Rocchi, McGill, Yost and Welker and hospitalized during that period.

3.

ANSWER:

Subsequent to onset of illness February 20, 2004, multiple ailments affected me and during testing in March and April 2004 testing confirmed HIV.

4.

ANSWER:

Multiple letters from Dr. Rocchi disclosing my ailments and reasons unable to work were submitted regularly to VP Siegel. Note also that IBEW being self-insured was aware of my medical conditions.

5.

ANSWER:

Edwin Hill
VP Siegel
Wyatt Earp, Jr.
Mike Flanagan
Marie Peluso

6.

ANSWER:

   Review medical history.

7.

ANSWER:

   Review medical history.

8.

ANSWER:

   Review medical history.

9.

ANSWER:

   Objection. Asks for legal conclusion. Without waiving objection medical records speak for themselves. HIV/AIDS from February 2004 forward. Impaired in working, sleeping, socializing, eating and engaging in strenuous activities.

10.

ANSWER:

   Objection. Asks for legal conclusion. Without waiving objection it is averred Hill and Siegel terminated me on the perception I could not do my job with or without an accommodation.

11.

ANSWER:

   While home during medical leave I had contact with various local unions, giving advice, answering questions, etc..

12.

ANSWER:

Page 3 of 6

At a 3rd District progress meeting I asked and requested of VP Siegel that my workload be resumed and local unions I had previously serviced be returned for my representation.

13.

ANSWER:

Letter of Dr. Rocchi allowing me to resume normal duties.

14.

ANSWER:

I was not permitted to attend manufacturing and broadcasting conferences.

15.

ANSWER:

VP Siegel did not allow me to attend conference mentioned in #14.

16.

ANSWER:

Best way for me to answer this is to compare myself to Wyatt Earp. Whatever problems I had with timeliness of reports, so did Earp. If Defendant had been willing to work with me, accommodate me, I could have kept working.

17.

ANSWER:

International Representative Mike Flanagan, International Representative Marie Peluso and others over the years have mocked this activity and joked about inadvertently walking into an all-gay Christmas Party at Hershey Park during a December Third District Staff meeting/party held there.

Page 4 of 6

18.

ANSWER:

It is evident at all IBEW functions that if you are not married or without a potential spouse you were jeered as not being part of the projected family friendly IBEW mentality.

19.

ANSWER:

See #18 above.

20.

ANSWER:

Flanagan and Peluso, and the Buffalo Local Union Utility Business Manager for years have made derogatory remarks about homosexuals.

21.

ANSWER:

Disclose known homosexuals prior to this action.

22.

ANSWER:

Disclose known homosexuals since this action.

23.

ANSWER:

Terminating an individual with HIV/AIDS would certainly curtail health care costs and assist in maintaining favorable experience rating for the IBEW's health plan.

24.

ANSWER:

Disclose homosexual hires since December 8, 2004, or otherwise prove hiring of known homosexuals.

Respectfully submitted,

_____

Joseph H. Chivers, Esquire
PA ID No. 39184
Suite 600
312 Boulevard of the Allies
Pittsburgh, PA   15222-1923
jchivers@employmentrightsgroup.com
(412) 281-1110
(412) 281-8481 FAX

Counsel for Plaintiff
Steven A. Kamen

DATED: October 15, 2007

Page 6 of 6

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Answers to Defendant IBEW's First Set of Interrogatories was served via first-class mail, postage prepaid, this 15th day of October, 2007, on the following:

Terry R. Yellig, Esquire
Sherman, Dunn, Cohen, Leifer & Yellig, P.C.
Suite 1000
900 Seventh Street, N.W.
Washington, D.C. 20001

Counsel for Defendants

Joseph H. Chivers, Esquire
PA ID No. 39184
Suite 600
312 Boulevard of the Allies
Pittsburgh, PA 15222
jchivers@employmentrightsgroup.com
(412)281-1110 / FAX 281-8481

Counsel for Plaintiff
Steven A. Kamen

**SUBJECT** 66-06

**TO**

**FROM**

**REPLY BY** ASAP

Steven A Kamen

J. McLafferty 284-8305

**MESSAGE**

Enclosed are the forms we discussed:
1. Appeal withdrawal form
2. Medical Assessment form
3. DAP form

We can offer you medical in another category if your doctor completes the Medical Assessment Form. The doctor who completed your last form states you were employable. To be eligible for any

**REPLY** medical the doctor has to state you have a mental/physical disability. In conjunction with this form you must also apply for Social Security. The DAP form is our way of tracking your Social Security Application.

   If you have any questions, please call me before 3:00. Thank you.

**DATE**

RECIPIENT-RETURN THIS COPY TO SENDER



DEPOSITION
EXHIBIT
Kamen 20
11/28/07

# REPORT OF
# PHYSICAL/MENTAL EXAMINATION

| CASE IDENTIFICATION | | | | | |
|---|---|---|---|---|---|
| CO | RECORD NUMBER | CAT | CTR DIG | DIST. | |
| 10 | 121218 | | | | |

RECORD NAME
Steven A Kamen

LINE NO.

WORKER AND NUMBER
McLafferty

CASELOAD NO.
0126

DATE
6-6-06

## SECTION I COMPLETED BY CAO

NAME
Steven A. Kamen

MAIDEN NAME

BIRTHDATE (Mo./Day/Year)
7/28/57

ADDRESS
3 Fincher Lane    Butler Pa 16001

ZIP CODE

SOCIAL SECURITY NO.
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

I HEREBY AUTHORIZE THE RELEASE OF MEDICAL/CLINICAL INFORMATION TO THE DEPARTMENT OF PUBLIC WELFARE AS NECESSARY TO DETERMINE MY ELIGIBILITY FOR ASSISTANCE.

SIGNATURE OF PUBLIC ASSISTANCE APPLICANT/CLIENT    DATE

ARRANGE FOR AN APPOINTMENT WITH A PHYSICIAN OR LICENSED PSYCHIATRIC CLINIC.
MAIL OR RETURN THE FORM TO THE COUNTY ASSISTANCE OFFICE AS SOON AS POSSIBLE.
ASK THE CAO WORKER FOR HELP TO SCHEDULE AN APPOINTMENT IF NECESSARY.

## SECTION II TO BE COMPLETED BY PHYSICIAN OR PSYCHOLOGIST

HISTORY (Complaints and history of present illness or dysfunction: (give date of onset)

1. neck and back pain - chronic
2. migraine headaches
3. Hiv ⊕ - generalized fatigue.
4. atrial fibrillation
5. depression
6. hypertension.
7. moderate cardiac dysfunction

DIAGNOSTIC STUDIES PREVIOUSLY PERFORMED: (Enter here the results of any special X-Ray, laboratory and other diagnostic studies relating to patient's present illness or disability — Give Dates.)

6/04/06  CD4 - 131
3/03/04  HIV ⊕
11/19/03  cardiac cath - moderate Left ventricle systolic dysfunction - EF 30%

RETURN TO:

Butler CAO
108 Woody Dr
Butler Pa 16001

PLEASE CHECK EACH ITEM BELOW IN THE APPROPRIATE COLUMN AND DESCRIBE ABNORMALITIES AND DETAILED INFORMATION RELATED TO THE DISORDER.

PHYSICAL/MENTAL CAPACITY: CHECK (✔) THE MOST APPROPRIATE BLOCK IN THE LIST BELOW THAT REFLECTS YOUR OPINION OF THE PATIENT'S CAPACITY TO WORK.

CHECK (✔) ONLY ONE)

1. [ ] **Capacity Unlimited.** Physical/Mental Capacity is adequate to seek and maintain full-time employment in a normal work environment with normal work schedules.

2. [ ] **Capacity Unlimited with Accommodations.** Handicapped or disadvantaged by a serious illness or condition, but not to the point that precludes full-time gainful employment if reasonable accommodations are made. Reasonable accommodations may include: structural modifications, modified work schedules, acquisition or modification of equipment or devices, provisions for readers or interpreters, job restructuring and other similar actions, or the need for drug maintenance.

     Check all of the block(s) that apply:

     [ ] Physical Limitations    [ ] Mental Limitations    [ ] Health Sustaining Medication Needed

3. [ ] **Capacity Limited with Accommodations.** Has a chronic or acute physical or mental condition which restricts but does not prohibit employment if work is 30 hours or less a week.

     Check all of the block(s) that apply:

     [ ] Physical Limitations    [ ] Mental Limitations    [ ] Health Sustaining Medication Needed

4. [ ] **Temporarily Incapacitated.** Currently incapacitated due to a temporary condition or as a result of an injury or an acute condition and the incapacity temporarily precludes employment.

     The temporary incapacity is expected to last until _____
                                                            DATE

     Is a reassessment of this condition needed after the above date?    [ ] Yes    [ ] No

5. [X] **Incapacitated.** Limiting physical or mental condition which precludes employment.

COMMENTS: IF BLOCK 2, 3, 4 OR 5 IS CHECKED, SUBSTANTIATE YOUR ASSESSMENT OF PHYSICAL OR MENTAL INCAPACITY BY PROVIDING INFORMATION REGARDING:

(1) DIAGNOSIS (Primary and Secondary) AND MEDICATIONS RELATED TO EACH DIAGNOSIS.

Primary: HIV (+)                  Medications:

Secondary: atrial fibrillation
moderate cardiac dysfunction.
depression.                  Medications:

*Handwritten medications (right margin):*
Avapro 300mg daily
Tikosyn 250mcg Q12°
Coumadin 7.5mg daily
Zoloft 150mg daily
Metoprolol 50mg in AM
25mg in pm
Sustiva 600mg daily
Truvada i daily

(2) FUNCTIONAL LIMITATIONS

- easily fatigues - difficult ī strenuous exercise / work.
- should avoid crowds due to immune system compromise.

(3) HAS THE PATIENT EVER RECEIVED 30 CONTINUOUS DAYS OF INPATIENT CARE IN A HOSPITAL OR PSYCHIATRIC UNIT FOR THE MENTALLY ILL OR MENTALLY RETARDED?

[ ] Yes   [X] No   [ ] Unknown      Length of time other than 30 days: _____

If Yes, please identify facility and date.

_____    FROM _____    TO _____
                           FACILITY                                           DATE

(4) PERMANENT IMPAIRMENT OR MEDICAL CONDITION (DOES NOT REQUIRE REVERIFICATION)

## SECTION IV GENERAL HEALTH INFORMATION

| BLOOD PRESSURE | PULSE | HEIGHT | WEIGHT | DISTANT VISION | WITHOUT GLASSES | | WITH GLASSES | |
|---|---|---|---|---|---|---|---|---|
| | | | | | RIGHT | LEFT | RIGHT | LEFT |
| 122/84 | 76 | 76in | 204 lbs. | | | | | |
| IING | RIGHT | | LEFT | BLOOD SEROLOGY | URINALYSIS | SP. GR. | ALBUMIN | SUGAR |
| Ordinary Conversation | | /15 | | /15 | | | | |

037770B                          PAGE 2                                  PA 586 - 9/92

# SECTION V CLINICAL FINDINGS (TO BE COMPLETED BY PHYSICIAN)

THE INFORMATION IN THIS SECTION WILL BE USED BY THE CAO TO MAKE AN ASSESSMENT OF YOUR PATIENT'S QUALIFICATION FOR (1) GENERAL ASSISTANCE OR (2) EXEMPTION FROM PUBLIC ASSISTANCE WORK REQUIREMENTS BECAUSE OF A PHYSICAL OR MENTAL CONDITION.

| | Normal | Abnormal | Not Evaluated | DETAILED INFORMATION |
|---|---|---|---|---|
| A. HEAD, NECK | X | | | |
| B. EYES AND EARS (General) | X | | | |
| C. NOSE, THROAT, MOUTH | X | | | |
| D. BREASTS | X | | | |

E. PULMONARY DIAGNOSIS (if abnormal, please check (✔) appropriate diagnosis and provide detailed information which includes physical findings).

☐ BRONCHITIS    ☐ BRONCHIAS ASTHMA
☐ BRONCHIECTASIS    ☐ EMPHYSEMA
☐ PNEUMOCONIOSIS (Stage)    ☐ PULMONARY FIBROSIS
☐ TUBERCULOSIS    ☐ TUMOR
☐ OTHER

DETAILED INFORMATION SHOULD INCLUDE PERCUSSION, EFFECT OF EXERCISE, AUSCULTATION, ETC.

F. CARDIOVASCULAR DISEASE (if abnormal, please provide diagnosis in blank space and include American Heart Association classification. Also check (✔) appropriate signs and symptoms block(s) and provide detailed information).

*on cardiac cath - mild LV dilation.*

DIAGNOSIS:

☒ DYSPNEA: ☒ ON EXERTION ☐ AT REST
☐ CHECK PAINS:
☐ LUNGS: (Rales, Emphysema, etc.)    ☐ PERIPHERAL EDEMA: (Site & Degree)
☒ HEART: ENLARGEMENT    ☐ CYANOSIS: (Lips, Nails)
☐ MURMURS: (Locate and describe)    ☐ PULSE RATE: _____ Before exercise
☐ PERIPHERAL VESSELS: (Describe)    _____ After exercise
☐ CARDIAC CLASSIFICATION (AHA)    ☐ LIVER ENLARGEMENT: (Degree)

| | Normal | Abnormal | Not Evaluated | DETAILED INFORMATION |
|---|---|---|---|---|
| G. HEMIC (Sickle Cell, Anemia, Clotting Disorders, Leukemia) | X | | | |
| H. LYMPHATIC | X | | | |
| I. MULTIPLE BODY SYSTEM DISORDERS (Lupus, Morbid Obesity, etc.) | X | | | |
| J. IMMUNE DISORDERS (AIDS, etc.) | | X | | HIV + / AIDS. |
| K. NEOPLASTIC DISEASE (Cavier, etc.) | X | | | |
| L. SPECIAL SENSES & SPEECH DISORDERS | X | | | |
| M. ABDOMEN (palpitable abnormalities, hernia, scars, digestive disorders) | X | | | |
| N. RECTUM (Hemorrhoids, Prostate, Other) | X | | | |
| O. ENDOCRINE SYSTEM | X | | | |
| P. G-U SYSTEM | X | | | |
| Q. EXTREMITIES | X | | | |

R. ORTHOPEDIC DISORDERS (Identify type of disorder and indicate range of motion, strength, ankylosis, muscle atrophy, etc.). If arthritis, specify type and check (✔) site of involvement.

*chronic neck & back pain.*
*- difficulty ī kneeling, stooping, lifting.*

☐ HIPS    ☐ KNEES    ☐ ANKLES
☐ TOES    ☐ SHOULDERS    ☐ ELBOWS
☐ WRISTS    ☐ FINGERS    ☒ SPINE

REMAINING FUNCTION: Describe patient's ability to do the following:

☐ WALK    ☐ STAND
☐ STOOP OR BEND    ☐ LIFT    ☐ KNEEL
   ☐ CARRY

IS A BRACE OR PROSTHESIS WORN? ☐ YES ☒ NO
TYPE? _____ FOR HOW LONG? _____
HOW EFFECTIVE IS APPLIANCE?

| | Normal | Abnormal | Not Evaluated | DETAILED INFORMATION |
|---|---|---|---|---|
| S. SKIN | X | | | |
| T. PELVIC (Vaginal) | X | | | |

U. NEUROLOGIC (If neurologic disease or abnormality is present, provide diagnosis and detailed information such as describe reflex changes, motor impairment, disturbance of gait, coordination, etc.)

IF EPILEPTIC, CHECK (✔) TYPE:

☐ GENERALIZED TONIC-CLONIC    ☐ SIMPLE PARTIALS
☐ COMPLEX PARTIALS    ☐ ABSENCE SEIZURES

IF SEIZURES ARE PRESENT, DESCRIBE SEIZURES AND INDICATE FREQUENCY.

03770C

V. PSYCHIATRIC

*DIAGNOSIS: (IF ABNORMAL, INDICATE DIAGNOSIS)*

MENTAL OR EMOTIONAL DISTURBANCE: (Please check (✔) appropriate abnormalities and provide detailed information.)

| | |
|---|---|
| **DETAILED INFORMATION** | |

depression

[X] A. ABNORMALITIES OF BEHAVIOR AND APPEARANCE.

[ ] B. EVIDENCE OF POOR COMPREHENSION OR CONFUSION.

[ ] C. ABNORMAL EMOTIONAL REACTION.

[ ] D. ABNORMAL THOUGHTS OR IDEAS (Give descriptive quote)

[ ] E. LEVEL OF MENTAL RETARDATION (Indicate IQ if known)

[ ] NONE    [ ] MILD    [ ] MODERATE

[ ] SEVERE    [ ] PROFOUND

DO YOU CONSIDER THIS PERSON CAPABLE OF MANAGING HIS/HER OWN AFFAIRS?

[X] YES    [ ] NO

IS THIS PERSON ORIENTED FOR TIME? [✔] YES    [ ] NO

PLACE _____ OR PERSON _____

IS MEMORY DEFECT PRESENT FOR RECENT EVENTS? [ ] YES    [ ] NO

REMOTE EVENTS?    [ ] YES    [ ] NO

[ ] F. PSYCHOMOTOR

---

SUMMARY AND EVALUATION:   What is your general impression of the patient's attitude toward his/her condition? Is further study or specialist examination advisable for completeness of diagnosis, prognosis or treatment? If so, specify type and indicate specialist or institution of your choice.

Mr. Kamen has a history of cardiac disease consisting of atrial fibrillation, ~~moderate~~ mild left ~~systolic~~ ventricle systolic dysfunction.

He also has been diagnosed c̄ HIV / AIDS & is currently on medications for this. His immune system is compromised.

In addition he suffers from migraine headaches & chronic back pain.

Because of all these problems, I feel that Mr Kamen is incapacitated.

---

I HEREBY CERTIFY THAT THE INFORMATION ABOVE IS BASED ON AN EXAMINATION OF THE PATIENT ON 6/15/06 AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.    DATE

PHYSICIAN'S/PSYCHOLOGIST'S PRINTED NAME, ADDRESS & LICENSE NO.

John Rocchi MD.    MD060991-L
480 E. Jefferson St.
Butler, PA 16001

PHYSICIAN'S/PSYCHOLOGIST'S SIGNATURE

*JRocchi*    6/15/06

PREPARED    DATE

[X] PHYSICIAN    [ ] PSYCHOLOGIST

037700

PA 586    9/92

# Steven A. Kamen
# 3 Fincher Lane
# Butler, PA 16001
# 724-287-8393
## Rx List as of 6/15/06

| | | |
|---|---|---|
| Avapro | 300mg | 1 per day/am |
| Tikosyn | 250mcg | 1 every 12 hours |
| Coumidin | 7.5mg | 1 per day/pm |
| Zoloft | 150mg | once per day/am |
| Metoprolol | 50mg | 1 in am |
| | 25mg | 1 in pm |
| Sustiva | 600mg | once per day/pm |
| Truvada | | once per day/pm |
| Centrum Vitamin | | 1 per day/pm |

**DX :**  **Chronic A-Fib**
**Obstructive Sleep Apnea**
**ADHD / Depression**
**HIV +**

Commonwealth of Pennsylvania • Department of Public Welfare

**AMY L. ZANELLA**
DAP Advocate
Disability Advocacy Program

Telephone:
(724) 284-8217
724

Butler County Assistance Office
~~229 W. Diamond St., P.O. Box 1590~~
Butler, PA 16003-~~1590~~
108 Woody Dr

| CASE NUMBER | | | | | LINE NO. | PROG. STATUS CODE |
|---|---|---|---|---|---|---|
| Record Number | Cat. | GR GP | Ctr. Dig. | Dist. | | |
| 01 218 | PA | | 4 | | 01 | 04 |

| DATE OF BIRTH | SEX | *RACE/ ETHNIC GROUP | SOCIAL SECURITY NUMBER: |
|---|---|---|---|
| 7/25/57 | ☒ M ☐ F | 5 | 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 |

TELEPHONE NUMBER:
724-287-8393

FROM ▶ ☐ DAP ADVOCATE ☐ MW

CHARACTERISTICS FROM THE DISABILITY PROFILE:

☒ DAP ADVOCATE
COPIES OF DOCUMENTS RELATING TO THE FOLLOWING ARE ATTACHED:

| # SOCIAL HISTORY | # EMPLOYMENT HISTORY | # ☒ MEDICAL RECORDS | # NO SUPPORTING DOCUMENTATION AVAIL. |
|---|---|---|---|

HAS CLIENT APPLIED FOR SSI/SSD?
☐ YES  ☐ NO  ☒ UNKNOWN  IF YES - DATE ▶ Apld

IF CLIENT HAS APPLIED STATUS OF APPLICATION
☐ PENDING  ☐ DENIED - DATE ▶  ☐ UNKNOWN

PREVIOUSLY RECEIVED SSI/SSD BUT TERMINATED
☐ YES  ☐ NO  ☐ UNKNOWN  IF YES - DATE ▶

IF BENEFITS DENIED OR TERMINATED HAS CLIENT APPEALED
☐ YES  ☐ NO  ☐ UNKNOWN  IF YES - DATE ▶

IF APPEALED - STATUS
☐ PENDING  ☐ DENIED - DATE ▶  ☐ UNKNOWN

McLafferty mc _____ Signature of MW     724-234-585 _____ Telephone Number     6/6/06 _____ Date Form Completed

☒ CASE RECEIVED BY DAP ADVOCATE
SIGNATURE _____     DATE 6/6/06

## SOCIAL SECURITY ADMINISTRATION USE ONLY

CLIENT HAS APPLIED FOR SSI/SSD?
☐ YES  ☐ NO  ☐ UNKNOWN  IF YES - DATE ▶

IF YES, STATUS OF APPLICATION
☐ PENDING  ☐ DENIED - DATE ▶

PREVIOUSLY RECEIVED SSI/SSD BUT TERMINATED
☐ YES - DATE ▶  ☐ NO  SEE REASON BELOW.

IF BENEFITS DENIED OR TERMINATED HAS CLIENT APPEALED
☐ YES - DATE ▶  ☐ NO  SEE REASON BELOW.

IF APPEALED - STATUS
☐ PENDING  ☐ DENIED - DATE ▶

REASON:

_____ Signature of SSA Representative     _____ Telephone Number     _____ Date Form Completed

☐ TO TRANSMIT OTHER INFORMATION

CLIENT AGREEMENT — I agree to cooperate with staff of the Butler CAO _____ County

Assistance Office and the SSA District Office seeking Federal SSI/SSDI Benefits for Steven Ramsey

_____ Client's Signature     6/9/06 _____ Date

Social Security Administration
# Supplemental Security Income
Important Information

SOCIAL SECURITY
220 S MAIN STREET
SUITE 106
BUTLER, PA 16001
Claim Number: 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C1
June 20, 2006
DMP

STEVEN KAMEN
3 FINCHER LN
BUTLER PA 16001

Dear STEVEN

We are writing to tell you that before we can make a decision about your request for Supplemental Security Income (SSI) payments , you must file an application.

WELFARE NOTIFIED US OF YOUR INTENT TO FILE

## What To Do Next

You should get in touch with us right away because the date you file an application can make a difference in the amount of your SSI payments.

If you file the application by August 27, 2006, we will use June 9, 2006, the date of the written request, as the filing date. If you do not file, we cannot pay you any past due payments.

Call or visit any Social Security office. We will help you fill out the application for SSI payments.

Call or visit any Social Security office. We will help you fill out the application.

## What Will Happen

If you file an application, we will review the case and make a decision. If you do not agree with what we decide, you will be able to appeal the decision.

## If You Have Any Questions

We invite you to visit our web site at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local office at 724-282-7274. We can answer most questions over the phone. If you are deaf or hard of hearing, you

See Next Page

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C1                                                    Page 2 of 2

may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

> SOCIAL SECURITY
> SUITE 106
> 220 S MAIN STREET
> BUTLER PA 16001

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

*George Ziecina*

George Ziecina
Field Office Manager

**JOSEPH H. CHIVERS**
*ATTORNEY-AT-LAW*
*SUITE 600*
*312 BOULEVARD OF THE ALLIES*
*PITTSBURGH, PA 15222-1923*
*(412) 281-1110*
*FAX (412) 281-8481*

July 8, 2005

Dr. John Rocchi
480 East Jefferson Street
Butler, PA 16001

          Re:  **Steven A. Kamen- S.S.N.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;**
               **Request for Medical Records**

Dear Records Officer:

     Enclosed please find a medical record release authorization
signed by Mr. Kamen.  Please forward a copy of his file to the
above address at your earliest convenience.  Also, please bill
for the cost at the above address.  If pre-payment is required,
please call so that immediate payment can be made.  Otherwise, I
will forward the amount upon receipt of the file.

     Thank you for your cooperation.

                              Yours very truly,



                              Joseph H. Chivers, Esquire


Enclosure

cc:  Steven A. Kamen

## AUTHORIZATION TO RELEASE MEDICAL INFORMATION

Patient Name: _Steven A. Kamen_    Date of Birth _7/28/57_

To:  _Dr. John Rocchi_

_480 East Jefferson St._

_Butler, PA 16001_

_____

I have been a patient at _Dr. Rocchi's office_    I understand that the facility has legally protected health information about me or the person I represent. I understand that signing or not signing this form will not affect treatment I receive in any way.

I, _Steven Kamen_ hereby authorize the medical records department to release to:

**Joseph H. Chivers, Esquire**
**Suite 600•312 Boulevard of the Allies**
**Pittsburgh, PA 15222-1923**
**(412) 227-0763**

The following information or copies of:
___ Discharge Summary
___ Progress Notes                ___ Operative Reports                ___ Consultation
_X_ Emergency Department      ___ Radiology (x-ray,CT,MRI,etc.)      ___ Lab Results
                                              ___ Outpatient/Clinic
_X_ The above information and/or the entire clinical record including HIV-related information.
___ The above information and/or the entire clinical record including mental health, drug or alcohol treatment.
___ Billing records
___ Other (specify)_____

Reason for request:  LEGAL

This authorization will expire in six months or:_____
I understand that this authorization is subject to revocation at any time. A photocopy or facsimile of this authorization will be considered valid unless otherwise specified. I also understand and agree that this authorization will terminate as set forth above unless I revoke this authorization in writing. I understand that recipients may redisclose information that I have authorized them to receive.

Date: _7/8/05_                      Signature: _____

                                        Client Name:  _Steven A. Kamen_

                                        Address: _605 Slippery Rock Road_

                                        _Slippery Rock, PA 16057_

                                        _____

                        Social Security No. _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_

BUTLER MEMORIAL HOSPITAL
911 East Brady St.
Butler, PA  16001
RESPIRATORY CARE SERVICES

PULMONARY FUNCTION LABORATORY REPORT

KAMEN,STEVEN A

| | | | |
|---|---|---|---|
| LOC: OAS | ACCT#: 26115188 | UNIT#: 323518 | ADM/REG:08/13/98 |
| ATTENDING: ROCCHI, JOHN | DOB: 07/28/57 | AGE: 41 | SEX: M |
| | REG REF   FAMILY: MAHMOOD, ARSHAD | | |
| | | ADMITTING: | |

Interpretation:  The FVC and the FEV1 are both normal. The FEV1/FVC ratio is mildly
reduced. The total lung capacity is normal. The diffusion capacity is
very slightly reduced. The configuration of the flow volume loop is not
distinctive.

Impression:  The reduced FEV1/FVC ratio may represent very mild airflow obstruction
especially if interpreted in the light of the patient's history of
cigarette smoking and the reduced diffusion capacity that would be
suggestive of emphysema. Alternatively this could be a normal variant.
There is no restrictive defect.

ACEF        :LMG
DICT DATE: 08/13/98                        Physician Signature
TRANS DATE: 08/14/98
                                                    ACEVEDO, FREDERIC A

Additional copy

Page 1 of 1



KAMEN, STEVE                           JOHN R. ROCCHI, M.D.
12/17/2001

SUBJECTIVE:  He comes in with sinus congestion, runny nose for the last 10 weeks or
so, especially in the mornings.  No real cough.  It is mainly up in his head.

OBJECTIVE:  On exam his TMs are clear.  His nasal turbinates are pale blue and
swollen.  He has clear rhinorrhea.  His throat has mild erythema.  Lungs are clear.  Heart:
Regular rate and rhythm.  Abdomen:  Soft, positive bowel sounds.  Extremities without
edema.

IMPRESSION:  Allergic rhinitis.  We will treat Astelin nasal spray, two sprays b.i.d.  We
will set him up with an allergist for further evaluation since he has had a history of
allergies in the past and has required shots in the past.

JRR:ksw
T:01/23/2002

KAMEN, STEVE     7/28/57     JOHN R. ROCCHI, M.D.
2/13/2002

SUBJECTIVE:   He comes in with cough and congestion, coughing up yellow to dark green sputum.  Chest feels a little tight.

OBJECTIVE:  TM's clear.  Throat has mild erythema.  Lungs have some faint rhonchi in the bases.  Heart is regular rate and rhythm.  Abdomen soft.   Chest x-ray does not reveal any obvious pneumonia.

IMPRESSION:
1. Bronchitis.  Treat with Levaquin 500 mg a day for 10 days and Durituss G 1 b.i.d.  See him back if no improvement, sooner if needed.

JRR:ksw
T: 5/09/2002

**OFFICE VISITS**

| NAME | Steven Kamen | MARITAL STATUS S M W D SEP | DATE OF BIRTH | 7/28/57 | **Formedic** |
| ADDRESS | | | PHONE (H) | (O) | |
| OCCUPATION / EMPLOYER | | REFERRED BY | | | |

| MEDICATIONS | INSURANCE |
| | DRUG ALLERGIES |

| DATE DIAGNOSIS CPT CODE | HISTORY & PHYSICAL | HT | WT | BMI | BP | P | T |
|---|---|---|---|---|---|---|---|
| 7-5-02 | WT: 289# Cough x 100. | | | | | | |
| 9-5-02 | Wt 264# Hiccups for 3 days | | | | | | |
| 10/8/02 | DBH | | | | | | |
| left | lower back pain - | | | | | | |
| 10-8-02 | Fluzone 0.5 ml IM LA | | | | | | |



| 10-21-02 | Wt ... Still has itchy rash - no change - |

Avandia® rosiglitazone maleate

KAMEN, STEVE            7/28/1957            JOHN R. ROCCHI, M.D. JRR
5/16/2002

SUBJECTIVE: He comes in he has had hiccups for the past couple of days off and on since he ate Chinese food. He has felt a little bit nauseated but no chest pain or shortness of breath. He otherwise feels very well and has felt well recently. He is under some stress.

OBJECTIVE: On exam BP: see nurse note. Lungs: Clear. Heart: RRR. Abdomen: Soft, positive bowel sounds. Extremities: No C-C-E. He has some mild upper gastric tenderness. EKG: Normal sinus rhythm. No acute changes.

IMPRESSION: 1) Hiccups: We'll try him on some Nexium if this does not help consider reglan. 2) History of Heart disease: We'll check a CMP on him and lipid panel. He is to call me tomorrow if he is not improving.

JRR:mrb
T:5/23/2002

KAMEN, STEVEN      7/28/1957      JOHN R. ROCCHI, M.D.  
7/5/2002

SUBJECTIVE: He comes in for follow up he has had a cough for the past 10 days which is dry. There's no real fevers and he denies chest pain.

OBJECTIVE: BP: 110/70. Lungs: Have some faint crackles in the right base. Heart: RRR. Abdomen: Soft, positive bowel sounds. Extremities: No C-C-E.

IMPRESSION: 1) Right Lower Lobe Pneumonia: Will treat with Levequin 500mg a day for 10 days an Robitussin AC 2 tsp q6h for cough will see back if no improvement.

JRR:mrb
D:7/5/2002
T:7/8/2002

KAMEN, STEVE                7/28/1957        JOHN R. ROCCHI, M.D.  JR
10/21/2002

SUBJECTIVE: He comes in for follow up he has had a rash on his arms which has now progressed to his legs and his chest and his abdomen.

OBJECTIVE: He has a lot of raised papulas in all of these areas especially around his waist. He has had this for about 2 months and has tried a Medrol Dose-Pak and has not gotten any better.

IMPRESSION: 1) I suspect that looking at the rash today he has scabies. I discussed local control of scabies with washing everything in hot water and bagging everything for 2 weeks that can not be washed. Will treat him with Elemite Cream apply for 8 to 14 hours and then wash off as well as some Atarax. Will see him back if no improvement.

JRR:mrb
D:10/21/2002
T:10/22/2002

4-8-08 WT: 307# 6mo. ✓up c/o His weight
136/84.    P6B

KAMEN,STEVEN    DOB  07/28/1957    Dr. Rocchi/jgr        11/24/2002

Chief Complaint: he comes in for follow up. He has been itchy, mainly his back is itchy and somewhat on his chest as well. He really has not changed anything recently. Has not changed any medications in the past year. He has not really had a rash at all. He is otherwise feeling fine.

Physical Exam:

Vital Signs: blood pressure as noted in nurse's notes. Pulse 60 and regular.

Abdomen: soft, positive bowel sounds.

Lungs: clear bilaterally.

Heart: regular rate and rhythm.

Back: no obvious rash. He does have some red areas which appear to be traumatic from itching.

Impression
1. Itch, cause unclear. I don't think this is due to his medications. Try Zyrtec 10mg per day to see if this will help, if not he will follow up.
2. Coronary artery disease. History of atrial fibrillation. Continue current medication. Check an INR, lipid panel and CMP.

2/13/02  cough — chest tight  X/wk.        brown/green sputum.
         to  Clinic

Butler Memorial Hospital
911 East Brady Street                                    PAGE 1
Butler, PA  16001            **Final Physician Report**
(724)284-4500                    RUN FOR: 04/14/03          PRINTED: 04/14/03-1530
                             For Doctor: ROCCHI,JOHN              *

| | | | |
|---|---|---|---|
| **Name:** KAMEN,STEVEN A | | **Age/Sex:** 45/M | **Attend:** KHAN,MOHAMMED A.R. |
| **Acct:** 3937960? | **Unit:** 323518 | **DOB:** 07/28/57 | **PCP/Fam:** ROCCHI,JOHN |
| **Reg:** 04/14/03 | **Disch:** | **SSN:** 073465275 | **Status:** REG REF    **Loc:** OAS |
| **Patient's Home Phone:** (724)283-7644 | | | |

**Spec:** 0414:H00136U     **ll:** 04/14/03-0716    **Rcv:** 04/14/03-0716    **Status:** COMP    **Req#:** 02035231

**Ordered:**   PT, PTT                                                    **Ord Dr:** KHAMA
**Comments:** FAX TO 282-7701   CALL 282-6100
              FAXED 4-14 0930 WB

| Test | Result | Flag | Reference |
|---|---|---|---|
| _PT_ | | | |
| >   PT TEST | 11.6 | | 9.0-13.0 SEC. |
| >   INR | 1.1 | | |
| | _INR THERAPEUTIC RANGE: 2.0 - 3.0 (TO MONITOR WARFARIN)_ | | |
| | _EXCEPTIONS:_ | | |
| | _1. PREVENTION OF SYSTEMIC EMBOLISM WITH MECHANICAL HEART_ | | |
| | _VALVE          THERAPEUTIC RANGE: 2.5 - 3.5_ | | |
| | _2. TREATMENT OF POST-MYOCARDIAL INFARCTION/REDUCTION OF_ | | |
| | _RECURRENCE.     THERAPEUTIC RANGE: 2.5 - 3.5_ | | |
| _PTT_ | | | |
| >   PTT TEST | 37.6 | H | 20.0-35.0 SEC. |

P Jr

did PI stop
commatin ?

H-High    L-Low    #-Delta    **Final Physician Report**    *-Critical    **-Abnormal

4-15-03 3²⁰ Lmom rc

Butler Memorial Hospital
911 East Brady Street
Butler, PA 16001
(724)284-4500

# Final Physician Report

PAGE 1

RUN FOR: 04/09/03

PRINTED: 04/09/03-1530

For Doctor: ROCCHI,JOHN                *

---

Name: KAMEN,STEVEN A
Acct: 39329859    Unit: 323518
Reg: 04/08/03    Disch:
Patient's Home Phone: (724)283-7644

Age/Sex: 45/M
DOB: 07/28/57
SSN: 073465275

Attend: ROCCHI,JOHN
PCP/Fam: ROCCHI,JOHN
Status: REG REF    Loc: OASX

---

Spec: 0408:C00307R    ll: 04/08/03-1003    Rcv: 04/08/03-1140    Status: COMP    Req#: 02029677

Ordered: LIPID PROFILE, COMP METABOL, CPK, T4, TSH, HEPATITIS PROF.

Ord Dr: ROCJ

| Test | Result | Flag | Reference |
|------|--------|------|-----------|
| COMP METABOL | | | |
| > GLUCOSE | 94 | | 70-110 MG/DL |
| > BUN | 13 | | 7-22 MG/DL |
| CREATININE | 1.1 | | 0.5-1.3 MG/DL |
| > BUN/CREAT | 11.8 | | 8-27 |
| SODIUM | 144 | | 136-147 MM/L |
| K. SERUM | 4.3 | | 3.6-5.3 MM/L |
| CHLORIDE | 109 | | 98-110 MM/L |
| CO2 CONTENT | 28 | | 22-34 MM/L |
| CALC OSMOL | 287 | | 269-297 mOSM/KG |
| > CALCIUM | 8.5 | | |
| > T BILI | 0.6 | L | 8.7-10.7 MG/DL |
| ALK PHOS | 89 | | 0.1-1.2 MG/DL |
| SGPT (ALT) | 21 | | 30-128 U/L |
| > SGOT (AST) | 18 | | 5-47 U/L |
| > CPK | 122 | | 5-40 U/L |
| > TOTAL PROTEIN | 6.7 | | 60-225 U/L |
| ALBUMIN | 4.6 | | 6.0-8.4 G/DL |
| > GLOBULIN | 2.1 | | 3.5-5.3 G/DL |
| A/G RATIO | 2.2 | | 1.8-4.2 G/DL |
| > CHOLESTEROL | 138 | | 1.0-2.5 |
| | | | - MG/DL |

| | ADULT | 2-19 YEARS | |
|---|-------|------------|---|
| DESIRABLE | < 200 | < 170 MG/DL | |
| BORDERLINE | 200-240 | 170-185 MG/DL | |
| HIGH | > 240 | > 185 MG/DL | |
| > TRIGLYCERIDES | 197 | | 40-200 MG/DL |
| > HDL CHOLESTEROL | 23 | | MG/DL |
| CORONARY RISK INCREASED | | | |
| MALE | < 45 MG/DL | | |
| FEMALE | < 55 MG/DL | | |
| > CHOL/HDL RATIO | 6.0 | | |
| CORONARY RISK INCREASED | | | |
| MALE | > 4.5 | | |
| FEMALE | > 4.0 | | |
| > LDL CHOL CALC | 76 | | 0-130 MG/DL |
| > T4 | 6.0 | | 4.5-12.0 uG/DL |
| > TSH | 1.0 | | 0.5-7.0 uIU/ML |

---

H-High    L-Low    #-Delta    Final Physician Report    *-Critical    **-Abnormal

**PROGRESS NOTES**

| NAME | DATE OF BIRTH | PG# | **Formedic** |
|---|---|---|---|

KAMEN, STEVEN          9-5-97          DR. ROCCHI/vrp

Comes in as a new patient. He is a f/u after an MVA. He had a car accident on Tuesday. He thinks he fell asleep at the wheel. It happened around noon. He was seen in the E.R.     because of some neck pain, as well as low back pain. X-rays at that time revealed normal L forearm. There is some mild interstitial prominence in both lungs; however, no evidence of broken ribs, etc.

**PMH:**  Significant for sinusitis and hay fever, as well as, a Hx of borderline HTN. He notes that he snores loudly at night; his wife confirms this. She also notes that intermittently he will stop breathing for short periods of time. He notes that he has been more tired over the past 6-7 months. He has had 2 other car accidents in the past where he thinks he has also fallen asleep.

**MEDICATIONS:**  Darvocet for his back.

**PE:**  He has a similar car accident in the late 1980's. He sustained multiple broken ribs, lung contusions, bilateral pneumothoraces.

**ALLERGIC TO PENICILLIN AND SULFA.**

**FAMILY HX:**  Positive for MI in his father at age 58, heart disease, diabetes, arthritis and strokes.

**SOCIAL HX:**  He is married with 4 children. He smokes 1½ packs cigarettes q.d. for the past 20 yrs. He drinks several cups of coffee per day.

**PE:**  On exam today his BP is 140/102. Generally, he is a well appearing, well nourished white male in no apparent distress.

**EYES:**  PERRL. EOMI.

**NECK:**  W/o adenopathy or JVD.

**LUNGS:**  Clear to A&P bilaterally.

**HEART:**  Irregular rate and rhythm. Heart rate is about 90-100. No murmurs, rubs or gallops.

**ABDOMEN:**  Soft. Nondistended. NABS.

**EXTREMITIES:**  W/o edema.

**BACK:**  There is mild tenderness to palpation over the L lumbar spine.

**IMPRESSION:**  1. S/P MVA with lower back strain. The patient does have a Hx of mild disc protrusion in the Lumbar spine, evidenced of a previous MRI.

**PLAN:**  Continue treatment with Darvocet for the time being and see if this clears up. I think this is most likely back strain, however, if it is not, will obtain another MRI.

**EKG:**  He appears to be in A fib/flutter. I discussed this with Dr. Mahmood. He feels it is his rate if well controlled at 90-100. He could be started on Aspirin. He is to be seen by Dr. Mahmood on Monday for an ECHO and a stress test. Dr. Mahmood will f/u with him on Wednesday. I will f/u with him in the office next W. I instructed him to take an aspirin a day. If he develops any kind problems over the weekend, he is to get in touch with us.

4

| DATE - TIME WT / BSA CPT CODE | | |
|---|---|---|

Formedic

9-5-97  307# Bp 140/102  mva) Tuesday Treated Bmh.

pain neck, back, arms.  Pt at Providence 1960 Schumacher

Dr. Mahmood    fl(u)/12/97/15    Cardiolite stress test → 9-8-97
9-16-97                                                        8:00
1:15                                          Echo → 9-8-97
                                                              8:30



**STADOL NS**
(butorphanol tartrate) Nasal Spray

RAPID MIGRAINE PAIN RELIEF..
One spray away!

one spray
one nostril
one mg

\* Onset of analgesia is within 15 minutes. If adequate pain relief is not achieved within 60-90 minutes, an additional 1 mg dose (one spray in one nostril) may be given.
Please see enclosed full prescribing information.

◆ Bristol-Myers Squibb Company    Cephalon®
West Chester, PA 19380-0645
U.S.A.

©1996, Bristol-Myers Squibb Company, Princeton, NJ 08543    Issued December 1996    ◆ Printed on recyclable paper

FAMILY PRACTICE          PROGRESS NOTES

NAME _Steve Kamen_____ SS# _____ PAGE # ___

ADDRESS _____

NE (HOME)_____ (WORK)_____ DATE OF BIRTH _____

DRUG ALLERGIES _____

| DATE | NOTES |
|---|---|
| 9-18-97 293 BP 110/70 f/u-visit | |

KAMEN, STEVE        9-18-97            DR. ROCCHI/vrp

Comes in for f/u. He recently was discharge from Mercy Hospital. He was
found to have cardiomyopathy, thought to be viral in origin. He is currently
on Imdur, Capoten 6.25 mg t.i.d., _____ 80 mg b.i.d. and Coumadin 10 mg
q.d. He notes he is tired all the time. This has not changed over the past
several months. He also is found to have sleep apnea. He is on a Bipap
machine at home. He is having some difficulty tolerating this.
BP 110/70.
LUNGS:              Clear.
HEART:              Irregularly regular. He is in A/F.
ABDOMEN:            Soft.
EXTREMITIES:        W/o edema.

IMPRESSION:     1. Cardiomyopathy.
                2. Atrial fib.
PLAN:              See Dr. Mahmood in approx 1 W.
                   He is also having his INR followed by Dr. Mahmood.
                   He is going to have an electrocardioversion in October
        in attempt to put him back into sinus rhythm.
                   He will follow up with me after this.

10/6/97 DSL#
       Flup
       BP 100/60                                              mimi

KAMEN, STEPHEN        10-6-96

Comes in with increased difficulty breathing and congestion. Denies any
CP. He feels more fatigued than usual.
LUNGS:              Clear to A&P.
HEART:              Irregular. No JVD.
CXR:               No evidence of failure.
EXTREMITIES:       W/o evidence of edema.
His daughter did have atypical URI, pneumonia-type illness about 1 W
ago.
PLAN;            Doxi to cover atypicals.
Return after his cardioversion next W.

                                        Dr. Koffman→ 11-04-97
                                                     3:00

10.16.97 form for travelers completed & mailed—copy

10-22-97 286#
         dry cough, sore throat                                mimi

10-22-97 — pt given copies of records to take to
         Dr. Haas at Cleveland Clinic. (SW)

**NOTES**

KAMEEN, STEVE        10-22-97        DR. ROCCHI/vrp

Comes in with very sore irritated throat for the past 2 days. No
significant cough or SOB.
EARS:
THROAT:              TM clear.
                     Very erythematous throat and palate.
NECK:
LUNGS:               Shoddy ANT cervical adenopathy.
HEART:               Clear.
                     Irregular.
IMPRESSION:          Tonsillitis.
PLAN:                Treat with Cefzil. In addition, he has been more
depressed since the onset of all his medical problems.
                     Refer him to Dr. Foster for evaluation.
                     He is interested in a flu shot, but wants to wait
                     until he is over his sore throat.
                     have him come back in a W or so for this.

12-17-97 @ 1115 Am  Wife Reports Tmp 100.6° C Mild  + Sore Throat Cough
        Cephalgia                                    Appt 1⁰⁰  12-17-97 @ /JRR

12-17-97    287#    98.0    See above message                        ___ 65

KAMEN, STEVEN       12-17-97        DR. ROCCHI/vrp

Comes in for eval of sore throat and a cough, achiness, temp of 100.6
today. He has been clear surgically in the past.
EARS:                TMs clear bilaterally
THROAT:              Erythematous.
NECK:                Mild adenopathy.
LUNGS:               Clear.
HEART:               Regular.

IMPRESSION:          TOnsillitis.
PLAN:                Treat with Cefzil for this. Give Robitussin AC for his
cough.

1-26-98 Dr Dlemos re removal q cysts from neck 2-13-98  9:30  ___ 28


4-29-98 264 BP 118/60 pain (L) foot went to ER no fx gave
indocin swelling + pain went away now back ___



**Precose**
(acarbose tablets)™     50 mg, 100 mg

**NIDDM management
from the first bite.**

Please see accompanying Prescribing Information.

Bayer
Pharmaceutical
Division

© January 1996 Bayer Corporation
All Rights Reserved.
Printed in USA. A09365

BUTLER MEMORIAL HOSPITAL
911 East Brady St.
Butler, PA  16001
DEPARTMENT OF CARDIOLOGY

## ECHOCARDIOGRAM REPORT

KAMEN,STEVEN A                ACCT#: 25690025      UNIT#: 323518

LOC: OAS            REG REF    DOB: 07/28/57      AGE: 40        SEX: M
PROCEDURE: ECHOCARD DOPPLER          ADM/REG: 06/06/98    SERV: 06/06/98
ATTENDING: MAHMOOD, ARSHAD           *
ORD DR: MAHMOOD, ARSHAD              *                              *

MEASUREMENTS:                              NORMAL VALUES (ADULT):

| | | |
|---|---|---|
| MITRAL VALVE SLOPE | 87 | 80-150 MM/SEC. |
| MITRAL VALVE EXCURSION | 24 | OVER 20 MM |
| LEFT ATRIAL SIZE | 3.9 | 1.9 - 3.8 CM |
| AORTIC ROOT DIAMETER | 3.2 | 2 - 3.7 CM |
| AORTIC VALVE DIMENSION | 2.5 | 2.6 - 2.6 CM |
| IV SEPTUM THICKNESS | 0.8 | 0.7 - 1.2 CM |
| POSTERIOR LV WALL THICKNESS | 1.1 | 0.7 - 1.2 CM |
| RV END DIASTOLIC DIMENSION | --- | 1 - 2.6 CM (LL) |

LEFT VENTRICULAR INTERNAL DIMENSIONS:

| | | |
|---|---|---|
| END DIASTOLE | 6.4 | 3.5 - 5.5 CM |
| END SYSTOLE | 4.7 | 2.5 - 4.0 CM |
| END DIASTOLIC VOLUME | --- | |
| END SYSTOLIC VOLUME | --- | |
| STROKE VOLUME | --- | |
| EJECTION FRACTION | 50% | |

INTERPRETATION

LEFT ATRIUM - Left atrium is normal in internal dimension.  No clot is seen.
MITRAL VALVE - Mitral valve cusps are thin walled and pliable.  They display
normal motion.  Doppler across the mitral valve demonstrates trivial mitral
regurgitation.
LEFT VENTRICLE - Left ventricle is mildly dilated.  The interventricular septal
wall and posterior wall are normal in thickness.  There is mild global
hypokinesia with overall ejection fraction 50%.
AORTIC ROOT - Aortic root is normal in internal dimension.  Aortic cusps are
thin walled and pliable.  They display normal motion.  Doppler across the aortic
valve is unremarkable.
RIGHT HEART STRUCTURES:  Right heart structures are within normal limits.  There
is mild tricuspid regurgitation.

IMPRESSION:

1.   Dilated left ventricle with mild global hypokinesia.
2.   Ejection fraction 50%.

Additional copy

BUTLER MEMORIAL HOSPITAL
911 East Brady St.
Butler, PA 16001
DEPARTMENT OF CARDIOLOGY

ECHOCARDIOGRAM REPORT

KAMEN, STEVEN A                    ACCT#: 25690025      UNIT#: 323518
                                   DOB: 07/28/57        AGE: 40
LOC: OAS                  REG REF  ADM/REG: 06/06/98    SERV: 06/06/98    SEX: M
PROCEDURE: ECHOCARD DOPPLER
ATTENDING: MAHMOOD, ARSHAD              *    FAMILY: ROCCHI, JOHN              *
ORD DR: MAHMOOD, ARSHAD            *

CC:   RAD-2
      ROCCHI

ROSR      :SW                 Physician Signature_____
DICT DATE: 06/07/98.                         ROSENBLOOM, RICHARD
TRANS DATE: 06/08/98

Additional copy                              Page 2 of 2

NOTES

-23-98  290#    Sinus Cong. HA c/wx. - USNy
Tylcnol Sinus - no improvement - CSR

**KAMEN, STEVE**  DOB: 7-28-57    11-23-98    DR. ROCCHI/vrp    gh

Comes in for eval of nasal congestion, frontal headaches, maxillary sinus tenderness for the past W. Over-the-counter things are not helping.

PE: On exam TM's are clear. Nasal turbinates are red and swollen. There is L sided maxillary sinus tenderness.
LUNGS: Clear.
HEART: Regular.

IMPRESSION: Sinusitis

PLAN: Treat with Cefzil 500 mg b.i.d. for the first two days, then 250 mg b.i.d. for a total of 10 days. Also have him Nasarel nasal spray 2 puffs b.i.d. for the first 3-4 days, then once a day. F/u if no improvement.

12/14/98  284#
F/UP, no better

12-16-98  Dr Balouris today for visual field defect of ☉
eye -- Pt leaving office per appt - MRI of
head c̄ δ contrast T visual field defect c̄ HA at
BMH on 12-16-98  at 1130 ──── cm
12-16-98  Pts. WIFE NOTIFIED MRI NL ☺

12-22-98 -- Dr. Welker Re "chronic sinus problem" 12-30-98 at 3:30pm -c

**KAMEN, STEVE**  DOB: 7-28-57  12-16-98    DR. ROCCHI/vrp

Comes in with L sided headache and complaints of decreased vision out of his L eye laterally mainly. He has had this for about 3 W. He was being treated for a sinus infection, congestion and sinus pain and pressure on the L side; however, he has since developed decreased vision in this eye.

E: On exam the PERRL. ROMI. TM's clear. No facial asymetry.
Throat has mild erythema.
LUNGS: Clear.
HEART: Regular.                          gr
ABDOMEN: Soft. There are 2+ knee and ankle jerks, as well as 2+ biceps and triceps. Good strength in the upper and lower extremities. No focal neuro deficits.

IMPRESSION: Possible visual field defect.

PLAN: Have him see Dr. Balouris today for further eval of this.
He an MRI to r/o any kind of stroke causing this visual field defect.
F/u after this.

4-99

PROGRESS NOTES

Name _____
Address _____    SS# _____    PAGE # ____
PHONE (HOME) _____    (WORK) _____    DATE OF BIRTH _____
DRUG ALLERGIES _____

| DATE | NOTES |

**KAMEN, STEVE**        4-23-98        DR. ROCCHI/vrp

Comes in with a sore L foot; it seems to be over the midfoot. On exam there is no significant erythema. There is tenderness there.   X-ray does not reveal any fracture.
IMPRESSION:        Arthritis vs stress fracture vs gout.
PLAN:        Start him on Relafen. If he does not improve, I will have him see Dr. Hootman for further eval.

10-6-98  Cancel R18 AmF
10-7-98  286  BP 126/82  V.P
10-7-98  Flu c̄ Dr. Mahmood on 10-9-98 @ 2:00 for CP AmF —
10/9/98  Flu inj Comox 098331C  0.5cc —

---

**KAMEN, STEVEN**        10-7-98        DR. ROCCHI/vrp

Comes in for f/u. He has been feeling more tired than usual. He also had an episode of CP approx 1 W ago which lasted to about 20 min. This resolved with rest. He has been feeling more tired since being taken off his medicines for his heart.

PE: On exam the lungs are clear. Heart regular, w/o murmur. Abdomen soft. EKG reveals normal sinus rhythm with a rate of about 70's. He does not have any acute ischemic changes present. Because he is on Amiodarone will repeat a CXR. Will also repeat a thyroid panel. F/u with Dr. Mahmood to see about altering his medicines any. F/u with him after he sees Dr. Mahmood.

10-15-98  BP 124/70  P/U

---

**KAMEN, STEVEN**        10-15-98        DR. ROCCHI/vrp

In today for f/u. His stress test is about the same as last yrs. We discussed his cholesterol and will most like put him on medication for this. I will discuss all this with Dr. Mahmood. In addition, he has had a chronic dry cough, probably due to his Zestril. Discussed switching him over to angiotensin receptor blocker. I will be in touch with him by phone.

Medipine EXTENDED TABLETS    30 mg    60 mg    90 mg    Pharmaceutical Division    Please see accompanying Prescribing Information    XO9147 BAYADCP0128

OFFICE VISITS

NAME _Steven Kamen_    DATE OF BIRTH _____ NA

ADDRESS _____

ONE (HOME) _____ (WORK) _____ MEDICATIONS _____

DRUG ALLERGIES

| DATE | NOTES | HT | WT | BP | P | T |
|---|---|---|---|---|---|---|
| 9-15-99 | Wt. 281# ↑ BP 108/78 | | | | | KC |

9-17-98 Dr Grimes St Clare office 9.22.98 @ 2:00 re hyperthyroidism
Copy g 9-15-99 B/W faxed to Dr Grimes
9-17-98 BmH US g thyroid 9-20-98 @ 2:45

**KAMEN, STEVE**  9-15-99  DR. ROCCHI/vrp

In today for f/u. He has had diarrhea, Wt loss, anxiousness, sweats, dry
mouth, increased polyuria, polydypsia. Mother and father both had
diabetes. His sister had her thyroid removed for some reason.

PE: BP stable.
HEENT unremarkable.
LUNGS: Clear.
HEART: Regular.
ABDOMEN: Soft. Nondistended. NABS. No masses noted.
Urinalysis neg.

IMPRESSION: Possible diabetes vs thyroid disease, less likely something
like the chromocytoma or carcinoid. Check a thyroid panel, MP, CBC. F/u
after this.

9-28-99 Wt. 273 BP 114/68  2 wk f/u, not feeling
well yet, still tired, sweat & chilled

9/28/99 Appt E D. Yost on Oct 1st at 3:00 dx: lesion on
upper mouth

**KAMEN, STEVEN**  9-28-99  DR ROCCHI/ds

Comes in for f/u, still very sweaty, nervous and aggitated at
times. Dr Grimes placed him on Capizole for this. PE shows BP
stable. Lungs clear. Heart regular. Abd soft. Discussed his
case with Dr Grimes, to see if he could recommend anything
further. He has not any rashes, fevers. There is a slight
reaction with
See him back as usual. Continue his current meds.

Make it your goal standard **LIPITOR**
atorvastatin calcium

Please see brief summary of prescribing information.    TAKING CHOLESTEROL TO NEW LOWS

PARKE-DAVIS    © 1998 Warner-Lambert Company    PD-166-NJ-0231-A1(018)
810026    Pfizer

OFFICE VISITS

NAME _Steve Kamen_          DATE OF BIRTH _7-28-57_

ADDRESS _____

PHONE (HOME) _____ (WORK) _____    MEDICATIONS _____

DRUG ALLERGIES _____

| DATE | NOTES | HT | WT | BP | P | T |
|------|-------|----|----|----|----|----|
| 7-1-99 | Wt. 244" BP 98/58  L 100/68 | | | BP ✓, no problems today | fu | |

---

**KAMEN, STEVE**    7-1-99    DR. ROCCHI/vrp

Comes in for eval. He has been very sluggish and tired recently. He is on Lopressor 300 mg q.d. for HA. He also notes he has been depressed and his temper has been a problem.

PE: BP today is 100/68.
LUNGS: Clear
HEART: Regular. About 60/min.
ABDOMEN: Soft.

IMPRESSION: CAD and HTN.
PLAN: Continue his Avapro, but drop his Lopressor to 100 mg b.i.d.

    2. Hypercholesterolemia. He was started on Lipitor, but has not has his lipids checked recently.
PLAN: Get a lipid panel, AST-ALT, CPK.

    3. Depression.
PLAN: Start him on Zoloft 25 mg q.d. Increase to 50 mg q.d. in one W.

    4. F/u in 1 mo.

---

**KAMEN, STEVE**    DOB: 7-28-57    8-6-99    DR. ROCCHI/vpr

Comes in for eval of several swollen lumps under each arm pit; he has had this off-and-on for most of the summer. They get sore at times and get more swollen then get less swollen. Denies any fevers or night sweats.

PE: There are several firm nodules, indurated areas on the axillary regions. They appear to be in the subcutaneous tissue, not deep into the axilla. They are freely mobile. They are tender. There is no surface erythema.

IMPRESSION: Probable folliculitis.
Instructed him not to use deodorant, but to use warm compresses three to four times a day.

PLAN: Treat with Cefzil 500 mg b.i.d. x 10 days.
    F/u if these do not improve. He may need further eval and biopsy if they do not improve.

ase see brief summary of prescribing information.

**ARKE-DAVIS**    © 1998 Warner-Lambert Company    PD-166-NJ-0231-A1(018)  810026

TAKING CHOLESTEROL TO NEW LOWS

# INTERNAL MEDICINE — PROGRESS NOTES

NAME *Steven Kamen*

SS# _____  PAGE # _____

ADDRESS _____

ONE (HOME) _____  (WORK) _____  DATE OF BIRTH _____

DRUG ALLERGIES _____

| DATE | NOTES |
|---|---|
| 9-15-00 | Pt. sees Dr. Mahmoud, is requesting Coumadin |
| 9/26/00 | send letter to pt reg him to call our office Re 9/15 labs — we've attempted to call 9/19, 9/20, 9/21, 9/22 & 9/26 — *Dr* |
| 9/29/00 | Notified of BW — re- dig level   CB |
| 10-11-00 | Wt. 284 B/P 110/60 Coughing Congested. Nasal Congestion P-80 R-20 Afebrile. Nasal Drain Gr/Yellow. — ls |
| 10-23-00 | Wt. 280° Still Coughing, wheezing, Congestion in chest + sinus, sore throat all over, no fever, started Oct 10, is A-A |
| 10/28/00 | Rx's are ✓ PT 1 WK Notified pts wife of 10/26 labs — Cont. same *Dr* |
| 11/2/00 | Spoke to pt told stool culture — (−) Dr. will speak to Finchi on where to go from here because diarrhea better but still bad — M.E. |
| 11/3/00 | Dr. Walula's office— Appt ✕ Wed 11-29-00 @ 1:15   ls |
| -/3/00 | Pt. notified of Lab results. — ls |
| 11-16-00 | ok to have dental work ⅴ day pre pc. R |

---

KAMEN, STEVEN        10-11-00        DR.ROCCHI/ril 9/11

Comes in for f/u. He has a cough & congestion, having some mild wheezing. On exam, lungs have some faint wheeze in the bases. Heart RRR. Abd soft.

IMP: Bronchitis. Treat with Cefzil 500 bid for 10 days & Robitussin AC 1-2 tsp q6h prn. See him back if no improvement.

---

KAMEN, STEVEN        10-23-00        DR.ROCCHI/ril 9/11

Comes in with cough & congestion for the last couple of wks. He was on Cefzil & did not get better. Since then he has had cardioversion at the Cleveland Clinic. Continues to have a cough, coughing up some brownish sputum. On exam, lungs have some faint rhonchi in the bases, otherwise are clear. Heart RRR now. His x-ray does not reveal any obvious pneumonia.

IMP: Bronchitis. Will have to check with his cardiologist to see what we can give him because of his new medication. Will be in touch with him by phone.



Published study results demonstrated:[4]

**DURATION OF ACTION INCREASED WITH DOSE OF ADDERALL**[5]

ADDERALL®

Shire Richwood Inc.

✓Shire

Kamalesh Sakaran, MD

| DATE | NOTES |
|------|-------|
| 12/18/00 | Flu vaccine L Deltoid — |
| 1/2/01 | Appts Dr. Demos on Jan 25th at 9:45 dx: mole change — S |
| 1-01 | Spoke c̄ pt to advise Coumadin ↓ from 5mg /7.5mgalt to 5mg/5mg/7.5mg alt Q3days, pt states Dr. Mahmood called & ↓ to 5mg QD — advised to have one d. |
| 1/19/01 | do Coumadin ↓ Wt. 300 B/P 118/80 Possible Bronchitis, Productive Cough 4/6r c̄ Brown Mucous — Wheezing — |

---

**KAMEN, STEVEN       1-19-01       DR. ROCCHI/ril**
Comes in with cough & congestion, coughing up yellow sputum, wheezing a little bit. On exam, TM's are clear. Throat has mild erythema. Lungs have some faint, expiratory wheezes in the bases. Heart regular, rate & rhythm. Abdomen soft.

— **IMP:** Bronchitis. Will treat with Levaquin 500 mg qd for 10 days, Robitussin AC 2tsp q6h. See him back if no improvement.

---

| | |
|------|-------|
| 8-8-01 | Advised to ↓ Coumadin to 5mg /7.5mg alt QD — d. |
| 5-16-00 | Wt. 286" Hiccups for 3 days — stopped 1hr ago, over due — PT, rhinorrhea, sore throat off & on, some chest congestion, started over 2wks ago d. |
| | 1/27/02   P68 |

Published study results demonstrated:
**DURATION OF ACTION INCREASED WITH DOSE OF ADDERALL**

ADDERALL

Shire Richwood Inc.

Shire

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document



06/18/2003 - Office Visit: Sick Visit
Provider: John R. Rocchi MD
Location of Care: William A. DiCuccio M.D. & Associates

## OFFICE VISIT
## History of Present Illness
**History from:** patient
**Reason for visit:** sick call
**Chief Complaint:** Pt. has obsession with picking at skin
**History of Present Illness:** continues to have problems with picking at skin.  Has multiple lesions on arms and legs. Some are open .

## Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
**Social History (reviewed - no changes required):** divorced

## Risk Factors
**Tobacco use:** current
  **cigarettes:** yes
  **Counseled to quit/cut down:** yes
**Passive smoke exposure:** no
  **Alcohol use:** yes
  **Average drink(s) per day:** 0
  **Type:** rum
**HIV high risk behavior:** no
**Seatbelt use:** 100 %

## Review of Systems
**Cardiovascular:** Denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema.
**Respiratory:** Denies cough, dyspnea, excessive sputum, hemoptysis, wheezing.
**Skin:** Complains of see HPI, rash, itching. Denies dryness, suspicious lesions.

## Vital Signs
**Weight:** 308 pounds
**Blood Pressure #1:** 134/94 mm Hg
**Blood Pressure #2:** 112/84 mm Hg

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

## Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



**Carotid arteries:** pulses 2+, symmetric, no bruits
**Abdominal aorta:** no enlargement or bruits

**Skin**
**Inspection:** multiple scarred lesion on legs,arms

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)

**New Orders:**
Added new Service order of Est 99213 (CPT-99213) - Signed
Added new Referral order of Dermatology (Derm) - Signed


**Signed by John R. Rocchi MD on 06/18/2003 at 10:04 AM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street Butler, PA 16001
724-282-1530 Fax:

*August 3, 2005*
Page 1
Chart Document



**12/02/2003 - Office Visit: Follow-up Visit**
**Provider:** John R. Rocchi MD
**Location of Care:** William A. DiCuccio M.D. & Associates

**OFFICE VISIT**
## History of Present Illness
**History from:** patient
**Reason for visit:** flup on cardiac cath , discuss meds
**Chief Complaint:** cough fro 2 days

## Risk Factors
**Tobacco use:** current
  **cigarettes:** yes
  **Counseled to quit/cut down:** yes

## Review of Systems
**General:** Denies fevers, chills, sweats, anorexia, fatigue, malaise, weight loss.
**Cardiovascular:** Complains of peripheral edema. Denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND.
**Respiratory:** Denies cough, dyspnea, excessive sputum, hemoptysis, wheezing.

## Vital Signs
**Height:** 76 inches
**Weight:** 304 pounds
**Respirations:** 16
**Blood Pressure:** 116/82 mm Hg

## Calculations
**Body Mass Index:** 37.14

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

## Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop
**Carotid arteries:** pulses 2+, symmetric, no bruits
**Periph. circulation:** no cyanosis, clubbing, edema, or varicosities

## Gastrointestinal
**Abdomen:** soft, non-tender, no masses, bowel sounds normal
**Liver and spleen:** no enlargement or nodularity

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



## Assessment & Plan

**Assessment & Plan:** cardiomyopathy.  Ef 30% which is decreased from previous.  To see Dr.  Mahmood next week .  Will also refer back the Cleveland Clinic.

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) q.d.
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.

**New Orders:**
Added new Service order of Est 99213 (CPT-99213) - Signed
Added new Service order of Return to clinic in: (rto) - Signed

**Signed by John R. Rocchi MD on 12/02/2003 at 11:30 AM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August  3, 2005*
Page 1
Chart Document



**02/23/2004 - Office Visit: Sick Visit**
**Provider:** John R. Rocchi MD
**Location of Care:** William A. DiCuccio M.D. & Associates

**OFFICE VISIT**
**History of Present Illness**
**History from:** patient
**Reason for visit:** sick
**Chief Complaint:** f/u
**History of Present Illness:** pt comes in for HA, fever, sore throat, aches all over, started Fri. eve.

## Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
**Social History (reviewed - no changes required):** divorced

## Risk Factors

## Review of Systems
**General:** Complains of fevers, chills. Denies sweats, anorexia, fatigue, malaise, weight loss.
**Ears/Nose/Throat:** Complains of nasal congestion, sore throat. Denies earache, ear discharge, tinnitus, decreased hearing, nosebleeds, hoarseness, dysphagia.
**Cardiovascular:** Denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema.
**Respiratory:** Denies cough, dyspnea, excessive sputum, hemoptysis, wheezing.

## Vital Signs
**Height:** 76 inches
**Weight:** 297 pounds
**Pulse rate:** 68
**Respirations:** 16
**Blood Pressure:** 118/76 mm Hg

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

## Ears, Nose and Throat
**Otoscopic:** canals clear, tympanic membranes intact with good movement, no fluid
**Pharynx:** pharyngeal erythema

## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

## Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop

## Gastrointestinal

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



**Abdomen:** soft, non-tender, no masses, bowel sounds normal
**Liver and spleen:** no enlargement or nodularity

## Assessment & Plan
**Assessment & Plan:** sore throat- will treat with levaquin and short course of prednisone

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) q.d.
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 11/2 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
LEVAQUIN 500 MG TAB (LEVOFLOXACIN) 1 po qd
MEDROL (PAK) 4 MG TAB (METHYLPREDNISOLONE) as directed

**New Orders:**
Added new Service order of Est 99213 (CPT-99213) - Signed
Added new Test order of Rapid Strep Screen (RSS) - Signed

**Prescriptions:**
MEDROL (PAK) 4 MG TAB (METHYLPREDNISOLONE) as directed 02/23/2004 #1 x 0
      Entered, Authorized and Signed by:     John R. Rocchi MD
      Method used:   Printed then faxed to ...
                      Giant Eagle-CVM
                      1521 N. Main Street
                      Butler, PA  16001
                      Ph: 724-282-9160
                      Fax: 724-282-1648
LEVAQUIN 500 MG TAB (LEVOFLOXACIN) 1 po qd 02/23/2004 #10 x 0
      Entered, Authorized and Signed by:     John R. Rocchi MD
      Method used:   Printed then faxed to ...
                      Giant Eagle-CVM

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 3
Chart Document



1521 N. Main Street
Butler, PA  16001
Ph: 724-282-9160
Fax: 724-282-1648


**Signed by John R. Rocchi MD on 02/23/2004 at 4:16 PM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document

03/01/2004 - Office Visit: Sick Visit
**Provider:** John R. Rocchi MD
**Location of Care:** William A. DiCuccio M.D. & Associates

## OFFICE VISIT
## History of Present Illness
**History from:** patient
**Reason for visit:** sick
**Chief Complaint:** f/u
**History of Present Illness:** Pt comes in with c/o fever, sore throat, HAs very bad, not able to eat or sleep, muscles spasms in legs,  still on Levaquin - has 2 more days, ER visit Sat.  Has had headache which has been severe for past week.  Neck is sore.  Having muscle soreness.  Has had fever to 102  for 8 days. Headache is the worst symptom now.

## Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
**Social History (reviewed - no changes required):** divorced

## Risk Factors

## Review of Systems
**General:** Complains of fevers, chills. Denies sweats, anorexia, fatigue, malaise, weight loss.
**Ears/Nose/Throat:** Complains of earache, sore throat.
**Cardiovascular:** Denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema.
**Respiratory:** Complains of cough.
**Gastrointestinal:** Complains of diarrhea.
**Musculoskeletal:** Complains of muscle cramps.

## Vital Signs
**Height:** 76 inches
**Weight:** 292 pounds
**Pulse rate:** 68
**Respirations:** 16
**Blood Pressure:** 108/78 mm Hg

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

## Ears, Nose and Throat
**Otoscopic:** tm's slightly bulging
**Pharynx:** pharyngeal erythema

## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** occasional exp wheeze on right side

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



### Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop
**Periph. circulation:** no cyanosis, clubbing, edema, or varicosities

### Gastrointestinal
**Abdomen:** soft, non-tender, no masses, bowel sounds normal
**Liver and spleen:** no enlargement or nodularity

### Assessment & Plan
**Assessment & Plan:** acute febrile illness- cause unclear. will admit for further eval and get spinal tap. NO bed currently in hosptial. suggested going back to er. He would prefer to wait at home for a bed. will test for influenza.

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
FEBRILE ILLNESS (ICD-780.6)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) q.d.
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 11/2 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
LEVAQUIN 500 MG TAB (LEVOFLOXACIN) 1 po qd
MEDROL (PAK) 4 MG TAB (METHYLPREDNISOLONE) as directed
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn

**New Orders:**
Added new Service order of No Charge For Visit (nc) - Signed
Added new Test order of Other Lab Test (Other) - Signed

**Prescriptions:**
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn 03/01/2004 #50 x
1

Entered, Authorized and Signed by:    John R. Rocchi MD

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 3
Chart Document



Method used:   Printed then faxed to ...
                  Giant Eagle-CVM
                  1521 N. Main Street
                  Butler, PA  16001
                  Ph: 724-282-9160
                  Fax: 724-282-1648

**Signed by John R. Rocchi MD on 03/01/2004 at 3:12 PM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document



**03/05/2004 - Office Visit: Follow-up Visit**
**Provider:** John R. Rocchi MD
**Location of Care:** William A. DiCuccio M.D. & Associates

**OFFICE VISIT**
## History of Present Illness
**History from:** patient
**Reason for visit:** follow up
**Chief Complaint:** follow up hosp
**History of Present Illness:** Headaches not as frequent but just as severe.  Had one episode of diarrhea last night.  Still has sore throat.   Has abd distension and diffuse pain.  Was in hospital with viral meningitis.

## Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
4.viral meningitis, 3/04
**Social History (reviewed - no changes required):** divorced

## Risk Factors

## Review of Systems
**General:** Complains of see HPI, fevers. Denies chills, sweats, anorexia, fatigue, malaise, weight loss.
**Cardiovascular:** Denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema.
**Respiratory:** Denies cough, dyspnea, excessive sputum, hemoptysis, wheezing.
**Gastrointestinal:** Complains of nausea, diarrhea, abdominal pain.

## Vital Signs
**Height:** 76 inches
**Weight:** 295 pounds
**Pulse rate:** 78
**Respirations:** 16
**Blood Pressure:** 120/70 mm Hg

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

## Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop
**Periph. circulation:** no cyanosis, clubbing, edema, or varicosities

## Gastrointestinal
**Abdomen:** soft, non-tender, no masses, bowel sounds normal

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



**Liver and spleen:** no enlargement or nodularity

## Assessment & Plan
**Assessment & Plan:** abd pain- xray with few air fluid levels, schedule ct scan.  Start ppi.

very anxious - start ativan

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
FEBRILE ILLNESS (ICD-780.6)
ABDOMINAL PAIN, GENERALIZED (ICD-789.07)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) q.d.
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 11/2 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
LEVAQUIN 500 MG TAB (LEVOFLOXACIN) 1 po qd
MEDROL (PAK) 4 MG TAB (METHYLPREDNISOLONE) as directed
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn
ATIVAN 1 MG TAB (LORAZEPAM) 1 po tid prn

**New Orders:**
Added new Test order of Abd Series Acute (CPT-74022) - Signed
Added new Service order of Est 99213 (CPT-99213) - Signed
Added new Service order of Return to clinic in: (rto) - Signed
Added new Test order of CT abd/pelvis w& w/o (CPT-74170) - Signed

**Prescriptions:**
ATIVAN 1 MG TAB (LORAZEPAM) 1 po tid prn 03/05/2004 #30 x 3
          Entered, Authorized and Signed by:    John R. Rocchi MD
          Method used:   Printed then faxed to ...
                Giant Eagle-CVM

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 3
Chart Document



1521 N. Main Street
Butler, PA  16001
Ph: 724-282-9160
Fax: 724-282-1648

Signed by John R. Rocchi MD on 03/05/2004 at 10:05 AM

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document



03/17/2004 - Office Visit: Follow-up Visit
**Provider:** John R. Rocchi MD
**Location of Care:** William A. DiCuccio M.D. & Associates

## OFFICE VISIT
## History of Present Illness
**History from:** patient
**Reason for visit:** f/u
**Chief Complaint:** f/u
**History of Present Illness:** Pt comes in for follow up apt. after seeing Dr. Magill,  still feeling bad. Feels tired and achy.

Has had difficulty keeping right eye closed.  Eyelid feels weak.  He also he had problems sucking a through a straw and he thinks his smile is asymmetric.

Did see Dr. McGill who feels he did have viral meningitis and diverticulitis and he put the pt on antibiotics for the diverticulitis.  He was also concerned that his symptoms may be consistent with primary HIV infection.  Hiv is still pending.


## Risk Factors

## Review of Systems
**General:** Complains of chills, fatigue, malaise, weight loss. Denies fevers, sweats, anorexia.
**Cardiovascular:** Denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema.
**Respiratory:** Denies cough, dyspnea, excessive sputum, hemoptysis, wheezing.
**Neurologic:** Complains of see HPI, paresthesias.

## Vital Signs
**Height:** 76 inches
**Weight:** 274 pounds
**Pulse rate:** 76
**Respirations:** 16
**Blood Pressure:** 136/92 mm Hg

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

## Eyes
**External:** conjunctivae and lids normal
**Pupils:** equal, round, reactive to light and accommodation

## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

## Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



**Carotid arteries:** pulses 2+, symmetric, no bruits

**Gastrointestinal**
**Abdomen:** soft, non-tender, no masses, bowel sounds normal
**Liver and spleen:** no enlargement or nodularity

**Neurologic**
**Cranial nerves:** has decreased ability to wrinkle foredhead on right and strength of right eye muscles less than on left.  He also does have some right sided mouth asymmetry.

## Assessment & Plan
**Assessment & Plan:** viral illness with meningitis and now Bell's Palsy.  Discussed with Dr. McGill.  Since he has had this for about a week he did not think treating with acycolovir would not be helpful.  Also waiting for hiv to return.

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
FEBRILE ILLNESS (ICD-780.6)
ABDOMINAL PAIN, GENERALIZED (ICD-789.07)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) q.d.
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 11/2 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
LEVAQUIN 500 MG TAB (LEVOFLOXACIN) 1 po qd
MEDROL (PAK) 4 MG TAB (METHYLPREDNISOLONE) as directed
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn
ATIVAN 1 MG TAB (LORAZEPAM) 1 po tid prn

**New Orders:**
Added new Service order of No Charge For Visit (nc) - Signed

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 3
Chart Document

**Signed by John R. Rocchi MD on 03/17/2004 at 4:19 PM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document



**03/25/2004 - Office Visit: Follow-up Visit**
**Provider:** John R. Rocchi MD
**Location of Care:** William A. DiCuccio M.D. & Associates

**OFFICE VISIT**
## History of Present Illness
**History from:** patient
**Reason for visit:** f/u
**Chief Complaint:** f/u
**History of Present Illness:** Pt comes in for 1 wk follow up, still cold and nauseated some, eating better. Feeling some better.  Not having fevers anymore.  Still having trouble sleeping.

## Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
4.viral meningitis, 3/04
**Social History (reviewed - no changes required):** divorced

## Risk Factors

## Review of Systems
**General:** Complains of fatigue, malaise, weight loss. Denies fevers, chills, sweats, anorexia.
**Ears/Nose/Throat:** Complains of hoarseness.
**Cardiovascular:** Denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema.
**Respiratory:** Denies cough, dyspnea, excessive sputum, hemoptysis, wheezing.

## Vital Signs
**Height:** 76 inches
**Weight:** 263 pounds
**Pulse rate:** 72
**Respirations:** 16
**Blood Pressure:** 122/84 mm Hg

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

## Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop
**Carotid arteries:** pulses 2+, symmetric, no bruits
**Periph. circulation:** no cyanosis, clubbing, edema, or varicosities

## Gastrointestinal
**Abdomen:** soft, non-tender, no masses, bowel sounds normal

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



**Liver and spleen:** no enlargement or nodularity

## Assessment & Plan
**Assessment & Plan:** viral illness.  Awaiting viral lode for HIV.  For follow up with Dr. McGill.

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
FEBRILE ILLNESS (ICD-780.6)
ABDOMINAL PAIN, GENERALIZED (ICD-789.07)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) q.d.
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 11/2 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
MEDROL (PAK) 4 MG TAB (METHYLPREDNISOLONE) as directed
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn
AMBIEN 5 MG TAB (ZOLPIDEM TARTRATE) 1 po qhs prn insomnia

**New Orders:**
Added new Service order of Est 99212 (CPT-99212) - Signed
Added new Service order of Return to clinic in: (rto) - Signed

**Prescriptions:**
AMBIEN 5 MG TAB (ZOLPIDEM TARTRATE) 1 po qhs prn insomnia 03/25/2004 #15 x 3
    Entered, Authorized and Signed by:     John R. Rocchi MD
    Method used:   Printed then faxed to ...
                Giant Eagle-CVM
                1521 N. Main Street
                Butler, PA  16001
                Ph: 724-282-9160
                Fax: 724-282-1648

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

Signed by John R. Rocchi MD on 03/25/2004 at 10:05 AM

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document



**04/12/2004 - Office Visit: Follow-up Visit**
**Provider: John R. Rocchi MD**
**Location of Care: William A. DiCuccio M.D. & Associates**

## OFFICE VISIT
## History of Present Illness
**History from:** patient
**Reason for visit:** f/u
**Chief Complaint:** f/u
**History of Present Illness:** Pt comes in for 2 wk follow up, voice still bad, unable to sleep at night.

## Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
4.viral meningitis, 3/04
**Social History (reviewed - no changes required):** divorced

## Risk Factors

## Review of Systems
**General:** Complains of weight loss. Denies fevers, chills, sweats, anorexia, fatigue, malaise. Has not lost any more weight

## Vital Signs
**Height:** 76 inches
**Weight:** 260 pounds
**Pulse rate:** 60
**Respirations:** 16
**Blood Pressure:** 108/70 mm Hg

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

## Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop

## Gastrointestinal
**Abdomen:** soft, non-tender, no masses, bowel sounds normal
**Liver and spleen:** no enlargement or nodularity

## Assessment & Plan

**Problem List:**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document

Steven A Kmieci                                    Home (724) 287-2 Office (724) 865-4679
Male  DOB 07/30/1957                               Ins  Blue Cross (PA)

ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
FEBRILE ILLNESS (ICD-780.6)
ABDOMINAL PAIN, GENERALIZED (ICD-789.07)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) q.d.
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 11/2 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
MEDROL (PAK) 4 MG TAB (METHYLPREDNISOLONE) as directed
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn
AMBIEN 5 MG TAB (ZOLPIDEM TARTRATE) 1 po qhs prn insomnia

**New Orders:**
Added new Service order of Est 99212 (CPT-99212) - Signed

**Signed by John R. Rocchi MD on 04/12/2004 at 1:53 PM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document



08/03/2004 - Office Visit: Follow-up Visit
Provider: John R. Rocchi MD
Location of Care: William A. DiCuccio M.D. & Associates

## OFFICE VISIT
### History of Present Illness
**History from:** patient
**Chief Complaint:** f/u
**History of Present Illness:** Dr McGill wants him to have some injections and he needs some Rx.  Feels pretty good.  Back to work.

## Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
4.viral meningitis, 3/04
**Social History (reviewed - no changes required):** divorced

## Risk Factors

## Review of Systems
**General:** had some sweats last week , these have resolved
**Cardiovascular:** Complains of palpitations. Denies chest pains, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema.
**Respiratory:** Denies cough, dyspnea, excessive sputum, hemoptysis, wheezing.

## Vital Signs
**Height:** 76 inches
**Weight:** 280 pounds
**Pulse rate:** 60
**Pulse rhythm:** regular
**Respirations:** 16
**Blood Pressure:** 110/82 mm Hg

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

### Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

### Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop
**Periph. circulation:** no cyanosis, clubbing, edema, or varicosities

### Gastrointestinal
**Abdomen:** soft, non-tender, no masses, bowel sounds normal
**Liver and spleen:** no enlargement or nodularity

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

## Assessment & Plan

**Assessment & Plan:** cv - stable, continue same meds

HIV + continue to follow with Dr. McGill,   will vaccinate hepB and pneumovax

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
FEBRILE ILLNESS (ICD-780.6)
ABDOMINAL PAIN, GENERALIZED (ICD-789.07)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) q.d.
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 1 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn
AMBIEN 5 MG TAB (ZOLPIDEM TARTRATE) 1 po qhs prn insomnia
ZOLOFT 100 MG TAB (SERTRALINE HCL) 1 po qd
VALIUM 10 MG TABS (DIAZEPAM) 1 po qd prn

**New Orders:**
Added new Service order of Hepatitis B (>20) (CPT-90746) - Signed
Added new Service order of Pneumovax (CPT-90732) - Signed
Added new Test order of INR (CPT-85610) - Signed
Added new Test order of Fasting Lipids (CPT-80061) - Signed
Added new Test order of CMP (CPT-80053) - Signed
Added new Test order of CPK (CPT-82550) - Signed
Added new Service order of Est 99213 (CPT-99213) - Signed
Added new Service order of Return to clinic in: (rto) - Signed

**Prescriptions:**
VALIUM 10 MG TABS (DIAZEPAM) 1 po qd prn  #50 x 1
        Entered and Authorized by:     John R. Rocchi MD
        Signed by:     John R. Rocchi MD on 08/03/2004

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

Steven A Kanehl
Male DOB 04/23/1959                    Home (724)496-9143 Office (724)865-6576
                                                     Insurance CIGNA (144)

Method used:    Printed then faxed to ...
                Giant Eagle-CVM
                1521 N. Main Street
                Butler, PA  16001
                Ph: 724-282-9160
                Fax: 724-282-1648
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn  #50 x 1
    Entered and Authorized by:    John R. Rocchi MD
    Signed by:    John R. Rocchi MD on 08/03/2004
    Method used:    Printed then faxed to ...
                Giant Eagle-CVM
                1521 N. Main Street
                Butler, PA  16001
                Ph: 724-282-9160
                Fax: 724-282-1648
ZOLOFT 50 MG TAB (SERTRALINE HCL) 1 po qd  #90 x 3
    Entered and Authorized by:    John R. Rocchi MD
    Signed by:    John R. Rocchi MD on 08/03/2004
    Method used:    Printed then faxed to ...
                Giant Eagle-CVM
                1521 N. Main Street
                Butler, PA  16001
                Ph: 724-282-9160
                Fax: 724-282-1648


**Signed by John R. Rocchi MD on 08/03/2004 at 11:21 AM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document



**10/19/2004 - Office Visit: Follow-up Visit**
**Provider: John R. Rocchi MD**
**Location of Care: William A. DiCuccio M.D. & Associates**

**OFFICE VISIT**
**History of Present Illness**
**History from:** patient
**Chief Complaint:** f/u
**History of Present Illness:** Car accident on Thursday - follow up to ER visit. - Whip lash , back pain and lt shoulder pain Neck and shoulder still bother him.  Was rear ended while at a stop.  Neck and left shoulder still sore.  Had many xrays in er. Xrays with some degenerative changes of neck and lumbar spine.

**Past, Family, and Social History**
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
4.viral meningitis, 3/04
**Social History (reviewed - no changes required):** divorced

**Risk Factors**

**Review of Systems**
**General:** Denies fevers, chills, sweats, anorexia, fatigue, malaise, weight loss.
**Cardiovascular:** Denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema.
**Respiratory:** Denies cough, dyspnea, excessive sputum, hemoptysis, wheezing.
**Musculoskeletal:** Complains of see HPI, back pain, stiffness.

**Vital Signs**
**Height:** 76 inches
**Weight:** 284 pounds
**Pulse rate:** 70
**Respirations:** 16
**Blood Pressure:** 120/72 mm Hg

**Physical Exam**
**General appearance:** well nourished, well hydrated, no acute distress

**Respiratory**
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

**Cardiovascular**
**Auscultation:** S1, S2, no murmur, rub, or gallop
**Periph. circulation:** no cyanosis, clubbing, edema, or varicosities

**Gastrointestinal**
**Abdomen:** soft, non-tender, no masses, bowel sounds normal

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



**Liver and spleen:** no enlargement or nodularity

## Musculoskeletal
**Head and neck:** tender over lateral left neck muscles.  Tender over upper left anterior chest and colar bone.  Slight decrease in rom of neck.   NO real bruising over this area.

## Assessment & Plan
**Assessment & Plan:** neck, left upper chest and shoulder contusion - continue analgesia prn.

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
ABDOMINAL PAIN, GENERALIZED (ICD-789.07)
NECK PAIN (ICD-723.1)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) 1 po qd
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 1 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn
AMBIEN 5 MG TAB (ZOLPIDEM TARTRATE) 1 po qhs prn insomnia
ZOLOFT 100 MG TAB (SERTRALINE HCL) 1 po qd
VALIUM 10 MG TABS (DIAZEPAM) 1 po qd prn

**New Orders:**
Added new Service order of Est 99213 (CPT-99213) - Signed

**Signed by John R. Rocchi MD on 10/19/2004 at 3:39 PM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document

███████████████████████████████████████████
███████████████████████████████████████████

**11/12/2004 - Office Visit: Sick Visit**
**Provider:** John R. Rocchi MD
**Location of Care:** William A. DiCuccio M.D. & Associates

## OFFICE VISIT
### History of Present Illness
**History from:** patient
**Reason for visit:** see chief complaint
**Chief Complaint:** headache X 1 1/2 weeks
**History of Present Illness:** Throbbing on top of head - constant.    Headache is dull but throbbing at times.  Tylenol hasn
t helped much.  Tylenon pm helped some.  Was in mva about 2 weeks before headache started.  Thinks vision is getting worse has trouble seeing close up.

### Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
4.viral meningitis, 3/04
**Social History (reviewed - no changes required):** divorced

### Risk Factors

### Review of Systems
**General:** Denies fevers, chills, sweats, anorexia, fatigue, malaise, weight loss.
**Eyes:** Complains of see HPI. Denies blurring, diplopia, irritation, discharge, vision loss, eye pain, photophobia.
**Ears/Nose/Throat:** Denies earache, ear discharge, tinnitus, decreased hearing, nasal congestion, nosebleeds, sore throat, hoarseness, dysphagia.

### Vital Signs
**Height:** 76 inches
**Weight:** 280 pounds
**Pulse rate:** 60
**Respirations:** 14
**Blood Pressure:** 110/80 mm Hg

### Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

### Eyes
**External:** conjunctivae and lids normal
**Pupils:** equal, round, reactive to light and accommodation
**Ophthalmoscopic:** discs sharp and flat, no a/v nicking, hemorrhages, or exudates

### Ears, Nose and Throat
**Otoscopic:** canals clear, tympanic membranes intact with good movement, no fluid
**Pharynx:** tongue normal, posterior pharynx without erythema or exudate

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

## Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop

## Assessment & Plan
**Assessment & Plan:** headache - he will get his eyes check.  Will have him try fioricet.   If headaches worsen will require further eval.

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
ABDOMINAL PAIN, GENERALIZED (ICD-789.07)
NECK PAIN (ICD-723.1)
HEADACHE (ICD-784.0)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) 1 po qd
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 1 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn
AMBIEN 5 MG TAB (ZOLPIDEM TARTRATE) 1 po qhs prn insomnia
ZOLOFT 100 MG TAB (SERTRALINE HCL) 1 po qd
VALIUM 10 MG TABS (DIAZEPAM) 1 po qd prn
FIORICET 325-50-40 MG TAB (ACETAMINOPHEN-CAFF-BUTALBITAL) 1 po q6hrs prn pain

**New Orders:**
Added new Service order of Est 99213 (CPT-99213) - Signed

**Prescriptions:**
FIORICET 325-50-40 MG TAB (ACETAMINOPHEN-CAFF-BUTALBITAL) 1 po q6hrs prn pain  #30 x 1
    Entered and Authorized by:    John R. Rocchi MD

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 3
Chart Document

Signed by:      John R. Rocchi MD on 11/12/2004
Method used:    Printed then faxed to ...
                Giant Eagle-CVM
                1521 N. Main Street
                Butler, PA  16001
                Ph: 724-282-9160
                Fax: 724-282-1648

**Signed by John R. Rocchi MD on 11/12/2004 at 11:02 AM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document



**12/02/2004 - Office Visit: Follow-up**
**Provider:** John R. Rocchi MD
**Location of Care:** William A. DiCuccio M.D. & Associates

## OFFICE VISIT
## History of Present Illness
**History from:** patient
**Reason for visit:** routine follow-up
**Chief Complaint:** F/U Headaces  c/o headaces are not any better.
**History of Present Illness:** Headaches had gotten a little better for a while.  Now has headaches more again.  Headache is dull and on top of head.  Not severe though.  Had throat culture positive for non group A strep.  Was not treated since he was getting better.  Not having fever.  No visual.

## Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
4.viral meningitis, 3/04
**Social History (reviewed - no changes required):** divorced

## Risk Factors
**Cigarettes:** YES  packs/day  **Passive Smoke Exposure:** no  **Alchol use:** 0
**Seatbelt use:** 100
## Review of Systems
**General:** Denies fevers, chills, sweats, anorexia, fatigue, malaise, weight loss.
**Cardiovascular:** Denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema.
**Respiratory:** Denies cough, dyspnea, excessive sputum, hemoptysis, wheezing.
**Neurologic:** Denies transient paralysis, weakness, paresthesias, seizures, syncope, tremors, vertigo.

## Vital Signs
**Height:** 76 inches
**Weight:** 294 pounds
**Pulse rate:** 68
**Pulse rhythm:** regular
**Respirations:** 16
**Blood Pressure:** 112/70 mm Hg

## Calculations
**Body Mass Index:** 35.92

## Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

## Eyes
**External:** conjunctivae and lids normal
**Pupils:** equal, round, reactive to light and accommodation
**Ophthalmoscopic:** discs sharp and flat, no a/v nicking, hemorrhages, or exudates

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



## Ears, Nose and Throat
**Otoscopic:** canals clear, tympanic membranes intact with good movement, no fluid
**Pharynx:** pharyngeal erythema

## Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

## Cardiovascular
**Auscultation:** S1, S2, no murmur, rub, or gallop
**Periph. circulation:** no cyanosis, clubbing, edema, or varicosities

## Gastrointestinal
**Abdomen:** soft, non-tender, no masses, bowel sounds normal
**Liver and spleen:** no enlargement or nodularity

## Assessment & Plan
**Assessment & Plan:** headache - ? due to throat, does get headaches with strep throat, will treat with course of antibiotic.  He is to see Dr. Mcgill in several weeks.

**Problem List:**
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
ABDOMINAL PAIN, GENERALIZED (ICD-789.07)
NECK PAIN (ICD-723.1)
HEADACHE (ICD-784.0)
PHARYNGITIS, ACUTE (ICD-462)

**Current Allergies:**
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

**Current Medications:**
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) 1 po qd
AVAPRO 150 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 1 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn
AMBIEN 5 MG TAB (ZOLPIDEM TARTRATE) 1 po qhs prn insomnia

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 3
Chart Document



ZOLOFT 100 MG TAB (SERTRALINE HCL) 1 po qd
VALIUM 10 MG TABS (DIAZEPAM) 1 po qd prn
FIORICET 325-50-40 MG TAB (ACETAMINOPHEN-CAFF-BUTALBITAL) 1 po q6hrs prn pain
LEVAQUIN 500 MG TAB (LEVOFLOXACIN) 1 po qd

**New Orders:**
Added new Test order of Other Lab Test (Other) - Signed
Added new Service order of Est 99213 (CPT-99213) - Signed


**Prescriptions:**
LEVAQUIN 500 MG TAB (LEVOFLOXACIN) 1 po qd  #10 x 0
    Entered and Authorized by:    John R. Rocchi MD
    Signed by:    John R. Rocchi MD on 12/02/2004
    Method used:    Printed then faxed to ...
        Giant Eagle-CVM
        1521 N. Main Street
        Butler, PA  16001
        Ph: 724-282-9160
        Fax: 724-282-1648



**Signed by John R. Rocchi MD on 12/02/2004 at 1:04 PM**

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 1
Chart Document



04/15/2005 - Office Visit: Sick Visit
Provider: John R. Rocchi MD
Location of Care: William A. DiCuccio M.D. & Associates

## OFFICE VISIT
### History of Present Illness
**History from:** patient
**Reason for visit:** see chief complaint
**Chief Complaint:** lump on right side of neck. painful started last night
**History of Present Illness:** Has a lump on anterior right neck, first noticed last night, is tender to palpation. No fever. Does have a cat. Painful to touch.

### Past, Family, and Social History
**Past History (reviewed - no changes required):** 1.a fib
2.sleep apnea
3.hypercholesterolemia
4.viral meningitis, 3/04
**Social History (reviewed - no changes required):** divorced

### Risk Factors

### Review of Systems
**General:** Denies fevers, chills, sweats, anorexia, fatigue, malaise, weight loss.
**Ears/Nose/Throat:** Denies earache, ear discharge, tinnitus, decreased hearing, nasal congestion, nosebleeds, sore throat, hoarseness, dysphagia.
**Heme/Lymphatic:** Complains of see HPI, enlarged lymph nodes. Denies abnormal bruising, bleeding.

### Vital Signs
**Height:** 76 inches
**Weight:** 296 pounds
**Pulse rate:** 60
**Respirations:** 16
**Blood Pressure:** 130/80 mm Hg

### Physical Exam
**General appearance:** well nourished, well hydrated, no acute distress

### Ears, Nose and Throat
**Otoscopic:** canals clear, tympanic membranes intact with good movement, no fluid
**Pharynx:** tongue normal, posterior pharynx without erythema or exudate

### Neck
**Neck:** tender enlarged probable lymph node

### Respiratory
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

### Cardiovascular

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 2
Chart Document



Auscultation: S1, S2, no murmur, rub, or gallop
Periph. circulation: no cyanosis, clubbing, edema, or varicosities

## Gastrointestinal
Abdomen: soft, non-tender, no masses, bowel sounds normal
Liver and spleen: no enlargement or nodularity

## Lymphatic
Neck: anterior cervical adenopathy 2 cm, tender, nonfluctuant

## Assessment & Plan
Assessment & Plan:
lymphadenitis - localized to right anterior neck.  will screen for cat scratch and toxoplasmosis.  Will treat with zpak, follow if no better.

Problem List:
ATRIAL FIBRILLATION (ICD-427.31)
SKIN RASH (ICD-782.1)
ANXIETY DEPRESSION (ICD-300.4)
CORONARY ARTERY DISEASE (ICD-414.00)
HYPERTENSION (ICD-401.9)
HYPERLIPIDEMIA (ICD-272.4)
RIB PAIN, LEFT SIDED (ICD-848.3)
TONSILLITIS, ACUTE (ICD-463)
ABDOMINAL PAIN, GENERALIZED (ICD-789.07)
NECK PAIN (ICD-723.1)
HEADACHE (ICD-784.0)
PHARYNGITIS, ACUTE (ICD-462)
LYMPHADENITIS, ACUTE (ICD-683)

Current Allergies:
PENICILLIN
SULFA
VERAPAMIL
MORPHINE

Current Medications:
LIPITOR 10 MG TAB (ATORVASTATIN CALCIUM) 1 po qd
* AVAPRO 300 MG TAB (IRBESARTAN) q.d.
LOPRESSOR 50 MG TAB (METOPROLOL TARTRATE) b.i.d.
COUMADIN 7.5 MG TAB (WARFARIN SODIUM) as directed
ZOLOFT 50 MG TAB (SERTRALINE HCL) 1 po qd
TIKOSYN 250 MCG CAP (DOFETILIDE) 1 po q 12 hrs
VICODIN ES 7.5-750 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po q6hrs prn
AMBIEN 5 MG TAB (ZOLPIDEM TARTRATE) 1 po qhs prn insomnia
ZOLOFT 100 MG TAB (SERTRALINE HCL) 1 po qd
VALIUM 10 MG TABS (DIAZEPAM) 1 po qd prn
FIORICET 325-50-40 MG TAB (ACETAMINOPHEN-CAFF-BUTALBITAL) 1 po q6hrs prn pain
LEVAQUIN 500 MG TAB (LEVOFLOXACIN) 1 po qd
ZOLOFT 100 MG TAB (SERTRALINE HCL) 1 po qd

**William A. DiCuccio M.D. & Associates**
480 E. Jefferson Street  Butler, PA 16001
724-282-1530  Fax:

*August 3, 2005*
Page 3
Chart Document



COUMADIN 2.5 MG TAB (WARFARIN SODIUM) 1 po qd
COUMADIN 5 MG TAB (WARFARIN SODIUM) as directed
METOPROLOL TARTRATE 25 MG TABS (METOPROLOL TARTRATE) 1 po qd
ZITHROMAX Z-PAK 250 MG TAB (AZITHROMYCIN) as directed

**New Orders:**
Added new Test order of Other Lab Test (Other) - Signed
Added new Service order of Est 99213 (CPT-99213) - Signed
Added new Test order of INR (CPT-85610) - Signed

**Prescriptions:**
ZITHROMAX Z-PAK 250 MG TAB (AZITHROMYCIN) as directed  #1 x 0
    Entered and Authorized by:     John R. Rocchi MD
    Signed by:      John R. Rocchi MD on 04/15/2005
    Method used:    Printed then faxed to ...
              Giant Eagle-CVM
              1521 N. Main Street
              Butler, PA  16001
              Ph: 724-282-9160
              Fax: 724-282-1648


**Signed by John R. Rocchi MD on 04/15/2005 at 11:09 AM**

# Memo

**To:**      International Representatives Gino, Kamen and Macchia

**From:**    Donald C. Siegel

**Date:**    January 20, 2004

**Re:**      2004 Manufacturing Conference

---

Enclosed are copies of correspondence from International President Hill in connection with the 2004 Manufacturing Conference scheduled for May 5-7, 2004 at the Frontier Hotel & Casino in Las Vegas, Nevada. Please arrange your schedules to attend. Strongly encourage your locals to attend this important conference as well.

DCS:jm

Enclosure



DEPOSITION EXHIBIT
Kamen 21
11/28/07

4.3

| | | | |
|---|---|---|---|
| SUBJECT: | **ANTI-HARASSMENT** | EFFECTIVE DATE: | 08/10/92 |
| APPROVED BY: | EDH | REVISION DATE: | 10/01/98 |

The International Brotherhood of Electrical Workers is committed to maintaining a work environment that is free of discrimination. In keeping with this commitment, we will not tolerate harassment of IBEW Employees by anyone, including any staff member, supervisor, co-worker, or patron of the IBEW.

Harassment consists of unwelcome conduct, whether verbal or physical, that is based upon a person's protected status; such as sex, color, race, ancestry, religion, national origin, age, physical handicap, medical condition, disability, marital status, veteran status, citizenship status, or other protected group status. The IBEW will not tolerate harassing conduct that affects tangible job benefits, that interferes unreasonably with an individual's work performance, or that creates an intimidating, hostile, or offensive working environment.

Sexual harassment deserves special mention. Unwelcome sexual advances, requests for sexual favors, or other sexually offensive behavior constitute sexual harassment when (1) submission to the conduct is an explicit or implicit term or condition of employment, (2) submission to or rejection of the conduct is used as the basis for an employment decision, or (3) the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

All IBEW Employees are responsible to help assure that we avoid harassment. If you feel that you have experienced or witnessed harassment, you are to notify immediately the Director of the Personnel Department; or in his absence, the International Secretary-Treasurer or his Executive Assistant over Personnel. The IBEW forbids retaliation against anyone for reporting sexual harassment, assisting in making a sexual harassment complaint, or cooperating in a sexual harassment investigation.

The IBEW's policy is to investigate all such complaints thoroughly and promptly. To the fullest extent practicable, the IBEW will keep complaints and the terms of their resolution confidential. If an investigation confirms that harassment has occurred, the IBEW will take corrective action, including such discipline, up to and including immediate termination of employment, as is appropriate.

