1

```
 1          UNITED STATES DISTRICT COURT
 2     FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3                  - - -
 4   STEVEN A. KAMEN,          )
                               )
 5            Plaintiff,       )
                               )
 6        vs.                  ) Civil Action
                               ) CA 1:06CV01063
 7   INTERNATIONAL BROTHERHOOD,) (RMC)
     OF ELECTRICAL WORKERS,    )
 8   IBEW and EDWIN HILL,      )
                Defendant.     )
 9
                       - - -
10
11        Deposition of DONALD C. SIEGEL
11
            May 31, 2007
12
                   - - -
13
          The deposition of DONALD C. SIEGEL,
14   called as a witness by the Plaintiff,
     pursuant to notice and the Federal Rules of
15   Civil Procedure pertaining to the taking of
     depositions, taken before me, the
16   undersigned, Lois Sikoski, a Notary Public in
     and for the Commonwealth of Pennsylvania, at
17   the offices of IBEW, Third District Office,
     500 Cherrington Parkway, Suite 325,
18   Coraopolis, Pennsylvania 15108, commencing at
     1:57 o'clock p.m. the day and date above set
19   forth.
20                 - - -
21     COMPUTER-AIDED TRANSCRIPTION BY
         NETWORK DEPOSITION SERVICES
22        PITTSBURGH, PENNSYLVANIA
              412-281-7908
23
                   - - -
24
25
```

**Transcript of Donald Siegel**

2

```
 1   APPEARANCES:
 2      On behalf of the Plaintiff:
 3         Law Offices of Joseph Chivers:
            Joseph Chivers, Esquire
 4         312 Boulevard of the Allies
            6th Floor
 5         Pittsburgh, Pennsylvania 15222
 6
        On behalf of the Defendant:
 7
           Terry R. Yellig, Esquire
 8         Sherman, Dunn, Cohen, Leifer & Yellig,
           P.C.
 9         Suite 1000, 900 Seventh Street
           Washington, D.C. 20001
10
11
                  - - -
12
        I-N-D-E-X
13   EXAMINATION BY:          PAGE:
     Mr. Chivers          3
14                - - -
15   DEPOSITION EXHIBIT NOS.:
        1 - 11-30-04 letter       23
16      2 - 3-16-04 letter        66
        3 - 3-6-04 letter         67
17      4 - 3-12-04 letter        71
18        (Exhibits not attached.)
19                - - -
20
21
22
23
24
25
```

3

```
 1            DONALD C. SIEGEL,
 2   called as a witness by the Plaintiff, having been
 3   first duly sworn, as hereinafter certified, was
 4   deposed and said as follows:
 5            EXAMINATION
 6   BY MR. CHIVERS:
 7      Q. Would you state and spell your name for the
 8   record, sir.
 9      A. Donald Siegel, S-i-e-g-e-I.
10      Q. Have you ever given a deposition before?
11      A. Yeah.
12      Q. I'll go over the ground rules briefly.  I'm
13   sure your lawyer has already explained them to
14   you.
15         Do you understand you're under oath?
16      A. Pardon me?
17      Q. Do you understand you're under oath?
18      A. Yes, yes.  I thought you said John Durow.
19      Q. Close.
20         Really, this is a formal question and
21   answer session.  I ask questions, you give
22   answers.  Not all of my questions but a lot of my
23   questions, lend themselves to a "yes" or "no"
24   answer.  Not all of them, but if I do ask you a
25   question of that nature, I do ask that you give it
```

4

```
 1   your best shot at answering "yes" or "no," and
 2   then if you want provide additional information if
 3   you think that's necessary for me to understand
 4   your answer.  Okay?
 5      A. Very good.
 6      Q. The other thing, too and you're doing it
 7   well so far is make sure you answer verbally,
 8   since we are trying to transcribe this, and
 9   needless to say, the shakes and the nods can be a
10   little confusing.
11         And I guess my question to you is:  If you
12   don't understand anything that I ask you, anything
13   that I say, it's incumbent upon you to say to
14   something.  The reason being that otherwise what
15   will happen if I ask you a question and you're
16   really not sure what I'm asking you, but you
17   provide an answer, anybody going back later
18   looking at the transcript will think that you
19   understood the question.  Okay?
20      A. Okay.
21      Q. So if there's something wrong with my
22   question, you don't understand any part of it,
23   tell me and I'll do my best to fix it.  All right?
24      A. Okay.
25      Q. Lastly, you're not on any prescription
```

5

```
 1   medication, nothing that would impair your ability
 2   to hear and understand?
 3      A. No.
 4      Q. All right.  Basic things first, how long
 5   have you been with the union?
 6      A. With the International?
 7      Q. Yeah.
 8      A. Since 1994, 13 years we're coming up on.
 9      Q. Since 1994?
10      A. Yes.
11      Q. What did do you before 1994?
12      A. I was the business manager of my local
13   union in Reading, Pennsylvania.
14      Q. And how long had you been the business
15   manager?
16      A. From 1989 to 1994.
17      Q. Is that with the local of the IBEW?
18      A. Correct.
19      Q. And what local was that?
20      A. Local 743 in Reading, Pennsylvania.
21      Q. Reading, PA.  Business agent, right?
22      A. Business manager.
23      Q. Business manager.  And before that, what
24   were you doing?
25      A. I was a journeyman wireman electrician, a
```

**Transcript of Donald Siegel**

6

1 construction electrician from 1969 until I became
2 business manager in 1989.
3 Q. What's your date of birth?
4 A. 9-23-48.
5 Q. All right. And since 1994, give me your
6 positions with the IBEW.
7 A. I was International representative from
8 1994 until January -- or March of 2002, then I
9 became the vice president.
10 Q. District 3?
11 A. Correct.
12 Q. And you're still the vice president of
13 District 3?
14 A. Yes.
15 Q. How many International reps do you have
16 reporting to you?
17 A. Right now 17.
18 Q. And is that pretty much constant since
19 2002?
20 A. We were up to 20 at one point, since 2002.
21 Q. Would it be safe to say then that you got
22 anywhere from 17 to 20 International reps
23 reporting to you?
24 A. Correct.
25 Q. And two of those reps, I mean, one of them

7

1 certainly was Steve Kamen?
2 A. Yes.
3 Q. And one of them was Wyatt Earp?
4 A. Correct.
5 Q. And Wyatt Earp is still an International
6 representative?
7 A. Yes.
8 Q. Wyatt Earp, did you discipline him at all
9 over the past few years?
10 A. Did I discipline him?
11 Q. Yes.
12 A. No.
13 Q. So as far as you know, Wyatt Earp has not
14 received any form of discipline since March of
15 2002?
16 A. Not -- I don't know. I know that President
17 Hill disciplined him at one point, but I don't
18 know the exact dates.
19 Q. Was that before you became vice president?
20 A. I believe it was.
21 Q. Yeah.
22 A. But not since I'm vice president.
23 Q. All right. Well, certainly, one of the
24 issues with Mr. Kamen is the timeliness of certain
25 reports, correct?

8

1 A. That's one of the issues, yes.
2 Q. One of the issues, I know, and I'll show
3 you the letter and we can go through some of the
4 other details.
5 Isn't it true that Mr. Earp since March of
6 2002 has also been late in filing reports with
7 you?
8 A. Yes.
9 Q. And what reports has Mr. Earp been late in
10 filing with you?
11 A. Mostly expense reports.
12 Q. Mostly, but not entirely?
13 A. Not entirely, no, his work reports have
14 been delinquent as well, his weekly work reports.
15 Q. Right. So in terms, if we were to develop
16 this category called late reports, Wyatt Earp late
17 reports that would include expense reports?
18 A. Correct.
19 Q. It would include work reports?
20 A. Correct, weekly reports.
21 Q. Weekly. Thanks.
22 Any other kinds of reports or other
23 documents that Mr. Earp is required to file with
24 you as part of his duties as an International rep
25 that he has been late on?

9

1 A. His objection -- there's a report called a
2 Per Capita Objection Report, which I don't stay on
3 top of, he may have been delinquent in that as
4 well. I would presume he was if you're delinquent
5 on weekly reports, you generally are delinquent
6 with those.
7 Q. Right. And do you have any kind of a
8 tally, either in your head or a tally that you
9 maintain in the file, of how many times since
10 March of 2002 Mr. Earp has been late on his
11 expense reports?
12 A. I did have a tally up until I think it was
13 last year, late last year when the International
14 went from filing paperwork to electronic
15 reporting. At that time I lost track of it
16 because they were being filed in Washington. We
17 weren't keeping track of it here in the office.
18 We are now tracking it again since January.
19 So what I would say is I think from the
20 middle of 2006 until the end of 2006, there's a
21 gap that we didn't track because of this
22 electronic process.
23 Q. From March of 2002 until the middle of
24 2006, do you have a recollection of how many times
25 Mr. Earp was late on his expense reports?

10

1    A. I don't have a specific recollection, but I
2    know that he was late.
3    Q. You indicated a moment ago you were keeping
4    a tally of that?
5    A. Yeah.
6    Q. Where?
7    A. We have a tally of it in the electronic
8    file. My secretaries actually keep that record.
9    Q. So I take it you could produce that pretty
10   quickly, the electronic tally?
11   A. I should be able to, yeah.
12   Q. Let me do this, I mean, we're here now and
13   I don't want to actually get up and stop the
14   deposition, but we'll take a break here in 20, 25
15   minutes, during that period of time, if you could
16   have that produced that would be really good.
17   A. Okay.
18   Q. It would save us a lot of time.
19      Now, let me ask you this about the
20   electronic tally: Is it your understanding that
21   that would reflect since you became vice president
22   Mr. Earp's timeliness or tardiness on filing
23   expense reports?
24   A. Yes. I don't know when I instituted that,
25   but it was pretty early on. I don't know that my

11

1    predecessor kept that tally.
2    Q. Who was your predecessor?
3    A. Larry Rossa, R-o-s-s-a.
4    MR. YELLIG: Perhaps for the record you
5    ought to spell Wyatt Earp also.
6    MR. CHIVERS: You know how to spell Wyatt
7    Earp.
8    Q. Well, at any rate, now, you've got you
9    indicated anywhere from 17 to 20 reps over the
10   course of your being a vice president?
11   A. Yes.
12   Q. Is there anybody other than Mr. Wyatt
13   Earp -- we'll talk about Steven Kamen in a
14   moment -- who has been late in filing expense
15   reports?
16   A. Yes.
17   Q. Who else?
18   A. Rich Redmond.
19   Q. Who else?
20   A. No one else comes to mind. You said
21   expense reports because --
22   Q. I did.
23   A. -- well, you've got to remember these are
24   out-of-pocket expenses for these guys. They're
25   generally pretty much on time. But Rich Redmond I

12

1    know has been late.
2    Q. What about weekly reports?
3    A. With the exception of maybe three weeks at
4    a time, up to four weeks, there's been off and on
5    reps that have been delinquent with that across the
6    staff I would say.
7    Q. Do you also maintain an electronic tally of
8    the timeliness that the International reps have
9    filed their weekly reports?
10   A. Restate that.
11   Q. I'm sorry. It's the same basic question I
12   had for you about expense reports. Do you keep an
13   electronic tally of the reps' filing of weekly
14   reports?
15   A. Yes, yeah. Those and the expense reports
16   are kept in the same kind of format.
17   Q. When you have that run, would you run me
18   the weekly reports as well?
19   A. I have it already down.
20   Q. You already do. Thanks.
21      Other than Steve Kamen, going on five
22   years?
23   A. It's coming up on six years now.
24   Q. It is past five years now. In the
25   five-plus years that you've been vice president,

13

1    other than Steve Kamen, have you disciplined -- by
2    disciplined, I mean either suspended or terminated
3    any other International representative?
4    A. No.
5    Q. Just Steve?
6    A. Correct. Now, when you say terminated, you
7    do understand that I recommended that
8    termination. I don't really have the authority to
9    either discipline or terminate an International
10   rep.
11   Q. Thanks. I was going to ask you that
12   anyway, because you understand I had a chance to
13   depose Mr. Hill --
14   A. Okay.
15   Q. -- on Tuesday, and you tell me if there's
16   something wrong with what he said. But his
17   testimony was that he actually is the one that
18   would sign, for example, the termination letter,
19   any formal discipline like that?
20   A. That's correct.
21   Q. Now, his testimony was that he relies on
22   his vice presidents like you?
23   A. Uh huh.
24   Q. Is that a fair statement?
25   A. Yeah, I would say that's a fair statement.

14

1    Q. Meaning he doesn't have the time. He
2  doesn't have the firsthand knowledge necessary of
3  what your International reps are or are not doing,
4  for him to individually or personally confirm the
5  information that you're providing to him, does he?
6    A. No, he doesn't.
7    Q. He relies on you?
8    A. That's correct.
9    Q. All right. Okay. So I mean, I think based
10  on that, between what you were saying and what
11  Mr. Hill is saying, it's fair to say that you're
12  the guy that had the interaction with Steve Kamen,
13  you're the guy that recommended that he be
14  terminated, correct?
15    A. Correct.
16    Q. Okay. Now, you were aware, were you not,
17  that Mr. Kamen was sick during these months in
18  2004? You knew he had some illnesses, did you
19  not?
20    A. I did.
21    Q. What did you know about those illnesses?
22    A. I only know what was reported to me. I
23  knew at one point he had the flu. It was reported
24  that he may have had viral meningitis at one
25  time. And there was also a mention of the fact

15

1  that he may be having a problem with his
2  gallbladder. That was around the same time as the
3  viral meningitis. I believe that was in the early
4  part of the spring of 2004. And that's it.
5    There's a mention of diverticulitis, I
6  noticed in my records, but I don't recall that. I
7  do know that it was in there. But I do recall
8  specifically the viral meningitis and the
9  gallbladder. I don't know that there was anything
10  specifically found with his gallbladder. But I do
11  remember a note that I got from Mike Welsh, my
12  executive assistant, that told me he spoke with
13  Steve. And then there was later some doctors'
14  notes that confirmed that.
15    Q. So in terms of hierarchy here, you're in
16  charge of this division, right, or District?
17    A. Correct.
18    Q. You're in charge of the District. You
19  mentioned Mr. Mike Welsh?
20    A. I have two what I refer to as executive
21  assistants. They're actually International reps,
22  but they act as executive assistants.
23    Q. Who?
24    A. Mike Welsh and John Malagiese.
25    Q. How do you spell those?

16

1    A. M-a-l-a-g-i-e-s-e and Welsh, W-e-l-s-h.
2    Q. Thanks.
3      You knew Steve was gay, correct?
4    A. No.
5    Q. You never knew that?
6    A. No.
7    Q. Nobody ever told you that?
8    A. No.
9    Q. Steve never told you that?
10    A. No.
11    Q. Edwin Hill never told you that?
12    A. No.
13    Q. Nobody ever told you that?
14    A. No.
15    Q. When did you first find out?
16    A. When this came out, whenever this suit is.
17  I was quite surprised by it, to be honest with
18  you.
19    Q. Okay. So I guess your testimony is that
20  whether he was gay or not had nothing to do with
21  your recommendation to terminate him?
22    A. Not at all.
23    Q. Okay. So Mike Welsh never said anything to
24  you about it?
25    A. No.

17

1    Q. John Malagiese --
2    A. Malagiese.
3    Q. -- Malagiese never said anything to you
4  about it?
5    A. No.
6    Q. Well, when you knew that Steve was sick
7  during those months in 2004, did you ever give him
8  an opportunity to take a job other than as
9  International representative with the union?
10    A. There are no other jobs that I'm even aware
11  of. No, I didn't. The answer to the question is
12  no, I'm not aware of any other jobs.
13    Q. Did you ever consider having him move down
14  to a local somewhere, like in the Pittsburgh area?
15    A. It wouldn't be my decision to do that. Our
16  locals are autonomous. I can't assign him to a
17  local union. In terms of the local union I
18  can't. No, I have no authority to do that.
19  That's not even in -- I would not even have
20  considered that, because there's no way in the
21  world that I could have accommodated that. It's
22  not even something I would think about.
23    Q. Well, to what extent did Steve's absences
24  in 2004, to what extent did that affect your
25  recommendation to terminate him?

18

1    A. His absences in 2004?
2    Q. Uh huh.
3    A. His absences in the early part of 2004 had
4  nothing to do with my recommendation to terminate
5  him. My recommendation to terminate him was based
6  on his performance, or his lack thereof. And the
7  fact that we were having difficultthy getting a
8  hold of him. He didn't answer e-mails. He didn't
9  return phone calls. And I had local unions that
10 had complained about his lack of attention to
11 their needs.
12    Q. Did you give Steve a chance to address
13 those concerns?
14    A. He didn't return half of the calls that we
15 sent out to him. And I did sit down with Steve in
16 May of 2003 and I talked with him a couple of
17 times.
18    Q. 2004 or 2003?
19    A. No, 2003, I think I sat down with him,
20 well, maybe -- no, no 2003. I'm pretty sure it
21 was May of 2003. It was whenever the progress
22 meeting was in 2003, either May or June. And I
23 had a conversation with him about it, his
24 performance. And I believe that's even documented
25 in my letter to President Hill.

19

1    Q. Yeah. What do you remember about that
2  meeting?
3    A. I just remember that we had a very candid
4  meeting, and that Steve was contrite in the sense
5  that he -- you know, he understood what I was
6  looking for. And he said that he would come
7  up-to-date with all of his reports and he would do
8  better. I mean, that's how I remember the
9  conversation going.
10    Q. Okay. Now, you did, in fact, recommend
11 that he be terminated, correct?
12    A. That's correct.
13    Q. All right. Now, what is it that was
14 different about Steve's performance that made you
15 recommend that he be terminated as compared to
16 Wyatt Earp, or as compared to -- let's just take
17 Wyatt Earp, because Wyatt Earp you indicated --
18 and I'll get a chance to look at the tally -- was
19 late on expense reports, was late on weekly
20 reports, and in turn Per Capita Objective Report,
21 what is it that made you recommend termination for
22 Steve but no discipline for Wyatt Earp?
23    A. Well, first of all, I didn't make that
24 comparison.
25    Q. Why not?

20

1    A. I didn't sit there and decide that, hey,
2  one over the other. That decision to terminate
3  Steve was based on Steve's performance and Steve's
4  performance only.
5    And Wyatt Earp, as long as you bring it up,
6  he's one of the best reps I have on staff --
7    Q. But obviously, what I'm looking --
8    A. -- and he performs remarkably well.
9    Q. Okay.
10    A. And he does his job remarkably well, and
11 when I contact him, I get a return call. And when
12 I e-mail him, I get a return e-mail. And all of
13 his locals are very, very confident of his
14 abilities. So in my mind, there is no comparison
15 in terms of job performance.
16    If we want to talk about just these work
17 reports, then I could say that there is no -- I
18 mean, there is no real difference there, any
19 material difference, but that's not the only
20 reason that I let go of Steve Kamen.
21    Q. Now, am I correct that the reasons that
22 your recommended his termination are contained in
23 that letter of December 8, 2004?
24    A. Most of it, yes.
25    Q. If you would, take a moment and look at

21

1  this, because I'm going to ask you some questions.
2    A. Okay.
3    Q. Take two or three minutes. Okay. I don't
4  want to rush you on that because that's an
5  important document.
6    A. Okay.
7    Q. All right. You've seen the letter,
8  correct?
9    A. Uh huh.
10    Q. How much of that did you write?
11    A. I wrote it all.
12    Q. Okay. You wrote it all, right?
13    A. Yes, I did.
14    Q. All right. And did you intend it to be
15 accurate?
16    A. Certainly.
17    Q. And are there any reasons, other than what
18 you've identified in that letter, that were the
19 basis for recommending the termination of Steve
20 Kamen?
21    A. Certainly my lack of confidence in his
22 ability to perform, I don't have -- I didn't
23 actually put that in there, but that's part of the
24 consideration.
25    Q. Why didn't you?

**Transcript of Donald Siegel**

22

1    A. Other than that, that's pretty much it.
2    Q. Pretty much it?
3    A. Uh huh.
4    Q. And you told President Hill that you
5    thought that Steve ought to be terminated?
6    A. Well, I told him I no longer needed him on
7    my staff, and I assumed when I said that he would
8    be terminated, yes.
9    Q. In other words, that Hill would pick up on
10   that and understand that and get rid of him,
11   right?
12   A. No. What that meant is that I assumed that
13   President Hill was probably not going to reassign
14   him.
15   Q. Didn't you have any discussions with Hill,
16   with President Hill about your letter, about this
17   letter of December 8th?
18   A. About the letter specifically?
19   Q. I don't mean --
20   A. I don't think so. I had discussions about
21   Steve Kamen's status here in the Third District,
22   yes.
23   Q. I mean, you say you wrote the letter. So I
24   assume what you did is --
25   A. I did.

23

1    Q. -- sent it up to President Hill for him
2    to sign it? Didn't he sign it?
3    A. Wait a minute. This is the letter -- I'm
4    sorry. Yeah, I'm looking at the wrong letter.
5    I'm thinking this is the letter that I wrote to
6    President Hill, but it's pretty much like the
7    letter I wrote to President Hill. No, I didn't
8    write this letter. I'm sorry.
9    Q. That's all right.
10   A. It looks a heck of a lot like the letter I
11   wrote to President Hill though.
12   Q. Here's the letter that you wrote. Take a
13   look at that.
14   A. There's a lot of cutting and pasting going
15   on in this letter. I wrote this letter.
16   MR. CHIVERS: Mark this as Deposition
17   Exhibit 1, the document of November 30th.
18   (Deposition Exhibit No. 1 was marked for
19   identification.)
20   Q. Okay. So if you take a look at Deposition
21   Exhibit 1, that's the letter that you wrote dated
22   November 30th, correct?
23   A. That is correct.
24   Q. And then Deposition Exhibit 1 from
25   Mr. Hill's deposition is this letter of December

24

1    8th?
2    A. That's correct. That's the letter that he
3    wrote to Steve.
4    Q. And what you're saying is it pretty much
5    just picks up on what you wrote?
6    A. It pretty much does, yeah.
7    Q. Why don't you keep those in front of you
8    for now.
9    Now, I don't know if I have that. Here you
10   go.
11   I want to show you the Amended Complaint in
12   this matter. And I want you to take a moment.
13   The only part I really want you to pick up on is
14   starting with paragraph 16. Go from 16 to 57.
15   Look, you can look at the whole thing if you
16   want. But 16 through 57, those are the factual
17   allegations made by Steve. And take a minute, and
18   I'm going to ask you some questions. Okay?
19   A. Okay.
20   Q. It will probably take you five minutes to
21   go through there.
22   (Recess.)
23   Q. Have you had a chance to look at the
24   Amended Complaint?
25   A. Yes, through 57, right?

25

1    Q. Say it again?
2    A. You said No. 57.
3    Q. 16 through 57.
4    A. Yeah.
5    Q. Good. If you would take a look at
6    paragraph 17, if you would.
7    A. Okay.
8    Q. I would assume based on the letter that you
9    wrote of November 30th and then the letter that
10   President Hill signed on November 8, do you take
11   exception to this?
12   A. Yes.
13   Q. Because you did not think that he performed
14   in a satisfactory manner?
15   A. No, not consistently.
16   Q. Well, up until last year, I mean, did you
17   ever give him a suspension or anything like that?
18   A. No.
19   Q. No?
20   A. No.
21   Q. You never said, "I'm going to suspend you
22   for a day or three days"?
23   A. I don't have the authority to do that, and
24   no, I never recommended it.
25   Q. I understand you don't have the authority.

Transcript of Donald Siegel

26

1   But I take it from your testimony you never
2   recommended a one-day suspension, three-day
3   suspension, anything short of a termination you
4   never recommended?
5       A. That's correct.
6       Q. Did you ever put any formal reprimand in
7   Steve's file saying --
8       A. I think there's some documents in there
9   that call attention to the lack of his filing
10  reports and so forth. But when you say formal
11  reprimand, other than that, no.
12      Q. Did you ever sit down with Steve, before
13  you recommended that he be terminated on November
14  30th, and tell him, "If you don't change A, B, C,
15  I'm going to recommend that you be terminated,"
16  did you ever say that to him?
17      A. I don't believe I ever said that in those
18  words, no.
19      Q. Why not? Why not give him a warning of
20  that nature, to say, "This is what I don't like
21  and if you keep doing it, I'm going to recommend
22  that you be terminated"?
23      A. Well, I think that it would be pretty much
24  understood that's that what was going to happen if
25  you didn't perform, but no, I never said those

27

1   words, no.
2       Q. You just assumed he understood that's what
3   you meant?
4       A. I assumed he understood that's what I
5   meant, and I assumed by his repeated apologies for
6   not performing or not being there on time
7   indicated to me that he certainly understood that
8   he had a problem.
9       Q. Well, I thought his apologies actually went
10  to the timeliness of his reports, did they not?
11      A. His apologies went to -- there was also an
12  apology for not making a particular meeting
13  somewhere.
14      In fact, as I looked back over the records,
15  when I looked at it again, I'm surprised that I
16  didn't act at that particular time. I must have
17  been in a good mood that day, because he basically
18  ignored an assignment. I didn't realize that at
19  the time, he said that because of Yom Kippur or
20  something else, after the fact, he didn't think
21  was worthy of him making a trip to Philadelphia
22  for a particular meeting. Now, that's just one of
23  the things that I came across, as I'm looking over
24  this stuff.
25      Q. Yeah.

28

1       A. I can't say that I acted on it at the time,
2   but that's just kind of an indication of the fact
3   that I was losing confidence in him taking
4   directions.
5       Q. Take a look, if you would, at paragraph
6   19. This has to do with when Steve was
7   hospitalized. I don't expect you to know the
8   exact date, but is that what you remember?
9       A. Yeah.
10      Q. Now, if you take a look paragraph 21, you
11  testified here earlier that you didn't know that
12  he had HIV?
13      A. That's correct.
14      Q. Okay.
15      MR. YELLIG: Excuse me. I don't think that
16  question was asked. I think you asked him if he
17  knew that Mr. Kamen was a homosexual.
18      MR. CHIVERS: I asked him that.
19      MR. YELLIG: But I don't believe you asked
20  him about HIV.
21      Q. Did you ever know that Steve was diagnosed
22  with HIV?
23      A. No, not until this Complaint.
24      Q. Fair enough.
25      If you'd take a look at the next page,

29

1   actually, paragraph 28. Sound about right, right
2   around May 1st, 2004 Mr. Kamen came back to work?
3       A. That sounds about right.
4       Q. Now, if you take a look at paragraph 29, is
5   it true that Steve was doing work from home during
6   this medical leave?
7       A. I wouldn't know.
8       Q. Why not?
9       A. Because he wasn't reporting.
10      Q. He wasn't reporting?
11      A. We weren't receiving any reports, how would
12  I know what he was doing?
13      Q. Did you call him?
14      A. Yes. He didn't return calls. He didn't
15  return e-mails. We had a hard time getting a hold
16  of him during that period of time.
17      Q. Do you have records of your e-mails sent to
18  Steve Kamen during 2004?
19      A. I have the records that are in here that
20  you have already.
21      Q. Well, because you've been testifying here
22  that, for example, you made phone calls or you
23  sent out e-mails and Steve didn't respond?
24      A. That's correct.
25      Q. So my question always is: What kind of

30

1   evidence is there of that fact? You have --
2       A. I have an e-mail that I think I sent in
3   February. He is shown to log on to his computer
4   in-between that time and April, and he ignored
5   that e-mail, or else he didn't see it and never
6   responded to it.
7       And then I have a receipt for one of those
8   e-mails that I sent in February that I think the
9   read receipt comes back in April. Now, don't hold
10  me to those dates. They're in there. So I'm
11  going strictly from my own memory at this point.
12  But those are in there. And I know that we had
13  put out cell phone calls to him.
14      My executive assistant, Mike Welsh, tried
15  to contact him a couple of times and he, in fact,
16  had sent an e-mail that was not responded to.
17      Q. Just a question for you having to do with
18  basically the accessibility of information. If
19  you had to produce copies of any e-mails that were
20  sent to Steve Kamen in the year 2004, is that all
21  still on your system here, do you know?
22      A. We don't have the server here. The server
23  is in Washington. So I would presume that it
24  would be. I mean, I'm not an IT guy. But I would
25  presume that they're somewhere.

31

1       MR. YELLIG: Can we go off the record for a
2   second.
3       (Off the record.)
4       Q. How about telephone records, I assume you
5   contract from this office for a telephone
6   carrier? You tell me if you do?
7       A. No. We have a carrier from this office,
8   and, yeah, we would have phone records. I don't
9   know if my office keeps them, but it's paid from
10  Washington. So the real -- the actual customer is
11  Washington. But they have them separated by
12  office. And I get a copy of the landline
13  records. I get no copies of cell phone records.
14  And none of my reps do.
15      Q. Let's just take the landline.
16      A. Those are from Washington. And I don't
17  know if they have the records or not.
18      Q. Would it be fair to say that to the extent
19  calls were made here from this office to Steve
20  Kamen, they'd most likely be on the landline, the
21  calls?
22      A. If they were coming from this office, yes.
23      Q. Do you know who the carrier is for the
24  landline?
25      A. It's Verizon. And I don't know if we have

32

1   the Verizon records, because we don't pay the
2   bill, it goes to Washington.
3       Q. I've done this on a lot of these cases.
4       A. The AT&T is the long-distance carrier. And
5   Verizon is the local carrier. And I presume that
6   calls made to Steve's cell phone and/or landline
7   would be local calls. I'm presuming that because
8   of the area codes. So I don't know if they would
9   show up on the AT&T records. I think they would
10  be in the Verizon records.
11      Q. Fair enough.
12      If you would take a look again at paragraph
13  29 of the Amended Complaint. Do you remember
14  reducing or at least taking some of Steve's duties
15  away when he was on medical leave?
16      A. Yes, I do.
17      Q. What duties were taken away?
18      A. Well, when I say duties, I took some locals
19  away. I believe three locals, three or four
20  locals.
21      Q. Do you remember what four locals were taken
22  away from him?
23      A. Off of the top of my head, I do not
24  remember specifically. I know they were right out
25  here in Western Pennsylvania. I think there was

33

1   one in Altoona.
2       Q. Well, when he returned on or about May 1st,
3   why didn't you give him those four locals back?
4       A. I had no confidence in him servicing those
5   locals. Why would I give them back to him? They
6   were being serviced now and I wasn't getting any
7   complaints. And, in fact, the locals were happy
8   to have a new rep.
9       Q. Well, would any of those locals have been
10  like 385, Local 385?
11      A. 385 may have been one of them.
12      Q. Local 2007?
13      A. That definitely was; one.
14      Q. Where is Local 2007?
15      A. Altoona.
16      Q. Altoona?
17      A. Correct.
18      Q. Where is Local 385?
19      A. They're all over Western Pennsylvania.
20  They're located here, very close to the office. I
21  think Butler. I'm not sure exactly where their
22  office is.
23      Q. The point is it's a Western Pennsylvania
24  local?
25      A. That's correct.

Transcript of Donald Siegel

34

1    Q. All right. What about 1968, Local 1968,
2  where is that, Brooklyn?
3    A. No, not Brooklyn. It's in New York. It's
4  no longer in existence, but that's a local that I
5  believe was taken away. That was a local that
6  complained about Mr. Kamen's lack of attention to
7  their needs.
8    Q. Now you get complaints from locals about
9  International reps, don't you? It's not like
10 Steve Kamen is the only International rep who has
11 had locals complain about them?
12   A. That's true. It's not like he's the only
13 one, but I've never gotten the number of
14 complaints on any other rep that I got on Steve
15 from locals that they serviced.
16     Now, there are local unions that may call
17 here or a member that calls here that complains
18 about someone that that rep doesn't even service
19 them. I don't know what's that about.
20     But in answer to your question, you asked
21 me to put some details in it.
22   Q. Yeah.
23   A. I cannot recall since 2002 specifically a
24 local union that complained about their service
25 rep to the extent that I received complaints about

35

1  Kamen.
2    Q. Okay.
3    A. I cannot recall any.
4    Q. Now, I've seen a written complaint only
5  from one, 1968, Local 1968.
6    A. Yes.
7    Q. Do you know of any other written complaints
8  from locals other than Local 1968?
9    A. Not off the top of my head, no.
10   Q. Then any of these other complaints would
11 have been verbal?
12   A. Mostly, yeah.
13   Q. Now, let's take Local 385, do you know
14 Scott Baker?
15   A. Yes.
16   Q. Do you know Terry Haines, H-a-i-n-e-s?
17   A. Yes.
18   Q. Terry was the former president of the
19 local?
20   A. That's correct.
21   Q. And then Scott Baker came in when?
22   A. I don't know specifically, but it was after
23 I became vice president, I believe.
24   Q. Okay. Did you have any discussions that
25 you remember with Scott Baker or Terry Haines

36

1  about Steve Kamen?
2    A. Specifically about, not that I recollect,
3  no.
4    Q. So you don't remember they're calling in to
5  complain about Steve?
6    A. No. I don't recall anyone from 385 making
7  a complaint about Steve.
8    Q. Okay. So if nobody complained from 385, if
9  nobody complained about Steve Kamen, why did you
10 take Local 385 off of him when he came back from
11 medical leave?
12   A. Because he wasn't doing the job that he was
13 already given. He wasn't performing what I had
14 him doing, so why would I give him anything back?
15 Things were running smoothly at that point.
16 There's no reason to give it back to him. So I
17 made that decision in the best of interest of what
18 I thought were the local unions and their
19 membership.
20   Q. Well, with taking those four locals away,
21 how many locals did Steve have, as of the time he
22 was terminated?
23   A. I don't recall.
24   Q. I'm not looking for a number necessarily
25 but an approximate number?

37

1    A. One, two or three. I really don't recall.
2  I think he had 1914 and one or two others.
3    Q. Do you remember what other ones he had?
4    A. It may have been 1968 -- or not 68. 63. I
5  don't recall.
6    Q. Hold on one second. And I'll see if I
7  could give you numbers and that will jog your
8  memory?
9    A. I have 139 locals, by the way.
10   Q. I'll give you the numbers and you just tell
11 me if you remember if they were Steve's.
12     Do you remember 1914?
13   A. Yeah, I mentioned that.
14   Q. Where is that local?
15   A. It's in -- it's right here in Western
16 Pennsylvania. Harvick -- or Harwick, Harwick is I
17 think the name of it.
18   Q. Harwick, PA.
19     Do you remember 1963?
20   A. Yes. That's here in the Pittsburgh area.
21   Q. That was also Steve?
22   A. Yes.
23   Q. And 2007, we already talked about out in
24 Altoona. 1968 that's in New York. 385 we talked
25 about that. That's here.

**NETWORK DEPOSITION SERVICES**

Transcript of Donald Siegel

### 38

1  Do you remember a local out of Meadeville,
2  Pennsylvania?
3  A. I know there's a local in Meadeville.
4  Q. Do you remember the number?
5  A. No.
6  Q. Do you know if Steve --
7  A. It doesn't come to mind.
8  Q. Do you know if Steve had it or not?
9  A. I don't recall.
10  Q. Do you know if there's a local up in
11  Rochester, New York?
12  A. Yes, 86.
13  Q. Do you know if Steve had that one?
14  A. They are a combination local. Yes, they're
15  serviced by two reps. Generally that local is
16  serviced by a manufacturing rep, which was part of
17  Steve's responsibilities, and also a construction
18  rep. I don't think of 86 as a manufacturing
19  local, but yes, Steve did service them.
20  Q. Well, would you say it's a pretty good
21  approximation of how many locals Steve had, we
22  just went through seven -- 385, 1968, 2007, 1914,
23  86, 1963, and a local we can't remember the number
24  in Meadeville, Pennsylvania. I just gave you
25  seven?

### 39

1  A. Uh huh.
2  Q. Does that sound about right for Steve
3  Kamen, the number of locals he would have had
4  before he was off on medical leave?
5  A. Originally, yes.
6  Q. Yeah.
7  A. That sounds about right.
8  Q. Now, you'll agree with me then that he goes
9  off in on his medical leave in February of 2004,
10  returns on or about May 1st, 2004 and he goes from
11  having seven locals down to four?
12  A. Uh huh.
13  Q. Correct, yes?
14  A. That sounds right, yes. I'm sorry.
15  Q. Okay. Well, did you ever talk to Steve and
16  explain to him why you were taking away three of
17  his seven locals?
18  A. No.
19  Q. Why not?
20  A. I think Steve was -- I want to tell you
21  something right now. I couldn't get a hold of
22  Steve half the time. Steve was not an easy guy to
23  get a hold of. He didn't return calls to this
24  office.
25  We had a policy when I became vice

### 40

1  president, every rep had to -- first of all, let
2  me explain that Mike Welsh, my executive
3  assistant, handles utility, manufacturing and
4  telephone reps. Steve is a manufacturing rep, for
5  all intents and purposes. So that would have been
6  the rep at my office that Steve would report to.
7  And then the construction reps would report
8  to John Malagiese, just to put that in a structure
9  for you.
10  When I became vice president, it was a
11  policy in this local -- in this District that
12  every rep, every field rep was to touch base with
13  their office counterpart at least once a week.
14  Almost every rep does that, consistent since
15  2002. In fact, more than once a week.
16  We would go weeks without Steve calling in,
17  to even talk to Mike Welsh. I had no idea what
18  Steve was doing half the time. And it wasn't just
19  during that period of 2004 that you want to focus
20  on. It was prior to that. There's a long history
21  of problems of contacting Steve. And there was a
22  long history of him not reporting to this office
23  on a regular basis.
24  Q. Did you ever send him an e-mail. I mean,
25  you did have his e-mail address, did you not?

### 41

1  A. Yeah, I had his e-mail address.
2  Q. And certainly your e-mail worked, didn't
3  it?
4  A. Yes.
5  Q. As far as you know, his worked?
6  A. As far as I knew, it did.
7  Q. Okay. Did you ever send him an e-mail
8  saying that he was hard to get in touch with?
9  A. I think that I alluded to that in an e-mail
10  that said, "We've been trying to get a hold of
11  you." Mike Welsh has left messages with him
12  saying that "We've been having a hard time getting
13  a hold of you," yeah. I don't think that that
14  should have been a secret.
15  Now, just remember too that we're talking
16  about International representatives here. These
17  are people that pretty much we rely on their
18  self-performance and self-supervision. I mean,
19  these are not particularly subordinates that are
20  looking for orders and direction from this office
21  every single day.
22  Q. I mean, they're pretty much off in the
23  field doing their thing, aren't they?
24  A. They are pretty much in charge of their
25  schedule. And they are to report back to here.

### Transcript of Donald Siegel

**42**

1 We've got to know what they're doing. And with
2 the exception of Steve, I could tell you on almost
3 any given week where my reps are.
4     Q. Okay. Now, if you take a look at again at
5 the Amended Complaint. Do you recall that Steve
6 asked you to get his locals back?
7     A. Yeah. I recall a conversation where he
8 said something about his locals. I don't remember
9 the specifics of it.
10     Q. Fair enough. And you told him, "No, you're
11 not going to get them back"?
12     A. I don't know that I said it exactly like
13 that, but I don't think I left any illusions. I
14 think he pretty much understood I wasn't going to
15 reassign them back to him.
16     Q. Did you give him any specific reasons why?
17     A. I told him that -- I believe I told him I
18 didn't have the confidence in him doing the job.
19 Now, I don't know, because you're asking me to
20 recollect a verbal conversation. I recall Steve
21 asking about it. And I recall me answering him.
22 But I don't have a stenographic memory of the
23 conversation. I don't have that. And I don't
24 think it was a very long conversation.
25     Q. Now, if you'd take a look at paragraph 33.

**43**

1 We've already talked about the fact that three of
2 his seven locals were taken away.
3     My question is: Did Steve, in fact, want
4 to go to certain training in 2004? Do you
5 remember that?
6     A. Not that I was aware of.
7     Q. All right.
8     A. I mean, when I read this, you're asking me
9 to look at 33, I'm not aware of any of this. I
10 mean, as far as manufacturing conferences, he was
11 assigned all the way through 2004 to every
12 manufacturing conference by this office. And I'm
13 not aware of any training that he was denied. And
14 I had no idea what this director thing is about.
15     Q. Yeah.
16     A. I don't know anything about that.
17     Q. We established that is actually premedical
18 leave.
19     You'll agree with this part though which
20 says he was never given back the duties he had
21 prior to his going out on sick leave. You'll
22 agree with that?
23     A. In terms of those local unions, he was
24 never reassigned those local unions, yes, I do
25 agree with that.

**44**

1     Q. All right. By the way, if you'd take a
2 look at paragraph 41, and excluding that phrase in
3 the middle, "whose work was inferior to
4 Plaintiff's," you'll agree with paragraph 41 to
5 the extent that it says none of the Defendant's
6 other International representatives have ever been
7 terminated for performance?
8     A. In this District.
9     Q. Fine. District 3?
10     A. Yeah, I agree with that.
11     Q. All right. And take a look at paragraph
12 42, based on your testimony, you'll agree with me
13 that other International representatives whose
14 expense reports were late have not been
15 terminated, correct?
16     A. That's correct.
17     Q. And also other International
18 representatives who have had incomplete paperwork,
19 they have not been terminated, correct?
20     A. Well, when you say incomplete paperwork.
21     Q. You're not sure what that means.
22     A. I'm not sure what that means, either you
23 have your work in or you don't have it in.
24     Q. How about other representatives, were any
25 other representatives late in performing their

**45**

1 assignments?
2     A. We have had representatives from time to
3 time that have been slow in performing their
4 assignments, but they've been in touch with this
5 office and, you know, given reasons for a delay.
6     I've reached out to other representatives
7 from time to time and asked them, why, you know,
8 what's taking so long? What's going on here?
9     Q. All right.
10     A. But the important part of that is I've
11 gotten a response from those representatives. I
12 could reach out to them and actually ask them that
13 question. And in some cases, the reasons were
14 plausible, and in other cases, maybe it was just a
15 little bit of procrastination, but we were able to
16 discuss it and get it done; nothing to the degree
17 of these tardiness that was in Steve's
18 assignments.
19     Q. All right. I want to show you some
20 documents. We're moving right along here. I
21 wanted to ask you before I move on.
22     You testified, at least with respect to
23 Local 385, you don't remember any complaints
24 coming from them about Steve Kamen?
25     A. No, I don't recall any, no.

**Transcript of Donald Siegel**

46

1    Q. Did you get any complaints out of Local
2 2007 out of Altoona about Steve?
3    A. Yes.
4    Q. What complaints did you get and from whom?
5    A. I got complaints the -- one of the officers
6 up there, and I don't recall the name, had said
7 that he didn't show up for negotiations, that they
8 couldn't get a hold of him.
9        And I did get a petition signed from some
10 people over at 2007, if I'm not mistaken.
11    Q. All right. Go through some of these
12 documents. I want to show you a series of
13 documents and ask if you recognize these. Okay?
14    A. Yes.
15    Q. I'm going to put these in front of you, a
16 stack of documents, okay. We're going to work our
17 way through these things.
18        MR. CHIVERS: Terry, these are the
19 documents that I showed Ed Hill on Tuesday.
20    Q. Take a look at the first one, if you
21 would. You're on copy there, correct?
22    A. Pardon me?
23    Q. Take a look. You're one of the cc's?
24    A. Correct.
25    Q. This is an e-mail dated December 8th,

47

1 2004. And I don't know, you could tell me, do you
2 remember this specific e-mail, by any chance?
3    A. I have a recollection of it, I mean now
4 that I see it.
5    Q. Now, apparently, if you'd take a look at
6 the lower part of December 1st, 2004, this has to
7 do with a meeting apparently between you and Steve
8 Kamen?
9    A. Are you talking about the same document,
10 December 8th?
11    Q. Yeah. Well, no. Take a look at the lower
12 part. You know how these e-mails are chains of
13 these things.
14    A. Okay.
15    Q. You see where it refers to a meeting that
16 Steve says he had with you the day before, which
17 would have been November 30th?
18    A. Yes.
19    Q. November 30th is the day that you wrote
20 that letter that we looked at before?
21    A. That's correct. That's also the date that
22 I met with Steve.
23    Q. And you told him you were going to
24 recommend that he be terminated?
25    A. I told him that I no longer needed him on

48

1 this staff.
2    Q. All right. Then take a look at the next
3 page, which is, now according to Steve in this
4 e-mail, there's no date at the top of it. We have
5 to assume it's right around that time of December
6 1st, because he refers to a meeting yesterday with
7 Vice President Siegel.
8    A. Yes.
9    Q. Oh, you know something, this is the same
10 e-mail that we had on the previous page.
11        Am I correct though, because what this
12 suggests, as you read it is that, in fact, you did
13 have a conversation, a telephone conversation with
14 Ed Hill about Steve Kamen at or about that time,
15 November 30th? Take a look at it. Steve is
16 referring to the fact --
17    A. Yeah, I may have called Ed. I think I sent
18 him an e-mail. I thought I did, but maybe I
19 didn't. But certainly, there was communication
20 between President Hill and myself, yes.
21    Q. Then take a look at the next page, which is
22 December 6th of 2004. Maybe it's December 8th?
23    A. Okay.
24    Q. Now, it says it's Steve is in this e-mail
25 to President Hill, he's saying that he is going to

49

1 continue to do his job. Okay?
2    A. Yeah. This is the first that I'm becoming
3 aware of this e-mail.
4    Q. Oh, is that right?
5    A. I've never seen this e-mail, before today.
6    Q. So you had no knowledge of that, right?
7    A. Not this particular e-mail, are we talking
8 about this one from Steve Kamen to President
9 Hill?
10    Q. Yeah. Do you know, this is kind of as an
11 aside, anything that happen to a broadcast
12 conference?
13    A. Pardon me?
14    Q. Do you have conferences that are broadcast
15 over some sort of a satellite or something?
16    A. No. You're referring to our department --
17    Q. Broadcast division.
18    A. -- a broadcast department that has a
19 conference every year; is that what you're
20 referring to?
21    Q. It must be what I'm referring to.
22    A. Yeah, they no longer have their own
23 conference. But up to 2004, they were still
24 having individual conferences. Yeah, I'm aware of
25 them.

50

1    Q. Did you prohibit Steve from participating
2  in that?
3    A. No, I didn't assign him.
4    Q. Had you assigned him in the previous years?
5    A. I may have. Larry Rossa may have assigned
6  him in previous years as well. In fact, I was
7  even assigned them in previous years. However,
8  President Hill at some point in time made it clear
9  that we were only to assign one or two reps to --
10    Q. Not everybody?
11    A. -- each conference. And at that time I
12  made the decision that I had three people that
13  serviced broadcasting -- Steve Kamen serviced
14  385. Randy Keefer serviced Local 98 and Dom
15  Macchia serviced our big broadcast local, 1212.
16    So Dom Macchia ever since that time has
17  been the rep assigned to broadcast conferences.
18  And the only rep. Keefer was no longer assigned
19  and neither was Kamen.
20    Q. Now, if you'd take a look at the next
21  document in that stack.
22    A. In this document?
23    Q. This is from you to Ed Hill. This is dated
24  November 30th. Do you see that?
25    A. I don't know why it's in such big print.

51

1    Q. Just the font. Anyway, you wrote this?
2    A. This is the e-mail. Remember, I said to
3  you that I had communicated when I thought it was
4  by e-mail. This is the e-mail.
5    Q. I got you. At any rate you're sending this
6  e-mail to Ed Hill, correct?
7    A. Correct.
8    Q. And in this, take a look at the middle of
9  it, there's a sentence here, "he briefly" -- he
10  referring to Steve Kamen -- "briefly described
11  personal problems with divorce, illness, a recent
12  car accident and IRS problems"?
13    A. That's correct.
14    Q. So apparently at this meeting that you had
15  with Steve Kamen on November 30th, you and he
16  discussed his illness, correct?
17    A. Correct.
18    Q. Well, I'm a little puzzled by that. You
19  obviously at that point, the day that you were
20  making a recommendation to terminate Steve, you
21  were aware of the fact, I mean, not only because
22  of what had happened earlier in the year, but
23  because of the discussion you had with Steve that
24  he had an illness, did you not?
25    A. Not at the moment. We discussed that in

52

1  the context of the fact that he had been sick. He
2  had gotten divorced. He bought a new home. He
3  had IRS problems from his mother's estate. His
4  mother had passed away. I mean, in that context,
5  we discussed all of those things. I didn't put
6  everything in here. But I mean, he said that he
7  was having some personal problems.
8    He had brought in all of these reports. I
9  forget how many there were. And when I asked --
10  when I asked about those, he specifically sat
11  there and said to me, I have no excuses. The IBEW
12  has been good to me.
13    Now, you know, a reasonable person would
14  say this, at this point in time, Mr. Kamen had
15  every opportunity in that interview to express to
16  me anything specific that would have prohibited
17  him from performing his duties. He did not.
18    We talked about his history, his history
19  going way back to his divorce, which I think was
20  much prior to this 2004 diagnosis that you cite.
21  And his mother's death, which was earlier that
22  than that as well. I think that was in 2003. And
23  many other things. I mean, he had been sick off
24  and on from time to time. But there was no way in
25  the world that I had the impression that he was

53

1  sick on November 30th.
2    So if what you're asking is was there a
3  discussion about an illness that he presently had,
4  no. That's not what was in the context of that
5  conversation.
6    Q. All right. Now, if you'd take a look at
7  the next -- actually, skip ahead to the next
8  document, because the next document is what we've
9  already marked as an exhibit. That's the November
10  30th letter?
11    A. Uh huh.
12    Q. And take a look at this stack of documents,
13  stack of pages, all --
14    A. Here.
15    Q. -- clipped together. November 30th, 2004
16  to Edwin Hill from Don Siegel regarding Steve
17  Kamen. You had indicated -- remember earlier in
18  the deposition I asked but this electronic
19  tally -- is this that electronic tally?
20    A. Yeah. That's what you're going to see.
21    Q. Yeah. So I already have a copy of it?
22    A. You do have a copy of it. I mean, you
23  asked for copies up through -- these are weekly
24  reports reports.
25    Q. Okay.

54

1    A. The expense reports aren't in here.
2    Q. Now, how could I tell --
3    A. What you'll see -- well, go ahead. Ask the
4 question. I'm sorry.
5    Q. That's all right. Am I correct, if you
6 take a look at all of these representatives, if
7 you take a look at these dates, the week ending
8 November 2nd, underneath you'll find the dates
9 that the reports were actually filed?
10    A. Correct.
11    Q. Were they filed electronically?
12    A. No. This was before our electronic
13 filing. These would have come in by paper.
14    Q. So this is the date that your office
15 received them?
16    A. The date we received them.
17    Q. So you could go through and you could make
18 a comparison about these various representatives
19 as to who, you know, as to who got them in first,
20 last and in-between. In other words, you could
21 track the timeliness of their filing the weekly
22 reports?
23    A. That's correct.
24    Q. At least for the period of November of 2002
25 through November of 2004?

55

1    A. That's correct.
2    Q. Okay. Then take a look at the next
3 document. Now, this I take it is the letter that
4 you sent to Steve asking him to meet with you on
5 November 30th?
6    A. That's correct.
7    Q. Well, you didn't have any apparent problem
8 in sending him a letter and having him respond to
9 it, did you?
10    A. No, apparently not.
11    Q. Well, can you think of any other instant
12 where you sent him a letter and he didn't respond
13 to a letter?
14    A. I can't think of it offhand, no.
15    Q. Well, then, I'm a having a little
16 difficulty understanding when you say you couldn't
17 get in touch with Steve. You didn't have any
18 problem getting in touch with Steve on this?
19    A. We spend tens of thousands of dollars on
20 electronic equipment. We pride ourselves in
21 technology. I don't communicate with all my reps
22 by snail mail. And I don't intend to start now.
23 So if I have to do it that way, then that's not
24 acceptable either to me.
25    Q. Okay.

56

1    A. When I need to get a hoid of someone,
2 remember something, we represent 130,000 members
3 here, 140,000 members. When they call in, they
4 don't want to be delayed. We pride ourselves in
5 rapid response. I'm not going to communicate with
6 every rep. If I have to do it this way, we're
7 going to become a dysfunctional organization.
8    Q. Fair enough.
9        The second page, it says, Steve Kamen as of
10 November 18th, 2004. Do you see that page?
11    A. The page attached to this?
12    Q. Yes.
13    A. Yes.
14    Q. Did you prepare this?
15    A. These are notes that I prepared for myself,
16 yeah, that probably were in the file.
17    Q. And you make a comment in here, the second
18 to the last paragraph, "There were complaints from
19 several locals that they could not contact Steve,
20 Local 385, 1914 and 1968"?
21    A. Uh huh.
22    Q. "Locals were reassigned to other reps and
23 we have not had complaints since then."
24        You're really talking about complaints
25 about Steve made by these locals prior to the time

57

1 that he went off on medical leave, or are you?
2 Because see the line here that says, "locals were
3 reassigned to other reps?"
4    A. Uh huh.
5    Q. You testified that you had those other reps
6 take those locals during the period of time that
7 Steve was off on medical leave?
8    A. Yeah. These are notes to myself, yeah, and
9 that's probably what I was referring to, because
10 I'm looking at it, and these are things that I
11 jotted down, and yeah, we haven't had those
12 complaints since then. The locals were reassigned
13 earlier that year.
14    Q. If you would take a look at the next
15 document.
16    A. Which is this document?
17    Q. Take a look at the next document, which
18 it's a fax cover page, International Brotherhood
19 of Electrical Workers?
20    A. From William Bohne.
21    Q. Bohne, he is the HR person?
22    A. Was at that time, yes.
23    Q. Okay. This is October 22, 2004. This is
24 to you. Did you ask for this information having
25 to do with the automobile accident?

58

1    A. I don't recall.
2    Q. I mean, why would you have gotten this
3  info?
4    A. I don't recall. I may have asked for it.
5    Q. Do you know why you would have asked for
6  it?
7    A. No, I don't recall.
8    Q. If you'd take a look at like the fifth page
9  in. This says, William Dicuccio, MD & Associates,
10  November 19, 2004. Do you see that where it says
11  past, family, and social history?
12    A. Correct.
13    Q. Do you see that?
14    A. I see it.
15    Q. Now, you obviously got these documents at
16  that time, correct?
17    A. Yes.
18    Q. And you had indicated to me that you
19  remember that there was a diagnosis of viral
20  meningitis, correct?
21    A. Correct, but I don't recall it from this
22  document.
23    Q. Oh.
24    A. That came from a conversation or a message
25  that Mike Welsh, my executive assistant, had with

59

1  Steve. And it was also in a doctor's note prior
2  to this, I believe, the viral meningitis, that
3  is. Yes, it's in this document. But are you
4  asking me specifically if I recall it from this?
5  I recalled it before I ever received this
6  document.
7    Q. Take a look at the next page after that.
8  This is page 2 of the information from
9  Dr. Dicuccio, D-i-c-u-c-c-i-o. Do you see where
10  it has the problem list?
11    A. Uh huh.
12    Q. "Yes"?
13    A. Yes, I see that now. I'm sorry. I forget
14  there's a stenographer here.
15    Q. Atrial fibrillation, anxiety, depression,
16  coronary artery disease, hyperlipidemia,
17  hypertension, abdominal pain?
18    A. Yes.
19    Q. You see all of that?
20    A. Yes, I see it.
21    Q. This is part of the information you
22  received, correct?
23    A. Yes.
24    Q. Then you see the current medications?
25    A. Yes.

60

1    Q. Now, I know you're not a doctor, at least I
2  assume you're not, correct?
3    A. No. I'm not a doctor.
4    Q. Didn't you talk to anybody about all of
5  this stuff, all of this information that you got
6  on Steve Kamen, as of October 22nd, 2004?
7    A. No.
8    Q. Well, you've been around a few years. I
9  mean, this is not that he's just taking aspirin
10  here, is he, these current medications?
11    A. Obviously not.
12    Q. Okay. Actually, you had all of this
13  information before you made the recommendation to
14  Edwin Hill to terminate Steve Kamen, didn't you?
15    A. I had this information, obviously. I
16  received it in October.
17    Q. And then if you flip ahead a couple of more
18  pages.
19    A. Flip ahead or back?
20    Q. There's only one. Not on this document.
21  We're just going to keep working our way through
22  these documents.
23    A. Which document?
24    Q. Take a look at this thing, it says,
25  "pending file 5-7-04 Steve Kamen." What is that,

61

1  if you know?
2    A. That's just what was in his pending file.
3  These were assignments not completed.
4    Q. Well, so the local number is like 2007; is
5  that right?
6    A. That's correct, that's the local number.
7    Q. And it says, "Transfered to P. Gino,
8  4-28-04," correct?
9    A. That's the last one down, yes.
10    Q. I'm not sure what that means.
11    A. That was charges that were filed against a
12  local union officer, which are very serious. They
13  cannot be delayed. And we were not getting a
14  response from Steve. Steve had not addressed it.
15  So I transfered to it Pat Gino on April of '04.
16  And Pat took care of it, probably in less than 30
17  days, I believe, if I recall.
18    Q. Well, you remember Steve was on medical
19  leave during this period of time, wasn't he?
20    A. Yeah, I do, but not 12-15 of '03 he wasn't.
21    Q. Actually, he went out in early February.
22  That's I mean at least that's what the notes
23  indicate?
24    A. Charges against local union officers, we
25  like to have them acted on as immediately as

## Transcript of Donald Siegel

### 62

1 possible. So some time had passed there.
2 Q. Now, does every one of these, it says, for
3 example, date assigned 10-27-99 complaint filed
4 Palmatier. Oh, I see, now, is this a list of
5 complaints made against the officers?
6 A. Yeah. These are of complaints that would
7 have been made against local union officers that
8 we then would assign a rep, their service rep to
9 investigate.
10 Q. Well, it sounds --
11 A. Or not necessarily against local union
12 officers. It could be about anything, having to
13 do with the local union.
14 Q. Am I correct that what this would indicate
15 is out of the four that were assigned to Steve
16 Kamen, four of these complaints against the
17 officers, three of them he handled properly and it
18 was this fourth one that you decided you had to
19 transfer over to another rep?
20 A. No.
21 Q. No?
22 A. We wouldn't get that from this. Three were
23 not as serious as the fourth one. That had to be
24 addressed immediately. These are not all charges
25 against local union officers. If you read the

### 63

1 regarding column, the last is charges were filed
2 against Jeff Blazier, financial secretary. That
3 indicates to me that charges were specifically
4 filed under our constitution against a local union
5 officer.
6 These other complaints were complaints --
7 I'm not sure of the specifics of them -- but one
8 was a complaint that had to do with downgrading.
9 I presume that had to do with something under the
10 Collective Bargaining Agreement.
11 Another one had to do with another
12 grievance complaint.
13 And the top one, I'm not sure what that
14 was, a complaint regarding Palmatier. They were
15 not charges. They were not charges filed against
16 a local union officer, which is a formal process
17 under our Constitution. These are very serious
18 and cannot afford a delay.
19 Q. Now, you didn't expect Steve to do this
20 while he was on medical leave, did you?
21 A. No.
22 Q. Did you talk to him before he went on
23 medical leave about this?
24 A. I don't recall if I did or not. I just
25 know that my history -- the history with Steve

### 64

1 getting to these things was not good. And I
2 needed this taken care of immediately. So I
3 transferred it to Pat Gino.
4 Q. Well, actually you would have had to
5 transfer it to Pat Gino anyway because Steve was
6 off on medical leave? Look, whether he had a
7 history --
8 A. You got to remember something. I don't
9 know when it was we first found out that Steve was
10 off on medical leave. It's true that we found out
11 eventually, but when we were first notified of it,
12 I mean, Steve was sick before in the -- this all
13 comes down to communications.
14 I find it interesting, in fact, that we
15 sent -- I sent an e-mail out to Steve, he didn't
16 answer it. The day after he was terminated, he
17 opened up his computer, and even had the knowledge
18 enough to figure out how to get a read receipt,
19 because he has tracking on it. You know, I got to
20 be honest with you, all I'm being convinced of, by
21 looking at all of this, is that, in fact, Steve
22 was not paying attention to his job until at such
23 time when he knew his job was in jeopardy, now
24 suddenly there's this big attention to it.
25 But getting back to it, I can't put my

### 65

1 frame of mind in those four months of 2004, only
2 then to say my experience with Steve Kamen had not
3 been good in him responding to things in a timely
4 manner. So, yeah, you're probably right, I would
5 have had to reassign it. But that wasn't the only
6 reason it was reassigned.
7 Q. Okay. Take a look at the next one, April
8 6, 2004.
9 A. Okay.
10 Q. You got this letter from Steve Kamen,
11 correct?
12 A. Yes.
13 Q. And attached to it is a note from his
14 physician, correct?
15 A. Correct.
16 Q. And that's excusing Steve from work for the
17 month of April while he continues to recover from
18 multiple serious health conditions, including
19 meningitis and diverticulitis. You got that,
20 correct?
21 A. Uh huh.
22 Q. "Yes"?
23 A. Yes.
24 MR. CHIVERS: Let me mark those two pages
25 as Exhibit 2.

### Transcript of Donald Siegel

66

1    (Deposition Exhibit No. 2 was marked for
2 identification.)
3    Q. Now, take a look at the next document,
4 March 16, 2004, and this is a letter that Steve
5 Kamen wrote you, correct?
6    A. Yes.
7    Q. And you got it, didn't you?
8    A. Yes.
9    Q. In the upper right-hand corner, there's a
10 K-a-m, it's kind of cut off, but did you write
11 that?
12    A. No. That's an interoffice thing that show
13 where it should be filed.
14    Q. What about the cc, Hill, FYI, in the upper
15 left-hand corner?
16    A. That's mine.
17    Q. That's yours?
18    A. Correct.
19    Q. Now, does that mean that you sent a copy
20 for information to Edwin Hill?
21    A. Correct.
22    Q. Now, did you also do the same thing with a
23 document of April 6th, 2004. Did you also send
24 that to Ed Hill?
25    A. I don't know.

67

1    Q. All right. You may have, you just don't
2 remember?
3    A. Yeah, I don't remember.
4    Q. But certainly you'll agree that you got
5 this letter of March 16, 2004 with the attached
6 note from Steve's doctor, correct?
7    A. Yes.
8    MR. CHIVERS: Let me mark that as Exhibit
9 3, those two pages.
10    (Deposition Exhibit No. 3 was marked for
11 identification.)
12    Q. And if you would take a look at the next.
13 You're doing it. What is this? This is a one
14 page, I don't know, is this a memo of some kind?
15    A. No. It's typical of the complaints that we
16 receive from time to time from members. And in
17 this particular case, it's obviously been sent in
18 by eight members from Local 1968 saying they're
19 not being represented properly by Steve Kamen.
20    Q. So 1968 is the one out of Rochester?
21    A. No, that -- 1968 isn't out of Rochester.
22 That's the local that's in White -- up around -- I
23 don't know where it's at. It was north of New
24 City, New York, but I'm not quite sure. But it's
25 not in Rochester.

68

1    Q. Well, look at --
2    A. This town of Rochester, that must mean
3 another Rochester, New York, I think the big
4 Rochester.
5    MR. YELLIG: Rochester, PA?
6    MR. CHIVERS: No, no. He means Rochester,
7 New York.
8    Q. Yeah, look, it says, Accord, New York.
9 It's not Rochester, New York.
10    A. Yeah, town of.
11    Q. Interesting. Well, whatever.
12    So the point is this is not the Kodak
13 Rochester, New York?
14    A. Correct.
15    Q. This is --
16    A. Well, the reason I make the distinction is
17 because Steve also serviced a local in
18 Rochester --
19    Q. That's what I thought.
20    A. -- Local 86.
21    Q. This is not --
22    A. It's not related to that.
23    Q. You'll agree with me that as of February
24 27th of 2004, Steve was off on medical leave
25 because his medical leave started February 20th?

69

1    A. (Witness nods head up and down.)
2    Q. "Yes"?
3    A. Yes.
4    Q. My question too, what I didn't understand,
5 you indicated a little while ago that you were not
6 even aware, I'm not going to quote you on this,
7 but something to the effect that you weren't even
8 aware that he was off on medical leave at first,
9 something to that effect?
10    A. Yes.
11    Q. Well, obviously, at some point you did
12 become aware of it?
13    A. Yes.
14    Q. Do you remember when you became aware of
15 the fact that he was off on medical leave?
16    A. No, I don't remember specifically.
17    Q. Am I correct that Steve had to coordinate
18 taking medical leave with the IBEW down in DC?
19    A. No.
20    Q. He was supposed to coordinate it with you?
21    A. Yeah. I mean, they put on their work
22 reports that they're sick, or they're off sick.
23 We have no formal process for that.
24    Q. Okay.
25    A. I imagine every district --

**Transcript of Donald Siegel**

70

1    MR. YELLIG: Go off the record for just a
2  second.
3    (Off the record.)
4    MR. YELLIG: Back on the record.
5    MR. CHIVERS: Back on the record.
6    Q. Take a look at the next page, the next
7  document. This is an e-mail from Steve Kamen?
8    A. Correct.
9    A. It's an e-mail from -- to me this is a read
10  receipt.
11    Q. Okay.
12    A. It's a read receipt from Steve to me.
13    Q. Now, then, the next page is from you to
14  Steve, correct?
15    A. That's probably this same one, yeah,
16  because I sent the message 2-27. It wouldn't have
17  the message in here. Well, yeah, it does. "Call
18  me ASAP." I sent it on 2-27. And I copied Mike
19  Welsh and John Malagiese. They read the e-mails
20  respectively on 2-28 and 3-1.
21    Steve opened his e-mail or read it,
22  according to this read receipt on April 8th.
23    Q. Then the next document from Michael Welsh
24  to you, "Subject, Steve Kamen's status March 12,
25  2004," so, obviously as of March 12th, you knew he

71

1  was on medical leave, correct?
2    A. Correct.
3    Q. All right.
4    A. This is the document I believe that I found
5  out about the viral meningitis because it's
6  mentioned in there.
7    MR. CHIVERS: Why don't we mark that as 4.
8  Let's mark that as Exhibit 4.
9    (Deposition Exhibit No. 4 was marked for
10  identification.)
11    Q. And then the next document, what is that?
12    A. That's a send receipt.
13    Q. From you to Steve, correct?
14    A. Correct.
15    Q. All right. Then this next document,
16  January 20th, 2004 to International reps Gino,
17  Kamen, and Macchia, M-a-c-c-h-i-a.
18    See, now, wouldn't this suggest for the
19  2004 manufacturing conference that all three of
20  these International reps were supposed to go?
21    A. They were all assigned, yeah, the
22  manufacturing conference.
23    Q. I understand.
24    A. Yes.
25    Q. That's it for that document. This is a

72

1  letter from Steve Kamen to you, correct?
2    A. Correct.
3    Q. And you got it, did you not?
4    A. Yes.
5    Q. Actually, it says, received January 21st?
6    A. That's Ara Mark in this office.
7    Q. Which would be the day after it was dated,
8  correct?
9    A. Yes.
10    Q. I mean, as far as you know, this is just
11  next day delivery, isn't it, for first-class mail
12  from here to Steve's place?
13    A. Pretty much so, yeah, it would seem that
14  way.
15    Q. That's it for that document.
16    Now, this is an e-mail from Mike Welsh to
17  Steve Kamen asking Steve to call, correct?
18    A. Correct.
19    Q. And also giving the cell phone number for
20  Mr. Welsh, correct?
21    A. Yes.
22    Q. Now, Steve had a cell phone too, didn't he?
23    A. Yes.
24    Q. Did you ever try to call him on his cell
25  phone?

73

1    A. Yes.
2    Q. And you were successful, weren't you, on
3  more than a few occasions? I mean, you reached
4  Steve on his cell phone, didn't you?
5    A. From time to time I did, more often than
6  not though I didn't.
7    Q. Meaning more often than not he didn't
8  answer?
9    A. He didn't answer or I didn't -- I had to
10  leave a voice mail, but yeah, I called him on his
11  cell phone.
12    Q. Then take a look at the next document,
13  January 20th, 2004. And this, again, goes to that
14  question of the manufacturing department,
15  correct?
16    A. That's me notifying President Hill of who I
17  assigned.
18    Q. All right. Take a look at the next
19  document after that. Go ahead. Two more
20  documents, two documents later. Yeah, that one,
21  where it says, October 21st, 2003 to Steve Kamen
22  from Don Siegel. You're telling Steve to
23  investigate this thing with Slovikosky, correct?
24    A. Correct.
25    Q. And how is this transmitted?

## Transcript of Donald Siegel

74

1    A. How is what transmitted?
2    Q. Is this a letter?  Is it a memo?  It looks
3 to be a letter form..
4    A. This, to Steve?
5    Q. Yeah.
6    A. That's a letter.
7    Q. You sent it via mail?
8    A. Correct.
9    Q. Okay.  Dated October 21, 2003 from
10 Mr. Siegel to Steve Kamen.  Now flip ahead a few
11 documents.  You got a letter dated April 21st,
12 2003.  You wrote this letter?
13    A. This letter?
14    Q. Right, you wrote the letter?
15    A. Yes.
16    Q. And you sent it to Steve first-class mail?
17    A. Yes.
18    Q. And you understand he got the copy of it,
19 he got the letter?
20    A. I presume he did.
21    Q. All right.  All right.  Give me two
22 minutes.  I'm going to step outside with Steve.
23 You're going to get that?
24    A. The electronic?
25    Q. Yeah.  Okay.  On the expense reports,

76

1 these representatives, these would be the dates that the
2 expense reports were received by your office?
3    A. Correct.
4    Q. All right.  And you could do that all the
5 way through until December of 2005?
6    A. Correct.  And remember, that unlike the
7 weekly reports, these are bi-weekly.
8    Q. Fair enough.
9    A. So every two weeks.
10    MR. CHIVERS:  Fair enough.  Well, that's
11 all I got.  Okay.
12    MR. YELLIG:  Thank you.
13    (Deposition concluded at 2:53 p.m.)

75

1 right?
2    A. Yes.
3    MR. CHIVERS:  If you do that, that will be
4 a big help.  Steve and I are going to talk
5 briefly, but I'm real close to being done.
6    (Recess.)
7    MR. CHIVERS:  Go back on the record.
8    Q. Mr. Siegel, thank you for getting this
9 report, this electronic report from your
10 secretary.
11    And I want you to confirm for me, what I
12 see here, this is an account or a summary of the
13 expense reports submitted by the International
14 representatives from November 2002 until
15 November/December 2005; is that correct?
16    A. Yes.
17    Q. And am I correct, sir, that one could go
18 through, and based on this first column on the
19 left, identify the individual representatives; is
20 that right?
21    A. Yes.
22    Q. And then as you go across from left to
23 right and look at the individual columns that will
24 show you the week ending and it will give a date,
25 and then underneath, over to the right of each of

77

CERTIFICATE
COMMONWEALTH OF PENNSYLVANIA)

COUNTY OF ALLEGHENY          )

    I, Lois Sikoski, do hereby certify that before
me, a Notary Public and for the DONALD C. SIEGEL, who
then was by me first duly sworn cautioned and sworn to
testify to the truth, the whole truth, and nothing but
the truth in the taking of his oral deposition in the
cause aforesaid; that the testimony then given by him as
set forth was by me reduced to stenotypy in the presence
of said witness, and afterwards transcribed by means of
computer-aided transcription.

    I do further certify that this deposition was
taken at the time and place in the foregoing caption
specified, and was completed without adjournment.
I further certify that the inspection, reading and
signing of said deposition were not waived by counsel
for the respective parties and by the witness and if
after 30 days the transcript has not been signed by said
witness that the witness received notification and has
failed to respond and the deposition may then be used as
though signed.

    I further certify that I am not a relative, counsel
or attorney of either party, or otherwise interested in
the event of this action.
IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my seal of office at Pittsburgh, on this
_____ day of _____, 2007.


_____
Lois Sikoski, Notary Public

In and for the Commonwealth of Pennsylvania
My Commission Expires May 18, 2008.

78

1  COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
2  COUNTY OF ALLEGHENY        ) S H E E T
3      I, DONALD C. SIEGEL, have read the foregoing pages
   of my deposition given on May 31, 2007, and wish to
4  make the following, if any, amendments, additions,
   deletions or corrections:
5
6  Page/Line      Should Read     Reason for Change
7
8
9
10
11
12
13  In all other respects, the transcript is true and
    correct.
14
15
16
17  _____
18  DONALD C. SIEGEL
19  Subscribed and sworn to before me this _____
20  day of _____, 2007.
21
22  _____
23  Notary Public
24
25

79

1
2  June 11, 2007
3
4  Sherman, Dunn, Cohen, Leifer & Yellig, P.C.,
   P.C.
5  Suite 1000, 900 Seventh Street, N.W.
   Washington, DC 20001
6
7  ATTN:  Terry R. Yellig, Esquire
8      NOTICE OF NON-WAIVER OF SIGNATURE
9  Please have the deponent read his deposition
   transcript.  All corrections are to be noted
10  on the preceding Errata Sheet.
11  Upon completion of the above, the deponent
    must affix his signature on the Errata Sheet,
12  and it is to then be notarized.
13  Please forward the signed original of the
    Errata Sheet to Joseph Chivers, Esq., for
14  attachment to the original transcript, which
    is in her possession, copying all other
15  counsel and myself.
16  As per the rules, if the witness does not
    sign the signature page within 30 days after
17  receipt of the transcript, signature is
    deemed waived.
18
19
20
21  Lois Sikoski
    Court Reporter
22
23
24
25