Capital Reporting Company

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLUMBIA
 2   _____
      STEVEN A. KAMEN,              :
 3                    Plaintiff,    :
                v                   : CASE NO:
 4                                  : 1:06CV01064 (RMC)
      INTERNATIONAL BROTHERHOOD OF  :
 5    ELECTRICAL WORKERS (IBEW) and :
      EDWIN D. HILL, an Individual, :
 6                    Defendants:
 7   _____
 8                                  Washington, D.C.
 9                              Tuesday, May 29, 2007
10   Deposition of:
11              EDWIN HILL
12
13   called for oral examination by counsel for
14   Plaintiff, pursuant to Notice, at the Offices of
15   IBEW, 900 7th Street, Northwest, Suite 1000,
16   Washington, D.C., before Mary E. Warner of Capital
17   Reporting, sworn by a Notary Public in and for the
18   District of Columbia, beginning at 9:00 a.m.
19
20
21
22
```

Page 2

1  APPEARANCES
2
3  On Behalf of the Plaintiff:
4     JOSEPH H. CHIVERS, ESQUIRE
5     The Employment Rights Group
6     312 Boulevard of the Allies
7     Suite 600
8     Pittsburgh, PA  15222
9     (412) 227-0763
10
11 On Behalf of the Defendants:
12
13    TERRY R. YELLIG, ESQUIRE
14    Sherman, Dunn, Cohen, Leifer & Yellig, PC
15    900 Seventh Street, N.W., Suite 1000
16    Washington, DC  20001
17    (202) 785-9300
18
19 ALSO PRESENT:
20    Steven Kamen
21
22

Page 3

1  CONTENTS
2  EXAMINATION BY                    PAGE
3     Counsel for Plaintiff           4
4
5
6  HILL DEPOSITION EXHIBITS         PAGE
7  1 Letter, 12/8/04                 38

Page 4

1  PROCEEDINGS
2  WHEREUPON,
3        EDWIN HILL
4  called as a witness, and having been first duly
5  sworn, was examined and testified as follows:
6     EXAMINATION BY COUNSEL FOR PLAINTIFF
7  BY MR. CHIVERS:
8     Q  Would you state and spell your name for
9  the record?
10    A  Edwin D. Hill.
11    Q  H-i-l-l?
12    A  Yes, sir.
13    Q  All right. Mr. Hill, have you ever given
14 a deposition before?
15    A  I have.
16    Q  I'll go over real fast the ground rules.
17 I'm sure Terry has explained to you how these
18 things go and you're familiar with it. I ask
19 questions, you give answers. You understand
20 you're under oath?
21    A  Uh-huh.
22    Q  Yes?

Page 5

1     A  Yes, I do.
2     Q  The other ground rule, you have to make
3  sure everything is verbal. When I ask you a
4  question and you give me an answer, give me a
5  verbal answer. Even though you and I for
6  conversation I know what you meant, the court
7  reporter needs to take this down.
8     A  Fine.
9     Q  Another thing the way I do depositions,
10 number one, I like to get through them. I'm not
11 going to belabor points. If you can answer one of
12 my questions, yes or no, please try to do so. And
13 if you have additional information that you think
14 it's important for me to understand, I invite you
15 to go ahead and ask.
16    A  That's fine.
17    Q  If you don't understand a question I ask,
18 you tell me.
19    A  I will.
20    Q  I will. It's okay. Because I really
21 want to make sure when we get done here today that
22 the record is clear what the question was and what

## Capital Reporting Company

**Page 6**

1   the answer was. Okay?
2   A   Uh-huh.
3   Q   Yes?
4   A   Yes.
5   Q   Thanks. The other thing too, I have to
6   ask you, do you have any reason why you can't hear
7   and understand today? You're not on medication?
8   A   No.
9   Q   Nothing that would impair your ability?
10  A   No, except his coffee.
11  Q   That too. I know how that works.
12  A   No, I'm fine.
13      MR. CHIVERS: The other thing, too,
14  procedurally, what will happen, Terry, you and I
15  haven't taken depositions before, my custom is and
16  certainly is in Federal Court, if you have an
17  objection, state the objection to form, not
18  substantive.
19  BY MR. CHIVERS:
20  Q   And what that means is that if I ask a
21  question and there's something wrong with it,
22  Terry may very well say objection, objection to

**Page 7**

1   form and say what's wrong with the question. We
2   don't have speaking objections where people say
3   substantively what's wrong.
4       THE WITNESS: That's fine.
5       MR. YELLIG: Other than a privilege.
6       THE WITNESS: What you do you mean by
7   that?
8       MR. YELLIG: If there's a privilege
9   question asked that required you to give you
10  information that's otherwise privileged then I
11  would object to it and instruct you not to answer
12  it.
13      THE WITNESS: That's fine.
14  BY MR. CHIVERS:
15  Q   How long have you been with IBEW?
16  A   50 years.
17  Q   50 years?
18  A   (Nods head).
19  Q   So actually 1957, in that --
20  A   '56.
21  Q   And when you started in 1956, what were
22  you doing for IBEW?

**Page 8**

1   A   I was an apprentice.
2   Q   Doing what?
3   A   Electrical work.
4   Q   You're an election by trade?
5   A   I am.
6   Q   Now when you were starting out as an
7   apprentice, I take it you would go to the Union
8   shop IBEW, they would then send you to a job?
9   A   Yes.
10  Q   Then at some point you transitioned to be
11  on the staff of IBEW?
12  A   Yes.
13  Q   When was that?
14  A   1982.
15  Q   And in 1982 what did you become?
16  A   International representative.
17  Q   Is that similar to the job that Steve
18  had, Steve Kamen?
19  A   That's exactly the same.
20  Q   All right. And how long were you an
21  International rep?
22  A   12 years.

**Page 9**

1   Q   All right. 1982 to 1994. What did you
2   become in 1994?
3   A   Vice President.
4   Q   And how long did you remain Vice
5   President?
6   A   1997.
7   Q   In 1997 what did you become?
8   A   International Secretary.
9   Q   And how long did you remain International
10  secretary?
11  A   That was a year but they transitioned it
12  into International Secretary Treasurer, so same
13  thing.
14  Q   How long did you remain?
15  A   2001.
16  Q   What happened in 2001?
17  A   I became International President.
18  Q   And you're still the President?
19  A   I am.
20  Q   By the way, the VP position, is that a
21  position similar to what Mr. Siegel has now?
22  A   It is.

(866) 448 - DEPO
www.CapitalReportingCompany.com                ©2007

Capital Reporting Company

Page 10

1  Q  And what VP were you and where?
2  A  Third District.
3  Q  And what's the Third District?
4  A  Same Vice President Don Siegel has.
5  Q  I got you. And that covers
6  geographically what area?
7  A  New York, Pennsylvania, Delaware, New
8  Jersey.
9  Q  Is that your biggest for IBEW?
10 A  It is, not geographically, membership.
11 Q  I understand. In terms of members, how
12 many members, an approximate number?
13 A  705,000, probably.
14 Q  Is that just in the United States or
15 worldwide?
16 A  Canada, United States, Puerto Rico.
17 Q  So it is north America?
18 A  Uh-huh.
19 Q  Okay. All right. Duties, I'm going to
20 ask you general questions about duties. I don't
21 expect you to -- this is not a test where you have
22 to get 100 percent. I want you to tell me in your

Page 11

1  own words, what are the duties of an International
2  representative similar to the position you had
3  from '82 to '94, similar to the position Steve
4  Kamen had.
5  A  Carried out the assignments that you are
6  given by the Vice President.
7  Q  And what do those typically include,
8  those assignments?
9  A  I mean, you want the short version or the
10 long one?
11 Q  Give me the short one.
12 A  Just you service the local unions.
13 Basically you service the local unions and handle
14 grievances and charges and some instances
15 trusteeships. There's a myriad of different
16 things that they do. It's just however you -- to
17 categorize it in all those things it would take me
18 20 minutes to explain to you.
19 Q  That's okay I'm generally familiar with
20 the Union activities. I wanted to make sure there
21 wasn't something different, unique.
22 A  No.

Page 12

1  Q  All right. And, again, I take it the
2  duty of the International rep as the whole Union
3  organization is to provide support and service to
4  the members?
5  A  Exactly.
6  Q  All right. Wyatt Earp, he is an
7  International rep?
8  A  He is.
9  Q  Same duties as Steve Kamen?
10 A  Yes.
11 Q  Same duty, generally speaking as you had
12 from '82 to '94?
13 A  Generally speaking.
14 Q  All right. Now, Mr. Hill is the Vice
15 President and you were the Vice President of the
16 District Three?
17 A  Yeah, I was.
18 Q  From '94 until '97. Describe generally
19 the duties of Vice President of District Three.
20 A  To make sure that the locals function
21 properly. To make sure that the International
22 representatives carry out their assignments, to

Page 13

1  promote good relationships with the employers, all
2  of them.
3  Q  Now, I take it from what you said that
4  the Vice President such as either Mr. Siegel or
5  yourself when you were the VP are the supervisors
6  of the International reps?
7  A  Yes, they are.
8  Q  All right. So in terms of the hierarchy,
9  an International rep reports to a VP?
10 A  Yes.
11 Q  Gets his assignments, gets performance
12 evaluations, those sorts of things?
13 A  Yes.
14 Q  All right. Are there performance
15 evaluations that are conducted regularly of
16 International representatives?
17 A  Depends on the International Vice
18 President.
19 Q  Fair enough. What's your familiarity
20 with the way in which Mr. Siegel -- and how long
21 has Mr. Siegel been the Vice President of District
22 Three approximately?

(866) 448 - DEPO
www.CapitalReportingCompany.com                ©2007

Page 14

1  A  Let's see, 2002, I think.
2  Q  And he's still the District Three VP?
3  A  He is.
4  Q  Are you familiar with the policy that
5  Mr. Siegel has relative to performance reviews for
6  his International reps?
7  A  No.
8  Q  Okay. Fair enough. Is that another way
9  of saying that you don't -- or do you review
10 performance evaluations for the International
11 reps?
12 A  Not regularly, no.
13 Q  Do you do it -- did you ever do it for
14 Steve Kamen?
15 A  No.
16 Q  Fair enough. Did you ever do it for
17 Wyatt Earp?
18 A  No.
19 Q  Okay. All right. Now do you in your
20 years with IBEW in particular since 1982, are you
21 aware of any International rep that has been
22 terminated for cause?

Page 15

1  A  Yes.
2  Q  Steve Kamen?
3  A  Other than Steve?
4  Q  Yeah.
5  A  Yes.
6  Q  Can you give me some names, if you
7  remember?
8  A  Mary Beauford.
9  Q  Mary Beauford?
10 A  Uh-huh, I terminated two or three of
11 them. I can't remember who, who they are. One in
12 Texas, Arizona. I can't remember his name.
13     MR. YELLIG: Can I stop for a second?
14 You're just -- you didn't want to know just those
15 who were terminated by Mr. Hill. I think it
16 sounds like he's thinking just the ones he
17 terminated.
18     MR. CHIVERS: I'll tell you what, if
19 there's a difference, I'll ask him.
20 BY MR. CHIVERS:
21 Q  Really I'm asking because you've been
22 with IBEW so many years?

Page 16

1  A  Can I go all the way back to '82 and tell
2  you who was terminated? No, I can't. Since I've
3  been President I can tell you pretty much, but may
4  not recall all the names. Since I was President I
5  can tell you pretty much. I can't remember some
6  of the names.
7  Q  So the record is clear, I'm asking you if
8  you can recall International representatives
9  terminated for cause since you became President?
10 A  Absolutely.
11 Q  And their names, one of them was Mary
12 Beauford?
13 A  There was another one in Texas.
14 Q  A man?
15 A  Yeah, I can't remember his name. That
16 information is readily available I just don't have
17 it in my mind.
18 Q  Fair enough. But your recollection is
19 maybe three of them, somewhere in that range?
20 A  Yeah, probably, three, yeah.
21 Q  Okay. Now, Steve Kamen was terminated
22 for cause, correct?

Page 17

1  A  Correct.
2  Q  All right. You've got a letter, I'll
3  show you it to you in a minute, that letter that
4  you wrote of December 8, 2004?
5  A  I did.
6  Q  You remember writing that letter?
7  A  I do.
8  Q  Now the termination of Steve Kamen, was
9  that a result of information that you got from
10 Mr. Siegel?
11 A  Uh-huh.
12 Q  Yes? I have to keep bugging you about
13 that.
14 A  That's right, keep bugging me. Yes.
15 Q  All right. Did you have any firsthand
16 knowledge of the facts that gave rise to
17 Mr. Kamen's termination, firsthand knowledge?
18 A  No.
19 Q  All right. So in effect you were relying
20 upon the information given to you by other people?
21 A  Yes.
22 Q  And then in consultation with those other

5 (Pages 14 to 17)

## Capital Reporting Company

Page 18

1  people and I don't want to just refer to other
2  people, other than Mr. Siegel, who did you rely
3  upon in deciding to terminate Steve Kamen?
4      A  No one.
5      Q  All right. So just Mr. Siegel?
6      A  Correct.
7      Q  All right. Do you remember the reasons
8  why Mary Beauford got terminated?
9      A  Yeah.
10     Q  What were they?
11     A  Couldn't do her job.
12     Q  All right. What does that mean?
13     A  What do you want it to mean? She just
14 couldn't do her job. She came here with the --
15 she worked in the building. With the
16 understanding she would do certain things and she
17 just couldn't get them done. You know, there was
18 no big issue, I just sent her back to the
19 District, that's all, back to her local Union, not
20 the District.
21     Q  When you say you sent her back, what does
22 that mean?

Page 19

1      A  It means I terminated here. She went
2  back to work for her local Union.
3      Q  As an electrician?
4      A  No, Mary was out of the telephone
5  department.
6      Q  I've got you. This might be me not being
7  terribly familiar with this, when you sent her
8  back to the local Union, does that mean she
9  continued to be an employee of IBEW?
10     A  No.
11     Q  So you terminated her employment from
12 IBEW?
13     A  Well, the International, I terminated her
14 employment from the International. You're
15 referring to that as the IBEW. We have local
16 Unions and she went to work for a local Union,
17 back to where she came from.
18     Q  I understand. Now is that something you
19 arranged her working for those local Union?
20     A  No.
21     Q  Okay. Do you remember about what year
22 Mary Beauford got terminated? You've been

Page 20

1  President approximately since 2001.
2      A  Yeah, probably two, maybe two years ago,
3  2005 maybe, roughly.
4      Q  Do you remember any of the particulars?
5  I understand that you told me she couldn't do her
6  job. What did that mean? She couldn't --
7      A  Well, she was not living up to her
8  expectation as far as the department Director was
9  concerned. And I take recommendations from the
10 Vice Presidents when I hire them. And I take
11 recommendations from the Vice President when we
12 terminate. And I was taking it when Steve was
13 hired we took the recommendation of --
14     THE WITNESS: I believe Larry hired you,
15 am I correct?
16     MR. KAMEN: Yes.
17     THE WITNESS: When Larry hired him, he
18 said Steve will do the job. I said that's fine.
19 Because you can be assigned to him and there's no
20 sense in me assigning somebody to him he doesn't
21 like and doesn't want to work with. That's the
22 way I've been doing business. If you can't deal

Page 21

1  with the person, I can't do nothing about it.
2  Same thing with Mary Beauford, the recommendation
3  came in here, we hired her, she didn't work out.
4  BY MR. CHIVERS:
5      Q  The recommendation came in to fire her?
6      A  The recommendation came from the
7  department directly to terminate her. Actually
8  they said, "I can't use her in the department."
9  When you're hired into the department or hired
10 into a District if they can't use them in the
11 District, you don't transfer them some place else.
12     Q  Fair enough. That's Mary Beauford and
13 then this other fellow that you --
14     A  He just drank too much.
15     Q  Yeah, okay.
16     A  I know what the problem was there.
17     Q  That's an issue. Do you remember anybody
18 else other than those two?
19     A  I sent one back to the District, I
20 demoted him and made him an International
21 organizer, a guy by the name of Shimmel, Dave
22 Shimmel.

**Capital Reporting Company**

Page 22

1  Q  S-h-
2  A  -- I-m-m-e-l, I believe.
3  Q  And about when was he terminated from the
4  International?
5  A  He still works for us.
6  Q  All right. But he wasn't --
7  A  He was here as an International
8  representative. He's no longer an International
9  representative. He is an International lead
10 organizer we have. It was kind of a demotion.
11 Q  Yeah. Do you remember about when that
12 happened?
13 A  Within the last year, I think.
14 Q  We'll call it about 2006.
15 A  That will be fine.
16 Q  Yeah. Well, are there any jobs other
17 than International rep or lead organizer for the
18 International here? Are there jobs other than
19 those two jobs?
20 A  There's all kind of clerical jobs and
21 things in building.
22 Q  Yeah, but setting aside the clerical jobs

Page 23

1  here in the building, are there other jobs out in
2  the field?
3  A  Well, we've created some here within the
4  last six, eight months to a year. They are lead
5  organizers and a field organizers.
6  Q  Lead organizers is the same as a field
7  organizer?
8  A  No, a lead organizer leads the field
9  organizers. How's that?
10 Q  That's good. That's why they call them a
11 lead organizer?
12 A  You got it.
13 Q  Were there lead organizers and field
14 organizers in 2004?
15 A  No, sir, there was not.
16 Q  So you didn't create those positions
17 until --
18 A  Just after our last convention which was
19 last September.
20 Q  September 2006?
21 A  Yes.
22 Q  Okay.

Page 24

1  A  Those are relatively -- it's a new
2  program that we have.
3  Q  When you considered Mr. Siegel's
4  recommendation to terminate Steve Kamen, did you
5  look at the possibility of putting him in a
6  different position other than the position as
7  International rep?
8  A  No, I did not.
9  Q  Now was there some reason you didn't?
10 A  Yeah, we didn't have any.
11 Q  Okay.
12 A  There was no other positions.
13 Q  That was it?
14 A  That's it. There is now.
15 Q  That's why I'm asking.
16 A  Yes.
17 Q  Hu. All right. Now I'm going to show
18 you something. And the way -- I'll show you this
19 document, that's the amended complaint.
20 A  Okay.
21    MR. CHIVERS: I'm not going to mark this
22 as an exhibit since it's part of the record.

Page 25

1  BY MR. CHIVERS:
2  Q  Have you had an opportunity to review
3  that today before you came?
4  A  No, I didn't.
5  Q  Well, take a minute. You probably have
6  looked at it at some point.
7  A  Maybe.
8  Q  You probably just don't remember.
9  A  Probably. Can I ask him a question?
10 Q  Go ahead. Just so you know, I'm asking
11 you to look at this because I'm going to ask you a
12 bunch of questions. You can run through and tell
13 me those things that you think are true and you
14 have a disagreement about.
15    Do you behind if I stand on occasion
16 during the deposition?
17 A  Help yourself.
18    (Short break taken)
19    MR. YELLIG: I advised President Hill he
20 didn't need to read the causes of action, just.
21    MR. CHIVERS: Correct, just the factual.
22    MR. YELLIG: Lay facts.

7 (Pages 22 to 25)

Capital Reporting Company

Page 26

1  BY MR. CHIVERS:
2  Q  Mr. Hill, you're aware of the fact that
3  you've been sued, you know that?
4  A  Oh, yeah.
5  Q  Yeah, I know.
6  A  I'm very much aware of that.
7  Q  I know you are. It's not everybody
8  enjoys doing that by any stretch, we don't.
9  Having said that I want to go through some factual
10 assertions were made here and you have to tell me
11 if you agree or disagree, all right?
12 A  Sure.
13 Q  First thing I want to confirm, you're a
14 citizen of Virginia, is that true?
15 A  I am.
16 Q  And of course you are the President of
17 the IBEW, correct?
18 A  Yes, sir.
19 Q  And if you take a look at page 3 --
20    MR. YELLIG: Hang on a minute. Let me
21 get my copy.
22    (Short break taken)

Page 27

1  BY MR. CHIVERS:
2  Q  I'm just going to go through and ask you
3  a few questions just to confirm some things and
4  then get your version of the facts. As the
5  President of IBEW, are you also identified as a
6  fiduciary -- do you know what that means, like on
7  the ERISA plans you have?
8  A  Yeah, I know what it means. One, it's
9  not an ERISA plan. It's not an ERISA. I'm not a
10 fiduciary. The secretary/treasurer is.
11 Q  Okay. I didn't know.
12    MR. YELLIG: You probably wonder why did
13 I deny that.
14    MR. CHIVERS: I did. So you're not.
15 That's good to know.
16 BY MR. CHIVERS:
17 Q  And then as far as conducting business,
18 you certainly, you conduct business on behalf of
19 IBEW in Pennsylvania, do you not? You have an
20 office?
21 A  Yes.
22 Q  You have an office, a continued business

Page 28

1  presence in Pennsylvania?
2  A  Absolutely.
3  Q  All right.
4    MR. YELLIG: Excuse me, when you say you,
5  are you referring to IBEW or Mr. Hill?
6    MR. CHIVERS: The IBEW, yeah, I am
7  talking about the IBEW.
8  BY MR. CHIVERS:
9  Q  Take a look at paragraph 16, if you would
10 at the bottom.
11 A  Yes, sir.
12 Q  As far as you know, that's accurate?
13 A  Nope.
14 Q  Okay. What is it that you think is
15 inaccurate?
16 A  Because you're not promoted. As a period
17 of time goes on, it's automatic, you're not
18 promoted, there's no tests or there's no review of
19 your -- whether you get to go on, it's just
20 automatic, you're hired at a certain wage.
21 Q  Got you. Paragraph 17, I take it you
22 would disagree with that statement? You

Page 29

1  terminated him, right?
2  A  I did.
3  Q  You terminated him because you felt he
4  was not performing properly?
5  A  I was relying on the report of the Vice
6  President, yes.
7  Q  Right. You are aware of the fact that
8  paragraph 19, Steve Kamen became ill, are you not?
9  A  I don't know if I was aware of the fact
10 on that particular date but I did know that he had
11 become ill.
12 Q  How soon -- obviously you knew before you
13 terminated in December of 2004 that he had been
14 ill, correct?
15 A  Correct.
16 Q  Did you know the nature of his illness?
17 A  No.
18 Q  When did you find out the nature of his
19 illness?
20 A  When I got a piece of paper that told me
21 that.
22 Q  Nobody came to you and said, "Hey,

8 (Pages 26 to 29)

Page 30

1  Steve's has HIV"? Steve has any kind of illnesses
2  like that?
3     A  I did.
4     Q  And how long did you know that?
5     A  Quite a while.
6     Q  All right. How did you become aware of
7  that?
8     A  Steve passed a note to one of the --
9  another member of the IBEW that was kind of
10 explicit. And the person gave the note to another
11 International representative. And the
12 International representative gave it to the Vice
13 President and they came to me about it. And I
14 said, "Just give me the note. I know Steve, I'll
15 talk to him."
16    Q  Do you remember about when that was,
17 2003?
18    A  No, I don't. It was probably 2002 maybe
19 in there.
20    Q  Did this occur at a convention or
21 something?
22    A  At a meeting in someplace in the Sixth

Page 31

1  District, I can't even remember where it was.
2     Q  What is the Sixth District?
3     A  That's the midwest, Indiana, Illinois,
4  Michigan, Wisconsin, Minnesota.
5     Q  Did you talk to Steve about that?
6     A  I did.
7     Q  A meeting here? A meeting where?
8     A  No, I just ran into Steve and made it a
9  point to talk to him.
10    Q  What did you say to him? Not verbatim
11 but what was the gist of it?
12    A  I told him that I didn't care about what
13 his sexual preference was, it didn't make any
14 difference to me, just didn't care. However, I
15 did care that he would approach another member of
16 the IBEW in an IBEW meeting, I resent that. Gave
17 him back the note that he gave him. I said,
18 "Please don't let it ever happen again."
19    Q  And it never happened again?
20    A  Not that I'm aware of that.
21    Q  What did Steve tell you when you told him
22 that?

Page 32

1     A  "Thank you." What's to say?
2     Q  Yeah, right. So if you take a look --
3  now, as of December 8th of 2004 when you
4  terminated Steve --
5     A  Yes, sir.
6     Q  -- were you personally aware of any
7  diagnosis that Steve had?
8     A  I was not.
9     Q  All right. And so was it not until this
10 litigation that you learned?
11    A  I believe so or until the charge was
12 filed until somebody told an agency or something
13 because he asked me if I knew and I told him I
14 didn't know.
15    Q  Yeah.
16    A  I still don't know.
17    Q  You don't have first hand knowledge?
18    A  No.
19    Q  You heard through these papers?
20    A  Yeah, it says right there.
21    Q  Now you were of course aware of the fact
22 that he took some time off, he had some medical

Page 33

1  leave during 2004?
2     A  Yes.
3     Q  Did you have any conversations with
4  Mr. Siegel about that?
5     A  Not really, no, the fact that he was off
6  and -- it's up to the Vice President to deal with
7  that kind of stuff. You know, we have all kind of
8  insurance and stuff, we just really don't -- I
9  quite honestly don't have the time to delve into
10 every little thing that happens like that.
11    Q  Take a look at paragraph 28.
12    A  Okay.
13    Q  It says on or about May 1st, 2004,
14 Plaintiff was able to return to work. I don't
15 expect you to have firsthand knowledge what date
16 he was or was not, but you were aware that Steve
17 returned to work after his medical leave?
18    A  I probably was.
19    Q  Are you aware of the fact that once Steve
20 returned to work in 2004 his duties were reduced?
21    A  I was not.
22    Q  All right. You never had a conversation

Capital Reporting Company

Page 34

1  with Mr. Siegel about that?
2  A  No.
3  Q  All right. And do you know in paragraph
4  31 about Plaintiff's, that is Steve's request to
5  have his regular duties restored?
6  A  I don't recall that.
7  Q  Is that based on what you said so far, am
8  I correct, that in normal circumstances you
9  wouldn't even be aware of the interaction between
10 a Vice President and his International rep?
11 A  No, I would not.
12 Q  All right. And do you know anything
13 about any training opportunities that Steve wanted
14 to take advantage of in 2004?
15 A  No, I'm not.
16 Q  Do you know anything about whether he was
17 allowed to assist at a manufacturing conference?
18 A  I have no idea.
19 Q  All right. Do you know if he was ever
20 given back the duties that had been taken away
21 from him prior to his medical leave?
22 A  I have no idea what duties were taken

Page 35

1  away from him.
2  Q  Okay. Fair enough. What's a Director
3  position? Do you know?
4  A  Uh-huh.
5  Q  What is that?
6  A  Somebody that's in the building here,
7  Director of the department, manufacturing
8  department, utility department. We have railroad,
9  manufacturing, broadcasting, telecommunications,
10 construction, utility, Government.
11 Q  Yeah, was there a Director position that
12 opened up in 2004, as you recall?
13 A  There may have been. Yes, I think that's
14 when Bob -- I can't remember.
15     THE WITNESS: Who was the guy that left,
16 Steve?
17     MR. KAMEN: Pete Patenza I believe got
18 the position, I believe so. It wasn't
19 manufacturing, it was the Director of purchasing.
20     THE WITNESS: Okay, that was Pete
21 Patenza, it was prior to 2004.
22     MR. CHIVERS: Prior to.

Page 36

1     THE WITNESS: Prior to.
2  BY MR. CHIVERS:
3  Q  Do you -- are you the one that decides
4  who gets these Director positions?
5  A  Yes, I am.
6  Q  Do you recall whether Steve put in a
7  request to be promoted? Is that a considered a
8  promotion to be Director? I would think.
9  A  You would think but most of the reps in
10 the field wouldn't think so.
11 Q  Well, at any rate, I assume it pays more
12 than International rep?
13 A  Yeah, it does, it's a promotion if you
14 want to look at it that way.
15 Q  If you want to look at it in terms of
16 making more money.
17 A  Right.
18 Q  Do you recall Steve applied for that
19 position?
20 A  I do not.
21 Q  All right. Okay. Who was your Executive
22 Assistant back in 2004?

Page 37

1  A  Probably Larry Nidic or Vince O'Reilly
2  then.
3  Q  All right. We'll get that name in a
4  second.
5  A  I can name them all and you can guess if
6  you want to.
7  Q  Go ahead.
8     MR. KAMEN: The name is on the witness
9  list.
10    THE WITNESS: Pat Riley.
11    MR. KAMEN: Yes.
12 BY MR. CHIVERS:
13 Q  There you go, Pat Riley. He's one of
14 your Executive Assistants?
15 A  He isn't here anymore. He was the
16 assistant to the International Secretary
17 Treasurer.
18 Q  Did he have any involvement in who got
19 the Director positions?
20 A  He may have made a recommendation. I
21 don't know. There's only one person that makes
22 that decision.

(866) 448 - DEPO
www.CapitalReportingCompany.com                    ©2007

Capital Reporting Company

Page 38

1  Q  That's you?
2  A  Fair enough.
3     MR. YELLIG: Excuse me for a moment. I
4  don't think the record is clear, what is the
5  position we're talking about?
6     MR. CHIVERS: Director of Purchasing.
7     MR. KAMEN: Uh-huh.
8  BY MR. CHIVERS:
9  Q  You said Pete Patenza or something?
10 A  Yeah, Pete was here, he retired.
11 Q  Take a look, if you would, at paragraph
12 37.
13 A  Yes, sir.
14 Q  Paragraph 37 talks about the reasons for
15 Mr. Kamen's termination. Let me show you this
16 letter that you signed. I assume you've seen it?
17 A  I do.
18    MR. CHIVERS: Let me mark that as
19 Deposition Exhibit 1.
20    (Hill Exhibit No. 1
21    was marked for identification).
22 BY MR. CHIVERS

Page 39

1  Q  Are you familiar with that letter, sir?
2  A  I am.
3  Q  Did you sign it?
4  A  I did.
5  Q  And where did you get the information
6  that's contained in that letter, the factual
7  information?
8  A  Let me read it and I can tell you.
9  Q  Yeah.
10    (Short break taken)
11    THE WITNESS: Okay.
12 BY MR. CHIVERS:
13 Q  And I'm showing you the letter of
14 December 8th of 2004. My question was the facts
15 that are contained within that, where did you get
16 the information?
17 A  Vice President Siegel.
18 Q  And this is apropos of what I asked you
19 before, did you have any firsthand knowledge of
20 these things yourself?
21 A  No.
22 Q  All right. If you can remember tell me,

Page 40

1  but otherwise tell me what you generally do, when
2  a Vice President makes a recommendation of that
3  nature? Do you ask him questions? Do you go
4  through and make sure that the Vice President
5  knows what he's talking about?
6  A  Sure.
7  Q  Do you have a specific recollection of
8  how you did that with Mr. Siegel with respect to
9  Mr. Kamen?
10 A  No, I do not.
11 Q  All right. You just though your general
12 practice is the Vice President comes to you with
13 that kind of recommendation, you talk to them, you
14 find out does he really know what he's talking
15 about?
16 A  Pretty much.
17 Q  Then at that point if you're satisfied
18 with the kind of responses you're getting from
19 your Vice President, then you adopt his
20 recommendation?
21 A  I do. We usually ask him to put it in
22 writing and because I won't terminate anybody

Page 41

1  unless I have a recommendation from the Vice
2  President, I just won't do it because I don't know
3  what they are doing in the field.
4  Q  Yeah.
5  A  I'll be quick to point that out and to
6  admit it. We have 200 and some reps in the field.
7  For me to know what every one of them is doing
8  every day of their life is impossible.
9  Q  What about you, how many VPs do you have?
10 I take it a VP for every district?
11 A  11.
12 Q  Okay. All right. Now, let me ask you
13 something, you know Wyatt Earp, don't you?
14 A  I do.
15 Q  Are you familiar with Wyatt Earp's
16 performance in terms of whether he also has
17 some --
18 A  Generally.
19 Q  Are you aware of the fact he has had
20 issues relative to the timeliness of his reports?
21 A  Yes, I am.
22 Q  Did you discipline him?

11 (Pages 38 to 41)

Capital Reporting Company

Page 42

1  A  Yes, I did.
2  Q  What did you do?
3  A  We gave him -- I don't know what you call
4  it. We didn't pay him for six months.
5  Q  Suspended?
6  A  Yes, thank you. That's good enough.
7  Q  Well, if you suspended him, do you
8  remember what six months you suspended?
9  A  No, I don't even remember it was a six
10 months termination.
11 Q  There was a suspension?
12 A  Yes.
13 Q  Do you recall whether the suspension
14 occurred before or after you terminated Steve
15 Kamen?
16 A  I don't recall. I think it was after.
17 It's only a guess. I shouldn't be guessing but --
18 Q  That's all right. You're not stuck with
19 it. If you tell me it's a guess, that's okay,
20 that's your recollection.
21 A  Right.
22 Q  All right. I mean, did you suspend or

Page 43

1  have Wyatt Earp suspended in any way in response
2  to this litigation?
3  A  No, absolutely not.
4    MR. YELLIG: Excuse me, this litigation,
5  meaning Kamen versus IBEW, Edwin Hill?
6    MR. CHIVERS: Yes.
7    THE WITNESS: No.
8  BY MR. CHIVERS:
9  Q  Okay. Why didn't you have Steve
10 suspended instead of terminated?
11 A  They are different cases.
12 Q  Tell me how.
13 A  Well, the issue with Wyatt Earp is his
14 reports. There's more to the issue with Steve.
15 Q  In your -- again, the letter will speak
16 for itself. But in your mind, what was the reason
17 that Steve got terminated and not suspended?
18 A  If it was simply reports, we would have
19 suspended him.
20 Q  Okay.
21 A  But because he was derelict in performing
22 his duties -- I mean, reports are one thing and

Page 44

1  that's a bookkeeping issue. And we really -- it
2  throws our whole system in the International
3  office into a tither when we don't get expense
4  reports, we don't get regular reports, throws
5  everything into a tither. We can overcome some of
6  that. On a repeated basis, we need to take some
7  action but there were other issues as you can tell
8  from the letter that involved Steve.
9  Q  Okay. Did you hear about any of these
10 issues with Steve before December of 2004?
11 A  Oh, yeah, yes.
12 Q  And I have some documents to show you but
13 generally, was this something that occurred over a
14 month or two, over six months, over a year?
15 A  I don't recall that.
16 Q  All right.
17 A  I mean, the letter was the result of
18 conversation and a letter from Vice President
19 Siegel and all of the other stuff that we have
20 that was -- I'm sure that our attorney gave you
21 all of that information we have here but it wasn't
22 just -- he didn't call up on December the 2nd and

Page 45

1  tell me all of this happened and he wanted to
2  terminate him.
3    MR. CHIVERS: Why don't we take a five
4  minute break? Okay?
5    (Short break taken)
6  BY MR. CHIVERS:
7  Q  This is a stack of documents. And we're
8  going to take one at a time the ones I want to
9  look at. If you would, take a look at the one on
10 the top. Unless I'm mistaken, I think they are
11 arranged mostly chronologically. These are the
12 documents I got from your attorney, Mr. Yellig.
13 Take a look at the first one. You wrote this
14 e-mail, I take it?
15 A  Probably, yes.
16 Q  Take a quick look. Just make sure you're
17 familiar with it.
18 A  Okay.
19 Q  I take it from this, this was leading up
20 to the termination, this e-mail?
21 A  I would imagine, yeah.
22 Q  And am I correct, this would reflect the

12 (Pages 42 to 45)

Page 46

1 kinds of communications -- I mean, you
2 communicated via e-mail and also by telephone with
3 Mr. Siegel?
4   A  Yes, I would say I did.  Okay.
5   Q  That first page, that is your e-mail,
6 correct?
7   A  It is.
8   Q  All right.  I'm not going to mark it as
9 an exhibit but so the record is clear, it's an
10 e-mail from Edwin Hill to Steve Kamen dated
11 December 6th, 2004.
12       If you take a look at the second page,
13 Mr. Hill.
14   A  This one here?
15   Q  Just start flipping them over to make
16 life easy for you.  There you go.  The second one
17 this is to you from Steve Kamen?
18   A  Uh-huh.
19   Q  I don't see a date on this.  Is it fair
20 to say, though, that Mr. Kamen and you would have
21 direct communications on occasion?
22   A  Steve?  I'm sorry.

Page 47

1   Q  Is it fair to say you and Steve would
2 have direct communications sometimes?
3   A  On occasion, probably.
4   Q  You've known Steve for how many years?
5   A  He can probably answer that better than I
6 can.
7       MR. KAMEN:  25.
8       THE WITNESS:  At least.
9 BY MR. CHIVERS:
10   Q  Somewhere around 25 years?
11   A  Knew his mother well.
12   Q  You would have known him, too, I suppose.
13 Next page, this is from Steve Kamen to Ed Hill
14 December 8, 2004 e-mail.  Do you see that?
15   A  Uh-huh.
16   Q  Now, in this apparently Steve is telling
17 you directly that he's going to continue to do his
18 job, correct?
19   A  I see it.
20   Q  Now then it must have been overcome by
21 events because that same day December 8, 2004, you
22 send the termination letter, correct?

Page 48

1   A  Correct.
2   Q  Then the next page, this is an e-mail --
3   A  Do you have any idea which came first,
4 this letter or -- was this mailed before this and
5 I got that one?
6   Q  I don't know.  All I can do is based
7 on --
8       MR. YELLIG:  The one is undated.
9       THE WITNESS:  The e-mail, when did I
10 write this letter?  It's the same day this e-mail
11 would have come in.  It's 1:00 in the afternoon
12 but did this go out in the morning?
13 BY MR. CHIVERS:
14   Q  I don't know.  My guess it must have
15 crossed.
16   A  I was curious.
17   Q  Take a look, then I've got a two page
18 document from Donald Siegel to you dated November
19 30th, 2004.  Do you see this?
20   A  Yes.
21   Q  And now, do you remember -- it's okay if
22 you don't, I'm asking, do you remember receiving

Page 49

1 this document from Mr. Siegel?
2   A  I'm sorry, your question?  Ask me again.
3   Q  Do you remember getting this document
4 from Mr. Siegel?
5   A  I don't remember but, you know --
6   Q  I understand.
7   A  Okay.
8   Q  Question, any reason to believe that you
9 didn't get it?  I mean, it's addressed to you
10 from --
11   A  No, no, no, there's no reason to say I
12 would not have gotten it.
13   Q  Fair enough.  Now if you take a look at
14 the middle of the page, actually it's the pdf
15 attachment to the e-mail --
16   A  This one here?
17   Q  No, the same document.  Take a look where
18 it says, "He briefly described personal problems."
19 Do you see that?
20   A  I see it.
21   Q  "With divorce, illness, a recent car
22 accident, and IRS problems."  Do you recall having

Page 50

1  any discussions with Mr. Siegel either at the time
2  you received this November 30th e-mail or prior to
3  November 30th about Steve's illness?
4      A   No, which illness?
5      Q   Any illness.
6      A   Wasn't he in the hospital at one time or
7  another? I would have known that.
8      Q   All right. Well, my question is this,
9  given the fact that Mr. Siegel is communicating
10 with you and referring to Steve's illness, do you
11 recall asking Mr. Siegel what the nature of the
12 illness was?
13     A   No, I do not.
14     Q   Do you recall whether Mr. Siegel told you
15 what the nature of the illness was?
16     A   I don't believe so.
17     Q   All right. Are you familiar, as the
18 President of IBEW, with a law called the Americans
19 with Disabilities Act?
20     A   I'm familiar with it.
21     Q   I don't expect you to be an expert on it,
22 so I'm not going to ask you questions as if you

Page 51

1  are.
2      A   Please don't.
3      Q   Yeah, please don't. My question is this,
4  do you have a general understanding or awareness
5  of the term called accommodation? Is that a term
6  that's familiar to you at all?
7      A   Yes.
8      Q   And did the question of whether Steve
9  Kamen was entitled to some kind of accommodation
10 under the ADA, was that a topic you ever discussed
11 with Mr. Siegel?
12     A   No.
13     Q   Have you had occasion in your prior
14 experience with the President of IBEW to discuss
15 accommodations for people with diseases and
16 illnesses?
17     A   I don't know I ever discussed it but we
18 have taken into consideration people with
19 illnesses and issues that they have.
20     Q   Is there anybody on the staff at IBEW who
21 typically handles those kinds of things, the
22 question of accomodation for your workers, your

Page 52

1  employees?
2      A   Not really, no.
3      Q   And it's fair to say at least with
4  respect to Mr. Kamen, you don't remember the
5  subject of accommodation being discussed?
6      A   I think you're -- if you're trying to
7  suggest that we would accommodate him because of
8  the illness that I didn't know he had, no.
9      Q   Right.
10     A   If you're suggesting would we try to
11 accommodate him for a problem that he had, an
12 illness that he had, yes, we do take that into
13 consideration. And we would take it into
14 consideration for everyone, we have. I'm sure
15 there was some consideration taken into the fact
16 that when Steve was off for his divorce and car
17 accident and all the problems like that, we
18 accommodated him.
19     Q   Just so the record is clear, what you're
20 saying as you sit here today, you do not recall
21 having a discussion with Mr. Siegel, for example,
22 about accommodating Steve's illness?

Page 53

1      A   I didn't know about Steve's illness.
2      Q   All right.
3      A   Was he not in the hospital at one time or
4  another before this?
5      Q   Yes, he was.
6      A   Okay. If he had a broken leg, would we
7  try to accommodate him, yeah.
8      Q   I guess my question, I think you answered
9  it, you don't recall having a discussion with
10 Mr. Siegel relative to his comment about Steve's
11 illness in light of this November 30th --
12     A   No, not a specific illness.
13     Q   All right. And what we're looking at
14 just now is a two page document, an e-mail from
15 Mr. Siegel to Mr. Hill dated November 30th, 2004.
16 If you take a look at the next document, two
17 page --
18     A   Uh-huh.
19     Q   And this letter is from Mr. Siegel to
20 you, correct?
21     A   That's correct.
22     Q   General question, do you remember

Page 54

1  receiving this letter?
2      A   No, I don't remember. I'm sure I did.
3      Q   Okay. And do you recall having any
4  discussions with Mr. Siegel about this letter?
5  Sir, I take it based on the date here, November
6  30th of 2004, which was just I guess eight or nine
7  days later, Mr. Kamen was terminated? Is it your
8  understanding this is part of the process that was
9  going on in --
10     A   Let me read the letter.
11     Q   Go ahead.
12     A   From a cursory look, yes.
13     Q   So this goes to the subject of reasons
14 why Mr. Siegel no longer wanted Mr. Kamen working
15 for him?
16     A   Correct.
17     Q   All right. And then if you would take a
18 look, go forward a few documents, and there's
19 this, I want you to flip forward to this one.
20 There you go. All right. I'm asking you to look
21 at a document on the front it looks like a fax
22 cover page.

Page 55

1      A   Yep.
2      Q   To Donald Siegel from William Bonay. Who
3  is William Bonay?
4      A   Bill was the Director of -- right now
5  he's the Director of the railroad.
6      Q   But at the time he was Director of
7  personnel?
8      A   Yes.
9      Q   Now, if you would take a look -- and by
10 the way, there's seven pages total, the fax cover
11 pages and six pages attached. Do you see that?
12     A   Yep, yes, I do.
13     Q   All right. Now, had you seen these
14 documents or did you see these documents prior to
15 December 8th of 2004?
16     A   I don't recall.
17     Q   If you would, take a look at the third to
18 last page. There you go. And about halfway down,
19 see where it says, "Past family and social
20 history"?
21     A   Yes, sir.
22     Q   And let's see, number one says A-F-IB,

Page 56

1  which I would assume is afibrillation. Do you see
2  that?
3      A   Yes.
4      Q   Second it says sleep apnea. Do you see
5  that?
6      A   Yes.
7      Q   Three, is says hypercholesteremia. Do
8  you know what that is?
9      A   No, do you know?
10     Q   You wouldn't want to hear my explanation.
11     A   Okay.
12     Q   And four, viral meningitis. Do you see
13 that?
14     A   Yes, I do.
15     Q   Your testimony is you don't recall seeing
16 this?
17     A   I don't recall seeing this.
18     Q   Okay. Now you see the date on the fax
19 cover page of October 22, 2004?
20     A   Yes, sir.
21     Q   Then flip to this document, one more
22 after that. All right. You're looking at a one

Page 57

1  page, it says pending file 5-7-04. Do you see
2  that?
3      A   Yes, sir.
4      Q   Do you know what this is? I mean,
5  generally speaking, what is this document?
6      A   I have no idea.
7      Q   Fair enough. All right. Then flip to
8  the next document. It says April 6th, 2004. And
9  this is to Donald Siegel. Give me two seconds.
10         (Short break taken)
11 BY MR. CHIVERS:
12     Q   Take a look, if you would, at the letter
13 dated April 6, 2004, from Steve Kamen to Don
14 Siegel. Did you see this letter at the time?
15     A   I did not.
16     Q   Take a look at the next letter, March 16,
17 2004.
18     A   Yes, sir.
19     Q   From Steve Kamen to Donald Siegel. Did
20 you see this letter at or about the time it was
21 written?
22     A   No, I did not.

15 (Pages 54 to 57)

Page 58

1  Q  If you take a look at the next, which
2  looks like a memo to IBEW, Third District from
3  Town of Rochester Highway Employees. Did you have
4  see this at or about the time it was written?
5  A  No.
6  Q  Okay. And flipping ahead about seven,
7  eight documents or so there's a September 27, 2003
8  letter from Steve Kamen to you. That's not it.
9  September 27, 2003. You may have gone by it.
10      MR. YELLIG: No, he's getting there.
11 BY MR. CHIVERS:
12  Q  There it is. Any reason to -- do you
13 remember receiving this letter?
14  A  I don't want to say I didn't see it. I
15 don't recall seeing it but I'm sure I did.
16  Q  Fair enough. Then flip two more
17 documents to the third document dated April 21st,
18 2003.
19  A  Okay.
20  Q  This is from Siegel to Steve Kamen.
21 You're down here on blind carbon copy, Edwin D.
22 Hill. Do you see that?

Page 59

1  A  I do.
2  Q  Any reason to believe you didn't get it?
3  I mean, we can assume, can't we, that you got it?
4  A  Absolutely. I know I got it.
5  Q  And you know you got it because you
6  have -- that's your handwriting?
7  A  I do that to all letters I get.
8  Q  When you actually receive it?
9  A  No, when I read it.
10  Q  When you read it. Oh, that's good.
11 Interesting.
12  A  Sometimes it may be two weeks before I
13 get around to reading it.
14  Q  Yeah. Okay. By the way, on Mary
15 Beauford, when Mary Beauford got terminated, do
16 you know what local she went to?
17  A  824.
18  Q  324?
19  A  824.
20  Q  Where's that local?
21  A  That's in Tampa, Florida.
22  Q  And do you know what job she's doing for

Page 60

1  the local down there?
2  A  I do not.
3  Q  Do you know the type of job?
4  A  No.
5  Q  Okay. All right. Give us five minutes,
6  Steve and I are going to talk again and then that
7  will be the last time.
8      (Short break taken)
9      MR. CHIVERS: I'm done, unless you want
10 to ask him some questions.
11     MR. YELLIG: Nope.
12     MR. CHIVERS: I'm finished. Thank you.
13 Thanks for your time.
14     (Whereupon, at 10:39 a.m., the
15     Deposition of EDWIN HILL
16     was concluded.)
17     * * * * * *

Page 61

1      CERTIFICATE OF NOTARY PUBLIC
2  I, Mary E. Warner, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing deposition was duly sworn by me;
6  that the testimony of said witness was taken by me
7  in stenotype and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness;
10 that I am neither counsel for, related to nor
11 employed by any of the parties to the action in
12 which this deposition was taken; and, further,
13 that I am not a relative or employee of any
14 counsel or attorney employed by the parties
15 hereto, nor financially or otherwise interested in
16 the outcome of this action.
17
18         MARY E. WARNER
19         Notary Public in and for
20         District of Columbia
21 My commission expires:
22 December 30, 2010

16 (Pages 58 to 61)



**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

1125 Fifteenth Street, N.W.
Washington, DC 20005
(202) 833-7000
http://ibew.org

EDWIN D. HILL
International President

JEREMIAH J. O'CONNOR
International Secretary-Treasurer

December 8, 2004

Mr. Steven Kamen
605 Slippery Rock Road
Slippery Rock, PA 16057

Dear Brother Kamen:

Under date of June 26, 1997, you received a letter from International President Barry notifying you of your employment as an International Representative of the IBEW, effective July 1, 1997. The letter stated that you were being employed by the International President, and it added that the letter "does not constitute a contract of employment, nor does it establish a fixed term of employment, inasmuch as you serve at the pleasure of the International President." That statement is consistent with Article IV, Section 3(d) of the IBEW Constitution, which states that the International President has the power to employ International Representatives and that "he has the power to discharge them."

Since the date of your employment, you have been working under the supervision of the International Vice President for the Third District, who is currently Donald C. Siegel. Based on a report of your performance as an International Representative that I have received from Vice President Siegel under date of November 30, 2004, I find that it is necessary to exercise my authority to discharge you from your position as an International Representative of the IBEW. Vice President Siegel's report demonstrates that you have been seriously delinquent in the filing of your required reports over a period of years, and that you have failed on a number of occasions to complete the assignments you have received from the Third District Office.

With respect to the former, Vice President Siegel advises me that he has had several conversations with you about your failure to file required reports in a timely manner. On some occasions, the reports are weeks late, and on other occasions they have been late by several months. For the period beginning May 1 of this year, no reports were received by Vice President Siegel until you delivered them to him late last month. Additionally, even when reports are turned in, you have frequently failed to provide all of the required information on the back of the form. Vice President Siegel also advises me that you have acknowledged several times that you had failed to file your reports as required, and that you have apologized for the failure on each occasion. Your failure with respect to the required reports is not new, and



Plaintiff
DEPOSITION EXHIBIT
1
5·29·07



**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

actually goes back a number of years. In fact, I am advised that there are several letters of apology, dating back to 1999, from you to me and to then Vice President Rossa in your file about this very issue.

Perhaps even more serious has been your inability on numerous occasions to carry out assignments received from the Third District Office. As you know, International Representatives are expected to perform their duties with a minimum of supervision, and they are expected to service their local unions and to complete assignments from the Third District Office on a timely basis. Vice President Siegel, however, has frequently experienced an inability to reach you at times when it was important to do so, and you have on many occasions not responded to e-mails from his office. I am advised that in spite of repeated requests to do so, you have failed to clear a number of assignments from the Third District, and you have three unfulfilled assignments in your file that date back as far as 1999. Included in your file is an April 21, 2003, letter from Vice President Siegel to you, expressing his displeasure with your being late in assignments and not handing in work and expense reports. His letter was a clear warning to you that improvement in your performance was required.

On one occasion, you failed to complete an assignment for more than six months, and it became necessary for Vice President Siegel to assign another Representative, who completed the assignment in less than thirty days. On another occasion, you were assigned to assist Local Union 1968 in its scheduled bargaining negotiations. The Local Union at that time had a brand new business manager, who was in need of assistance from an experienced International Representative. Even though you were scheduled to be at the Local Union for the negotiations, you failed to show up, and the Local Union could not reach you. On still another occasion, an assignment that you received in April of 2002 was not completed by you until January 2004. In addition, there have been complaints about your work from some of the locals that you service, which required Vice President Siegel to reassign some of your local unions to other members of his staff.

In sum, your performance as an International Representative has, for some time, been unacceptable. Vice President Siegel has spoken to you about these problems on several occasions, most recently in Atlantic City in May of this year. You assured him at that time that you would bring your reports up to date and complete your assignments on time in the future. According to Vice President Siegel, you have not followed through with those and earlier commitments you made, and the problems with your assignments and reports have only gotten worse. For all of these reasons, Vice President Siegel advised



**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS®**

you, when he met with you on November 30, 2004, that because of your failings, he no longer wished to retain you on the Third District staff.

In view of the lengthy history of your failings, and your inability to improve your performance as an International Representative in spite of warnings to you to improve and your commitments to do so, I must, in order to fulfill my obligations as International President of the IBEW, terminate you from employment as an International Representative of the IBEW, effective December 31, 2004.

You are to return all IBEW furnished credit cards and any property of the IBEW to Vice President Siegel upon receipt of this letter. Arrangements will be made by the Third District Office to pick up your IBEW leased vehicle.

Fraternally yours,

Edwin D. Hill
International President

EDH:nlc
Copy to International Vice President Donald Siegel, IBEW Third District