IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEVEN A. KAMEN | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:06cv01063 (RMC) |
| | ) | |
| v. | ) | JUDGE ROSEMARY M. COLLYER |
| | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| ELECTRICAL WORKERS (IBEW) | ) | |
| and EDWIN D. HILL, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF STEVEN A. KAMEN

I, Steven A. Kamen, do hereby swear and affirm to the following:

1. I am the Plaintiff in this action.

2. I reside at 711 West Penn Street, Butler, PA 16001-4141.

3. I am supplying this Affidavit in support of Plaintiff's Opposition to Summary Judgment in the above-captioned matter.

4. The assertion has been made by Defendant that I have not been substantially limited in any of my major life activities because of my HIV infection.

5. I have made it clear from the beginning with the EEOC and in this matter that my HIV has been a terrible affliction and has severely limited my ability to engage in normal life activities.

6. Well before I was diagnosed with HIV in April 2004 I was suffering repeated bouts of very serious, even life-threatening, conditions.

7. I suffered repeatedly from various infections ( bell's palsy, diverticulitis, thrush ) and viral meningitis.

8. This produced high fevers, terrible headaches ( unbearable even with high doses of pain medication ), lack of appetite ( lost about 40 pounds ) and sleeplessness.

9. There were periods of time beginning in February 2004 and extending through most of 2004 when I could not function at all and was either limited to my bed at home or required to go to the hospital.

10. On repeated occasions these conditions brought me close to death.

11. During these times I was unable to engage in any regular activities, be it walking, socializing, taking care of my own personal needs and certainly not working.

12. Not only did I have these actual conditions but either I, my sisters or my doctors were communicating the fact I had these conditions to IBEW in early 2004.

13. Apparently IBEW perceived I had conditions that severely limited my ability to work.

14. When I returned from medical leave around May 1, 2004, IBEW had already removed some 75% of my duties from me.

15. I asked repeatedly these duties be restored and IBEW either refused or simply ignored me.

16. Between the time I returned to work on May 1, 2004, and my termination I was able to do the limited duties that were still assigned to me.

17. However, I was significantly limited in many of my regular daily activities because of the HIV and its symptoms.

18. This included severe fatigue, sleeplessness and depression.

19. My blood test numbers ( HIV tests ) were also dropping so low that I had to start taking medication during these months ( May 2004 to December 2004 ).

20. The result was that during these months I could not engage in strenuous activities (such as

lifting, running, keeping long hours ) at anywhere near the level previous to the onset of my HIV in February 2004.

21. I also had to significantly reduce any activities away from work, getting significantly more sleep than before February 2004 and avoiding strenuous activities.

22. I believe IBEW was aware of my HIV well before I was terminated.

23. When I was out in February to May 2004 my sisters were communicating regularly with IBEW.

24. I know they were telling Don Siegel and Mike Welsh that I was out sick, had serious health problems, that these problems were permanent and that I could not return to work until cleared by my physician.

25. I also know that IBEW was getting information from my doctor, especially Dr. Rocchi.

26. I personally sent notes from Dr. Rocchi to Don Siegel, and I know that my doctor was sending his medical reports and notes to IBEW for purposes of insurance.

27. IBEW is self-insured, so my doctor was sending the medical reports directly to the IBEW offices in D.C..

28. These medical reports contained direct reference to the fact I was suspected of having HIV in March 2004, that tests confirmed HIV in April 2004, and that I was being treated for HIV throughout the remainder of 2004.

29. Also, I was in a work-related automobile accident in October 2004.

30. I was on my way back from an IBEW meeting at the UAW hall in Butler, PA, when I was rear-ended on Route 8.

31. I notified Mike Welsh at the IBEW office ( District 3 ) immediately.

32. IBEW sent me the workers' compensation papers to complete.

33. I completed these, signed medical authorizations regarding my treatment, and sent them back to IBEW headquarters.

34. IBEW then obtained my medical records from Dr. Rocchi.

35. These records specifically included references to my various medical problems, my treatments, and the fact I had been diagnosed with HIV.

36. Vice-President Siegel has admitted he saw these records before he recommended I be terminated as of November 30, 2004.

37. I also know that someone at IBEW accessed my e-mail account on my laptop computer in October 2004.

38. My e-mails included discussions about my HIV status with my sisters.

39. I have read the declaration of Vice President Siegel and there are several factual falsehoods.

40. For example, Siegel claims he "admonished" me numerous times in writing about my activity reports and my open assignments.

41. I was never given anything in writing by Siegel, or anyone else for that matter, and I notice IBEW does not attach any documents to that effect. The reason nothing is attached is because there never was anything in writing.

42. The only manner in which I was criticized about lack of communication was in e-mail communications, never in phone, fax or regular mail.

43. In fact, other than the times I was out on medical leave and so sick I could not respond to

anyone or anything, I could be reached by phone, fax or regular mail.

44. It is also false that I did not submit my Per Capita or LM-2 Reporting Form.

45. I submitted these along with my weekly reports.

46. The fact is that during my months after medical leave my workload was so significantly reduced there was little if anything to report for many of these weeks.

47. Moreover, I was assigned almost exclusively to the Presidential campaign in October 2004 right up until the November election.

48. This was an assignment made directly by IBEW headquarters, specifically the Executive Assistant to Edwin Hill.

49. No one at headquarters, either Hill or the Executive Assistant, made any complaints to me during these weeks about whether I had timely submitted my weekly reports.

50. No one complained about my performance during this period, but appeared very satisfied with my campaigning efforts for John Kerry.

51. The assertion by Vice President Siegel that he specifically talked to me about the Per

Capita and LM-2 Reporting Form on November 30, 2004, is also false.

52. He made no such comment, and in fact never had said anything to me before November 30, 2004, about this Form.

53. Following my termination my health condition deteriorated even further, finally requiring me to apply for Social Security Disability/Railroad Retirement benefits.

54. I was granted these benefits and remain disabled for purposes of these benefits to this day.

STEVEN A. KAMEN

Sworn to and subscribed
before me this 7th day
of April 2008.

Notary Public

My commission expires:

September 5, 2011

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Jessica L. May, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires Sept. 5, 2011
Member, Pennsylvania Association of Notaries